UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                    Chapter 11

      MY 2011 Grand LLC                         Case no.  19-23957 (RDD)


                      Debtor.

--------------------------------------------------------x

In re                                                    Chapter 11

      S&B Monsey LLC                            Case no.  19-23959 (RDD)


                      Debtor.

--------------------------------------------------------x

## ORDER TO SHOW CAUSE

        Upon the application (the "Dismissal Application") of MY 2011 Grand LLC and S&B Monsey LLC (the "Debtors") for an order dismissing these case under sections 1112 and 305 of the Bankruptcy Code, and for an order shortening time for the hearing of the Dismissal Application under Bankruptcy Rule 9006, and after due deliberation and sufficient cause appearing therefor, it is

        ORDERED, that a hearing on the Dismissal Application and the relief requested therein will be held before the Honorable Robert D. Drain, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601−5008; on January ___, 2020 at _____, and it is further

        ORDERED, that service of a conformed copy of this Order to Show Cause with the Dismissal Application by hand, facsimile, email or overnight delivery, upon all creditors, all parties who have filed a notice of appearance, and the Office of the United States Trustee, on or before January ___, 2020, shall be deemed good and sufficient service of this Order and the Hearing, and it is further

        ORDERED, that opposition to the Dismissal Application and the relief requested therein may be served and filed to be received by January ___, 2020, at ____ __.m.

Dated:  White Plains, New York
      January _____, 2020


                         _____
                         UNITED STATES BANKRUPTCY COURT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                                          Chapter 11

      MY 2011 Grand LLC                                          Case no.  19-23957 (RDD)


                Debtor.
--------------------------------------------------------x
In re                                                                          Chapter 11

      S&B Monsey LLC                                            Case no.  19-23959 (RDD)


                Debtor.
--------------------------------------------------------x

## MOTION TO DISMISS AND FOR EXPEDITED HEARING

      MY 2011 Grand LLC ("MY2011") and S&B Monsey LLC ("Monsey"), the

Debtors and Debtors-in-Possession (each a "Debtor" and collectively the "Debtors"), as and for

their application for an order dismissing these cases under sections 305 and 1112 of the

Bankruptcy Code, respectfully represent as follows:

## BACKGROUND

      1.      On November 6, 2019, each Debtor filed a Chapter 11 petition under Title

11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

      2.      My2011 owns a 31.75% membership interest in Grand Living LLC II.

Monsey owns a 33% membership interest in Grand Living LLC II.  Yoel Goldman, a non-debtor,

through his entity All Year Holdings Limited, holds the remaining 35.25% membership interest

in Grand Living LLC II.  Grand Living LLC II is the sole member of Grand Living LLC.  Grand

Living LLC owns the real property at 227 Grand Street, Brooklyn, New York 11211

("Property"), pictured below:



3.      227 Grand Mezz Lender LLC ("Mezz Lender") holds a $7,900,000 claim against MY2011 and a $5,800 claim against Monsey, secured by their respective membership interests in Grand Living LLC II ("Mezz Loans").

4.      The Debtors estimate that the value of the Property is $45.5 million. The Property mortgage is $16,350,000. The net equity in the Property is $29,150,000. MY2011's 31.75% share of the net equity has a $9,255,125 value. Monsey's 33% share has a $9,619,000 value.

5.      The Mezz Loans came due, but the Debtors could not agree with Mr. Goldman, the 35.25% member, on refinancing or on a buy-out of Mr. Goldman's interests. The

2

Debtors nonetheless found hard money financing, but at the last minute, the hard money lender demanded new terms that were unaffordable.  The Mezz Lender had scheduled a UCC sale of the Debtors' interests, and was unwilling to adjourn the sale to enable the Debtors obtain new financing.

6.      The Debtors, therefore, filed these cases to buy time to obtain such financing.  General unsecured claims total $172,675 in Monsey and $38,050 in MY2011.

7.      Agreement now has been reached for the buyout of the 35.25% membership interest held by All Year Holdings Limited, and the Debtors have found institutional financing to refinance the Mezz Loans and to pay for the purchase of the All Year Holdings Limited membership interest.

8.      Annexed hereto as Exhibit A is a copy of the Membership Interest Purchase Agreement ("MIPA") between the Debtors and Mr. Goldman.  Annexed hereto as Exhibit B is the Debtors' financing commitment from New York Community Bank ("New Lender").  The Debtors have a verbal commitment for mezzanine financing and expect a written commitment imminently.

9.      The MIPA provides for a closing on or before January 13, 2020, time of the essence, and conditioned on the prior entry of a Final Order dismissing the Bankruptcy Cases. If the order of dismissal has been entered but is not yet final, the Closing is extended to January 27, 2020.  The Debtor has targeted a closing on January 27, 2020.  A dismissal order must therefore be entered by January 13, 2020.

10.      The Debtors submit that the MIPA clears the obstacles to refinancing, and the refinancing enables the Debtors to pay the Mezz Lender's claim in full.  The Debtors,

3

therefore, seek dismissal of these cases, as the most efficient means to implement the settlement

and resolve the issues that caused the Debtors to file these cases.

11.     MY2011 scheduled creditor claims totaling $103,050, and Monsey

scheduled creditor claims totaling $248,854.  Before filing this motion, the Debtors' principals

contacted each creditor.  All creditors will be paid in the ordinary course of business, or under

other mutually agreeable terms between the parties.  If a claim is disputed, the affected creditor

will have adequate alternative forums to demand payment.

12.     A schedule of sources and uses is annexed hereto as Exhibit D.

### RELIEF REQUESTED HEREIN

13.     By this application, therefore, the Debtors seeks to dismiss these cases.  If

the New Lender needs more time to close, the Debtors reserve the right to request a later

dismissal date.

14.     Section 1112(b) of the Bankruptcy Code permits the Bankruptcy Court to

dismiss a voluntary Chapter 11 "for cause" upon the motion of any party in interest, including

the debtor.   The Bankruptcy Court has wide discretion in ruling on a motion to dismiss.  H.R.

Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 117

(1978), reprinted in 1978 U.S.C.C.A.N. 5787; *see also In re Preferred Door Co., Inc.*, 990 F.2d

547, 549 (10th Cir. 1993) (a court has broad discretion to dismiss a bankruptcy case); *Accord, In

re Dark Horse Tavern*, 189 B.R. 576 (Bankr. N.D.N.Y. 1995).

15.     "[G]enerally, a debtor wishing dismissal of a case should obtain this result

in all but extraordinary situations."  *See, e.g., In re Geller*, 74 B.R. 685, 689 (Bankr. E.D. Pa.

1987); *In re Kimble*, 96 B.R. 305, 308 (Bankr. D. Mont. 1988).  Thus, the *Geller* Court reasoned

4

that, some "plain legal prejudice" to creditors must be shown if dismissal is not to be granted.  *Id.* at 690.  And any such prejudice must outweigh the prejudice to the debtor in denying dismissal. Id.

16.     The *Geller* Court explained further that:  "While we believe that all creditors and the Trustee should clearly have an opportunity to convince the Court that "cause" in the form of "plain legal prejudice" for refusing to allow a debtor to voluntarily dismiss a bankruptcy case exists, we must confess that ... we would be hard-pressed to articulate just what circumstances could constitute such "plain legal prejudice," including the consideration of economy and integrity of the Courts, to justify the result of denial of a request to voluntarily dismiss a voluntary case. Hence, we would grant such a motion in all but extraordinary situations."

17.     Thus, in cases where the debtor has paid, or will pay all creditors, dismissal is routine:  "[dismissal is in the best interest of creditors . . . [where] the Debtor has paid all its pre-petition creditors and is remaining current on its post-petition obligations." *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. D. Pa. 1995), *citing, In re Melp*, Ltd., 143 B.R. 890, 893 (Bankr. E.D.Mo. 1992).  In addition, "[dismissal preserves the time and resources of this specialty court from the onerous and time consuming, non-bankruptcy related issues arising in the disputes between the [creditor] and the Debtor." *Id.* at 416.

18.     Dismissal is the appropriate result for these cases under section 305(a) of the Bankruptcy Code as well.  Under § 305, the Court, after notice and hearing, may dismiss or suspend a case if the interest of the creditors and debtor would be better served by such dismissal

or suspension. *See In re Shur Management Co., Ltd*., 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005),

*citing In re Eastman*, 188 B.R. 621, 625 (9th Cir. BAP 1995).

19.     In determining whether dismissal under § 305 is appropriate, courts must

look to the facts of the individual case. *In re Trina Associates*, 128 B.R. 858, 867 (Bankr.

E.D.N.Y. 1991); *In re Fitzgerald Group*, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983); *In re Artists'*

*Outlet, Inc.*, 25 B.R. 231 (Bankr. D. Mass. 1982).  Among the facts considered by the courts, are:

(a)  economy and efficiency of administration; (b) whether another forum is available to protect

the interests of both parties or there is already a pending proceeding in a state court; (c) whether

federal proceedings are necessary to reach a just and equitable solution; (d) whether there is an

alternative means of achieving the equitable distribution of assets; (e) whether the debtor and the

creditors are able to work out a less expensive out-of-court arrangement which better serves all

interests in the case; (f) whether a non-federal insolvency has proceeded so far in those

proceedings that it would be costly and time consuming to start afresh with the federal

bankruptcy process; and (g) the purpose for which jurisdiction has been sought.  *Trina*

*Associates*,128 B.R. at 867, *citing In re Fax Station, Inc.*,118 B.R. 176, 177 (Bankr. D. R.I.

1990).

20.     The Debtors submit that upon establishing their ability to close on the new

financing with the New Lender, dismissal of these Chapter 11 cases is in the best interests of the

Debtors, their creditors and the estate.  Again, all creditors will be paid in the ordinary course of

business, or under other mutually agreeable terms between the parties.  If a claim is disputed, the

affected creditor will have adequate alternative forums to demand payment.

21.     The Debtor is current, or will bring itself current, with its operating reports, and will file any remaining reports that may become due, and to pay any statutory fees of the United States Trustee under 28 U.S.C. § 1930.

22.     Were the Debtors to proceed by regular notice of motion, the Debtors could not obtain a dismissal order and still have enough time to close by the January 27, 2020 deadline.  Accordingly, the Debtors respectfully request that the Court enter an order under Bankruptcy Rule 9006 scheduling a hearing on shortened notice to be conducted at the Court's earliest convenience.

## **<u>CONCLUSION</u>**

WHEREFORE, the Debtors respectfully requests that the court enter the annexed Order to Show Cause setting this matter for a hearing on shortened notice, and at such hearing, assuming the Debtor can establish its ability to pay the Mezz Lender's claims, enter an order dismissing these cases, and that the Court grant such other and further relief as the court deems just and proper.

Dated: New York, New York
        January 3, 2020

BACKENROTH FRANKEL & KRINSKY, LLP
Proposed Attorneys for the Debtor

By:     s/Mark Frankel
        800 Third Avenue
        New York, New York  10017
        (212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                          Chapter 11
      MY 2011 Grand LLC              Case no.  19-23957 (RDD)

                        Debtor.
--------------------------------------------------------x
In re                                          Chapter 11
      S&B Monsey LLC                 Case no.  19-23959 (RDD)

                        Debtor.
--------------------------------------------------------x
STATE OF NEW YORK        )
                      )ss.:
COUNTY OF NEW YORK   )

## <u>AFFIDAVIT IN SUPPORT OF HEARING ON SHORTENED NOTICE</u>

        Mark Frankel certifies under penalty of perjury as follows:

        1.      I am a member of Backenroth Frankel & Krinsky, LLP, proposed attorneys for the above-captioned Debtors, and I am providing this certification to support the Debtors' motion for an order shortening time for a hearing of the annexed application.

        2.      Were the Debtor to proceed by regular notice of motion, the Debtors could not obtain a hearing before the deadline to close as demanded by the settlement agreement annexed to the dismissal motion filed herewith.  Accordingly, the Debtors respectfully request that the Court enter an order under Bankruptcy Rule 9006 scheduling a hearing on shortened notice to be conducted at the Court's earliest convenience.


Dated: New York, New York
      January 2, 2020

                                    s/ Mark Frankel

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                          Chapter 11

      MY 2011 Grand LLC                           Case no.  19-23957 (RDD)


                        Debtor.
--------------------------------------------------------x

In re                                                          Chapter 11

      S&B Monsey LLC                               Case no.  19-23959 (RDD)


                        Debtor.
--------------------------------------------------------x

## ORDER

      Upon the motion (the "Motion") of MY 2011 Grand LLC and S&B Monsey LLC, the

debtors and debtors-in-possession (the "Debtors"), seeking dismissal of these Chapter 11 cases,

and after due deliberation and sufficient cause appearing therefor, it is

      ORDERED, under 11 U.S.C. § 1112(b) and 305(a), that these cases commenced

under Chapter 11 of the Bankruptcy Code be, and hereby is, dismissed; and it is further

      ORDERED, that the Debtors pay to the United States Trustee the appropriate sum

required pursuant to 28 U.S.C. §1930 within ten (10) days of the entry of this order and

simultaneously provide to the United States Trustee an appropriate affidavit indicating the cash

disbursements for the relevant periods.

Dated:  White Plains, New York
        January _____, 2020


                              _____
                              UNITED STATES BANKRUPTCY COURT

# Exhibit A

EXECUTION VERSION

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of November 14, 2019 (the "Effective Date") by and among Grand Living II, LLC, a New York limited liability company ("Buyer" or the "Company"), and All Year Holdings Limited, a British Virgin Island company limited by shares ("Seller").

WHEREAS, Seller is a member of the Amended and Restated Limited Liability Company Agreement of the Company dated as of August 3, 2012, as amended by the First Amendment thereto dated as of September 30, 2016 and the Second Amendment thereto dated as of December 29, 2016 (as so amended, the "LLC Agreement") (all undefined capitalized terms used herein have the meanings assigned to them in the LLC Agreement); and

WHEREAS, Seller is the record and beneficial owner of membership interests in the Company arising from a Percentage Interest of 35.25% (the "Purchased Interest") and Seller desires to sell the Purchased Interest to the Buyer, and the Buyer desires to purchase the Purchased Interest from the Seller, upon the terms and subject to the conditions hereinafter set forth; and

The parties hereto agree as follows:

## ARTICLE I.

## DEFINITIONS

Section 1.01.  *Definitions*.  (a)  As used herein, and in addition to terms defined in the LLC Agreement and otherwise defined herein, the following terms have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; *provided* that neither the Company nor any subsidiary of the Company shall be considered an Affiliate of the Seller.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable law to close.

"Closing Date" means the date of the Closing.

"Code" means the United States Internal Revenue Code of 1986, as amended.

1

"Damages" means any damage, losses, liabilities, costs and expenses (whether involving a third party claim or a claim solely between the parties hereto), including interest, penalties, costs of mitigation, and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding, and all other amounts reasonably incurred in investigating, defending or settling any of the losses or liabilities covered hereby (including the reasonable costs and expenses incurred by the Indemnified Party in connection with Damages suffered by the Company).

"Governmental Authority" means any transnational, domestic or foreign federal, state or local governmental, regulatory or administrative authority, department, court, agency or official, including any political subdivision thereof.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"Settlement Agreement" means that certain Settlement Agreement, entered into contemporaneously with this Agreement, by and among, Toby Moskovits, Yechiel Michael Lichtenstein, My 2011 Grand LLC, Moshe Dov Schweid, S&B Monsey LLC, Yoel Goldman, All Year Holdings Limited, and Grand Living II LLC, resolving certain litigation and disputes as set forth therein.

"Tax" or "Taxes" means any and all domestic or foreign federal, state and local taxes or other taxes, levies, fees, imposts, duties, tariffs and other charges in the nature of tax, together with any interest, penalties or additions imposed in connection therewith or with respect thereto, imposed by any Tax Authority, including taxes imposed on, or measured by, income, franchise, profits or gross receipts, and also ad valorem, value added, sales, use, service, real or personal property, capital stock, license, payroll, withholding, employment, social security, workers' compensation, unemployment compensation, utility, severance, production, excise, stamp, occupation, premium, windfall profits, transfer and gains taxes, customs duties, documentary, filing, recordation and similar taxes.

"Tax Authority" means, with respect to any Tax, the Governmental Authority or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

Section 1.02.  *Other Definitional and Interpretative Provisions.*  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule

2

but not otherwise defined therein shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; *provided* that, with respect to any agreement or contract listed on any schedules hereto, all such amendments, modifications or supplements must also be listed in the appropriate schedule. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law," "laws" or to a particular statute or law shall be deemed to also include any and all applicable law.

## ARTICLE II.

## PURCHASE AND SALE

Section 2.01.   *Purchase and Sale*. Upon the terms and subject to the conditions of this Agreement, Seller agrees to sell to the Buyer, and the Buyer agrees to purchase from Seller, free and clear of all Liens the Purchased Interests at the Closing. The purchase price for the Purchased Interests is $11,790,000 (the "Purchase Price"), to be paid as follows:

(a)   On the Effective Date, Buyer shall deliver by wire transfer to Tratner & Associates PLLC, as escrow agent (in such capacity, "Escrow Agent"), an amount equal to $100,000 and, on or before December 13, 2019 a further sum of $100,000 (collectively, the "Deposit") in immediately available funds to be held by Escrow Agent in the Escrow Account. If either portion of the Deposit is not deposited by Buyer as and when due and payable hereunder, Seller shall have the right in Seller's sole and absolute discretion to terminate this Agreement by written notice to Buyer, whereupon neither party shall have any further rights or obligations hereunder except for those that expressly survive the termination of this Agreement.

(b)   At the Closing, Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an amount equal to the Purchase Price minus the Deposit to Seller.

Section 2.02.   *Escrow Provisions*.

(a)   The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and the Escrow Agent shall not be liable to either of the parties for any act or omission on its part, other than for its gross negligence or willful misconduct. Seller and Buyer shall jointly and severally indemnify and hold the Escrow Agent

3

harmless from and against all costs, claims and expenses, including attorneys' fees and disbursements, incurred in connection with the performance of the Escrow Agent's duties hereunder. The Escrow Agent shall not charge for its services hereunder. The Escrow Agent has acknowledged its agreement to these provisions by signing this Agreement in the place indicated following the signatures of Seller and Buyer.

(b)    The Escrow Agent shall hold the Earnest Money in escrow in his non-interest-bearing attorney escrow account (the "Escrow Account"). Escrow Agent shall not be liable for any failure, refusal, insolvency, or inability of the depository into which the Earnest Money is deposited to pay the Earnest Money at Escrow Agent's direction, or for any levies by taxing authorities based upon the taxpayer identification number used to establish this account.

(c)    The Escrow Agent shall hold the Deposit in escrow in the Escrow Account until the Closing or sooner termination of this Agreement and shall hold or apply such proceeds in accordance with the terms of this Section 2.02. Seller and Buyer understand that no interest is earned on the Deposit. At the Closing, the Deposit shall be paid by the Escrow Agent to, or at the direction of, Seller and credited against the Purchase Price. If for any reason the Closing does not occur and either party makes a written demand upon the Escrow Agent for payment of such amount, the Escrow Agent shall, within forty-eight (48) hours, give written notice to the other party of such demand. If the Escrow Agent does not receive a written objection from such other party within five (5) Business Days after the giving of such notice, the Escrow Agent is hereby authorized to make such payment. If the Escrow Agent does receive such written objection within such five (5) Business Day period or if for any other reason the Escrow Agent in good faith shall elect not to make such payment, the Escrow Agent shall continue to hold such amount until otherwise directed by joint written instructions from the parties to this Agreement or a final judgment of a court of competent jurisdiction. The Escrow Agent shall give written notice of such deposit to Seller and Buyer. Upon such deposit the Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

(d)    The Escrow Agent may at any time bring an interpleader action against Buyer and Seller in any court of competent jurisdiction and, upon deposit into court of the Deposit, shall be relieved of all further liability. The costs of such interpleader action shall be paid one-half by the Acquiring Parties and Moskovits, and one-half by Goldman and All Year.

Section 2.03.  *Closing*.

(a)    The closing (the "Closing") of the purchase and sale of the Purchased Interests hereunder shall take place on January 13, 2020 (such date, the "Initial Outside Closing Date"), by escrow deliveries to Escrow Agent, TIME OF THE ESSENCE, unless the Initial Outside Closing Date Closing is adjourned to January 27, 2020 (the "Second Outside Closing Date"), TIME OF THE ESSENCE, as provided in Section 8(c) of the Settlement Agreement.

(b)    At the Closing, (i) Seller shall deliver to Buyer, and Buyer shall deliver to Seller, a duly executed Assignment and Assumption Agreement in a form substantially the same as the form set forth on Exhibit A (the "Assignment and Assumption Agreement") evidencing the

4

transfer of the Purchased Interests held by Seller and the rights and obligations under the LLC Agreement in connection thereto and (ii) Buyer shall direct Escrow Agent to release the Second Installment and the Deposit to Seller.

## ARTICLE III.

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

Seller represents and warrants to the Buyer as of the date hereof and as of the Closing Date that:

Section 3.01. *Existence and Power.* Seller is duly formed, validly existing and in good standing under the laws of its jurisdiction of its formation and has all powers required to carry on its business as now conducted.

Section 3.02. *Enforceability.* This Agreement constitutes a valid and binding agreement of Seller, enforceable in accordance with its respective terms, except to the extent that enforceability thereof may be limited by bankruptcy, insolvency, reorganization and other similar applicable laws affecting the enforcement of creditors' rights generally and by general principles of equity.

Section 3.03. *Non-contravention.* The execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby do not and will not (a) violate the organizational documents of Seller, (b) violate any applicable law or (c) except as may be required under the documents evidencing or securing any Company or its Affiliates credit facility, require any consent or other action by any Person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Seller under any provision of any agreement or other instrument binding upon Seller with such exceptions as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby.

Section 3.04. *Ownership of the Purchased Interests.*

(a) Seller is the record and beneficial owner of the Purchased Interests free and clear of any Lien, other than any Liens imposed by the LLC Agreement or any of the Company's or its Affiliates' credit facility, and will transfer and deliver to the Buyer at the Closing valid title to the Purchased Interests free and clear of any Lien, other than any Liens imposed by the LLC Agreement and the Company's or its Affiliates' credit facility. No contracts exist with respect to the voting or transfer of any of the Purchased Interests owned by Seller and no Person is obligated to redeem or otherwise acquire any of the Purchased Interests owned by Seller.

(b) The Purchased Interests represent all the issued and outstanding equity interests in the Company owned directly or indirectly by the Seller, including but not limited to limited liability company membership interests received by way of investment, options or profits interests Seller has received as a Member, employee, Manager or investor of the Company, and

5

Seller owns no other equity interests of the Company whether it be units, profits interests or options. Except for the Purchased Interests, Seller has no beneficial or direct ownership interest in any rights, subscriptions, warrants, options, conversion rights, stock, membership interest, profits interest or other equity-related appreciation rights, phantom stock, agreements or arrangements of any kind outstanding to purchase, exchange, exercise for, transfer, sell, register or otherwise acquire from the Company any interests or other securities of any kind of the Company.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date that:

Section 4.01. *Existence and Power*. Buyer is duly formed, validly existing and in good standing under the laws of its jurisdiction of its formation and has all powers required to carry on its business as now conducted.

Section 4.02. *Authorization*. The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby are within the powers of Buyer and have been duly authorized by all necessary limited liability company action on the part of Buyer. This Agreement constitutes a valid and binding agreement of Buyer, enforceable in accordance with its respective terms, except to the extent that enforceability thereof may be limited by bankruptcy, insolvency, reorganization and other similar applicable laws affecting the enforcement of creditors' rights generally and by general principles of equity.

Section 4.03. *Non-contravention*. The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby do not and will not (a) violate the organizational documents of Buyer, (b) violate any applicable law or (c) require any consent or other action by any Person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Buyer under any provision of any agreement or other instrument binding upon Buyer with such exceptions as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

## ARTICLE V.

## COVENANTS

Section 5.01. *Confidentiality*. After the Closing, Seller will hold, and will use its reasonable best efforts to cause its members, managers, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of applicable law, all confidential documents and information concerning the Company obtained in connection with Seller's membership in the

6

Company, Seller's ownership of membership interests in the Company, its (or its members, as applicable) role as a Manager of the Company, except to the extent that such information can be shown to have been (i) in the public domain through no fault of Seller (ii) currently in the possession of Seller from sources unrelated to his prior ownership of membership interests in the Company. Notwithstanding the foregoing, nothing contained herein shall prohibit Seller from disclosing any such confidential information to any regulatory or governmental authority having jurisdiction over Seller.

Section 5.02. *Resignations.* From and after the Closing, Seller shall affirm that neither it nor any of its owners or principals including, without limitation, Yoel Goldman is a Manager of the Company and it and Yoel Goldman shall resign from any other office it or he may have held as an officer, director or Member of the Company.

Section 5.03. *Reserved.*

Section 5.04. *Conduct, Cooperation and Assistance.* At the Closing, Seller shall return to the Company any Company-issued keys and access cards, and from and after the Closing Seller further agrees that it and Yoel Goldman shall not access or attempt to access, either directly or indirectly, the Company's computer servers, internal networks, email accounts, or third-party vendor accounts.

Section 5.05. *Release from Loan Guarantees.* Buyer shall cause the holder of any financing secured by or otherwise relating to the Property to release Yoel Goldman from any guaranties or indemnities for which such party would otherwise be liable to the extent that such liabilities are due to acts occurring from and after the Closing Date (the "Release").

Section 5.06. Tax Information.

(a) Buyer and Seller shall ensure that the Company allocates all items of Company income, gain, loss, deduction, or credit attributable to the Purchased Interests for the taxable year of the Closing based on a closing of the Company books as of the Closing Date. The parties shall each file all required U.S. federal, state, and local income tax returns and related reports in a manner consistent with the foregoing. The Company shall deliver to Seller a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of (i) Seller's federal income tax returns covering the period from January 1, 2019 through the Closing Date, and (ii) such state and local income tax returns and other tax returns for such period as are required to be filed by Seller as a result of the Company's activities in such jurisdiction.

(b) Upon the request of Buyer, Seller shall request the Company to make an election under Section 754 of the Internal Revenue Code, as amended, and reasonably cooperate with the Company in making such an election.

7

ARTICLE VI.

CONDITIONS TO CLOSING

Section 6.01.    *Conditions to Obligation of the Buyer*.  The obligation of the Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of the following conditions:

(a)   the Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date,

(b)   the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date, and

(c)   Seller shall have executed and delivered to the Buyer the Assignment and Assumption Agreement described in Section 2.03(b), in form attached as Exhibit A to this Agreement.

Section 6.02.    *Conditions to Obligation of the Seller*.  The obligation of the Seller to consummate the Closing is subject to the satisfaction of the following conditions (or waiver by Seller):

(a)   The Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date,

(b)   The representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date,

(c)   The Buyer shall have executed and delivered to the Seller the Assignment and Assumption Agreement described in Section 2.03(b), in form attached as Exhibit A to this Agreement,

(d)   Seller shall have received the Release; and

(e)   Satisfaction of all requirements of Section 8(c) of the Settlement Agreement.

ARTICLE VII.

DEFAULT BY BUYER OR SELLER

Section 7.01.    If (i) Buyer defaults in the payment of the Purchase Price on the Closing Date, or (ii) Buyer defaults in the performance of any of its other material obligations to be performed on or before the Closing Date, under this Agreement or the Settlement Agreement, then in either of the preceding occurrences, Seller's sole remedy by reason thereof shall be to terminate

8

this Agreement and, upon such termination, Seller shall be entitled to retain the entire Deposit, and shall be entitled to recover any unpaid portion of the Deposit (and, any costs including reasonable legal fees incurred in recovering such portion), as liquidated damages for Buyer's default hereunder, it being agreed that the damages by reason of Buyer's default are difficult, if not impossible, to ascertain and the Deposit is a reasonable estimate of Seller's loss and does not constitute a penalty. Thereafter Buyer and Seller shall have no further rights or obligations under this Agreement except for those which are expressly provided for in this Agreement to survive the termination hereof.

Section 7.02.    If Seller defaults in any of its material obligations to be performed on or before the Closing Date, Buyer, as its sole remedy by reason thereof (in lieu of prosecuting an action for damages or proceeding with any other legal course of conduct, the right to bring such actions or proceedings being expressly and voluntarily waived by Buyer, to the extent legally permissible, following and upon advice of counsel) shall have the right, (i) to seek to obtain specific performance of Seller's obligations hereunder (it being expressly acknowledged by Buyer that the remedy of specific performance is an appropriate remedy in the event of a default by Seller under this Agreement), provided that any action for specific performance shall be commenced within sixty (60) days after such default or (ii) to receive a return of the Deposit and terminate this Agreement.

Section 7.03.    In the event either party hereto is required to employ an attorney because any litigation arises out of this Agreement between the parties hereto (whether pre- or post-Closing or during the term of this Agreement or after a termination hereof), the non-prevailing party shall pay the prevailing party all reasonable fees and expenses, including attorneys' fees and expenses, incurred in connection with such litigation.

Section 7.04.    Except for the Deposit, in no event shall the Seller seek to obtain monetary damages from the Buyer or any of its Affiliates or its and their officers, managers, Members, agents or representatives in connection with the transactions contemplated by this Agreement.  In no event shall the Buyer seek to obtain monetary damages from Seller in connection with the transactions contemplated by this Agreement.

ARTICLE VIII.

SURVIVAL; INDEMNIFICATION

Section 8.01.    *Survival.*  Each of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive until the first anniversary of the Closing Date.  The covenants and agreements of the parties hereto contained in this Agreement shall survive the Closing indefinitely or until the latest date permitted by applicable law.  Notwithstanding the preceding sentences, any breach of representation, warranty, covenant or agreement in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentence, if notice of the inaccuracy or breach thereof giving rise to such right of indemnity shall have been given to the party against whom such indemnity may be sought prior to such time.

9

Section 8.02.  *Indemnification.*

(a)  Seller hereby indemnifies Buyer, its Members (other than Seller), and its officers and Managers (the "Buyer Indemnified Parties") against, and agrees to hold each of them harmless from, any and all Damages suffered by the Buyer Indemnified Parties arising post-Closing out of any misrepresentation or breach of warranty by Seller.

(b)  Buyer hereby indemnifies Seller against, and agrees to hold Seller harmless from, any and all Damages suffered by Seller arising post-Closing out of any misrepresentation or breach of warranty by Buyer.

In no event shall Seller or Buyer be liable under this Section 8.02(a) or Section 8.02(b), respectively, for aggregate Damages in excess of the Purchase Price.

Section 8.03.  *Reserved.*

Section 8.04.  *Direct Claim Procedures.*  In the event an Indemnified Party has a claim for indemnity under Section 8.03 against an Indemnifying Party, the Indemnified Party agrees to give prompt notice in writing of such claim to the Indemnifying Party.  Such notice shall set forth in reasonable detail such claim and the basis for indemnification (taking into account the information then available to the Indemnified Party).  The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent such failure shall have materially prejudiced the Indemnifying Party.  If the Indemnifying Party does not notify the Indemnified Party within 30 days following the receipt of a notice with respect to any such claim that the Indemnifying Party disputes its indemnity obligation to the Indemnified Party for any Damages with respect to such claim, such Damages shall be conclusively deemed a liability of the Indemnifying Party and the Indemnifying Party shall promptly pay to the Indemnified Party any and all Damages arising out of such claim.  If the Indemnifying Party has timely disputed its indemnity obligation for any Damages with respect to such claim, the parties shall proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute shall be resolved by litigation in an appropriate court of jurisdiction determined pursuant to Section 9.06.

Section 8.05.  *Calculation of Damages.*  (a) The amount of any Damages payable under Sections 8.02 and 8.04 by the Indemnifying Party shall be net of any (i) amounts actually recovered by the Indemnified Party under applicable insurance policies or from any other Person alleged to be responsible therefor and (ii) tax benefit actually realized by the Indemnified Party arising from the incurrence or payment of any such Damages.  If the Indemnified Party receives any amounts under applicable insurance policies, or from any other Person alleged to be responsible for any Damages, subsequent to an indemnification payment by the Indemnifying Party, then such Indemnified Party shall promptly reimburse the Indemnifying Party for any payment made or expense incurred by such Indemnifying Party in connection with providing such indemnification payment up to the amount received by the Indemnified Party, net of any expenses incurred by such Indemnified Party in collecting such amount.

(b)  The Indemnifying Party shall not be liable under Section 8.02 for any Damages relating to any matter to the extent that (i) the Damages include consequential, incidental, special, punitive and indirect damages or lost profits, unless it has been judicially determined that the Indemnified Party is liable for any of such Damages to a third party.

(c)  Each Indemnified Party shall use reasonable best efforts to collect any amounts available under insurance coverage, or from any other Person alleged to be responsible, for any Damages payable under Section 8.05.

ARTICLE IX.

MISCELLANEOUS

Section 9.01.  *Notices.*  Any notice required or permitted under this Agreement shall be in writing and sent by email or overnight delivery as follows:

| | |
|---|---|
| If to the Seller: | Mr. Yoel Goldman<br>c/o All Year Management NY Inc.<br>12 Spencer Street<br>Brooklyn, NY 11205 |
| With a copy sent in the same manner and the same time to: | Blank Rome LLP<br>1271 Avenue of the Americas<br>New York, New York 10020<br>Attention:  Stephen E. Tisman, Esq.<br>stisman@blankrome.com |
| If to the Buyer: | Grand Living II LLC<br>679 Driggs Avenue<br>Brooklyn, New York 11211<br>Attention:  Yechiel Michael Lichtenstein |
| With a copy sent in the same manner and the same time to: | Cohen & Gresser LLP<br>800 Third Avenue, 21st Floor<br>New York, New York 10022<br>Attention:  Nicholas J. Kaiser, Esq.<br>NKaiser@cohengresser.com |

Section 9.02.  *Amendments and Waivers.*  (a)  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.

11

(b)  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 9.03.  *Expenses*.  Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

Section 9.04.  *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

Section 9.05.  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

Section 9.06.  *Jurisdiction*.  The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in a federal or state court sitting in New York City located in Kings County, New York which shall have exclusive jurisdiction.

Section 9.07.  *WAIVER OF JURY TRIAL*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.08.  *Counterparts; Effectiveness; Third Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original or an electronically transmitted pdf of an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

Section 9.09.  *Entire Agreement*.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties hereto with respect to the subject matter of this Agreement.

12

Section 9.10.  *Severability.*  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other governmental authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 9.11.  *"As-Is".*  Buyer hereby acknowledges that, except for the representations expressly set forth in Article 3 or in any document executed by Seller as part of Closing, Buyer has not relied upon, and will not rely upon, either directly or indirectly, any information, representation or warranty of Seller or any of its Affiliates, and further acknowledges that no such representations or warranties have been made. Buyer represents that it is a knowledgeable, experienced and sophisticated Buyer of real estate, and that, except as set forth in this Agreement, it is relying solely on its own expertise and that of Buyer's consultants in purchasing the Purchased Interests and that for the last thirty (30) months neither Seller nor its principals have been involved in the management of the Company.  Buyer acknowledges and agrees that upon Closing, except for the representations expressly set forth in Article 3 or in any document executed by Seller as part of Closing, Seller shall sell and convey to Buyer and Buyer shall accept the Purchased Interests "as is, where is", with all faults.  Buyer further acknowledges and agrees that there are no oral agreements, warranties or representations, collateral to or affecting the Purchased Interests or the Property by Seller or its Affiliates.  Seller is not liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Purchased Interests furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth or referred to herein.  Buyer acknowledges that the Purchase Price reflects the "as is" nature of this sale and any faults, liabilities, defects or other adverse matters that may be associated with the Purchased Interests or the Property.  Buyer has fully reviewed the disclaimers and waivers set forth in this Agreement with its counsel and understands the significance and effect thereof.

Section 9.12.    Seller and Buyer represent to each other that neither party has dealt with any broker or real estate consultant in connection with the transaction contemplated by this Agreement.  Seller and Buyer shall indemnify and hold the other free and harmless from and against any liabilities, damages, costs or expenses (including, but not limited to, reasonable attorneys' fees and disbursements) suffered by the indemnified party arising from a misrepresentation or a breach of any covenant made by the indemnifying party pursuant to this Section.

Section 9.13.    Notwithstanding anything to the contrary in this Agreement, if requested by either party, the other party agrees to execute such documents and undertake such other actions as may be reasonably required in order to facilitate a like-kind exchange.  In the event of such exchange, the requesting party agrees to pay or reimburse the other party for all costs and expense incurred by the other party effectuating such exchange which exceed the costs and expenses that the other party would have otherwise incurred in connection with the consummation (on a non

13

like-kind exchange basis) of the transaction contemplated by this Agreement, and the requesting party agrees that such exchange will not interfere with, increase or affect any of the other party's contractual rights or obligations hereunder.  Additionally, in order to obtain the benefits of a tax-deferred exchange, Seller may cause the Company to change the ownership of the Property, including but not limited to the creation of one or more tenancy-in-common interests in the Property, or otherwise structure the disposition of the Property in such a way as to obtain the benefits of Section 1031 of the Internal Revenue Code, provided that the rights of Buyer under this Agreement are not adversely affected in any material manner.  In no event shall Buyer nor Seller be obligated to incur any liability on account of such exchange that Buyer or Seller, as applicable would not have incurred in connection with the consummation (on a non like-kind exchange basis) of the transaction contemplated by this Agreement.

Section 9.14.    Seller and Buyer agree to execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such other instruments and documents as may be reasonably necessary in order to carry out the intent and purposes of this Assignment.

Section 9.15.    *Exculpation*

(a)    Seller's shareholders, partners, members, the partners or members of such partners or members, the shareholders of such partners or members, and the trustees, officers, directors, employees, agents and security holders of Seller and the partners or members of Seller assume no personal liability for any obligations entered into on behalf of Seller and its individual assets shall not be subject to any claims of any person relating to such obligations.  The foregoing shall govern any direct and indirect obligations of Seller under this Agreement.

(b)    Buyer's shareholders, partners, members, the partners or members of such partners or members, the shareholders of such partners or members, and the trustees, officers, directors, employees, agents and security holders of Buyer and the partners or members of Buyer (other than Seller in its capacity as a member of the Company) assume no personal liability for any obligations entered into on behalf of Buyer and their individual assets shall not be subject to any claims of any person relating to such obligations.  The foregoing shall govern any direct and indirect obligations of Buyer under this Agreement.

*[Signature page follows]*

14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**SELLER**

**ALL YEAR HOLDINGS LIMITED**

By: _____

Name: Yoel Goldman

Title:  President

**BUYER**

**GRAND LIVING II, LLC**

By: _____

Name:

Title

**AGREED TO SOLELY WITH RESPECT
TO THE ESCROW PROVISIONS IN
SECTION 2.02 HEREOF:**

**TRATNER & ASSOCIATES PLLC**

_____

1816314.2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**SELLER**

**ALL YEAR HOLDINGS LIMITED**

By: _____
Name: Yoel Goldman
Title:  President

**BUYER**

**GRAND LIVING II, LLC**

By: _~~Ym Lichtus~~_
Name: Ym Lichtus tun
Title  Authorized Signatory

**AGREED TO SOLELY WITH RESPECT
TO THE ESCROW PROVISIONS IN
SECTION 2.02 HEREOF:**

**TRATNER & ASSOCIATES PLLC**

_____

1816314.2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**SELLER**

**ALL YEAR HOLDINGS LIMITED**

By: _____
Name: Yoel Goldman
Title:  President

**BUYER**

**GRAND LIVING II, LLC**

By: _____
Name:
Title

**AGREED TO SOLELY WITH RESPECT TO THE ESCROW PROVISIONS IN SECTION 2.02 HEREOF:**

**TRATNER & ASSOCIATES PLLC**

_____
Dov Tratner

1816314.2

Exhibit A

Form of Assignment and Assumption Agreement

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment") is made as of the ___ day of _____, 20__, by and between ALL YEAR HOLDINGS LIMITED ("Assignor") and [_____] ("Assignee").

## W I T N E S S E T H :

**WHEREAS,** Assignor is the owner of 35.25% of the limited liability company interests (the "Interests") in Grand Living II, LLC, a Delaware limited liability company (the "Company"); and

**WHEREAS,** Assignor has agreed to transfer, assign and convey to Assignee the Interests, and Assignee has agreed to accept such assignment and assume all of Assignor's obligations and liabilities with respect to the Interests (the "Obligations and Liabilities") to the extent arising from and after the date hereof pursuant to the terms of Membership Interest Purchase Agreement dated as of November 14, 2019 between Assignor and Assignee (the "Purchase Agreement").

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Effective on the date hereof, Assignor hereby transfers, assigns and conveys all of its right, title and interest in the Interests to Assignee free and clear of any Lien (as defined in the Purchase Agreement).

2.      Assignee hereby accepts such assignment and assumes the Obligations and Liabilities pertaining to the Interests from and after the date hereof.

3.      Except as set forth in the Purchase Agreement, this Assignment is made without warranty or representation by Assignor and without recourse to Assignor in any manner whatsoever, express or implied.

4.      This Assignment may not be modified, altered or amended, or its terms waived, except by an instrument in writing signed by the parties hereto.

5.      None of the provisions of this Assignment are intended to be, nor shall they be construed to be, for the benefit of any third party.

6.      This Assignment may be executed in counterparts all of which taken together shall constitute one original assignment.

7.    If any provision of this Assignment is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination will not effect the remaining provisions of this Assignment, all of which will remain in full force and effect.

8.    This Assignment shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law rules of such state.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed and delivered this Assignment as of the date first above written.

**ASSIGNOR:**

ALL YEAR HOLDINGS LIMITED

By:    _____
       Name: _____
       Title: _____

**ASSIGNEE:**

[_____]

By: _____
Name:
Title:

Exhibit B

**New York Community Bank**

Member FDIC

And its divisions -
**Queens County Savings Bank • Roslyn Savings Bank
Richmond County Savings Bank • Roosevelt Savings Bank
Atlantic Bank • Garden State Community Bank
Ohio Savings Bank • AmTrust Bank**

NYCB Plaza, 102 Duffy Avenue - 5ᵗʰ Floor ● Hicksville, NY 11801 ● 516-519-5803 ● Fax: 516- 500-6794
Scott.Swerdlin@mynycb.com

*Scott Swerdlin*
**First Senior Vice President
Lending Department**

November 5, 2019

*227 Grand Street Condominium
c/o Michael Lichtenstein
679 Diggs Avenue
Brooklyn, NY 11211*

*via Mr. Avi Weinstock, Meridian Capital Group LLC*

> Re: Loan #8
> *One Residential Condominium Unit
> One Retail Condominium Unit &
> 11 interior parking spaces located at:
> 227 Grand Street
> Brooklyn, NY 11211*

This letter is issued as a ***conditional*** commitment on the part of New York Community Bank (the "**Lender**") to grant a loan (the "**Loan**") to be secured by a first mortgage lien on the premises described in section "2" of this letter and such other collateral as described in this letter, subject to the following terms and conditions:

## LOAN TERMS

1.    Borrower: The Borrower must be a single purpose/single asset entity acceptable to the Lender and comprised of principals satisfactory to Lender in its sole discretion (the "**Borrower**").

2.    Premises: The Premises are known as 227 Grand Street, Brooklyn, NY 11211 and presently consists of a parcel of land improved by **one** residential condo unit containing **41** residential apartments with **172** rooms, **one** retail condominium unit containing **10** stores (17,300 SF) and **11** interior parking garage spaces located within a **5-story** building of approximately **80,531** square feet (the "**Premises**").

3.    Loan Amount: **$28,000,000 (est.)** (the "**Loan Amount**").

4.    Loan Term: The Loan shall mature in twelve (12) years (the "**Term**").

Version 3/22/2019

5.      Interest Rate:

A. The interest rate for the first seven (7) years shall be fixed at **3.625%** per annum.

B. Thereafter, the interest rate shall be adjusted every year after the end of the seventh (7th) year of the Term (the "**Initial Rate Change Date**") and annually thereafter (each, a "**Rate Change Date**"), to a rate which is equal to the sum of the Index (defined below) and the Margin (defined below) and rounded up to the next one-eighth of one percentage point (0.125%). The "**Index**" is the highest prime rate as published in The New York Times on each applicable Rate Change Date. The "**Margin**" is **275** basis points. In the event the Index is no longer available, the Lender shall compute the interest rate by application of a comparable index selected by the Lender. The interest rate, as so adjusted from time to time, is referred to as the "**Adjusted Interest Rate**". The Loan shall have a minimum interest rate of **3.625%** and a maximum interest rate of 16%.

C. Option to Fix Interest Rate During Years 8 through 12 of the Term: The Borrower, at its option, may elect in lieu of the Adjusted Interest Rate set forth in sub-paragraph "B" above, to fix the interest rate (the "**Fixed Rate Option**") for the remaining five (5) years of the Term provided the Borrower adheres to all of the following conditions: (i) during the first seven (7) years of the Term, the Borrower shall have (a) timely made all payments required under the note, mortgage and all Loan Documents (defined below), and (b) not otherwise defaulted under any provision of the note, mortgage or any other Loan Document; (ii) the Borrower gives the Lender written notice of the Borrower's election to exercise this Fixed Rate Option at least thirty (30) days (but no more than one hundred twenty (120) days) prior to the Initial Rate Change Date; and (iii) at the time such notice is given, the Borrower simultaneously pays to the Lender a sum equal to one percent (1%) of the then unpaid principal balance of the Loan as a non-refundable option fee. Upon the fulfillment of all of the foregoing conditions, the interest rate for the ensuing five (5) years of the Term shall be fixed at a rate equal to the sum of the FHLBNY Index (defined below) and the Spread (defined below), rounded up to the next one-eighth of one percentage point (0.125%) (as so determined, the "**Fixed Option Interest Rate**"). In no event shall the Fixed Option Interest Rate be less than **3.625%** The "**FHLBNY Index**" is the 5 Year Fixed Rate Advance of the Federal Home Loan Bank of New York in effect as of the first business day of the month which is three (3) months prior to the Initial Rate Change Date and the "**Spread**" is **300** basis points. If the FHLBNY Index is not available, the Lender shall compute the Fixed Option Interest Rate by application of a comparable index selected by Lender.

6.      Monthly Payments: Monthly payments of interest only in the amount of **$84,583.33 (est.)** shall be due and payable for the first four (4) years during the initial seven (7) years of the Term. For the remaining years of the initial seven (7) year term, monthly payments of principal and interest in the amount of **$127,694.36 (est.)** shall be due and payable calculated based on a thirty (30) year amortization schedule. Thereafter, on the Initial Rate Change Date and each subsequent Rate Change Date, the monthly payments shall be calculated based on the then outstanding principal balance, the then applicable Adjusted Interest Rate and the remaining amortization period. However, if the Fixed Rate Option is elected by the Borrower under sub-paragraph "5(C)" above, then the monthly payments during the entire second five (5) years of the Term shall be calculated based on the then outstanding principal balance, Fixed Option Interest Rate and amortization schedule based upon the remaining period of the initial thirty (30) year schedule.

Unless the closing occurs on the first day of the month, the first payment shall be interest only calculated from the date of closing to the first day of the first month following the date of closing. Said interest payment will be made on the date of closing.

Interest due each month shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

7.    Monthly Escrow Payments: In addition to monthly principal and interest payments, each monthly payment shall include $1/12^{th}$ of all annual charges for real estate taxes, non-metered water and sewer taxes (frontage), flood insurance, if applicable, and, at the Lender's option, fire insurance premiums, as estimated by the Lender to provide funds sufficient to pay each of such charges one (1) month prior to the date when such charge become due and payable. All such funds shall be held by Lender in a non-interest bearing account, shall not be deemed trust or agency funds and may be co-mingled with the Lender's general funds. At closing, the Borrower shall pay to the Lender a tax service fee (as determined by the Lender) as well as an amount sufficient to establish a reserve to allow the payment of each of such charges one month prior to the date such charge becomes due.

8.    Prepayment Premium: The Loan may be prepaid in full upon payment to the Lender of all amounts due under the Loan Documents. Such prepayment shall include 100% of the principal balance plus an additional percentage of the principal balance, such percentages totaling in the aggregate as follows:

|  |  |
|---|---|
| In the 1st year of the Term: | 105% |
| In the 2nd year of the Term: | 105% |
| In the 3rd year of the Term: | 104% |
| In the 4th year of the Term: | 104% |
| In the 5th year of the Term: | 103% |
| In the 6th year of the Term: | 102% |
| In the 7th year of the Term: | 101% |

Commencing sixty (60) days prior to the seventh (7th) anniversary the borrower may prepay in full without penalty. There is no additional percentage of principal due after the seventh (7th) year of the Term unless the Borrower elects to exercise the Fixed Rate Option in which case the Loan may be prepaid in full upon payment to the Lender of all amounts due under the Loan Documents. Such prepayment shall include 100% of the principal balance plus an additional percentage of the principal balance, such percentages totaling in the aggregate as follows:

|  |  |
|---|---|
| In the 8th year of the Term: | 105% |
| In the 9th year of the Term: | 104% |
| In the 10th year of the Term: | 103% |
| In the 11th year of the Term: | 102% |
| In the 12th year of the Term: | 101% |

Commencing sixty (60) days prior to the twelfth (12th) anniversary the borrower may prepay in full without penalty. The foregoing additional percentages of principal shall be due and payable upon any prepayment of principal, voluntary or involuntary, including but not limited to any prepayment prior to the scheduled maturity date or following acceleration of the Loan. However, voluntary prepayment of less than the entire principal balance shall not be permitted. The Lender requires thirty (30) days prior written notice of any voluntary prepayment.

Version 3/22/2019

9.  EXISTING MORTGAGE HELD BY: _____

\#_____Balance as of_____is $_____

**OTHER LOAN PROVISIONS**

10.     Loan Documents/Required Principals and Definitions: The note, mortgage, consolidation agreement (if applicable) and all other documents executed and/or delivered in connection with and/or evidencing the Loan (collectively, the "**Loan Documents**"), shall be prepared by Lender's attorneys and shall be acceptable in all respects to the Lender and its attorneys in its and their sole discretion.  The Lender may require that the Borrower, **Michael Lichtenstein** and such other principals of the Borrower as the Lender shall determine (and such other principals, collectively, the "**Required Principals**") shall personally indemnify and hold the Lender harmless from certain losses and damages as further specified in this commitment.  For purposes of this commitment, the following definitions shall apply:

(i)  Debt Service Coverage Ratio ("**DSCR**") shall mean the ratio (as determined by the Lender) of Net Operating Income to the annual principal and interest payable on the Loan;

(ii)  "**Net Operating Income**" shall mean the actual income generated by the Premises based upon a then current rent roll (annualized) of the Premises (taking into account the vacancy factor assumed in the appraisal of the Premises in the event it is greater than the actual vacancy) less the greater of (A) the actual expenses of the Premises or (B) the expenses of the Premises set forth in a then current appraisal of the Premises acceptable to the Lender.

(iii)  Loan to Value ratio ("**LTV**") shall mean the ratio as determined by the Lender of the then current unpaid principal balance of the Loan to the lesser of (A) the purchase price of the Premises (if purchased in the past twelve months) or (B) the value as established by a current appraisal acceptable to the Lender.

The Loan Documents shall also include, but not by way of limitation, the following additional provisions:

a.     Late Charge: A late charge of 5% on payments made after the 15th day of any month computed on the amount of the monthly payment which is late.  The late charge shall not be applicable to the payment due at the scheduled maturity date.

b.     Default Rate/Advances Upon Default:  Upon the occurrence of any default, the Lender shall be entitled to (i) assess, and the Borrower shall pay, interest at the default rate which shall be the lower of (A) 20% per annum or (B) the highest rate then permissible under existing law; and (ii) make advances (as the Lender deems necessary in its sole discretion) to protect or preserve the Premises or the lien of the mortgage, pay liens, utilities or satisfy encumbrances and conduct such inspections or obtain such reports including, without limitation, appraisals, property condition reports and environmental reports.  Borrower shall be liable to the Lender for all of the foregoing and the same shall be deemed secured by the mortgage.

c.     Secondary Financing:  Prohibition against (i) any other financing of the fee, (ii) any financing of any leasehold estate, (iii) any pledge of, encumbrance against or mortgaging of any interest (direct or indirect) in the Borrower and (iv) any mezzanine financing.

d.     Due on Transfer: Prohibition against any transfers of all or any portion of the Borrower's fee or leasehold interest in the Premises or of any interest in the Borrower including, but not limited to, (i) an installment sales contract, (ii) a lease with an option to buy, (iii) a lease with a term in excess of three (3) years including renewal terms (other than (A) routine residential apartment leases and (B) with respect to leases of commercial spaces, stores or offices, if any, in the Premises, individual commercial, office or store leases, provided all such leases are made

- 4 -                          Version 3/22/2019

in the Borrower's ordinary course of business and upon then current market terms and rents, are acceptable to the Lender and comply with the provisions of the section below entitled "Leases, Rental Occupancy and Monthly Income/Financial Certifications"), (iv) the creation or imposition of any other lien or encumbrance, (v) any change in the interests of the principals of the Borrower as shareholders, partners, members and/or otherwise, including any change in the ownership of any entities which own (either directly or indirectly and/or through one or more sub-entities) any interest in the Borrower, (vi) any change in the management of the Premises in place at the closing of the Loan (vii) any pledge or mortgaging of, or placing any encumbrance upon, any interest, direct or indirect, in the Borrower and (viii) any attempt to convert the Premises, or any portion thereof, to a condominium or cooperative form of ownership and (ix) any financing by the Borrower, principals of Borrower or by any person with any ownership interest in the Borrower, whether direct or indirect, through one or more entities in which bonds, debentures or similar instruments are offered for sale to investors, whether privately or publicly, including any sale or offering thereof through a domestic or foreign marketplace and either (a) the underlying asset(s) or credit(s) supporting or serving, as the basis (directly or indirectly) of such financing is/are comprised of, in whole or in part, the Property or any part thereof or (b) where as part of the underlying asset(s) or credit(s) supporting or serving, in whole or in part, as the basis (directly or indirectly) of such financing, the Property has been or will be pooled, grouped with  or considered in conjunction with any other property(ies).

e.    Financial Reporting Requirements:  Financial Reporting Requirements: A covenant requiring the Borrower (any guarantor(s), indemnitor(s) and such principals of the Borrower as Lender shall determine) to submit financial information to the Lender, including, but not limited to, **semi-annual** income and expense statements (or more frequently upon the Lender's request), then current rent rolls and such other financial information as and when, and in such form as, the Lender shall require, including, without limitation, current personal financial statements of all guarantors, indemnitors and principals.  Upon expiration of the interest-only period, the Bank shall require an annual submission of the aforementioned financial information.  Said financial information must be provided to the Lender within sixty (60) days after the fiscal year end for the Borrower, and again within sixty (60) following the end of six (6) months from the start of the Borrower's fiscal year. **All such statements, rolls, etc. must clearly indicate the period or date which they represent and each must be signed and certified and dated by an authorized principal of the Borrower or the applicable guarantor or indemnitor**.  In the event the Borrower or the applicable guarantor or indemnitor fails to comply with the aforesaid, the Interest Rate shall be increased 2% per annum until such time as the financial information required under this paragraph is delivered to the Lender.

f.    Assignment of Rents/UCC Filings:  An absolute assignment of all leases, space leases, license agreements, rents, profits and security deposits, including restrictions on the Borrower as to the cancellation or modification of the leases and prepayments of rent.  A UCC Financing Statement and any necessary renewals thereof shall be executed and filed with the appropriate authorities as to all fixtures and personal property in connection with the Premises.

g.    Real Estate Tax Exemptions/Abatements/Indemnification: The Borrower's covenant and representation that it has complied with, and shall continue to comply with, so as long as any amount due and owing under the Loan remains unpaid, any and all laws, rules and regulations (including, without limitation, administrative and judicial rulings) relating to real estate tax abatements and/or exemptions, and/or rent regulation now or hereafter benefitting and/or affecting the Premises, including but not limited to Section 11-243 of the Administrative Code of the City of New York and New York State Real Property Tax Law Section 489 and further that the Borrower and the Required Principals shall personally indemnify and hold the Lender harmless from any and all penalties, loss, damages, costs and expenses (including but not limited

- 5 -                              Version 3/22/2019

to return of rents to individual tenants), which may arise as a result of any non-compliance or administrative or judicial modification of such laws, rules or regulations, such indemnity to survive repayment of the Loan.

h.    DHCR, ETPA and Rent Registrations:  The Borrower and the Required Principals shall certify that the D.H.C.R, E.T.P.A and any other type of rent registration filings submitted (or hereafter required and/or submitted) (**'Rent Registrations'**) are true and correct in all respects and the Borrower is not and will not be subject to any overcharge claims, if applicable. The Borrower will agree to timely file for additional rent increases whenever allowed by applicable Rent Registration laws and regulations and whenever commercially prudent.  At closing, the Lender shall receive the irrevocable consent of the Borrower to review all Rent Registrations for the Term of the Loan.  The Borrower and the Required Principals shall personally indemnify and hold the Lender harmless from any and all loss, claims, damage and/or penalties (including but not limited to return of rents to individual tenants), which may arise as a result of (a) any incorrect Rent Registrations filed before or after closing or (b) the failure to file any Rent Registrations, such indemnity to survive repayment of the Loan.

i.    Patriot Act Compliance:  A representation and warranty by the Borrower and the Required Principals that the Borrower and all principals (direct or indirect) of the Borrower, their affiliates, subsidiaries or any of their respective agents acting or benefitting in any capacity in connection with the transactions contemplated by the Loan Documents are in full compliance with, and shall continue to comply with any laws now or hereafter in effect relating to terrorism or money laundering, including without limitation Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by U.S. Department of Treasury Office of Foreign Assets Control (OFAC").

j.    Environmental Representations and Environmental Indemnity:  Representations and warranties from the Borrower and the Required Principals that the Premises are and shall remain free of all hazardous materials and are not used in any manner which violates applicable Federal, State or local environmental laws, that neither the Borrower nor any tenant has received any notice from a governmental agency for violation of such laws and, if such notice is received, the Lender will be notified immediately, and that there is no intention to use the Premises in violation of any environmental law, with the Borrower (**and the Required Principals if so required by the Lender in its sole discretion**) to execute an environmental indemnity in form and content satisfactory to the Lender whereby they jointly, severally and personally indemnify and hold the Lender, its agents, affiliates, employees and other people related to the Lender harmless with respect to such matters and materials and the performance of all obligations in connection therewith, such indemnity to survive repayment of the Loan.

k.    Exceptions to Non-Recourse Guaranty:  The Borrower and the Required Principals shall execute and deliver to the Lender at closing an exceptions to non-recourse guaranty with respect to the Lender's required exceptions to the non-recourse provisions, if any, of the Loan Documents, in form and content satisfactory to the Lender.

l.    Property Condition Assessment:  Prior to closing, the Lender may obtain, in its sole discretion, and at the Borrower's expense, a Property Conditions Assessment and Engineering Report (the "**Property Report**") which must be satisfactory to the Lender in all respects in its sole discretion.  The Property Report shall be prepared by certified engineering firm(s) acceptable to and approved by the Lender in its sole discretion and shall include, without limitation, an investigation, as the Lender deems necessary, of the structural, mechanical, electrical and engineering conditions on the Premises.  Should any work, cosmetic or otherwise,

be required to be performed in the Lender's sole opinion, the Lender will require that such conditions be corrected to its satisfaction prior to closing of the Loan.

m.    Closing Condition (Subject to): This commitment shall be subject to final Lender approval and a final review of the appraisal report to the satisfaction of the Bank yielding a maximum 65% LTV and a minimum 1.35X DSCR based upon a 30 year amortization schedule, as determined solely by the Lender.

n.    Mezzanine Financing: The Lender shall allow the Borrower to obtain Mezzanine Financing subject to the following:

- The Mezzanine Lender and Mezzanine Financing Terms must be acceptable to the Lender in all respects;

- The combined loan to value ratio of the Loan and the Mezzanine Financing is limited to 90% of the appraised final value of the property, as determined solely by the Lender;

- The combined debt service coverage ratio calculated as Net Operating Income divided by the annual principal and interest payable on the Loan (assuming a 30 year amortization schedule) plus the annual Mezzanine Financing payments, remains equal to or above a 1.05X for the life of the Loan, as determined solely by the Lender;

- The Required Principal, Michael Lichtenstein, must maintain (a) management control of the day-to-day operations of the Premises and (b) a vote in all major decisions involving Borrower and the Premises subject to any permitted transfers in the Mortgage;

- All documentation related to the Mezzanine Financing must be provided to the Lender prior to closing and must be satisfactory to the Lender and Lender's counsel;

- The Borrower shall be required to provide trailing six month income and expense statements, as well as fiscal year-end financial statements for the interest only period of the loan and so long as the Mezzanine Financing is in-place

- The Bank will monitor the subject loan on a semi-annual basis and, in the event the actual combined DSCR based upon first mortgage loan payments on a 30 year amortization schedule and Mezzanine Financing loan payments based upon the in-place repayment structure falls below a 1.05X DSCR, as determined solely by the Bank, the Borrower will be required to establish a debt service reserve in an amount necessary to generate a combined 1.20X DSCR.

## LENDER UNDERWRITING/PRECLOSING REQUIREMENTS

11.    Expenses/Good Faith Deposit: The Borrower must pay to the Lender the following nonrefundable fees (the **"Bank Fees"**):

| | |
|---|---|
| Appraisal Fee: | $3,149 |
| Processing Fee: | $2,750 |
| Commitment Fee: | PAR |
| **Total Bank Fees** | **$5,899** |

- 7 -                                        Version 3/22/2019

In addition, the Borrower must pay the Lender an amount equal to 1% of the Loan Amount (the "**Good Faith Deposit**") to be held by the Lender against all additional costs and expenses of the Loan incurred or to be incurred by the Lender. The Lender acknowledges receipt of the Borrower's funds in the sum of **$10,000** towards the Bank Fees and the Good Faith Deposit and the balance of **$275,899** remains due to the Lender. The Good Faith Deposit will be returned to the Borrower at the time the Loan closes, less any and all third party fees and expenses incurred or to be incurred by the Lender including any Bank Fees. If, through no fault of the Lender, the Loan does not close in accordance with the terms of this commitment, the Good Faith Deposit will be retained by the Lender as liquidated damages and may be applied by the Lender in payment of any fees and expenses incurred by the Lender including any Bank Fees and Lender's attorneys' fees and expenses. Notwithstanding the foregoing, if, through no fault of the Borrower, the Loan does not close in accordance with the terms of this commitment, the Good Faith Deposit will be returned to the Borrower less any and all of the Lender's third party fees and expenses incurred or to be incurred by the Lender including any Bank Fees and Lender's attorneys' fees and expenses. Any failure to meet and/or comply with any of the terms or conditions of this commitment shall be deemed to be the "fault of the Borrower".

12.    Borrower Submissions. The Borrower must submit to the Lender all of the documents set forth on the attached "*Schedule of Borrower Submissions*", each of which must be signed and certified to be true, complete and accurate by such principal(s) of the Borrower (as the Lender shall determine) and submitted to the Lender with signed acceptance of this commitment. All such documents are subject to the Lender's review and approval in the Lender's sole discretion. Upon the Lender's review of such items, additional documentation and/or information may be required by the Lender. **A closing date may not be scheduled until all outstanding items have been received, reviewed and approved by the Lender.** This commitment is subject to the Lender approving credit of the Borrower and all principals (direct or indirect) before closing. The enclosed "*Credit Authorization Form*" is to be completed, executed and returned with the executed commitment for all parties listed on the attached "*Ownership Interest Form*" which must also be completed, executed and returned with the executed commitment.

13.    Environmental Requirements: An "*Environmental Review Checklist*" must be completed, executed and returned with the signed commitment and is subject to the Lender's review and approval in the Lender's sole discretion. Prior to closing, the Lender may, at its option, obtain at the Borrower's expense a Phase I environmental report (as well as Phase II Reports and any other environmental reports that the Lender may deem necessary) (the "**Environmental Reports**"), all of which must be satisfactory to the Lender in all respects in its sole discretion. The Environmental Reports shall be prepared by certified environmental consulting firms acceptable to and approved by the Lender, and shall otherwise conform to an ASTM Standard Practice satisfactory to us and selected by us in our sole discretion. All hazardous materials, if any, must have been fully removed from the Premises, to the Lender's satisfaction, prior to the closing of the Loan.

14.    Judgments/Lawsuits:   This commitment is expressly subject to full payment and satisfaction of all judgments and liens, including, without limitation, state and/or federal tax liens, and discontinuance of all suits, against the Premises and/or the Borrower and/or principals (direct or indirect) of the Borrower, including any judgments, suits and/or such liens disclosed in any credit reports which the Lender has obtained or will obtain against the Borrower and/or such principals or delivery to the Lender of satisfactory documentary evidence that said judgments/liens/suits do not involve the Borrower and/or such principals and/or the Premises.

15.    Violations/Certificate of Occupancy: The Premises shall, at the closing of the Loan, be free of all violations of every federal, state and municipal department, agency, board or other authority having jurisdiction with written evidence of such removal submitted to the Lender before closing. Furthermore, there shall be no liens of record or otherwise affecting the Premises in any

Version 3/22/2019

manner whatsoever. The Borrower shall also deliver to the Lender a current, valid, permanent Certificate of Occupancy issued by the appropriate governmental entity covering the Premises as presently improved and occupied and permitting the usage indicated on the first page of this commitment. Such Certificate of Occupancy shall be subject to the Lender's attorneys' review and approval in their sole discretion. In the event no Certificate of Occupancy is legally required, proof of such fact satisfactory to the Lender's attorneys in their sole discretion must be delivered prior to closing.

16.    Subject to Inspection: The Lender reserves the right to terminate this commitment in the event the Premises are not approved, in the Lender's sole discretion, after an inspection by the Lender's directors, officers and/or representatives.

17.    Required Accounts:

Tenant Security Account: At least seven (7) days prior to closing the Loan, Borrower shall open with Lender a tenant lease security deposit account covering the lease security deposits (actually held by Borrower) for all leases at the Mortgaged Property for the entire Term of the Loan or until repayment of the Indebtedness ("**Lease Security Account**"). The Lease Security Account shall be funded at or prior to Closing.

The amount funded will represent approximately 1/12 of the subject property's stabilized annual rent roll (as determined by the Lender), or **$260,000**. The Lender will establish a Master Landlord Account with these proceeds. Within 60 days of the closing, the Borrower shall complete and submit the Lender's Tenant Security Account Application Package in order to open and fund each tenant's sub account.

Please contact the Lease Security Hotline at (516) 500-6304 (located at 102 Duffy Avenue, 2nd Floor, Hicksville, New York 11801) in order to arrange for the completion of all required documentation and the opening of the account prior to closing the Loan.

Operating Account: At least seven (7) days prior to closing the Loan, the Borrower shall open with the Lender a business checking account which shall serve as the operating account for the Premises for the entire Term. The account shall be the sole account which the Borrower maintains in connection with the Premises, including all income and expenses (inclusive of monthly debt service payments) with respect to the maintenance and operation of the Premises.

**In the event that any of the above required account(s) is/are not maintained with the Lender for the entire Term, the interest rate shall be increased by 2% annually above the otherwise applicable interest rate.**

18.    Auto-Debit of Monthly Payments: All monthly debt service payments, including, but not limited to, real estate tax escrow shall be auto-debited from the Borrower's operating account for the life of the loan. Please complete the attached form and return with the signed commitment.

**In the event that Auto-Debit is not established at closing and maintained with the Lender for the entire Term, the interest rate shall be increased by 2% annually above the otherwise applicable interest rate.**

## LEGAL CLOSING REQUIREMENTS

19.     Insurance: Evidence of hazard and liability insurance coverage is required in conformance with the attached *"Property and Liability Insurance Schedule For Multifamily and Commercial Loans."* All of such insurance shall be maintained during the entire Term of the Loan, all in accordance with the requirements of the Loan Documents.  Property (hazard) coverage shall be in an amount at least equal to **$32,100,000** and the Business Income/Rental Value limit must be at least **$3,195,521** with a six (6) month period of extended indemnity.  The Lender may, in its sole discretion, engage a third party insurance consultant to review any and all insurance documentation associated with this loan.  All costs associated with the insurance consultant will be paid by the Borrower.  The Lender shall not be obligated to make the Loan if the Premises or any part thereof are altered, damaged or destroyed prior to closing.

20.     Leases, Rental Occupancy and Monthly Income/Financial Certifications: Any and all leases now or hereafter affecting all or any portion of the Premises shall be subject to the Lender's review and approval in the Lender's sole discretion and shall be unconditionally subject and subordinate in all respects to the Loan and the lien of the mortgage(s) securing the Loan and to any and all modifications, renewals, replacements, extensions, assignments, assumptions and consolidations thereof.  Prior to closing, the Borrower must provide to the Lender (a) a sample form of the residential lease in use at the Premises, (b) copies of all non-residential leases, (c) current estoppels from all non-residential lessees, in form and content set forth in the attached "*Estoppel Certificate*" satisfactory to the Lender, (d) subordination and non-disturbance agreements from such non-residential tenants as the Lender shall require in form and content satisfactory to the Lender and (e) a current rent roll of the Premises (the "**Rent Roll**") certified by the Borrower to be true and complete, such Rent Roll to be satisfactory to the Lender in its sole discretion and to include the unit number, the name of the tenant, the expiration date of the lease, identification of any vacant units, the amount of the monthly rental, the amount of any security deposit and the amount of any arrears, the square footage of each non-residential unit, the total square footage of non-residential space and a listing and itemization of any and all other income generated by the Premises in such detail as the Lender shall require.

At the date of closing, there shall be at least:

(a) **40** residential units leased at the unit rents including all applicable escalations as submitted to the Lender under bona fide leases of one- to two-year terms at a minimum gross rental of **$2,070,161** annually;

(b) **10** commercial units leased at the unit rents as submitted to the Lender under bona fide leases as submitted to the Lender at a minimum gross rental of **991,115** annually;

(c) **31,500** in additional annual parking income, which must be supported via inclusion in the apartment leases or by individual leases for parking spaces.

At closing, the Borrower and the Required Principals must personally certify as to the accuracy of the Rent Roll and all other financial information submitted in connection with the Loan.

21.     Lender's Attorneys' Approval/Fees and Costs:  The Lender's attorneys must review and approve title, any easements or restrictions, survey, dedication of streets, all necessary certificates, compliance with all rules, regulations, ordinances or orders of any governmental authority having jurisdiction.  The decision of the Lender's attorneys as to (a) the form and substance of the Loan Documents, (b) matters of encumbrances and marketability and (c) all other matters shall be final and conclusive.  Prior to closing, the Borrower shall furnish such organizational documents,

corporate resolutions, certificates, legal opinions and such other documents, instruments, opinions and assurances as the Lender or its attorneys may request. The Lender's attorneys shall be:

Cullen & Dykman LLP
Garden City Center
100 Quentin Roosevelt Boulevard
Garden City, NY 11530-4850
(516)357-3700

The legal fees, all title charges and all other costs and expenses in connection with the Loan, including, without limitation, survey, insurance, all transfer taxes, gains taxes, mortgage taxes and recording charges, shall be paid by the Borrower.

22.     Security Lien/Title Insurance:  The mortgage to be given to the Lender shall be a valid first mortgage lien on the Borrower's fee estate in the Premises.  Fee title to the Premises shall be unencumbered and marketable, subject only to such exceptions as may be approved by the Lender and/or its attorneys in their sole discretion and shall be warranted by the Borrower and the Required Principals who shall indemnify the Lender from any title defects.  In addition, the mortgage shall be a first lien on all fixtures and articles of personal property used in connection with the Premises. The Borrower shall execute such documents as the Lender's attorneys in their sole discretion shall deem necessary to perfect and continue the lien.  Title insurance from a reputable and licensed title insurance company approved by the Lender in the full amount of the Loan, in form and substance satisfactory to the Lender in its sole discretion, shall be obtained at the Borrower's expense.  Prior to closing, the Borrower must deliver to the Lender's attorneys a title report for issuance of a mortgagee title insurance policy ("**Title Policy**") providing American Land Title Association Loan Policy coverage (2006 or such other version acceptable to the Lender) in the Loan Amount, issued by a title company acceptable to the Lender.  The original Title Policy must be acceptable to the Lender and Lender's attorneys in its and their sole discretion and must be delivered to the Lender at closing.

23.     Survey:  The Borrower shall, prior to the closing of the Loan, furnish a survey of the Premises prepared by a licensed surveyor which shall be (a) satisfactory to the Lender in all respects, (b) redated by a licensed surveyor, if more than ninety (90) days old at time of closing, and (c) guaranteed to the title company and the Lender and its successors and assigns.  The expense of said survey shall be borne by the Borrower.

**MISCELLANEOUS**

24.     Broker Indemnification:  The Borrower Parties (defined below) represent that they have not dealt with any broker in connection with the financing contemplated hereby, other than Meridian Capital Group, LLC (the "**Broker**"), and agree to pay the brokerage commission of the Broker. The "**Borrower Parties**" means, collectively, the Borrower and any of Borrower's owners and principal(s) (direct or indirect), any indemnitor(s) and any guarantor(s) (full or partial) of any portion of the Loan or obligation owed to the Lender related to the Loan transaction.  The Borrower Parties hereby jointly and severally indemnify and hold the Lender harmless from any claim for brokerage commissions made by any person, firm or corporation whatsoever who or which claims to have dealt with the Borrower or any of the Borrower Parties, and arising out of or in connection with the transactions contemplated hereby, and any costs, damage, liability and all attorneys fees and costs in connection therewith.  The Borrower Parties hereby represent that the Broker has been retained by the Borrower and that the Broker is solely the agent of the Borrower and not the Lender.

25.     Borrower Parties' Representations:  The Borrower Parties represent and warrant that (a) the Borrower will be the record owner in fee of the Premises at the closing of the Loan and (b) the

Borrower is the real party in interest with respect to the Loan. The Borrower and the Borrower Parties hereby confirm, and certify to, the accuracy, completeness and truthfulness of all information (including without limitation the rent rolls, leases, any net worth statements, financial statements, the income and expense statement(s) and the contract of sale, if applicable) submitted to the Lender in connection with the Loan, as well as all information to be submitted prior to, at the closing of, or in connection with the Loan, whether such information was submitted by the Borrower, any other of the Borrower Parties, the Broker and/or any agent, employee, principal, attorney or representative of the Borrower and that such information was, at the time of its submission to the Lender, and will be, at the closing of the Loan, true, complete and correct in all material respects. At the closing, Borrower Parties shall certify and warrant to the Lender, jointly and severally, that there has not been any material adverse change in the business, operations, properties, assets or condition of any of the Borrower Parties and that no event has occurred or circumstances exist that may result in such material adverse effect. The Borrower Parties understand and agree that the Lender, its officers, directors and/or employees may rely and are relying upon all such information and the Borrower Parties hereby agree, jointly and severally, to indemnify, save and hold harmless the Lender, its officers, directors and/or employees from any loss or damage (including, without limitation, reasonable attorneys fees and disbursements) that the Lender may sustain as a result of any misstatements, omissions or inaccuracies in such information. Any contract of sale submitted to the Lender may also be relied upon by the Lender in determining an appraised value of the Premises, however, to the extent there are any inconsistencies between such contract and the terms, provisions and requirements of this commitment, the terms, provisions and requirements of this commitment shall prevail. The Lender shall not be obligated to close the Loan and this commitment shall be terminated in the event of a breach of any of the foregoing representations, warranties or certifications or in the event of any change (a) in the equity ownership of the Borrower prior to closing or (b) in the financial condition of any of the Borrower Parties which the Lender in its sole determination deems to be material and adverse.

26.     Laws: The Borrower hereby acknowledges that the execution of this commitment and enforcement thereof are subject to the laws of the state of New York.

27.     Confidentiality: This letter is being issued to the Borrower upon the express condition that neither it nor its substance, shall be disclosed by the Borrower to any third person except those who are in confidential relationship with the Borrower (such as legal counsel, broker, accountants, or managing agents) and who agree to keep such information confidential or where disclosure is required by law. The Lender shall not be obligated to close the Loan and this commitment shall be terminated at the Lender's option in the event of a breach of any of the covenants in this paragraph.

28.     No Oral Modifications: The terms of this commitment shall not be waived or modified except in a writing, executed by the Lender. Any purported modification not in compliance with this provision is void.

29.     No Assignment: This commitment shall not be transferred or assigned without written consent of the Lender.

30.     Litigation Expenses: In any litigation (including any arbitration or bankruptcy proceedings) arising from this commitment or any of the Loan Documents, the Lender shall be entitled to recover and receive its reasonable attorneys' fees and costs, including those for any appeal(s), and said amounts shall be secured by the collateral securing the Loan if a Loan closing has been held.

31.     Resolution of Disputes: If any dispute arises under this commitment, the Loan, any Loan Document, or any other aspect of any transaction between the Lender and any of the Borrower

Parties, whether or not specifically relating to any Loan Document, said dispute will, at the Lender's election to be made by the Lender in its sole discretion, be resolved through binding arbitration in one of the following counties which shall be selected by Lender in its sole discretion: Nassau County (State of New York) or the county in which the Premises are located. Such arbitration shall be conducted in accordance with the rules of the American Arbitration Association or, at the election of the Lender made in its sole discretion, with the local rules of any arbitration association located in the county so selected by the Lender. If the Loan is secured by a mortgage or any other collateral, the Lender may elect to enforce the mortgage through sale, foreclosure or otherwise and/or to proceed against any other collateral in a judicial or non-judicial proceeding and the Lender may elect (in the Lender's sole discretion) to have any other disputes between the Lender and any of the Borrower Parties resolved by binding arbitration, including any counterclaim which any of the Borrower Parties may have, however, the Borrower Parties agree not to interpose any counterclaims or cross-claims in any such actions, proceedings or arbitrations other than compulsory counterclaims or cross-claims. In any event, in any law suit, arbitration or proceeding involving this commitment, the Loan, any Loan Document, or any other aspect of any transaction between the Lender and any of the Borrower Parties, the exclusive venue for any action shall be in the county in which the Premises are located.

32.    Consent to Venue, Jurisdiction and Service:  The Borrower Parties hereby irrevocably submit to (a) the jurisdiction of any federal or state court sitting in the State in which the Premises are located over any action or proceeding arising out of or related to this transaction and agree that personal jurisdiction over the Borrower Parties rests with such courts and (b) venue (county) shall be selected by Lender in its sole discretion. The Borrower Parties specifically and expressly waive personal service by manual delivery and agree that service of process may be made by prepaid certified mail directed to the applicable Borrower Party at the address of the Borrower Party for notices under the Loan Documents and that such service will be effective as if such Borrower Party had been personally served by in-hand delivery. Borrower Parties agree (a) to a waiver of jury trial in any such action or proceeding, (b) to a waiver of defenses and counterclaims (other than compulsory counter-claims) and (c) that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions. The Borrower Parties waive any objections to venue in any such action or proceeding on the basis of inconvenient forum. Any action or proceeding brought against the Lender shall only be brought in such courts. The Loan Documents shall provide for all of the foregoing.

33.    Survival of Commitment/Conflict with Loan Documents:  The terms and conditions of this commitment, including without limitation the provisions of the paragraphs entitled "Lender's Attorneys' Approval/Fees and Costs", "Broker Indemnification", "Borrower Parties Representations", "Litigation Expenses", "Resolution of Disputes", "Consent to Venue, Jurisdiction and Service", "Confidentiality" and "Waiver of Jury Trial", (as same may be amended from time to time in a writing signed by the Lender) not incorporated into the Loan Documents shall survive the Loan closing or, if the Loan does not close, the cancellation, termination or expiration of this commitment and shall remain binding on the parties hereto unless otherwise agreed to in writing signed by all parties hereto. In the event of a conflict between this commitment (as same may be so amended) and the final executed Loan Documents, the Loan Documents shall control.

34.   **WAIVER OF JURY TRIAL:  THE BORROWER, BORROWER PARTIES AND THE LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS COMMITMENT LETTER, THE LOAN, ANY LOAN DOCUMENT, ANY OTHER ASPECT OF ANY TRANSACTION BETWEEN THE LENDER AND THE BORROWER AND/OR THE BORROWER PARTIES OR THE RELATIONSHIP BETWEEN THE PARTIES THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY AND ALL SUCH ISSUE(S) TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

35.   Return Date/Expiration: The Loan must close (all conditions and requirements of this commitment having been met to the satisfaction of the Lender) by the close of business **December 20, 2019** (the "**Expiration Date**") or this commitment shall automatically expire and be canceled. This commitment shall not become effective unless the enclosed copy duly signed by the Borrower in space provided shall be *received* by the Lender within fourteen (14) days of the date hereof.  The Lender must receive, together with the executed acceptance of this commitment, a good check in the amount of **$275,899 (est.)**, which represents the balance of the fees due to the Lender.

Sincerely,

New York Community Bank

By: _____

Scott Swerdlin
First Senior Vice President

SS:jgg/js:rr
cc:  Cullen and Dkyman
Beatrisa Fomina

Accepted By: _____     Date: _____

Borrower/Title
On behalf of the Borrower and Borrower Parties

Please provide the following information:

Borrower's attorney's name: _____

Address: _____

Telephone: _____

Version 3/22/2019

# SCHEDULE OF BORROWER SUBMISSIONS

## LIST OF DOCUMENTS TO BE PROVIDED

Please submit to the Lender all of the documents set forth below. Each document so submitted must be signed by the managing principal(s) of the Borrower. The documents must be submitted to the Lender with signed acceptance of the foregoing commitment. All submitted documents are subject to the Lender's review and approval in the Lender's sole discretion. Upon the Lender's review of such items, additional documentation and/or information may be required.

- "*Credit Authorization Form*" (Authorization To Release Information); form enclosed; required for the Borrower, each managing principal of the Borrower and each guarantor
- Current (no more than six (6) months old) certified personal financial statements inclusive of location of cash/liquid assets and a detailed schedule of real estate owned for each managing principal of the borrower and guarantor set forth on the Ownership Interest Form.
- "*Environmental Review Checklist*"
- Copy of all commercial leases
- Copy of form of residential lease
- Certified rent roll, to be attached to the enclosed "*Certification Statement*" together with an "*Estoppel Certificate*" for each non-residential tenant
- Delinquency/Arrears Report
- DHCR or ETPA filings for the most recent year's filing
- "*Disclosure Statement*"
- Current year federal tax return for the borrowing entity signed, as filed with all referenced schedules and statements
- "*Verification of Mortgage*"
- Certificate of occupancy
- Organizational Documents:
  - ➢ For partnerships: a current, executed copy of the partnership agreement with all applicable amendments and exhibits for the borrowing entity
  - ➢ For limited liability companies: a current, executed copy of the operating agreement with all applicable amendments and exhibits for the borrowing entity
  - ➢ For corporations: a current, executed secretary's/officer's certificate listing all officers and their title held, as well as all shareholders and their percentage of ownership interest and current shareholders' agreement
  - ➢ All of the above is required for each sub-entity owning, directly or indirectly, any interest in the Borrower
- "*Ownership Interest Form*" – Complete for the Borrower as well as each and every sub-entity(ies) and all principal(s) owning, directly or indirectly, any interest in the Borrower. The form must be certified by a principal (satisfactory to the Lender) of the respective entity(ies). All principals (direct and indirect) must be identified. For each managing principal, a "*Personal Information Statement*" including a "*Personal Financial Statement Questionnaire*".
- List all other loans you may have with New York Community Bank and/or any of its divisions (Queens County Savings Bank, CFS Bank, Richmond County Savings Bank, Roslyn Savings Bank, Roosevelt Savings Bank, and Garden State Community Bank successor to Ironbound Bank, First Savings Bank of New Jersey, Penn Federal Savings

Bank, AmTrust Bank, Desert Hills Bank and Synergy Bank) and/or New York Commercial Bank and its division (Atlantic Bank) and their respective successor and/or assigns, including but not limited to Doral Bank and Long Island Commercial Bank, indicating the mortgage number, Federal I.D. numbers and Owning Entity of each.

| Mortgage No. | Federal I.D. # | Owning Entity |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

If none, check here.

Pre-Closing Documentation: "**Pre-Closing Documentation**" is all documentation and information required to be delivered to the Lender and/or the Lender's attorneys prior to closing either by the terms of this commitment letter or as the Lender or its attorneys may advise. In order for the Loan to fund and close on or before the Expiration Date, the Lender and the Lender's attorneys must be in receipt of all Pre-Closing Documentation at least five (5) business days prior to the Expiration Date.

Version 3/22/2019

Forward To Your Insurance Agent

> **New York Community Bank**
> **Property and Liability**
> **Insurance Schedule**
> **For Multifamily and**
> **Commercial Loans**
> *As of January 2010*

*NOTE:* Satisfactory evidence of insurance as required herein must be delivered to the Lender's Closing Attorney at least five (5) business days prior to closing. A closing date cannot be scheduled until insurance is approved by Lender's Closing Attorney.

A.    ***Insurance Coverage***. The following is a summary of coverage required by the Lender and is subject to the more detailed provisions of the Loan Documents:

    1.    ***Property Insurance:***
        a.    Special Form, Multi-Peril Insurance Policy (an "all risks" policy) with an Agreed Value clause and providing coverage on a 100% Replacement Cost basis including coverage for:
            i.    Terrorism
            ii.    Business Income/Rental Value
            iii.    Equipment Breakdown
            iv.    Law and Ordinance
            v.    Wind/Hail
            vi.    Earthquake (if applicable)
            vii.    Flood: Building & Contents, if applicable (limits to be established by the Lender). If the property is located in a Special Flood Hazard Area, satisfactory evidence of flood insurance must be provided in an amount as determined by the Lender considering replacement cost and risk of loss.
        b.    Coinsurance is not permitted
        c.    Deductible not to exceed $20,000
        d.    Business Income/Rental Value equal to one year's rent roll (as detailed in the Lender's appraisal) or in an amount as otherwise determined by the Lender
        e.    Equipment Breakdown coverage in an amount equal to or greater than the property coverage.

    2.    ***Liability Insurance:***
        a.    For loans under $3,000,000, combined single limit of at least $1 million per occurrence with $2 million in the aggregate. For loans of $3,000,000 or more, provide limits of $3 million per occurrence with $5 million in the aggregate. Coverage may be provided by an excess liability policy.
        b.    Deductible not to exceed $20,000.

B.    ***Evidence of Insurance***. Must be provided on ACORD certificates meeting the following requirements:

    1.    ***Property Coverage***:

a. ACORD 28 (2003/10) form or ACORD 28 (2006/07) form which shall include the New York Standard Mortgagee Endorsement (or equivalent for other states) naming the Bank as "Mortgagee" and "Loss Payee" and contain a provision requiring the insurance company to give the Bank thirty (30) days notice of any termination of the policy

b. If an ACORD 28 (2006) version is submitted, the following modifications must be included in the form:

    i. the following language must be stated in the Remarks section of the certificate: "This is evidence that insurance as identified has been issued, is in force, and conveys all the rights and privileges afforded under the policy and confers rights on the Additional Interest named below."

    ii. The Cancellation Notification must be changed to the following: "SHOULD THE POLICY BE TERMINATED, THE COMPANY WILL GIVE THE ADDITIONAL INTEREST IDENTIFIED BELOW 30 DAYS WRITTEN NOTICE, AND WILL SEND NOTIFICATION OF ANY CHANGES TO THE POLICY THAT WOULD AFFECT THAT INTEREST, IN ACCORDANCE WITH THE POLICY PROVISIONS OR AS REQUIRED BY LAW."

c. ALL BOXES ON THE FORM MUST BE CHECKED "YES" OR "NO"

d. Each insurance company issuing a policy must (i) be licensed in the State where the insured property is located and (ii) have a minimum AM Best's rating of B+ as well as a financial size of VIII or greater.

2. **Liability Coverage:**

a. ACORD 25 (3/93) with the following language stated in the Remarks section of the certificate: "*This is evidence that insurance as identified has been issued, is in force, and conveys all the rights and privileges afforded under the policy and confers rights on the Certificate Holder named below.*" It must contain a provision requiring the insurance company to give the Lender thirty (30) days notice of any termination of the policy.

b. The Lender must be named as "Additional Insured."

c. Each insurance company issuing a policy must (i) be licensed in the State where the insured property is located and (ii) have a minimum AM Best's rating of B+ as well as a financial size of VIII or greater.

3. **Lender's Address:**

The Lender's address for notices on both ACORD forms must be as follows:

New York Community Bank, its successors and/or assigns
P.O. Box 5070
Troy, MI 48007

C. **Paid Bill.** A paid bill showing that the premiums on all insurance policies have been paid for a full year from the closing date, must be delivered. The bill must itemize the premium allocated to each policy. Where a single policy includes both property and liability coverage, a single premium amount for the whole policy is acceptable.

Version 3/22/2019

D.    ***Blanket Policies.***  The property insurance policies required under Section A of this schedule may be included in blanket insurance policies covering other properties owned by Borrower or its affiliates provided that: (i) the blanket insurance policies comply with the requirements of the Loan Documents and this schedule and (ii) the Evidence of Insurance with respect to property coverage indicates that the amount of insurance available with respect to the Premises shall not be reduced below the Agreed Value Endorsement amount and the amount of the other insurance required to be provided under the Loan Documents shall not be reduced below the respective limits herein specified, notwithstanding claims with respect to other property of the insureds.

E.    ***Subject to Lender's Review and Approval.***  All insurance coverage shall be otherwise subject to the Lender's requirements (in its sole discretion) as to insurer, form, coverage, amounts and expiration date.  Borrower must also maintain Flood Insurance Coverage, if the Lender determines that such coverage is necessary, in an amount to be determined by the Lender.



New York Community Bank

Member FDIC

## THE AUTOMATIC PAYMENT PROGRAM

Please check one of the following:

☐ **NEW SET UP**      ☐ **CHANGE BANK ACCOUNT** ☐ **CANCEL**     ☐ **OTHERS** (Specify) _____

Loan Number: _____

Name(s) on the Loan Account: _____

Address: _____ City/State _____ Zip: _____

Bank where Payment is withdrawn (if not NYCB): _____ Phone No: _____

Checking Account Number: _____

Effective Date of withdrawal      Month _____ Day _____ *

*Payment will be withdrawn on the loan due date unless otherwise specified.*

AUTHORIZATION: This will authorize the financial institution indicated on the attached *blank voided check* to honor monthly withdrawals from the account on the check which are initiated through the Automated Clearing House (ACH) Network. The authorization to initiate these monthly withdrawals is hereby given for the purpose of making the monthly mortgage payment on the due date of the loan number indicated above. This authorization shall remain in force until the drawn on the bank receives written notification of cancellation from the mortgagor. I realize that I have additional options for stopping my automatic mortgage deduction. The notice of cancellation will be given at least thirty (30) days prior to its effective date and will automatically require that subsequent mortgage payments be made according to the terms of the note and mortgage or as instructed.

Authorized By: _____      _____   _____
                        **(PRINT NAME)**                                                                                        **(SIGN)**                                        **DATE**

Please fill out this form and return with a copy of a **BLANK VOID CHECK** to:

**MAIL:**        **Attn Financial Processing**
                    **New York Community Bank, 102 Duffy Ave 3rd Fl, Hicksville, NY 11801**

**FAX:**        **(516) 500-6761 OR**      **E MAIL:**      **FinancialProcessing@mynycb.com**

Updated 5/2015

Exhibit C – Intentionally Omitted

Exhibit D

### 227 Grand Street
**Senior & Mezz Pro Forma Closing Statement**

Sources of Funds:

| | |
|---|---:|
| Senior Loan Amount | 28,000,000.00 |
| Mezz Loan Amount | 3,000,000.00 |
| Equity | 5,750,000.00 |
| **Total Sources of Funds:** | **36,750,000.00** |

Uses of Funds:

| | |
|---|---:|
| Senior Debt Payoff | 16,275,000.00 |
| Mezz Debt Payoff | 7,325,000.00 |
| Partner Buyout | 11,415,000.00 |
| Senior/Mezz Loan - Closing Fees | 1,735,000.00 |
| **Total Uses of Funds:** | **36,750,000.00** |