Mark A. Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, 11th Floor
New York, New York 10022
Tel.: (212) 593-1100
Email: mfrankel@bfklaw.com

Mark S. Lichtenstein
Joshua D. Bernstein
Benjamin R. Joelson
AKERMAN LLP
520 Madison Avenue, 20th Floor
New York, New York 10022
Tel. (212) 880-3800
E-mail: Joshua.bernstein@akerman.com
E-mail: mark.lichtenstein@akerman.com
E-mail: Benjamin.joelson@akerman.com
*(Application to be filed to be retained
as special litigation counsel)*

*Attorneys for MY 2011 Grand LLC and
S&B Monsey LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MY 2011 Grand LLC, *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-23957 (RDD)<br>(Jointly Administered) |
| MY 2011 Grand LLC and S&B Monsey LLC,<br><br>Plaintiffs,<br><br>- against -<br><br>Yoel Goldman and All Year Holdings Limited,<br><br>Defendants. | Adv. Proc. No. _____ (RDD) |

## ADVERSARY PROCEEDING COMPLAINT

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification numbers are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).

55998636

Plaintiffs MY 2011 Grand LLC ("2011 Grand") and S&B Monsey LLC ("S&B Monsey") (collectively, the "Plaintiffs" or "Debtors"), by their undersigned counsel, file this Complaint against Yoel Goldman ("Goldman") and All Year Holdings Limited ("All Year", collectively "Defendants"), and allege as follows:

## NATURE OF THE PROCEEDING

1.      This is an action for declaratory judgment and to seek valuation of membership interests in connection with Plaintiffs' legitimate and valid "freezeout" merger relating to Grand Living II, LLC ("Grand Living" or the "Company").  As a result of Defendants' theft of company funds, misappropriation of substantial assets, wrongful trespass to the underlying real property and related chattels, and wrongful refusal to abide by New York State Court orders, and Defendants' most recent egregious act of blocking the Company's attempt to refinance for no valid reason, which put the Company into default, thereby raising the interest rate from 3.5% to 16% and increasing the annual interest payments by more than $2 million per year.  Plaintiffs – the majority in interest members of the Company – were left with no choice but to implement a freeze-out merger (the "Merger"), as is their right under New York law.  This proceeding seeks to confirm the validity of the Merger and place a value on Defendants' membership interests both of which determinations are critical to claims resolution process and ability to confirm a plan in the Plaintiffs' pending bankruptcy case.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

3.      This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a).

1

4.      This adversary proceeding is brought pursuant to 11 U.S.C. §§ 105, 1123 and 1129, and Rules 7001 of the Federal Rules of Bankruptcy Procedure.

5.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B), 157(b)(2)(L), and 157(b)(2)(O).

6.      Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

7.      Plaintiff 2011 Grand is a New York limited liability company with its principal place of business at 679 Driggs Avenue, Brooklyn, New York.

8.      Plaintiff S&B Monsey LLC is a New York limited liability company with its principal place of business at 160 Rutledge Street, Brooklyn, New York.

9.      On November 6, 2019, each Plaintiff commenced with this Court, a voluntary case under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code").

10.     Defendant Goldman is an individual who, upon information and belief, resides in Brooklyn, New York.

11.     Defendant All Year is a foreign entity formed under the laws of the British Virgin Islands, with at an address at c/o All Year Management NY Inc., 12 Spencer Street, Brooklyn, New York.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### The Company and the Property

12.     Grand Living II, LLC (previously defined as "Grand Living" or the "Company") was formed pursuant to an Operating Agreement, dated December 13, 2010. The Company's

2

members and managers subsequently entered into the Amended and Restated Limited Liability Company Agreement, dated August 3, 2012 (the "LLC Agreement").[2]

13.     The purposes of Grand Living "are to invest and to co-invest from time to time in real estate and other investments, and to acquire, hold, develop, manage and dispose of those investments, and to engage in any other lawful activity incident to the foregoing for which a limited liability company may be organized under the Act." Ex. A, § 4.1.

14.     Pursuant to this purpose, Grand Living is the sole member and managing member of Grand Living LLC, a wholly-owned subsidiary of Grand Living.  Grand Living LLC in turn owns the real property located at 225-227 Grand Street, Brooklyn, New York (the "Property"). The Property consists of a four story building with 41 residential units, as well as commercial and retail space.

**The Majority in Interest Members of the Company**

15.     Under the LLC Agreement, S&B Monsey and 2011 Grand constitute a "Majority in Interest" of the Company's members, as they are the "Members holding more than fifty percent (50%) of the Percentage Interests of the Company." Ex. A, § 1.  Together, S&B Monsey and 2011 Grand own 64.75% of the outstanding Membership Interests of the Company.

16.     Goldman, the principal of All Year, owns the remaining 35.25% of the Membership Interests of the Company.

**Removal of Defendants by the Majority in Interest**

17.     Due to numerous acts of wrongdoing by Defendants, the Majority in Interest members of the Company decided it was necessary to remove Goldman as Manager of the Company and All Year as Property manager of the Company.

---

[2] A true and correct copy of the LLC Agreement is annexed hereto as Exhibit A.

55998636

19-23957-rdd   Doc 78   Filed 01/11/21   Entered 01/11/21 20:45:33   Main Document
Pg 5 of 74

18.     Accordingly, by written consent dated September 19, 2016 (the "Consent"), members Toby Moskovits ("Moskovits"), S&B Monsey and 2011 Grand terminated All Year as the management company of the Property.

19.     Together, Moskovits, S&B Monsey and 2011 Grand represented 64.75% of the outstanding membership interests in the Company, satisfying the 50% threshold needed for a "Majority in Interest" under the LLC Agreement. Ex. A, § 1.

20.     The Consent, undertaken by the duly constituted Majority in Interest of the Company, revoked All Year's authorization to be present on and operate the Property, and critically revoked its authorization to collect funds from the operation of the Property, including rental income. Ex. B.[3]

21.     Furthermore, the Majority in Interest executed a First Amendment to the Amended and Restated Limited Liability Company Agreement of the Company, dated September 30, 2016 (the "Amended LLC Agreement").[4] Ex. C.

22.     The Amended LLC Agreement was consented to not only by the Majority in Interest, but also by Moshe Dov Schweid ("Schweid") in his capacity as Manager. Ex. C, p. 4.

23.     The Amended LLC Agreement, as executed by the Manager of the Company and the duly constituted Majority in Interest of the Company, removed Goldman as a named Manager of Grand Living. *Id.*

**Defendants Interfere With The Majority In Interest's Actions**

24.     Defendants, however, refused to abide by the decision of the Company's Majority in Interest and the Company's Manager, Schweid.

---

[3] A true and correct copy of the consent is annexed hereto as Exhibit B.
[4] A true and correct copy of the Amended LLC Agreement is annexed hereto as Exhibit C.

55998636

25.     Defendants brought suit in the New York State Court seeking to halt the management decisions taken by the Majority in Interest and Schweid as Manager, including Goldman's removal as Manager of the Company and the removal of All Year as manager of the Property.  Such efforts were rejected four times by the courts.

26.     Defendants also attempted to stymie efforts by the Company's Manager and Majority in Interest to transition the Property's operations.  Defendants actions hindered the effective and efficient operation and management of the Company, and threatened the economic viability of the Company.  As a result, the Company and Majority in Interest members, and Manager, were forced to file a lawsuit against Defendants on March 6, 2017 in the New York State Court.  The Company and Majority in Interest members successfully obtained injunctive relief, *inter alia*, enjoining and restraining Defendants from taking any further action with respect to the management and operation of the Company and/or the Property.

27.     Goldman's conduct detrimental to the Company did not end, however, with his removal as Manager and the commencement of litigation between the parties.  In fact, one of his acts most damaging to the Company occurred very recently, when he thwarted the Company's ability to obtain a one year extension on its mortgage loan, which would have allowed the company to obtaining refinancing.  The refusal of Goldman to sign the extension documents were the only cause of the Lender calling a default, as the loan was in good standing all along, and only Goldman's illogical refusal put the loan into default, which caused the rate to go up to 16% annually (which is more than $2 million annually in extra penalty cost as the rate increased by about 12.5% on the mortgage amount of about $16,300,000), and caused penalties to accrue in addition to the extremely high default rate of 16%.  Goldman's misconduct caused a devastating impact on the finances of the business and imperiled the property and has prevented the Company

5

from being able to refinance.  It appears that Goldman was secretly colluding with others to cause the Company to go into default on its mortgage, with the intention of then trying to buy the note from the lender or partnering with someone to do so.

28.      By way of background, Grand Living LLC is the borrower on a mortgage loan (the "Loan") on the Property with Santander Bank, N.A. (the "Lender").  The Loan had an original maturity date of January 1, 2020.  On or about December 26, 2019, the Lender agreed to extend the maturity date of the Loan to April 1, 2020. While many banks were not granting further extensions in the current economic climate, on or about February 26, 2020, the Lender offered to extend the maturity date of the Loan from April 1, 2020 to March 31, 2021, conditioned on receiving certain basic information.  As is relevant here, the Lender requested from Goldman (1) a simple letter "indicating that there are no adverse changes/info to [Goldman's] Multiple property schedule or Personal financial statements," (2) "something from Goldman related to the negative press around his [British Virgin Islands company]," (3) authorization to run Goldman's credit, and (4) a statement regarding certain Israel bonds and that they do not affect the Property.[5]

29.      The purpose of the one year extension of the Loan was to give the parties time to seek to resolve the ongoing litigations between them, which would allow the Company to obtain refinancing. The Company previously had difficulties refinancing due to the ongoing litigation between the parties.

30.      Between February 2020 and April 2020, Goldman continuously assured the Majority in Interest members that he would take all actions necessary for the extension to be granted.  The Majority in Interest members and Meridian Capital (the broker) continuously requested Goldman to provide the necessary (and basic) information and to sign the relevant

---

[5] A copy of the Lender letter is annexed hereto as Exhibit D.

55998636

documents, including requests in writing sent to Goldman, on March 5, 2020, March 25, 2020, March 30, 2020, April 14, 2020, April 17, 2020, April 23, 2020, April 24, 2020 and April 29, 2020.

31.     Goldman knew that his failures to provide the relevant documents and information put the Company at extreme risk.  Goldman, however, continuously failed and refused to provide the simple documents and information.  Goldman was fully aware that without his cooperation and action, the Loan could not be extended.

32.     As a result of Goldman's actions and the going-forward needs of the Company, the Majority In Interest members were left with no choice but to implement a freeze-out merger (previously defined as the "Merger"), as is their right pursuant to Sections 407 and 1002 of the New York Limited Liability Company Law ("LLCL").

33.     Conducting the Merger was the only way to save the Debtors, Company, their creditors and the Property from financial ruin, not only because of Goldman's most recent intentional misconduct with respect to the loan extension, but also based on his past misconduct in looting money and obstructing the operation of the business.

**Plaintiffs Conduct the Merger**

34.     On September 22, 2020, the Majority in Interest sent a Notice of Action in Lieu of Meeting, Notice of Merger, and Notice of Dissenters' Rights (the "Merger Notice"), which, among other things, informed Defendants that the Majority in Interest of the Company and the GL Merger Partner, LLC ("GL Merger") had adopted certain resolution by written consent, which approved the merger of the Company with and into GL Merger as described by the Agreement and Plan of Merger. [6] Ex. D.

---

[6] A true and correct copy of the Merger Notice is annexed hereto as Exhibit E.

35.     The Merger Notice also informed Defendants that their direct or indirect interests shall be cancelled automatically, will cease to exist and will be converted into the right to receive, in cash and without interest, an amount equal to Two Million Eight Hundred Sixty-Five Thousand Five Hundred Thirty-Eight Dollars ($2,865,538.00) in the aggregate. Ex. E.

36.     Simultaneously with the Merger Notice, Plaintiffs provided a Written Offer pursuant to LLCL § 1005(a) to pay Goldman $2,865,538.00, representing the fair value of the former membership interests in the Company held by Defendants.[7] Ex. F.

37.     On October 2, 2020, Defendants sent a written objection by a Notice of Dissent rejecting the offer by the Company to pay $2,865,538.

38.     Also, on October 2, 2020, despite the commencement of the bankruptcy cases, Defendants commenced an action in the Supreme Court of the State of New York, Kings County, against a number of non-debtors captioned as *Yoel Goldman and All Year Holdings Limited vs. Grand Living II, LLC, GL Merger Partner, LLC, Yechiel Michael Lichtenstein and Moshe Doc Schweid*, Index No. 518781/2020 (the "2020 Action"). Ex. G.[8]   Initiated by the filing of a Summons with Notice, the plaintiffs in the 2020 Action seek declaratory relief that the Merger lacked authorization and is null and void *ab initio* and damages of not less than $15 million. Defendants have not yet served a complaint in the 2020 Action.

39.     The Merger was effected for good faith business reasons and as part of Debtors' efforts to reorganize and emerge from bankruptcy.  As demonstrated above, conducting the Merger is the only way to save the Debtors, Company, their creditors and the Property from financial ruin, not only because of Goldman's most recent intentional misconduct with respect to the loan extension, but also based on his past misconduct in looting money and obstructing the operation

---

[7] A true and correct copy of the Written Offer is annexed hereto as Exhibit F.
[8] A true and correct copy of the Summons with Notice commencing the 2020 Action is annexed hereto as Exhibit G.

55998636

of the business.  The Merger is a valid business strategy that benefits all parties involved and allows the Debtors to emerge from bankruptcy.  The Debtors and its principals are acting appropriately in strict accordance with their fiduciary duties in attempting to maximize – and preserve – the value of the Debtors' property for the benefit of all creditors.

40.    Given that the Merger was valid and proper, Goldman's only right is to seek proper valuation or appraisal of his membership interests.

41.     The effectiveness of the Merger and the determination of the consideration to be paid to Goldman pursuant thereto are inextricably intertwined with the Plaintiffs' ability to refinance their mezzanine debt and the property owner to refinance its mortgage debt. Accordingly,  as the Court was advised during the December 7, 2012, 2020 hearing on Goldman's motion to invalidate the merger and for relief from the automatic stay, it is critical that the core matters underlying the merger, including the valuation of the merger consideration and the propriety of the merger generally, previously implicated in the 2020 Action and the merger process under the New York Business Corporation Law, be brought before this Court for determination, contemporaneous with the hearings on confirmation of a plan and objection to Goldman's filed bankruptcy claim.

### FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

42.    Plaintiffs restate and reallege the allegations in paragraphs 1 through 41 above, as if fully set forth herein.

43.    There is an actual, present controversy regarding the legal rights and duties of the parties.

55998636

44.     Specifically, there is an actual, present controversy regarding the validity and enforceability of the Merger. S&B Monsey and 2011 Grand represent 64.75% of the outstanding membership interests in the Company.

45.     S&B Monsey and 2011 Grand constitute a "Majority in Interest" of the Company under the LLC Agreement.

46.     Pursuant to LLCL Sections 407 and 1002, the Majority in Interest has the right to consent to a merger or consolidation.

47.     The Majority in Interest properly consented to and were authorized to consent to the Merger.

48.     Plaintiffs properly effectuated the merger in compliance with the LLCL.

49.     Pursuant to the Merger, Goldman and All Year's membership interests ceased to exist.

50.     The valid membership approval of the Merger forecloses Goldman from pursuing any legal or equitable remedies other than his appraisal rights.

51.     Goldman is not entitled to any monetary damages or other consideration in connection with the merger, other than what this Court determines as the merger consideration to which he is entitled.

## SECOND CLAIM FOR RELIEF
### (Valuation/Appraisal Pursuant to 11 U.S.C. §§ 105, 1123 and 1129)

52.     Plaintiffs restate and reallege the allegations in paragraphs 1 through 51 above, as if fully set forth herein.

53.     The disputes between Plaintiffs and Defendants, including the issues raised in the 2020 Action and the valuation issues related to the merger, are related and should be heard by the

10

Bankruptcy Court on a consolidated basis to facilitate the expedited resolution of all contested issues as part of the plan confirmation process.

54.     Accordingly, Plaintiffs have commenced this action to present to the Court for resolution the issue of the monetary amount Goldman is entitled to under the merger process.

55.     Having failed to come to an agreement on the price to be paid for Defendants' membership interests in the Company, this Court should determine Defendants' rights following the Merger and fix the fair value of the interests in the event Defendants are entitled to payment for them.

56.     Plaintiffs believe, and therefore state the fact to be, that the amount offered to Goldman for his membership interest in the Company represented and represents not less than the fair value of his holdings as of the close of business on the day prior to the Majority in Interest's consent, excluding any appreciation or depreciation directly or indirectly induced by the adoption of the Agreement and Plan of Merger or its proposal.

57.     More than 90 days have elapsed since the making of the aforesaid offer to Defendants, but Defendants have failed to accept the offer and Plaintiffs have been unable to reach agreement with them upon the price to be paid for their interests.

58.     Refusal by Goldman to accept the offer was arbitrary and vexatious and not in good faith.

## **RESERVATION OF RIGHTS**

59.     The Plaintiffs reserve the right to further amend this Complaint so as to include further information, to add additional defendants, and/or additional causes of action that may become known to the Plaintiffs at any time during this adversary proceeding, through formal discovery or otherwise, and for any such amendments to relate back to this Complaint.

55998636

**WHEREFORE,** Plaintiffs demand judgment as follows:

a.  on their First Claim for Relief, a declaration that the Merger was valid and authorized and that Defendants are not entitled to any monetary damages or other consideration other than appropriate merger consideration as determined by this Court;

b.  on their Second Claim for Relief, a declaration that the $2,865,538.00 is the fair value of the former membership interests in the Company held by Defendants;

c.  reimbursement of the costs and expenses of this adversary proceeding, including reasonable attorneys' fees; and

d.  for such other and further relief as is deemed just and proper.

**[SIGNATURE PAGE TO FOLLOW]**

55998636

Dated:  New York, New York
        January 11, 2021

                            BACKENROTH FRANKEL & KRINSKY, LLP


                    By:    */s/Mark A. Frankel*
                           Mark A. Frankel
                           800 Third Avenue, 11th Floor
                           New York, New York 10022
                           Tel.: (212) 593-1100
                           Email: mfrankel@bfklaw.com

                                   -and-

                           Mark S. Lichtenstein
                           Joshua D. Bernstein
                           Benjamin R. Joelson
                           AKERMAN LLP
                           520 Madison Avenue, 20th Floor
                           New York, New York 10022
                           Tel. (212) 880-3800
                           E-mail: *Joshua.bernstein@akerman.com*
                           E-mail: *mark.lichtenstein@akerman.com*
                           E-mail: *Benjamin.joelson@akerman.com*
                           *(Application to be filed to be retained*
                           *as special litigation counsel)*

                           *Attorneys for the Plaintiffs*

55998636

# EXHIBIT A

# COPY OF LLC AGREEMENT

THE INTERESTS OF THE MEMBERS ISSUED UNDER THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE OR THE DISTRICT OF COLUMBIA. NO RESALE OR TRANSFER OF AN INTEREST BY A MEMBER IS PERMITTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT AND ANY APPLICABLE FEDERAL OR STATE SECURITIES LAWS, AND ANY VIOLATION OF SUCH PROVISIONS COULD EXPOSE THE SELLING OR TRANSFERRING MEMBER AND THE COMPANY TO LIABILITY.

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF GRAND LIVING II, LLC

This Limited Liability Company Agreement is dated as of August 3, 2012, and is entered into by and among Yoel Goldman, Moshe Dov Schweid, S&B Monsey LLC, MV 2011 LLC, Toby Moskovits, (the Persons whose names appear on *Schedule A* as Members), and others, as amended from time to time, and who are bound by the provisions of this Agreement.

WHEREAS, the parties have entered into an initial Operating Agreement dated December 13 2010;

WHEREAS, per a loan agreement dated December 2, 2010, Moshe Dov Schweid had the right to convert a loan to Grand Living into 33% of Member Interest in the Company, which notice of such election was provided on August 2, 2012;

WHEREAS, per a loan agreement dated December 29, 2010, Toby Moskovits had the right to convert a loan into 5% of Member Interest in the Company, which notice of such election was provided on January 2, 2012;

Whereas, Yechial Michael Lichtenstein was a Member and Manager of the Company, but transferred his Member Interest per the agreement dated May 18, 2012 executed in connection with the May 18, 2012 refinance of the Grand Living loan with G4 Lenders and the payoff of Eastern Capital;

The parties hereto agree as follows:

1.    Definitions.   When used herein, the following terms have the meanings set forth below:

"Act" means the New York Limited Liability Company Law, as amended.

"Affiliate" means any Person, directly or indirectly, controlling, controlled by or under common control with such Person.

"Agreement" means this Limited Liability Company Agreement and all schedules thereto, as amended from time to time.

#25631335 v5.991866.98568

"Capital Account" means the account of each Member established and maintained on the books of the Company as provided in Section 7 hereof.

"Capital Contribution" in respect of a Member means the amount of consideration contributed by such Member, as such, from time to time to the capital of the Company.

"Certificate" means the certificate of formation of the Company that is executed and filed with the New York Department of State pursuant to the Act, as amended from time to time.

"Code" means the Internal Revenue Code of 1986, as amended (or any corresponding provisions of any succeeding law).

"Company" means the limited liability company formed pursuant to the Certificate.

"Company Return" means the U.S. Limited Liability Company Return of Income of the Company as filed with the United States Internal Revenue Service.

"Depreciation" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis. In the event that the federal income tax depreciation, amortization, or other cost recovery deduction is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method, except to the extent the Code Section 704(c) "remedial allocation" method has been elected with respect to the underlying Company property in which case Depreciation with respect to such property shall be calculated in a manner consistent with Treasury Regulations §1.704-3(d).

"Designated Party" means any Member, the Manager or Managers, and any officer, director, employee, partner, stockholder or member of the Company or any any Member or the Manager or Managers or any Affiliate thereof.

"Expenses" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses, however, shall not include amounts paid in settlement by a Person or the amount of judgments or fines against a Person.

"Fiscal Year" shall mean one calendar year or any portion of such period, but solely to the extent such shorter period is necessary to allocate Net Income, Net Loss, and other items of income, gain, loss, or deduction pursuant to Section 8 consistent with Code Sections 706 and 704(b).

"Gross Asset Value" means, with respect to any asset, the adjusted basis of such asset for federal income tax purposes, except as follows: (a) the initial Gross Asset Value of any asset contributed

FILED: KINGS COUNTY CLERK 03/06/2017 08:58 AM          INDEX NO. 504396/2017

NYSCEF DOC. NO. 8          19-23957-rdd     Doc 78     Filed 01/11/21     Entered 01/11/21 20:45:33     Main Document          RECEIVED NYSCEF: 03/06/2017

Pg 18 of 74

by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and a majority of the Managers, (b) the Gross Asset Values of Company assets shall be adjusted to reflect any revaluations made pursuant to Section 7.2, (c) the Gross Asset Value of any Company asset distributed to a Member shall be the gross fair market value of such asset on the date of distribution, (d) the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code should the Company make an election under Section 754 of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(m), and (e) if the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (d) above or Section 7.2 hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Losses.

"Indemnifiable Costs" means all costs, Expenses, damages, claims, liabilities, fines and judgments (including the reasonable cost of the defense, and any sums which may be paid with the consent of the Company in settlement), incurred in connection with or arising from a claim, action, suit, proceeding or investigation, by or before any court or administrative or legislative body or authority.

"Interest" means the right of a Member to any and all allocations and distributions to which such Member may be entitled as provided in this Agreement, together with the duties and obligations of such Member to comply with all provisions of this Agreement.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the regulations thereunder.

"Lichtenstein" means Yechial Michael Lichtenstein, the initial Manager of the Company.

"Majority in Interest" means Members holding more than fifty percent (50%) of the Percentage Interests of the Company.

"Manager" means Goldman and/or Schweid.

"Member" means any person admitted to the Company as a member.

"Net Cash Flow" means, for each Fiscal Year, the Company's Net Income (for this purpose any Net Losses shall be treated as negative Net Income), adjusted as follows:

(a)     Increased by the following:

(i)     Any receipts which are not included in the computation of Net Income (such as, loan proceeds and withdrawals from reserves, but excluding Capital Contributions).

(ii)     Any deductions not involving cash expenditures (such as depreciation, amortization and other cost recovery deductions).

(b)     Decreased by the following:

(i)     All expenditures which are not deducted in determining Net

3

Income (such as expenditures for capital improvements, asset acquisitions, and loan repayments).

        (ii)     Contributions to any reserve established for anticipated Company cash needs.

    "Net Income" and "Net Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(l) of the Code shall be included in taxable income or loss), with the following adjustments:

        (a)     Income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Losses shall be added to such taxable income or loss.

        (b)     Expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such expenditures pursuant to Treasury Regulations §1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Losses shall be subtracted from such taxable income or loss.

        (c)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (b), (c), or (d) of the definition of Gross Asset Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Net Income or Net Losses.

        (d)     Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

        (e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period.

        (e)     Net Income and Net Losses of the Company (including items thereof) that are allocated pursuant to Section 8.1.2 shall be excluded in computing Net Income or Net Losses.

    "Percentage Interest" means the Capital Contribution of a Member divided by the aggregate Capital Contributions of all Members multiplied by 100 and expressed as a percentage.

    "Person" means any natural person, limited liability company, partnership, limited partnership, corporation, trust or other entity.

    "Proceeding" shall include any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Company or otherwise

FILED: KINGS COUNTY CLERK 03/06/2017 08:58 AM
INDEX NO. 504396/2017
NYSCEF DOC. NO. 8
19-23957-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document
RECEIVED NYSCEF: 03/06/2017
Pg 20 of 74

and whether of a civil, criminal, administrative or investigative nature, in which a Person subject to Section 13.1 was, is or will be involved as a party or otherwise by reason of the fact that such Person is a Designated Party, by reason of any action taken by him or of any action on his part while acting as a Designated Party, or by reason of the fact that he is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, in each case whether or not serving in such capacity at the time any liability or expense is incurred for which indemnification, reimbursement, or advancement of Expenses can be provided under this Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Target Account" means, with respect to any Member for any Fiscal Year or period, an amount equal to the hypothetical distribution such Member would receive if all assets of the Company, including cash, were sold for cash equal to their Gross Asset Value (taking into account any adjustments to Gross Asset Value for such Fiscal Year or period), all liabilities allocable to such assets were then due and were satisfied according to their terms, all minimum gain chargebacks required by this Agreement were made, and all obligations of Members to contribute additional capital to the Company were satisfied, and all remaining proceeds from such sale were distributed pursuant to Section 8.2.2 (except that amounts deemed constructively distributed pursuant to the computation of prior Target Account balances shall not be treated as having been actually distributed for the computation of such given Target Account balance).

"Treasury Regulations" means the regulations promulgated under the Code, as such regulations may be amended from time to time (including temporary regulations and corresponding provisions of succeeding regulations).

"Unreturned Capital Contributions" means, with respect to each Member, such Member's aggregate Capital Contributions reduced by the aggregate distributions to such Member pursuant to (i) Section 8.2.2 and (ii) pursuant to Section 8.2.1 that are deemed to be made pursuant to Section 8.2.2.

2.    Organization.

2.1.    Formation. The Members hereby form the Company pursuant to the Act.

2.2.    Name. The name of the Company is Grand Living II, LLC.

2.3.    Certificate. The Manager has caused the Certificate meeting the requirements of the Act to be filed in the office of the New York Department of State and shall amend it from time to time as required by the Act.

2.4.    Registered Office and Agent. The registered office of the Company in the State of New York is located at 80 State Street, Albany, New York 12207. The name of the registered agent of the Company for service of process on the Company in the State of New York is Corporation Service Company, Inc., or such other office or agent as the Manager from time to time so determines.

3.    Principal Office. The principal office of the Company shall be located at 277 Classon Avenue, Brooklyn, New York 11205, or at such other place as the Manager from time to time may determine.

5

4.    Purpose and Powers.

4.1.    Purpose. The purposes of the Company are to invest and to co-invest from time to time in real estate and other investments, and to acquire, hold, develop, manage and dispose of those investments, and to engage in any other lawful activity incident to the foregoing for which a limited liability company may be organized under the Act.

4.2.    Powers. The Company, and the Manager on behalf of the Company, (a) shall have and exercise all powers necessary, advisable, convenient or incidental to accomplish its purposes as set forth in Section 4.1 and (b) shall have and exercise all the rights and powers of a limited liability company under the Act.

5.    Term.   The term during which the Company shall exist shall commence on the date the Certificate is filed in the office of the New York Department of State and shall continue until dissolved as provided in Section 11.

6.    Members, Capital Contributions and Status.

6.1.    Members; Voting.   The Members of the Company shall be set forth on *Schedule A* attached to this Agreement, as that schedule is amended from time to time. When a Member is required or entitled to vote on or consent to a matter, each Member will vote in proportion to its Percentage Interest, except as otherwise provided herein. Any action permitted to be taken by the Members at a meeting may be taken at any time, without notice or other requirement of any kind, upon the written consent of such Members holding at least the requisite interest that would be necessary to authorize or take that action at a meeting.

6.2.    Capital Contributions.   The initial Capital Contribution of each of the Members shall be set forth on *Schedule A*, which shall also show the Member's initial Percentage Interest, as adjusted from time to time.

6.3.    Capital Contributions of the Members.   Each Member will contribute in cash or other consideration to the capital of the Company its initial Capital Contribution set forth on *Schedule A* as of the date hereof, and shall not be a Member until such Capital Contribution is made.

6.4.    Admission of Additional Members.   Subject to the prior written approval of the Manager, additional Members may be added from time to time and a Member may increase its Capital Contribution. An additional Member or a Member increasing its Capital Contribution shall make a Capital Contribution to the Company at the time of admission equal to its Capital Contribution, unless the Manager otherwise determines. The terms upon which a Member may increase its Capital Contribution or a new Member is admitted shall be determined by the Manager in his sole discretion. Unless otherwise determined, the expenses of the Company that are allocated to the Members on or after the effective date of such admission shall be allocated first to such new Members to the extent necessary to cause such Persons to be treated with respect to such items as if they had been Members from the commencement of the Company.

6.5.    Repayment of Capital Contributions of Members.   Unless otherwise agreed upon by the Manager, no Member shall withdraw any of its capital except upon the dissolution or liquidation of the Company to the extent provided in this Agreement. Under circumstances requiring a

6

return of any Capital Contribution, no Member shall have the right to receive property other than cash except as may be specifically provided herein. The Manager(s) shall have no liability whatsoever for the return of the Capital Contributions of any Member, and such return shall be made solely from available Company assets, if any, and each Member hereby waives any and all claims it may have against each Manager with respect thereto.

6.6.   Limited Liability of Members. Notwithstanding anything to the contrary in this Agreement, the liability of each Member, as a Member, for losses and expenses of the Company or for obligations or liabilities of the Company of any kind or nature shall in no event exceed in the aggregate the Capital Contribution of such Member, except as otherwise provided in the Act.

6.7.   Manager Managed; No Interest No Resignation. The management of the Company shall be vested solely in the Manager. No interest shall be payable to the Members with respect to any Capital Contributions made to the Company, unless otherwise determined by the Manager. No Member may resign from the Company.

7.   Capital Accounts.

7.1.   Maintenance of Capital Accounts. The Company shall maintain a Capital Account for each Member in accordance with Treasury Regulations issued under Section 704(b) of the Code.

7.1.1.   To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocable share of Net Income and the amount of any Company liabilities assumed by such Member or which are secured by any property of the Company distributed to such Member (but only to the extent such liabilities are to be credited pursuant to such Treasury Regulations).

7.1.2.   To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property of the Company distributed to such Member pursuant to any provision of this Agreement, such Member's allocable share of Net Losses and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company (but only to the extent such liabilities are to be debited pursuant to such Treasury Regulations).

7.1.3.   In the event any Interest of a Member in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

7.2.   Revaluation of Property. The Capital Accounts of the Members shall be adjusted to reflect a revaluation of the property of the Company (including intangible assets such as goodwill) to its fair market value in accordance with Treasury Regulations §1.704-1(b)(2)(iv)(f), at the following times: (i) in connection with the acquisition of an Interest in the Company by a new or existing Member for more than a de minimis capital contribution; (ii) in connection with a distribution of money or other property (other than a de minimis amount) by the Company to a retiring or continuing Member as consideration for an Interest in the Company; or (iii) in connection with the liquidation of the Company. In the event of any revaluation of the property of the Company hereunder, the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations §1.704-

7

1(b)(2)(iv)(f) and (g).

       7.3.   Compliance with Treasury Regulations. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations §1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event that the Manager shall determine that it is prudent to modify the manner in which Capital Accounts or any debits or credits thereto are computed in order to comply with such Treasury Regulations, the Manager may make such modifications; provided that such modifications are not likely to have a material adverse effect on the amounts distributable to the Members upon the dissolution of the Company.

       8.    Allocations and Distributions.

       8.1.   Allocations.

       8.1.1.   Allocation of Net Income and Net Losses. Net Income and Net Losses for any Fiscal Year shall be allocated to the Members during such Fiscal Year in a manner that will, as nearly as possible, cause the Capital Account balance of each Member at the end of such Fiscal Year to equal such Member's Target Account.

       8.1.2.   Compliance with Treasury Regulations. The allocations set forth in Section 8.1.1 are intended to allocate Net Income and Net Losses to the Members in compliance with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder. If the Manager reasonably determines that the allocation of Net Income and Net Losses for any period pursuant to the provisions of Section 8.1.1 does not satisfy the "substantial economic effect safe harbor" of Section 704(b) of the Code or the Treasury Regulations promulgated thereunder (including the minimum gain and Member minimum gain chargeback requirements of Treasury Regulations §1.704-2 and the qualified income offset requirement of Treasury Regulations §1.704-1(b)(2)(ii)(d)), then notwithstanding anything to the contrary contained in this Agreement, items otherwise included in the computation of Net Income and Net Losses shall be specially allocated in such manner as the Manager shall reasonably determine to be required by Section 704(b) of the Code and the Treasury Regulations promulgated thereunder; provided, however, that, if the Manager exercises his authority to make such allocations, then, notwithstanding the other provisions of this Section 8.1, but subject to Section 704(b) of the Code and the Treasury Regulations promulgated thereunder, the Manager shall reallocate Net Income and Net Losses among the Members so as to cause the Members' respective separate Capital Accounts to have the balances (or as close thereto as possible) that they would have if Net Income and Net Losses were allocated without reference to the allocations permitted by this Section 8.1.2.

       8.1.3.   Tax Allocations: Code Section 704(c). For each Fiscal Year, items of taxable income, deduction, gain, loss or credit shall be allocated for income tax purposes among the Members in the same manner as their corresponding book items were allocated pursuant to Section 8.1.1 hereof for such Fiscal Year, as modified by the following principles: (a) in accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value, (b) in the event the Gross Asset Value of any Company asset is adjusted pursuant to clause (b) or (d) of the definition of

Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder, (c) any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement and (d) allocations pursuant to this Section 8.1.3 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, other items, or distributions pursuant to any other provision of this Agreement.

8.2.  Distributions.

8.2.1.  Tax Distributions.  The Manager may cause the Company to distribute to each Member annually in cash no later than ninety (90) days after the close of each Fiscal Year up to an amount, determined by the Manager, equal to the product of (a) such Member's share of the taxable income of the Company allocated to such Member for such Fiscal Year and (b) the Presumed Tax Rate. For purposes of this Section 8.2.1, a Member's Presumed Tax Rate shall be determined by the Manager based upon an estimate of the highest marginal Federal income tax rates for corporations or individuals, whichever is higher, applicable to ordinary income and capital gain income, plus the highest marginal New York income tax rates for corporations or individuals, whichever is higher, applicable to ordinary income and capital gain income. The Manager may elect in his sole discretion to apply a uniform "Presumed Tax Rate" for each Member, such uniform rate not to exceed 45%. The amount, if any, distributable pursuant to this Section 8.2.1 shall be reduced by all other distributions of Net Cash Flow made in such Fiscal Year (other than distributions made to fund tax liabilities pursuant to this Section 8.2.1). Any distributions made pursuant to this Section 8.2.1 shall be treated for purposes of this Agreement as an advance of and reduce the amounts otherwise distributable to the Members pursuant to Section 8.2.2.

8.2.2.  Net Cash Flow.  Net Cash Flow, if any, remaining after distributions under Section 8.2.1 shall be distributed to the Members, in such amounts and at such times as the Manager may determine, but in any event within thirty (30) days of receipt by the Company of the cash constituting such Net Cash Flow as would be available to be distributed under this Section 8.2.2, in the following order and priority:

(a)  First, one hundred percent (100%) to the Members in proportion to and to the extent of their Unreturned Capital Contributions.

(b)  Second, to the Members in proportion to their Percentage Interests until all remaining Net Cash Flow has been distributed to the Members.

9.  Management and Restrictions.

9.1.  Management.  Except as otherwise specifically provided in this Agreement or the Act, the Company and its business shall be managed, controlled and operated by the Manager, who shall be a "manager" of the Company within the meaning of Section 102(n) of the Act. A Manager need not be a Member. Any contract agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Manager shall be deemed to have been duly

9

executed. Upon the resignation, death or disability of the Manager, a replacement Manager shall be appointed by the affirmative vote of a Majority in Interest, unless the current manager has previously appointed a Manager to resume his rights. Whenever this Agreement provides that a determination shall be made or an action shall be taken by the Company or the Manager, such determination or act may be made or taken by the Manager in his sole discretion, whether or not such sole discretion is specified herein.

9.2. Expenses. (a) Except as otherwise provided in this Section, no Member shall be reimbursed for expenses incurred on behalf of, or otherwise in connection with, the Company. The Manager shall be reimbursed by the Company for reasonable out-of-pocket expenses, including but not limited to administrative expenses, management related expenses, legal expenses, accounting, expenses, general overhead expenses and any expense incurred by the Manager on behalf of the Company.

(b) The Company shall be responsible for and shall bear the fees, costs and expenses of or incidental to the formation and organization of the Company. The Company shall be responsible for and shall bear all (i) expenses incurred in connection with the preparation of the Company's financial statements (it being understood and agreed that the Company shall not be required to provide audited financial statements to the Members), tax returns, K-1's and other reports and communications with Members; (ii) taxes and other governmental charges levied against the Company; (iii) expenses incurred in connection with the dissolution, winding up or liquidation of the Company; and (iv) any other reasonable fees, expenses and charges contemplated by this Agreement.

10. Interests Acquired for Investment; Transfers of Interests in Company.

10.1. Representations of Members. Each Member hereby represents and warrants to the Company for itself and only for itself that: (i) its acquisition of its Interest is made as principal for its own account for investment purposes only and not with a view to the resale or distribution of such Interest; (ii) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment in the Company; (iii) it is able to bear the economic risk of losing its entire investment in the Company; (iv) it acknowledges that all material documents, records and books pertaining to its investment in the Company have, on request, been made available to it, and it has been able to ask such questions and obtain such information as it determined was necessary to make an informed investment in the Company; (v) it acknowledges the extremely risky nature of the Company's proposed investments and acknowledges that the Company will not exercise control over such investments; (vi) it has consulted its own tax advisors concerning the proposed investment in the Company; (vii) in making its investment, it is not relying upon information from or the judgment of any other Member or any Manager, but is relying upon its own analysis of the investment and its risks; (viii) it is an "Accredited Investor" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act; and (ix) all of the members, stockholders or other holders of equity interests therein as of the date of this Agreement are United States Persons.

10.2. Transfer of Interests. No Member may transfer, sell, pledge, hypothecate, create a security interest in or lien upon, encumber, gift, give, place in trust, assign or otherwise dispose of any Interest in any manner whatsoever without the prior written approval of the Manager. Any transfer of any Interest in violation of this article shall be null and void and of no effect for any purpose.

10.3.  Right of First Refusal.  In the event a Member desires to transfer its Interest (a Member may only transfer all, not a portion, of its Interest), such Member shall deliver written notice of a *bona fide* offer (which notice shall specify in reasonable detail the material terms of the offer to purchase such Interest) to the Manager.  The Manager shall have a right of first refusal to purchase the Interest proposed to be transferred on the same terms as set forth in the *bona fide* written offer, which right may be exercised by the Manager for a period of forty five (45) days from the date the Member proposing such transfer delivers written notice to the Manager.  If the Manager does not exercise his right of first refusal, the other Members have right of first refusal to purchase all (but not less than all) of the Interest on the same terms as set forth in the *bona fide* written offer, which right may be exercised by the Members for a period of twenty (20) days from the date the Manager's purchase option expires.  If more than one Member exercises its purchase rights, all exercising Members shall participate according to their proportional Interest (calculated among all participating Members) prior to the proposed sale.  If the other Members do not exercise their purchase rights within the time period provided herein with respect to all of the Offered Membership Interests, the Selling Member shall be free for a period of 30 days thereafter to sell his Interest to the proposed purchaser identified in the *bona fide* offer, provided that the following conditions are satisfied:

(i)      the purchaser agrees to be bound by all the terms of this Agreement; and

(ii)     the Member approves of the sale or transfer in writing.

Upon expiration of the 30-day period, the Member desiring to transfer its Interest must re-offer the Interest to the Manager, and then the Members, in accordance with the requirements of this subsection 10.3.

10.4.  Permitted Transfers.  Notwithstanding any provision of this Agreement, a Member may transfer his Interest, either during his lifetime or upon his disability or death, to any entity formed and controlled by such Member or such Member's family, their spouses and/or their children and/or their grandchildren, other than a minor or incompetent, or trust or custodial account for the sole benefit of one or more of the foregoing without offering such Interest to the Manager or other Members, provided that the person to whom the Interest is transferred agrees in writing to be bound by the terms and provisions of this Agreement.  Any person or entity to whom an Interest is transferred as permitted by the provisions of this Section 10.4 shall be deemed to be a "Member" for purposes of this Agreement.

10.5.  Manager Transfers.  The Manager may sell or transfer an Interest to additional investors with no limitations, provided that the Manager provides written notice to any other Member(s) five (5) days in advance of such sale or transfer.

11.  Termination of Company.  The Company shall be dissolved upon the Manager's election to dissolve the Company.  Each Member agrees that he shall not (i) dissolve or cause the dissolution of the Company, whether by court action or otherwise, except under the circumstances specified in this Agreement, or (ii) cause a partition of any of the Company's property, whether by court action or otherwise, it being agreed that any such action would cause a substantial hardship to the Company and would be in breach and contravention of this Agreement.  Upon a dissolution of the Company, the Manager or, in the absence of the Manager, a committee (the "Liquidation Committee") chosen by a Majority in Interest shall take full account of the Company's assets and liabilities, and shall determine which assets shall be distributed in kind and which assets shall be liquidated, which

11

liquidation shall be carried out as promptly as is consistent with obtaining the fair value thereof. In connection with such determination, the value of those securities which are not to be liquidated but are to be distributed in-kind shall be determined by the Manager or the Liquidation Committee, as applicable. Assets of the Company or the proceeds therefrom, if the Manager or Liquidation Committee, as applicable, elects to liquidate the same, to the extent sufficient therefor, shall be applied and distributed in the following order: (i) to the discharge of all the Company's debts and liabilities to creditors, including Members who are creditors, to the extent otherwise permitted by law whether by payment or the making of reasonable provision for payment thereof); and (ii) the balance of such assets or proceeds shall be distributed among the Members in accordance with Section 8.2.2.

      12.    <u>Amendment</u>. Except as otherwise specifically set forth in this Agreement, this Agreement may be amended, modified, discharged or terminated in whole or in part only by the written consent of the Manager and a Majority in Interest of the Members, except any provision of this Agreement requiring a determination or decision by a greater percentage of Percentage Interests shall require not less than that greater percentage of Percentage Interests to amend, modify, discharge or terminate that provision. Notwithstanding the foregoing, the Manager may unilaterally amend this Agreement, without the consent of any other Person, as he may determine necessary in his sole discretion in order to resolve ambiguities, supply missing terms, correct typographical errors, or properly reflect the number and identity of Members and their Interests.

      13.    <u>Miscellaneous</u>.

      13.1.    <u>Indemnification</u>. The Company will indemnify and hold harmless any Designated Party, from any and all Indemnifiable Costs which may be incurred by or asserted against such Person, by reason of any action taken or omitted to be taken on behalf of the Company and in furtherance of its interests. No Person will be entitled to claim any indemnity or reimbursement under this Section 13.1 with respect to any Indemnifiable Cost that may be incurred by such Person which results from: (a) the failure of the Person to act in accordance with the provisions of this Agreement; or (b) any decision made or action taken or omitted to be taken by such Person (i) in bad faith and in a manner that such Person should reasonably have known to be opposed to the best interests of the Company, or with respect to any criminal Proceeding, had reasonable cause to believe such Person's conduct was unlawful, or (ii) resulting from fraud or gross negligence by the Person. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, preclude a determination that such Person acted in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal Proceeding, had no reasonable cause to believe its conduct was unlawful. To the extent that a Person claiming indemnification under this Section 13.1 has been successful on the merits in defense of any Proceeding referred to in Section 13.1 or in defense of any claim, issue or matter in any such Proceeding, such Person must be indemnified with respect to such matter as provided in such Section 13.1. A determination that a Person to be indemnified under this Section 13.1 has met the applicable standard stated in the second sentence of this Section 13.1 may be made by either the Manager or in accordance with a written opinion by independent legal counsel selected by the Manager. In making any determination with respect to indemnification, the Manager or, if the Manager so decides, either a committee of the Company whose members are not affiliated with any Manager or independent legal counsel, as the case may be, is authorized to make the determination on the basis of its evaluation of the records of the Company or any management company to the Company and of the statements of the party seeking indemnification with respect to the matter in question and is not required to perform

<div align="center">12</div>

any independent investigation in connection with any determination. However, any party making any such determination is authorized, in its sole discretion, to take such other actions (including engaging counsel) as it deems advisable in making the determination. The rights provided by this Section 13.1 will inure to the benefit of the heirs, executors, administrators, successors, and assigns of each Person eligible for indemnification under this Agreement.

13.2.  Notices.  Except as otherwise specified herein, any notice, payment, demand or other communication required or permitted to be given by any provision of this Agreement shall be deemed to have been delivered and given for all purposes (i) if delivered personally to the party or to an officer or agent of the party to whom the same is directed, or (ii) if delivered by telecopy or facsimile to the party with acknowledgment of good transmission, or (iii) whether or not the same is actually received, if sent by overnight carrier or mail, postage and charges prepaid addressed as follows: if to the Company, Grand Living II, LLC, c/o Yoel Goldman, 277 Classon Avenue, Brooklyn, New York, 11205, or to such other address or telecopier number as the Company may from time to time specify by written notice to the Members; if to a Member, at such Member's address or telecopier number set forth on *Schedule A* hereto, or to such other address or telecopier number as such Member may from time to time specify by written notice to the Company; shall be deemed to be effective as of the date so delivered if delivered personally (which shall include delivery by overnight carrier or by telecopy or facsimile), or as of the third business day after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

13.3.  Section Headings; Severability; Counterparts.  Section and other headings contained in the Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provisions hereof. Each provision of the Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reasons whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Agreement. This Agreement may be executed by facsimile or email scan and in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one Agreement.

13.4.  Governing Law.  New York law shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties, without giving effect to its principles of conflict of law.

13.5.  Binding Effect; Entire Agreement.  Subject to the provisions contained in Section 10 hereof, each and every covenant, term, provision and agreement herein contained shall be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto. This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and there are no agreements, understandings, restrictions, representations or warranties among the parties other than those set forth or provided for in this Agreement.

IN WITNESS WHEREOF, this Limited Liability Company Agreement has been executed as of the date first set forth above.

MANAGER:

YOEL GOLDMAN

_____

MANAGER:

MOSHE DOV SCHWEID

_____

MEMBER:

TOBY MOSKOVITS

_____

MEMBER:

S & B MONSEY LLC

_____

MEMBER:

MY 2011 LLC

_____

14

19-23957-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document
Pg 30 of 74

*Schedule A*

GRAND LIVING II, LLC
INITIAL CAPITAL CONTRIBUTIONS AND PERCENTAGE INTEREST
As of December [___], 2010

| Member Name | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| S&B Monsey LLC C/O Moshe Dov Schweid 160 Rutledge Street Brooklyn, New York 11211 Telephone: 718-938-0703 | $2,280,000 | 33% |
| Joel Goldman 199 Lee Avenue, Brooklyn, NY Telephone: Email: yoel@allyearmgt.com | $2,500,000 | 35.25% |
| Toby Moskovits 137-55 71st Avenue Flushing NY Email: Toby@heritage-equity.com | $250,000 | 5% |
| MY 2011 LLC C/O Moshe Dov Schweid and Toby Moskovits 160 Rutledge Street Brooklyn NY 11211 | 100% of 225-227 Grand Living including the property and all improvements | 26.75% |
| | Total | 100% |
| | | |

# EXHIBIT B

# COPY OF CONSENT

CONSENT OF THE MEMBERS
OF
GRAND LIVING II, LLC

The undersigned, being members holding the requisite majority membership interest of Grand Living II, LLC, a New York limited liability company ( the "Company"), do hereby consent on this 19th day of September 2016 to the adoption of the recitals and resolutions set forth below pursuant to Section 402 and 407 of the New York Limited Liability Company Law and Section 6.1 of the Company's Amended and Restated Limited Liability Company Agreement dated August 3, 2012 (the "Operating Agreement") (all undefined capitalized terms used herein have the meanings assigned to them in the Operating Agreement):

WHEREAS, the Company is the sole member and managing member of Grand Living LLC;

WHEREAS, Grand Living LLC has retained All Year Management LLC to operate and manage the property located at 225-227 Grand Street, Brooklyn, New York (the "Property") pursuant to that certain Property Management Agreement, effective as of November 20, 2011 (the "Property Management Agreement"), between Grand Living LLC and All Year Management LLC, a copy of which has been made available to the Members; and

WHEREAS, the Company and Grand Living LLC wish to terminate the Property Management Agreement and the services provided by All Year Management LLC in connection with the Property Management Agreement by sending a notice of termination (the "Termination Notice") to All Year Management LLC pursuant to Section 1.2 of the Property Management Agreement, and to engage a new management company to provide for the operation and management of the Property.

NOW, THEREFORE, IT IS RESOLVED, that the termination of the services rendered by All Year Management LLC and the termination of the Property Management Agreement pursuant to Section 1.2 of such agreement, be, and hereby is, authorized and approved by the Company; and be it further

RESOLVED, that the Termination Notice made available to the Members be, and hereby is, authorized and approved by the Company; and be it further

RESOLVED, that the engagement of Northside Management NY LLC in place of All Year Management LLC and the entering into a Property Management Agreement with Northside Management NY LLC be, and hereby is, authorized and approved; and be it further

RESOLVED, that Moshe Dov Schweid in his capacity as Manager of the Company, be, and hereby is, authorized and directed to execute and deliver the Termination Notice and the Property Management Agreement on behalf of the Company in its capacity as managing member of Grand Living LLC, with such changes in the Property Management Agreement as are deemed necessary or advisable by him, his execution and delivery thereof to be conclusive evidence of such approval; and be it further

FILED: KINGS COUNTY CLERK 03/06/2017 08:58 AM
INDEX NO. 504396/2017

NYSCEF DOC. NO. 9
19-23957-rdd   Doc 78   Filed 01/11/21   Entered 01/11/21 20:45:33   Main Document
RECEIVED NYSCEF: 03/06/2017
Pg 33 of 74

RESOLVED, that Moshe Dov Schweid in his capacity as Manager is hereby authorized and empowered to make, execute and deliver, or to accept delivery of, or to cause to be made, executed and delivered, in each case acting singly, with full power of substitution, all such additional or ancillary, leases, certificates, agreements, documents, instruments and other papers, and to do or cause to be done all such acts or things, as such party may deem necessary, appropriate or desirable to effectuate and carry out the purposes and intent of the foregoing resolutions; and be it further

RESOLVED, that any act or acts of or on behalf of the Company and of any person or persons designated and authorized to act by the Company, which acts would have been authorized by the foregoing resolutions except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Company.

[The balance of this page is intentionally left blank; signature page follows.]

FILED: KINGS COUNTY CLERK 03/06/2017 08:58 AM
NYSCEF DOC. NO. 9
INDEX NO. 504396/2017
RECEIVED NYSCEF: 03/06/2017
19-23957-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document
Pg 34 of 74

In witness whereof, the undersigned have executed this Consent of the Members as of September 19, 2016.

_____
Toby Moskovits

S&B MONSEY LLC

By: _____
Name:  Moshe Dov Schweid
Title:

MY 2011 GRAND LLC

By: _____
Name:  Michael Lichtenstein
Title:  Manager

# EXHIBIT C

# COPY OF AMENDED
# LLC AGREEMENT

19-23921-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document

## FIRST AMENDMENT TO THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF GRAND LIVNG II, LLC

This First Amendment to the Amended and Restated Limited Liability Company Agreement (this "Amendment") of Grand Living II, LLC, a New York limited liability company (the "Company"), dated as of September 30, 2016, is among the individuals and entities signatories hereto.

**WHEREAS**, the manager and members of the Company signing this Amendment desire to amend that certain Amended and Restated Limited Liability Company Agreement ("Operating Agreement") of the Company dated as of August 3, 2012 (all undefined terms used in this Amendment have the meanings assigned to them in the Operating Agreement) in accordance with Section 12 of the Operating Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto, consisting of the Manager and the requisite Members holding a Majority in Interest, intending to be legally bound, hereby agree to amend the Operating Agreement as follows:

1. Section 1 of the Operating Agreement is hereby amended by deleting the definition of Manager in its entirety and replacing it with the following definition:

   "Manager" means Schweid and Lichtenstein, each a "Manager" and collectively the "Managers."

2. Section 3 of the Operating Agreement is hereby amended by changing the principal office address of the Company to 679 Driggs Street, Brooklyn, New York 11211.

3. Section 6.4 of the Operating Agreement is hereby amended by deleting the last sentence thereof in its entirety.

4. Section 9.1 of the Operating Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

   9.1 Management. Except as otherwise specifically provided in this Agreement or the Act, the Company and its business shall be managed, controlled and operated by the unanimous decision of the Managers, who shall each be a "manager" of the Company within the meaning of Section 102(p) of the Act. A Manager need not be a Member. Any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Manager shall be deemed to have been duly executed; provided that such contract, agreement, deed, lease note or other document or instrument has been executed by such Manager with the unanimous consent and approval of all of Managers. Upon the resignation, death or disability of a Manager, a replacement Manager shall be appointed by the

affirmative vote of a Majority in Interest, unless such Manager has previously appointed a Manager to assume his rights and responsibilities. Whenever this Agreement provides that a determination shall be made or an action shall be taken by the Company or the Manager, such determination or act shall be made or taken by the unanimous decision of the Managers, and whenever this Agreement provides that an action shall be taken by a Manager or any Manager, such action or determination shall be taken with the unanimous consent of all of the Managers.

5. Section 10.3 is hereby amended by inserting the following at the end of the second sentence therein:  ", with each of the Managers participating according to their Interests in proportion to each other or as otherwise agreed between them."

6. Section 12 of the Operating Agreement is hereby amended by replacing "he" and "his" with "the Manager" and "the Manager's", respectively.

7. Section 13.2 of the Operating Agreement shall be amended by deleting the Company address in its entirety and inserting the following in its place:

> If to the Company,
> Grand Living II, LLC
> c/o Moshe Dov Schweid
> 160 Rutledge Street
> Brooklyn, NY 11211
>
> With a copy to:
> Michael Lichtenstein
> Manager, Grand Living II, LLC
> 929 East 5th Street
> Brooklyn, NY 11230

8. Schedule A of the Operating Agreement is hereby amended by deleting the existing Schedule A in its entirety and inserting the Schedule A attached to this Amendment in its place.

Other than as provided in this Amendment, all terms and conditions set forth in the Operating Agreement remain in full force and effect. The Operating Agreement as modified, amended and supplemented by this Amendment, embodies the entire agreement and understanding of the parties with respect to the subject matter and supersedes all prior agreements and understandings between them.  All future references to the Operating Agreement shall be to the Operating Agreement as amended, supplemented and modified by this Amendment.  The governing law and dispute resolution provisions of the Operating Agreement govern this Amendment.

This Amendment may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute

FILED: KINGS COUNTY CLERK 03/06/2017 08:58 AM
INDEX NO. 504396/2017
NYSCEF DOC. NO. 10
19-23957-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document
RECEIVED NYSCEF: 03/06/2017
Pg 38 of 74

but one and the same agreement. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

**SIGNATURE PAGE TO FOLLOW**

FILED: KINGS COUNTY CLERK 03/06/2017 08:58 AM
NYSCEF DOC. NO. 10
INDEX NO. 504396/2017
RECEIVED NYSCEF: 03/06/2017
19-23957-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document
Pg 39 of 74

IN WITNESS WHEREOF, the Manager and the requisite Members holding a Majority in Interest have executed this Amendment to the Amended and Restated Operating Agreement of Grand Living II, LLC and by signing this Amendment below conclusively evidence their consent and agreement to the terms and conditions of this Amendment.

**MANAGER**

Moshe Dov Schweid, Manager

**MEMBERS**:

**Toby Moskovits**

**S&B MONSEY LLC**

By:
Name:  Moshe Dov Schweid
Title:

**MY 2011 GRAND LLC**

By:
Name:  Michael Lichtenstein
Title:  Manager

FILED: KINGS COUNTY CLERK 03/06/2017 08:58 AM
NYSCEF DOC. NO. 10
INDEX NO. 504396/2017
RECEIVED NYSCEF: 03/06/2017

19-23957-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document
Pg 40 of 74

*Schedule A*

## GRAND LIVING II, LLC
### INITIAL CAPITAL CONTRIBUTIONS AND PERCENTAGE INTEREST
### As of September __, 2016

| Member Name | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| S&B Monsey LLC<br>C/O Moshe Dov Schweid<br>160 Rutledge Street<br>Brooklyn, New York 11211<br>Telephone:  718-938-0703 | $2,280,000 | 33% |
| Yoel Goldman<br>199 Lee Avenue<br>Brooklyn, NY<br>Telephone:<br>Email: yoel@allyearmgt.com | $2,500,000 | 35.25% |
| Toby Moskovits<br>137-55 71st Avenue<br>Flushing NY<br>Email: Toby@heritage-equity.com | $250,000 | 5% |
| MY 2011 GRAND LLC<br>c/o Yechial Michael Lichtenstein<br>929 East 5th Street<br>Brooklyn, NY 11230 | 100% of 225-227 Grand Living including the property and all improvements | 26.75% |
|  | Total | 100% |
|  |  |  |

# EXHIBIT D

# COPY OF LENDER LETTER

 Santander

| | |
|---|---|
| | **Extension Granted** |

December 26, 2019

Grand Living, LLC.
1274 49th Street, #184
Brooklyn, NY 11219

> Re: obligations of Grand Living, LLC. (The "Borrower") to Santander Bank, N.A. (the "Bank")
> Loan No: 7214029
> Mortgaged Premises: 227 Grand Street, Brooklyn, NY 11211

Dear Borrower:

The above referenced mortgage loan (the "Loan") matures on **January 1, 2020**. Pursuant to the approval by the loan committee, the Loan will be conditionally extended to **April 1, 2020** (the period beginning January 1, 2020 and ending April 1, 2020 shall be referred to herein as the "Extension Period"), provided the Borrower complies with the following terms and provisions:

1.  During the Extension Period, Borrower shall pay monthly installments of principal and interest (including any applicable escrows) in the amount of **$92,643.00** (the "Extension Payments"). The Extension Payments shall be due on the first day of each month and no later than the 11th of the month. Please note, your monthly payments may change due to escrow adjustments, so please continue to refer to the monthly mortgage statement for payment amounts.

Provided that Borrower complies with the above conditions, and otherwise complies with all of Borrower's obligations under this agreement and under the Loan, interest on the Loan during the Extension Period shall accrue at the rate of **3.52%** as provided in the Loan Documents prior to the Maturity Date.

In the event the Borrower does not comply with the above provisions or otherwise defaults under the terms of the Loan, the Bank shall be free in its sole and absolute discretion to proceed to enforce any or all of its rights and remedies under or in respect of the Loan and applicable law, including without limitation (i) the collection of the full accelerated amount due under the Loan, including principal, interest, the Default Rate interest (as defined in the underlying Loan documents), fees, and costs incurred or sustained by the Bank in connection with the preservation of or enforcement of any rights of the Bank under the Loan, (ii) the institution of foreclosure proceedings against the Mortgaged Property, and (iii) the commencement of legal proceedings to collect the Loan from the Borrower.

If the Extension Payments are not applied by Auto Debit, please remit to the following address:

> Santander Bank, N.A.
> 200 Liberty Street 17th FL
> Mail Code: NY1-6488-PM17
> New York, NY 10281
> Attn: Cynthia Man

Except as otherwise expressly provided for herein, nothing herein shall extend to or affect in any way any of Borrower's obligations under the Loan, or any of the rights or remedies of the Bank under the Loan, and the Bank shall not be deemed to have waived any or all of such rights or remedies with respect to any default under the Loan.

Respectfully,                                         Acknowledged and Agreed:

Cynthia Man
(212) 656- 9855                                       _Moshe Dov Schweid_
                                                      Grand Living, LLC.

# EXHIBIT E

# COPY OF THE
# MERGER NOTICE

**GRAND LIVING II, LLC**
**679 Driggs Avenue**
**Brooklyn, New York 11211**

**NOTICE OF ACTION IN LIEU OF MEETING**
**NOTICE OF MERGER**
**NOTICE OF DISSENTERS' RIGHTS**

**VIA CERTIFIED OR REGISTERED MAIL**
**RETURN RECEIPT REQUESTED AND FEDEX**

September 22, 2020

All Year Holdings Limited
Mr. Yoel Goldman
c/o All Year Management NY Inc.
12 Spencer Street
Brooklyn, New York 11205

All Year Holdings Limited
Mr. Yoel Goldman
199 Lee Avenue
Brooklyn, New York 11211

     **NOTICE** is hereby given pursuant to Sections 407 and 1002 of the New York Limited Liability Company Law (the "LLCL") that (i) the holders of a majority holding 64.75% of the membership interests of Grand Living II, LLC, a New York limited liability company (the "Company"), and (ii) the holders of 100% of the membership interests of GL Merger Partner, LLC, a New York limited liability company ("GL Merger"), adopted certain resolutions by written consent, a copy of which is attached hereto as Exhibit A (the "Member Consent"). The Member Consent approved the merger (the "Merger") of the Company with and into GL Merger pursuant to the LLCL, with the Company being the surviving company in the Merger, as contemplated by the Agreement and Plan of Merger, dated as of September 22, 2020, by and between the Company and GL Merger, a copy of which is attached hereto as Exhibit B (the "Merger Agreement").

     Capitalized terms not defined herein have the meanings ascribed to them in the Merger Agreement.

     The Merger shall become effective upon the filing of a Certificate of Merger with the Secretary of State of the State of New York (the "Effective Date").

     Pursuant to the terms of the Merger Agreement, on the Effective Date the membership interests of the Company issued and outstanding immediately prior to the Effective Date (the "Company Membership Interests") by virtue of the Merger and without any action on the part of the Company or the holders of the Company Membership Interests, shall be treated as follows: (a) the Company Membership Interests owned by Yoel Goldman and/or any entity in which Yoel

Goldman has a direct or indirect interest, including without limitation All Year Holdings Limited, or owned by any of his or their transferees (individually and collectively, "All Year"), shall be canceled automatically and will cease to exist and will be converted automatically into the right to receive, in cash and without interest, an amount equal to Two Million Eight Hundred Sixty-Five Thousand Five Hundred Thirty-Eight Dollars ($2,865,538.00) in the aggregate (the "Merger Consideration"); and (b) the Company Membership Interests owned by each member of the Company other than All Year will be cancelled automatically and shall cease to exist and no consideration shall be given in exchange therefor. In addition, pursuant to the Merger Agreement, on the Effective Date, each one percent (1%) interest in GL Merger shall automatically be converted into and become a newly issued, fully-paid and non-assessable one percent (1%) interest in the surviving company in the Merger.

Pursuant to Section 1002(e) of the LLCL, you have the right to file with the Company written notice of dissent (the "Notice of Dissent") from the Merger. Such notice must be filed, in accordance with Section 623 ("Section 623") of the New York Business Corporation Law (the "BCL"), within twenty (20) days of this Notice. Pursuant to Section 1005(a) of the LLCL ("Section 1005(a)"), within ten (10) days of receiving such Notice of Dissent, the Company is required to send to you a written offer (the "Offer") to pay in cash the fair market value (the "FMV") of your Company Membership Interests.

Should you choose to dissent, upon the Effective Date, pursuant to Section 1002(f) of the LLCL, you shall not become or continue to be a member of or hold an interest in the Company or in GL Merger, and you shall not be entitled to receive the Merger Consideration, but you shall be entitled to receive in cash from the Company the FMV of your Company Membership Interests as of the close of business of the day prior to the Effective Date in accordance with Section 509 of the LLCL.

The Company has already determined that the FMV of your Company Membership Interests is the Merger Consideration, which will also be the amount of the Offer.

Should you choose to accept the Offer, in accordance with Section 1005(a), payment in cash, without interest, shall be made to you within ten (10) days of the Company's receipt of your acceptance.

If you and the Company fail to agree on the price to be paid for your Company Membership Interests within ninety (90) days of the Offer, pursuant to Section 1005(b) of the LLCL, the appraisal procedure provided for in paragraphs (h), (i), (j) and (k) of Section 623 shall apply.

Copies of the LLCL statutes referenced above are attached hereto as Exhibit C, and a copy of Section 623 is attached hereto as Exhibit D. These exhibits set forth the procedures you must follow in the event that you exercise your dissenters' rights. We encourage you to read Exhibit C and Exhibit D carefully and in their entirety. A dissenting member may only exercise dissenters' rights by complying with these provisions.

Failure to follow the steps required by the LLCL and Section 623 may result in the loss of dissenters' rights, in which event you will be entitled to receive the Merger Consideration with respect to your Company Membership Interests in accordance with the Merger Agreement.

In view of the complexity of the relevant provisions of the LLCL and the New York Business Corporation Law ("BCL"), if you are considering exercising your dissenters' rights under the LLCL and the BCL, you should consult your own legal advisor.

Sincerely,

GRAND LIVING II, LLC

By: _____
Name:  Yechial Michael Lichtenstein
Title:  Manager

By: _____
Name:  Moshe Dov Schweid
Title:  Manager

# MEMBER CONSENT

# WRITTEN CONSENT
## OF THE
## MEMBERS
## OF
## GRAND LIVING II, LLC
## AND
## GL MERGER PARTNER, LLC

September 22, 2020

The undersigned, being (i) the holders of a majority holding 64.75% of the membership interests of Grand Living II, LLC, a New York limited liability company (the "Company"), and (ii) the holders of 100% of the membership interests of GL Merger Partner, LLC, a New York limited liability company ("GL Merger"), hereby consent to, approve and adopt the following resolutions pursuant to Section 407 of the New York Limited Liability Company Law by written consent without a meeting, but with force and effect as if adopted at a duly constituted meeting:

**WHEREAS**, the undersigned, in their capacity as (i) the holders of a majority holding 64.75% of the membership interests of the Company and (ii) the holders of 100% of the membership interests of GL Merger, respectively, have the authority to act on behalf of and to bind the Company and GL Merger, and

**WHEREAS**, the holders of a majority holding 64.75% of the membership interests of the Company believe that it is in the best interests of the Company to merge the Company with and into GL Merger with the Company being the surviving entity; and

**WHEREAS**, the holders of 100% of the membership interests of GL Merger believe it is in the best interests of GL Merger to merge with the Company, with the Company being the surviving entity.

**NOW THEREFORE BE IT**

**RESOLVED**, that the undersigned hereby authorize and empower each of the Company and GL Merger to enter into that certain Agreement and Plan of Merger by and between the Company and GL Merger, dated as of September 22, 2020 and substantially in the form attached hereto as Exhibit A (the "Agreement and Plan of Merger"), and authorize the merger of the Company with and into GL Merger, with the Company being the surviving entity (the "Merger"); and be it further

**RESOLVED**, that each of the Company and GL Merger are hereby authorized and empowered to consummate the transactions contemplated by the Agreement and Plan of Merger; and be it further

**RESOLVED**, that each of Moshe Dov Schweid and Yechial Michael Lichtenstein, each individually without the other, each as a Manager of the Company and/or an Authorized Signatory of the Company and/or GL Merger, are hereby authorized and empowered to execute and acknowledge the Agreement and Plan of Merger and to file the appropriate Certificate of Merger

setting forth the substance thereof with the proper officials in the State of New York and any counties or other subdivisions thereof, together with such other agreements, certificates and papers as may be necessary or appropriate to permit the merger of the Company with and into GL Merger pursuant to the Agreement and Plan of Merger, to become effective under the laws of the State of New York; and be it further

RESOLVED, that each of Moshe Dov Schweid and Yechial Michael Lichtenstein, each individually without the other, each as a Manager of the Company and/or an Authorized Signatory of the Company and/or GL Merger, are hereby authorized and empowered to take or cause to be taken any and all action, to execute and deliver any and all agreements, certificates, instruments or other documents, and to do any and all things which, in his judgment, may be necessary or advisable to effectuate the foregoing resolutions, and to carry out the purposes thereof, and that the execution and delivery by such person of any agreement, certificate, instrument or other document, or the doing by them of any such act (including the authorization of any change in any of the foregoing referenced agreements, certificates, instruments or documents), shall conclusively establish his authority so to do from the Company and GL Merger.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*.]

**IN WITNESS WHEREOF**, the undersigned, being the holders of a majority of the membership interests of the Company and the holders of 100% of the membership interests of GL Merger, do hereby execute this consent as of the date first above written.

MY 2011 LLC
By: _____
Name:  Yechial Michael Lichtenstein
Title:   Manager


S&B MONSEY LLC
By: _____
Name:  Moshe Dov Schweid
Title: Manager

# EXHIBIT A TO WRITTEN CONSENT

# AGREEMENT AND PLAN OF MERGER

# AGREEMENT AND PLAN OF MERGER

## BY AND BETWEEN

## GRAND LIVING II, LLC

## AND

## GL MERGER PARTNER, LLC

**THIS AGREEMENT AND PLAN OF MERGER** (this "<u>Agreement</u>") is made and entered into as of the 22nd day of September, 2020, by and between Grand Living II, LLC, a New York limited liability company (the "<u>Company</u>"), and GL Merger Partner, LLC, a New York limited liability company ("<u>GL Merger</u>"). The Company and GL Merger are hereinafter sometimes collectively referred to as the "<u>Constituent Companies</u>."

**WHEREAS**, the holders of a majority holding 64.75% of the membership interests of the Company and the holders of 100% of the membership interests of GL Merger have approved the merger (the "<u>Merger</u>") of the Company with and into GL Merger, with the Company being the surviving entity (the "<u>Surviving Company</u>"), and have authorized by written consent each of the Company and GL Merger to enter into this Agreement, and to do all things necessary to consummate the Merger.

**NOW, THEREFORE**, the Constituent Companies, in consideration of the mutual covenants, agreements and provisions hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree to and prescribe the terms and conditions of said Merger and mode of carrying the same into effect as follows:

1. <u>Merger</u>. At the Effective Time (as hereafter defined), the Company shall be merged with and into GL Merger, with the Company being the Surviving Company. The Surviving Company shall be governed by the laws of the State of New York, and the separate existence of GL Merger shall cease forthwith at the Effective Time.

2. <u>Effective Time</u>. The Merger shall become effective upon the filing of the Certificate of Merger in New York (the "<u>Effective Time</u>").

3. <u>Effectiveness of Merger</u>. The terms and conditions of the Merger are as follows:

(a) The Articles of Organization of the Company, as it shall exist at the Effective Time, shall be the Articles of Organization of the Surviving Company until the same shall be altered, amended or repealed, as therein provided. The Operating Agreement of GL Merger, as it shall exist at the Effective Time, shall be the Operating Agreement of the Surviving Company except that the Operating Agreement of GL Merger shall hereby be amended to provide that the name of the surviving company is "Grand Living II, LLC".

(b) Upon the Effective Time, the membership interests of the Company issued and outstanding immediately prior to the Effective Time (the "<u>Company Membership Interests</u>")

owned by Yoel Goldman and/or any entity in which Yoel Goldman has a direct or indirect interest, including without limitation All Year Holdings Limited, or owned by any of his or their transferees (individually and collectively, "All Year"), shall be canceled automatically and shall cease to exist and shall be converted automatically into the right to receive, in cash and without interest, an amount equal to Two Million Eight Hundred Sixty-Five Thousand Five Hundred Thirty-Eight Dollars ($2,865,538.00) in the aggregate (the "Merger Consideration"). Upon the Effective Time, All Year shall not become or continue to be a member of or hold an interest in the Surviving Company.

(c)     Upon the Effective Time, the Company Membership Interests owned by each member of the Company other than All Year shall be cancelled automatically and shall cease to exist and no consideration shall be given in exchange therefor.

(d)     Upon the Effective Time, each one percent (1%) interest in GL Merger shall automatically be converted into and become a newly issued, fully-paid and non-assessable one percent (1%) interest in the Surviving Company.

(e)     Upon the Merger becoming effective, all the real estate, property, rights, privileges, franchises, patents, trademarks, licenses, registrations and other assets of every kind and description of the Company shall be transferred to and vested in Surviving Company without further act or deed. The Constituent Companies hereby agree that Surviving Company shall be authorized to execute and deliver or cause to be executed and delivered on behalf of each Constituent Member all such deeds and instruments and to take or cause to be taken such further or other actions as the Surviving Company may deem necessary or desirable in order to vest in and confirm to the Surviving Company title to and possession of any real estate, property, rights and interests of the Constituent Companies acquired or to be acquired by reason of or as a result of the Merger herein provided for and otherwise to carry out the intent and purposes hereof.

4.     Effectiveness of Merger. Notwithstanding any provision of this Agreement to the contrary, including Section 3(b) hereof, Company Membership Interests issued and outstanding immediately prior to the Effective Time (and held by a holder who has not consented to this Agreement in writing and who properly exercises appraisal rights of such Company Membership Interests in accordance with Section 1002 of the Liability Company Law of the State of New York (the "LLCL") (such Company Membership Interests being referred to collectively as the "Dissenting Company Membership Interests" until such time as such holder fails to perfect or otherwise loses such holder's appraisal rights under the LLCL with respect to such Company Membership Interests) shall not be converted into a right to receive the Merger Consideration, but instead shall be entitled to only such rights as are granted by Section 1002 of the LLCL; provided, however, that if, after the Effective Time, such holder fails to perfect, withdraws or loses such holder's right to appraisal pursuant to Section 1002 of the LLCL or if a court of competent jurisdiction shall determine that such holder is not entitled to the relief provided by Section 1002 of the LLCL, such Company Membership Interests shall be treated as if they had been converted as of the Effective Time into the right to receive the Merger Consideration in accordance with Section 3(b) hereof, without interest thereon.

5.     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

7.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

8.    Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, excluding choice of law principles thereof.

9.    Counterparts: Signatures. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows.]*

**IN WITNESS WHEREOF**, the parties to this Agreement, pursuant to the approval and authority duly given by resolutions adopted by written consent in lieu of a meeting by the of a majority of the membership interests of the Company and by written consent in lieu of a meeting by the holders of all of the membership interests of GL Merger, have caused this Agreement and Plan of Merger to be executed by the duly authorized officer/member/manager of each party hereto as the respective act, deed and agreement of each of said entities, as the date first above written.

**GRAND LIVING II, LLC**


By: _____
Name: Moshe Dov Schweid
Title:   Manager


By: _____
Name: Yechial Michael Lichtenstein
Title:   Manager


**GL MERGER PARTNER, LLC**


By: _____
 Name:  Moshe Dov Schweid
 Title:   Authorized Signatory


By: _____
 Name:  Yechial Michael Lichtenstein
 Title:   Authorized Signatory

# MERGER AGREEMENT

# AGREEMENT AND PLAN OF MERGER

## BY AND BETWEEN

## GRAND LIVING II, LLC

## AND

## GL MERGER PARTNER, LLC

**THIS AGREEMENT AND PLAN OF MERGER** (this "<u>Agreement</u>") is made and entered into as of the 22nd day of September, 2020, by and between Grand Living II, LLC, a New York limited liability company (the "<u>Company</u>"), and GL Merger Partner, LLC, a New York limited liability company ("<u>GL Merger</u>"). The Company and GL Merger are hereinafter sometimes collectively referred to as the "<u>Constituent Companies.</u>"

**WHEREAS**, the holders of a majority holding 64.75% of the membership interests of the Company and the holders of 100% of the membership interests of GL Merger have approved the merger (the "<u>Merger</u>") of the Company with and into GL Merger, with the Company being the surviving entity (the "<u>Surviving Company</u>"), and have authorized by written consent each of the Company and GL Merger to enter into this Agreement, and to do all things necessary to consummate the Merger.

**NOW, THEREFORE**, the Constituent Companies, in consideration of the mutual covenants, agreements and provisions hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree to and prescribe the terms and conditions of said Merger and mode of carrying the same into effect as follows:

1.  <u>Merger</u>. At the Effective Time (as hereafter defined), the Company shall be merged with and into GL Merger, with the Company being the Surviving Company. The Surviving Company shall be governed by the laws of the State of New York, and the separate existence of GL Merger shall cease forthwith at the Effective Time.

2.  <u>Effective Time</u>. The Merger shall become effective upon the filing of the Certificate of Merger in New York (the "<u>Effective Time</u>").

3.  <u>Effectiveness of Merger</u>. The terms and conditions of the Merger are as follows:

(a)   The Articles of Organization of the Company, as it shall exist at the Effective Time, shall be the Articles of Organization of the Surviving Company until the same shall be altered, amended or repealed, as therein provided. The Operating Agreement of GL Merger, as it shall exist at the Effective Time, shall be the Operating Agreement of the Surviving Company except that the Operating Agreement of GL Merger shall hereby be amended to provide that the name of the surviving company is "Grand Living II, LLC".

(b)     Upon the Effective Time, the membership interests of the Company issued and outstanding immediately prior to the Effective Time (the "Company Membership Interests") owned by Yoel Goldman and/or any entity in which Yoel Goldman has a direct or indirect interest, including without limitation All Year Holdings Limited, or owned by any of his or their transferees (individually and collectively, "All Year"), shall be canceled automatically and shall cease to exist and shall be converted automatically into the right to receive, in cash and without interest, an amount equal to Two Million Eight Hundred Sixty-Five Thousand Five Hundred Thirty-Eight Dollars ($2,865,538.00) in the aggregate (the "Merger Consideration").  Upon the Effective Time, All Year shall not become or continue to be a member of or hold an interest in the Surviving Company.

(c)     Upon the Effective Time, the Company Membership Interests owned by each member of the Company other than All Year shall be cancelled automatically and shall cease to exist and no consideration shall be given in exchange therefor.

(d)     Upon the Effective Time, each one percent (1%) interest in GL Merger shall automatically be converted into and become a newly issued, fully-paid and non-assessable one percent (1%) interest in the Surviving Company.

(e)     Upon the Merger becoming effective, all the real estate, property, rights, privileges, franchises, patents, trademarks, licenses, registrations and other assets of every kind and description of the Company shall be transferred to and vested in Surviving Company without further act or deed.  The Constituent Companies hereby agree that Surviving Company shall be authorized to execute and deliver or cause to be executed and delivered on behalf of each Constituent Member all such deeds and instruments and to take or cause to be taken such further or other actions as the Surviving Company may deem necessary or desirable in order to vest in and confirm to the Surviving Company title to and possession of any real estate, property, rights and interests of the Constituent Companies acquired or to be acquired by reason of or as a result of the Merger herein provided for and otherwise to carry out the intent and purposes hereof.

4.     Effectiveness of Merger.  Notwithstanding any provision of this Agreement to the contrary, including Section 3(b) hereof, Company Membership Interests issued and outstanding immediately prior to the Effective Time (and held by a holder who has not consented to this Agreement in writing and who properly exercises appraisal rights of such Company Membership Interests in accordance with Section 1002 of the Liability Company Law of the State of New York (the "LLCL") (such Company Membership Interests being referred to collectively as the "Dissenting Company Membership Interests") until such time as such holder fails to perfect or otherwise loses such holder's appraisal rights under the LLCL with respect to such Company Membership Interests) shall not be converted into a right to receive the Merger Consideration, but instead shall be entitled to only such rights as are granted by Section 1002 of the LLCL; provided, however, that if, after the Effective Time, such holder fails to perfect, withdraws or loses such holder's right to appraisal pursuant to Section 1002 of the LLCL or if a court of competent jurisdiction shall determine that such holder is not entitled to the relief provided by Section 1002 of the LLCL, such Company Membership Interests shall be treated as if they had been converted as of the Effective Time into the right to receive the Merger Consideration in accordance with Section 3(b) hereof, without interest thereon.

78-53994-lng  Doc 18  Filed 03/28/23  Entered 03/28/23 13:50:43  Main Document

5.	Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.	No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

7.	Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

8.	Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, excluding choice of law principles thereof.

9.	Counterparts: Signatures. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows.*]

**IN WITNESS WHEREOF**, the parties to this Agreement, pursuant to the approval and authority duly given by resolutions adopted by written consent in lieu of a meeting by the of a majority of the membership interests of the Company and by written consent in lieu of a meeting by the holders of all of the membership interests of GL Merger, have caused this Agreement and Plan of Merger to be executed by the duly authorized officer/member/manager of each party hereto as the respective act, deed and agreement of each of said entities, as the date first above written.

**GRAND LIVING II, LLC**

By: _____
Name:  Yechial Michael Lichtenstein
Title:   Manager

By: _____
Name: Moshe Dov Schweid
Title:   Manager

**GL MERGER PARTNER, LLC**

By: _____
Name:  Yechial Michael Lichtenstein
Title:   Authorized Signatory

By: _____
Name:  Moshe Dov Schweid
Title:   Authorized Signatory

Exhibit C to Notice

# NEW YORK CODE
# LIMITED LIABILITY COMPANY LAW

## Section 407. Action by members without a meeting.

(a)     Whenever under this chapter members of a limited liability company are required or permitted to take any action by vote, except as provided in the operating agreement, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken shall be signed by the members who hold the voting interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the members entitled to vote therein were present and voted and shall be delivered to the office of the limited liability company, its principal place of business or a manager, employee or agent of the limited liability company having custody of the records of the limited liability company. Delivery made to the office of the limited liability company shall be by hand or by certified or registered mail, return receipt requested.

(b)     Every written consent shall bear the date of signature of each member who signs the consent, and, except as provided in the operating agreement, no written consent shall be effective to take the action referred to therein unless, within sixty days of the earliest dated consent delivered in the manner required by this section to the limited liability company, written consents signed by a sufficient number of members to take the action are delivered to the office of the limited liability company, its principal place of business or a manager, employee or agent of the limited liability company having custody of the records of the limited liability company. Delivery made to such office, principal place of business or manager, employee or agent shall be by hand or by certified or registered mail, return receipt requested.

(c)     Prompt notice of the taking of the action without a meeting by less than unanimous written consent shall be given to those members who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting. In the event that the action that is consented to is such as would have required the filing of articles or a certificate under any other section of this chapter, if such action had been voted on by members at a meeting thereof, such articles or certificate filed under such other section shall state, in lieu of any statement required by such section concerning any vote of members, that written consent has been given in accordance with this section and that written notice has been given as provided in this section.

## Section 509. Distribution upon withdrawal.

Except as provided in this chapter, upon withdrawal as a member of the limited liability company, any withdrawing member is entitled to receive any distribution to which he or she is entitled under the operating agreement and, if not otherwise provided in the operating agreement, he or she is entitled to receive, within a reasonable time after withdrawal, the fair value of his or her membership interest in the limited liability company as of the date of withdrawal based upon his or her right to share in distributions from the limited liability company.

**Section 1002. Procedures for merger or consolidation.**

(a)     In connection with a merger or consolidation under this chapter, rights or securities of, or interests in, a limited liability company or other business entity that is a constituent party to the merger or consolidation may be exchanged for or converted into cash, property, rights or securities of, or interests in, the surviving or resulting limited liability company or other business entity or, in addition to or in lieu thereof, may be exchanged for or converted into cash, property, rights or securities of or interests in, a limited liability company or other business entity that is not the surviving or resulting limited liability company or other business entity in the merger or consolidation.

(b)     The members of each domestic limited liability company or other business entity shall adopt (with respect to a domestic limited liability company, in the manner provided in subdivision (c) of this section) an agreement of merger or consolidation, setting forth the terms and conditions of the conversion of the membership interests of the members of the domestic limited liability company into interests in the surviving or resulting limited liability company or other business entity or the cash or other consideration to be paid or delivered in exchange for membership interests in each domestic limited liability company, or a combination thereof

(c)     The agreement of merger or consolidation shall be submitted to the members of each domestic limited liability company who are entitled to vote with respect to a merger or consolidation at a meeting called on twenty days' notice or such greater notice as the operating agreement may provide. Subject to any requirement in the operating agreement requiring approval by any greater or lesser percentage in interest of the members who are entitled to vote with respect to a merger or consolidation, which shall not be less than a majority in interest of those members who are so entitled to vote, the agreement shall be approved on behalf of each domestic limited liability company (i) by such voting interests of the members as shall be required by the operating agreement, or (ii) if no provision is made, by the members representing at least a majority in interest of the members.

(d)     Notwithstanding authorization by the, members, the agreement of merger or consolidation may be terminated or amended pursuant to a provision for such termination or amendment, if any, contained in the agreement of merger or consolidation.

(e)     Any member that is a party to a proposed merger or consolidation who is entitled to vote with respect to such proposed merger or consolidation may, prior to that time of the meeting at which such merger or consolidation is to be voted on, file with the domestic limited liability company written notice of dissent from the proposed merger or consolidation. Such notice of dissent may be withdrawn by the dissenting member at any time prior to the effective date of the merger or consolidation and shall be deemed to be withdrawn if the member casts a vote in favor of the proposed merger or consolidation.

(f)     Upon the effectiveness of the merger or consolidation, the dissenting member (referred to in subdivision (e) of this section) of any domestic limited liability company shall not become or continue to be a member of or hold an interest in the surviving or resulting limited liability company or other business entity but shall be entitled to receive in cash from the surviving or resulting domestic limited liability company or other business entity the fair value of his or her

membership interest in the domestic limited liability company as of the close of business of the day prior to the effective date of the merger or consolidation in accordance with section five hundred nine of this chapter but without taking account of the effect of the merger or consolidation.

(g)     A member of a domestic limited liability company who has a right under this chapter to demand payment for his or her membership interest shall not have any right at law or in equity under this chapter to attack the validity of the merger or consolidation or to have the merger or consolidation set aside or rescinded, except in an action or contest with respect to compliance with the provisions of the operating agreement or subdivision (c) of this section.

(h)     A limited liability company whose original articles of organization were filed with the secretary of state and effective prior to the effective date of this subdivision shall continue to be governed by this section as in effect on such date and shall not be governed by this section, unless otherwise provided in the operating agreement.

**Section 1005. Payment of interest of dissenting members.**

(a)     Within ten days after the occurrence of an event described in section ten hundred two of this article, the surviving or resulting domestic limited liability company or other business entity shall send to each dissenting former member a written offer to pay in cash the fair value of such former member's membership interest.  Payment in cash shall be made to each former member accepting such offer within ten days after notice of such acceptance is received by the surviving or resulting domestic limited liability company or other business entity.

(b)     If a former member and the surviving or resulting limited liability company or other business entity fail to agree on the price to be paid for the former member's membership interest within ninety days after the surviving or resulting domestic limited liability company or other business entity shall have made the offer provided for in subdivision (a) of this section, or if the domestic limited liability company or surviving domestic limited liability company or other business entity shall fail to make such an offer within the period provided for in subdivision (a) of this section, the procedure provided for in paragraphs (h), (i), (j) and (k) of section six hundred twenty-three of the business corporation law (or any successor provisions or statute) shall apply, as such paragraphs may be amended from time to time.

(c)     A payment under this section shall constitute a return of a member's contribution for the purposes of section five hundred eight of this chapter.

# NEW YORK CODE
## BUSINESS CORPORATION LAW

**Section 623. Procedure to enforce shareholder's right to receive payment for shares**

(a)     A shareholder intending to enforce his right under a section of this chapter to receive payment for his shares if the proposed corporate action referred to therein is taken shall file with the corporation, before the meeting of shareholders at which the action is submitted to a vote, or at such meeting but before the vote, written objection to the action. The objection shall include a notice of his election to dissent, his name and residence address, the number and classes of shares as to which he dissents and a demand for payment of the fair value of his shares if the action is taken. Such objection is not required from any shareholder to whom the corporation did not give notice of such meeting in accordance with this chapter or where the proposed action is authorized by written consent of shareholders without a meeting.

(b)     Within ten days after the shareholders' authorization date, which term as used in this section means the date on which the shareholders' vote authorizing such action was taken, or the date on which such consent without a meeting was obtained from the requisite shareholders, the corporation shall give written notice of such authorization or consent by registered mail to each shareholder who filed written objection or from whom written objection was not required, excepting any shareholder who voted for or consented in writing to the proposed action and who thereby is deemed to have elected not to enforce his right to receive payment for his shares.

(c)     Within twenty days after the giving of notice to him, any shareholder from whom written objection was not required and who elects to dissent shall file with the corporation a written notice of such election, stating his name and residence address, the number and classes of shares as to which he dissents and a demand for payment of the fair value of his shares. Any shareholder who elects to dissent from a merger under section 905 (Merger of subsidiary corporation) or paragraph (c) of section 907 (Merger or consolidation of domestic and foreign corporations) or from a share exchange under paragraph (g) of section 913 (Share exchanges) shall file a written notice of such election to dissent within twenty days after the giving to him of a copy of the plan of merger or exchange or an outline of the material features thereof under section 905 or 913.

(d)     A shareholder may not dissent as to less than all of the shares, as to which he has a right to dissent, held by him of record that he owns beneficially. A nominee or fiduciary may not dissent on behalf of any beneficial owner as to less than all of the shares of such owner, as to which such nominee or fiduciary has a right to dissent, held of record by such nominee or fiduciary.

(e)     Upon consummation of the corporate action, the shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of his shares and any other rights under this section. A notice of election may be withdrawn by the shareholder at any time prior to his acceptance in writing of an offer made by the corporation, as provided in paragraph (g), but in no case later than sixty days from the date of consummation of the corporate action except that if the corporation fails to make a timely offer, as provided in paragraph (g), the time for withdrawing a notice of election shall be extended until sixty days from the date an offer is made. Upon

expiration of such time, withdrawal of a notice of election shall require the written consent of the corporation. In order to be effective, withdrawal of a notice of election must be accompanied by the return to the corporation of any advance payment made to the shareholder as provided in paragraph (g). If a notice of election is withdrawn, or the corporate action is rescinded, or a court shall determine that the shareholder is not entitled to receive payment for his shares, or the shareholder shall otherwise lose his dissenters' rights, he shall not have the right to receive payment for his shares and he shall be reinstated to all his rights as a shareholder as of the consummation of the corporate action, incl ding any intervening preemptive rights and the right to payment of any intervening dividend or other distribution or, if any such rights have expired or any such dividend or distribution other than in cash has been completed, in lieu thereof, at the election of the corporation, the fair value thereof in cash as determined by the board as of the time of such expiration or completion, but without prejudice otherwise to any corporate proceedings that may have been taken in the interim.

(f)     At the time of filing the notice of election to dissent or within one month thereafter the shareholder of shares represented by certificates shall submit the certificates representing his shares to the corporation, or to its transfer agent, which shall forthwith note conspicuously thereon that a notice of election has been filed and shall return the certificates to the shareholder or other person who submitted them on his behalf. Any shareholder of shares represented by certificates who fails to submit his certificates for such notation as herein specified shall, at the option of the corporation exercised by written notice to him within forty-five days from the date of filing of such notice of election to dissent, lose his dissenter's rights unless a court, for good cause shown, shall otherwise direct Upon transfer of a certificate bearing such notation, each new certificate issued therefor shall bear a similar notation together with the name of the original dissenting holder of the shares and a transferee shall acquire no rights in the corporation except those which the original dissenting shareholder had at the time of transfer.

(g)     Within fifteen days after the expiration of the period within which shareholders may file their notices of election to dissent, or within fifteen days after the proposed corporate action is consummated, whichever is later (but in no case later than ninety days from the shareholders' authorization date), the corporation or, in the case of a merger or consolidation, the surviving or new corporation, shall make a written offer by registered mail to each shareholder who has filed such notice of election to pay for his shares at a specified price which the corporation considers to be their fair value. Such offer shall be accompanied by a statement setting forth the aggregate number of shares with respect to which notices of election to dissent have been received and the aggregate number of holders of such shares. If the corporate action has been consummated, such offer shall also be accompanied by (1) advance payment to each such shareholder who has submitted the certificates representing his shares to the corporation, as provided in paragraph (f), of an amount equal to eighty percent of the amount of such offer, or (2) as to each shareholder who has not yet submitted his certificates a statement that advance payment to hint of an amount equal to eighty percent of the amount of such offer will be made by the corporation promptly upon submission of his certificates. If the corporate action has not been consummated at the time of the making of the offer, such advance payment or statement as to advance payment shall be sent to each shareholder entitled thereto forthwith upon consummation of the corporate action. Every advance payment or statement as to advance payment shall include advice to the shareholder to the effect that acceptance of such payment does not constitute a waiver of any dissenters' rights. If the corporate action has not been consummated upon the expiration of the ninety day period

after the shareholders' authorization date, the offer may be conditioned upon the consummation of such action. Such offer shall be made at the same price per share to all dissenting shareholders of the same class, or if divided into series, of the same series and shall be accompanied by a balance sheet of the corporation whose shares the dissenting shareholder holds as of the latest available date, which shall not be earlier than twelve months before the making of such offer, and a profit and loss statement or statements for not less than a twelve month period ended on the date of such balance sheet or, if the corporation was not in existence throughout such twelve month period, for the portion thereof during which it was in existence. Notwithstanding the foregoing, the corporation shall not be required to furnish a balance sheet or profit and loss statement or statements to any shareholder to whom such balance sheet or profit and loss statement or statements were previously furnished, nor if in connection with obtaining the shareholders' authorization for or consent to the proposed corporate action the shareholders were furnished with a proxy or information statement, which included financial statements, pursuant to Regulation 14A or Regulation 14C of the United States Securities and Exchange Commission. If within thirty days after the making of such offer, the corporation making the offer and any shareholder agree upon the price to be paid for his shares, payment therefor shall be made within sixty days after the making of such offer or the consummation of the proposed corporate action, whichever is later, upon the surrender of the certificates for any such shares represented by certificates.

(h)     The following procedure shall apply if the corporation fails to make such offer within such period of fifteen days, or if it makes the offer and any dissenting shareholder or shareholders fail to agree with it within the period of thirty days thereafter upon the price to be paid for their shares:

(1)     The corporation shall, within twenty days after the expiration of whichever is applicable of the two periods last mentioned, institute a special proceeding in the supreme court in the judicial district in which the office of the corporation is located to determine the rights of dissenting shareholders and to fix the fair value of their shares. If, in the case of merger or consolidation, the surviving or new corporation is a foreign corporation without an office in this state, such proceeding shall be brought in the county where the office of the domestic corporation, whose shares are to be valued, was located.

(2)     If the corporation fails to institute such proceeding within such period of twenty days, any dissenting shareholder may institute such proceeding for the same purpose not later than thirty days after the expiration of such twenty day period. If such proceeding is not instituted within such thirty day period, all dissenter's rights shall be lost unless the supreme court, for good cause shown, shall otherwise direct

(3)     All dissenting shareholders, excepting those who, as provided in paragraph (g), have agreed with the corporation upon the price to be paid for their shares, shall be made parties to such proceeding, which shall have the effect of an action quasi in rem against their shares. The corporation shall serve a copy of the petition in such proceeding upon each dissenting shareholder who is a resident of this state in the manner provided by law for the service of a summons, and upon each nonresident dissenting shareholder either by registered mail and publication, or in such other manner as is permitted by law. The jurisdiction of the court shall be plenary and exclusive.

(4)     The court shall determine whether each dissenting shareholder, as to whom the corporation requests the court to make such determination, is entitled to receive payment for his shares. If the corporation does not request any such determination or if the court finds that any dissenting shareholder is so entitled, it shall proceed to fix the value of the shares, which, for the purposes of this section, shall be the fair value as of the close of business on the day prior to the shareholders' authorization date. In fixing the fair value of the shares, the court shall consider the nature of the transaction giving rise to the shareholder's right to receive payment for shares and its effects on the corporation and its shareholders, the concepts and methods then customary in the relevant securities and financial markets for determining fair value of shares of a corporation engaging in a similar transaction under comparable circumstances and all other relevant factors. The court shall determine the fair value of the shares without a jury and without referral to an appraiser or referee. Upon application by the corporation or by any shareholder who is a party to the proceeding, the court may, in its discretion, permit pretrial disclosure, including, but not limited to, disclosure of any expert's reports relating to the fair value of the shares whether or not intended for use at the trial in the proceeding and notwithstanding subdivision (d) of section 3101 of the civil practice law and rules.

(5)     The final order in the proceeding shall be entered against the corporation in favor of each dissenting shareholder who is a party to the proceeding and is entitled thereto for the value of his shares so determined.

(6)     The final order shall include an allowance for interest at such rate as the court finds to be equitable, from the date the corporate action was consummated to the date of payment. In determining the rate of interest, the court shall consider all relevant factors, including the rate of interest which the corporation would have had to pay to borrow money during the pendency of the proceeding. If the court finds that the refusal of any shareholder to accept the corporate offer of payment for his shares was arbitrary, vexatious or otherwise not in good faith, no interest shall be allowed to him.

(7)     Each party to such proceeding shall bear its own costs and expenses, including the fees and expenses of its counsel and of any experts employed by it. Notwithstanding the foregoing, the court may, in its discretion, apportion and aims all or any part of the costs, expenses and fees incurred by the corporation against any or all of the dissenting shareholders who are pasties to the proceeding, including any who have withdrawn their notices of election as provided in paragraph (e), if the court finds that their refusal to accept the corporate offer was arbitrary, vexatious or otherwise not in good faith. The court may, in its discretion, apportion and assess all or any part of the costs, expenses and fees incurred by any or all of the dissenting shareholders who are parties to the proceeding against the corporation if the court finds any of the following:

(A)     that the fair value of the shares as determined materially exceeds the amount which the corporation offered to pay; or

(B)     that no offer or required advance payment was made by the corporation;

19-23921-rdd    Doc 48    Filed 01/11/51    Entered 01/11/51 50:35:33    Main Document

(C)    that the corporation failed to institute the special proceeding within the period specified therefor, or

(D)    that the action of the corporation in complying with its obligations as provided in this section was arbitrary, vexatious or otherwise not in good faith.

In making any determination as provided in clause (A), the court may consider the dollar amount or the percentage, or both, by which the fair value of the shares as determined exceeds the corporate offer.

(8)    Within sixty days after final determination of the proceeding, the corporation shall pay to each dissenting shareholder the amount found to be due him, upon surrender of the certificates for any such shares represented by certificates.

(i)    Shares acquired by the corporation upon the payment of the agreed value therefor or of the amount due under the final order, as provided in this section, shall become treasury shares or be cancelled as provided in section 515 (Reacquired shares), except that, in the case of a merger or consolidation, they may be held and disposed of as the plan of merger or consolidation may otherwise provide.

(j)    No payment shall be made to a dissenting shareholder under this section at a time when the corporation is insolvent or when such payment would make it insolvent. In such event, the dissenting shareholder shall, at his option:

(1)    Withdraw his notice of election, which shall in such event be deemed withdrawn with the written consent of the corporation; or

(2)    Retain his status as a claimant against the corporation and, if it is liquidated, be subordinated to the rights of creditors of the corporation, but have rights superior to the non-dissenting shareholders, and if it is not liquidated, retain his right to be paid for bis shares, which right the corporation shall be obliged to satisfy when the restrictions of this paragraph do not apply.

(3)    The dissenting shareholder shall exercise such option under subparagraph (1) or (2) by written notice filed with the corporation within thirty days after the corporation has given him -written notice that payment for his shares cannot be made because of the restrictions of this paragraph. If the dissenting shareholder fails to exercise such option as provided, the corporation shall exercise the option by written notice given to him within twenty days after the expiration of such period of thirty days.

(k)    The enforcement by a shareholder of his right to receive payment for his shares in the manner provided herein shall exclude the enforcement by such shareholder of any other right to which he might otherwise be entitled by virtue of share ownership, except as provided in paragraph (e), and except that this section shall not exclude the right of such shareholder to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is unlawful or fraudulent as to him.

(l)     Except as otherwise expressly provided in this section, any notice to be given by a corporation to a shareholder under this section shall be given in the manner provided in section 605 (Notice of meetings of shareholders).

(m)     This section shall not apply to foreign corporations except as provided in subparagraph (e) (2) of section 907 (Merger or consolidation of domestic and foreign corporations).

# EXHIBIT F

# COPY OF THE
# WRITTEN OFFER

GRAND LIVING II, LLC
679 Driggs Avenue
Brooklyn, New York  11211

**VIA CERTIFIED OR REGISTERED MAIL**
**RETURN RECEIPT REQUESTED AND FEDEX**

September 22, 2020

All Year Holdings Limited
Mr. Yoel Goldman
c/o All Year Management NY Inc.
12 Spencer Street
Brooklyn, New York 11205

All Year Holdings Limited
Mr. Yoel Goldman
199 Lee Avenue
Brooklyn, New York 11211

      Re:    Written Offer under Section 1005(a) of the
              New York Limited Liability Company Law ("NYLLCL")

Dear Mr. Goldman:

This letter constitutes a written offer, pursuant to Section 1005(a) of the NYLLCL, to pay Yoel Goldman an amount equal to Two Million Eight Hundred Sixty-Five Thousand Five Hundred Thirty-Eight Dollars ($2,865,538.00), representing the fair value of the former membership interests in Grand Living II, LLC, a New York limited liability company, held by Yoel Goldman and/or any entity in which Yoel Goldman has a direct or indirect interest, including without limitation All Year Holdings Limited, or by any of his or their transferees.  This letter also constitutes tender to you of such fair value.

Very truly yours,

**GRAND LIVING II, LLC, a New York limited liability company**

By: _____
Name:  Yechial Michael Lichtenstein
Title:    Authorized Signatory

By: _____
Name:  Moshe Dov Schweid
Title:    Authorized Signatory

# EXHIBIT G

# COPY OF THE SUMMONS WITH NOTICE COMMENCING THE 2020 ACTION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| YOEL GOLDMAN and ALL YEAR HOLDINGS LIMITED,<br><br>                    Plaintiffs,<br><br>      v.<br><br>GRAND LIVING II, LLC, GL MERGER PARTNER, LLC, YECHIAL MICHAEL LICHTENSTEIN, and MOSHE DOV SCHWEID,<br><br>                  Defendants. | Index No.:<br><br>**SUMMONS WITH NOTICE**<br><br>Plaintiff designates Kings County as the place of trial.<br><br>Basis of venue is Plaintiff's principal place of business. |

**TO THE ABOVE-NAMED DEFENDANTS:**

You are hereby summoned to appear in this action by serving a notice of appearance on Plaintiff's attorney within twenty (20) days after the service of this Summons, exclusive of the day of service, or thirty (30) days after the service is complete if this Summons is not personally delivered to you within the State of New York.

If you do not serve a notice of appearance within the applicable time limitation stated above, a judgment may be entered against you, by default, for declaratory relief, and for the sum of at least $15,000,000 together with interest thereon, plus attorneys' fees, costs and disbursements.

Plaintiff designates Kings County as the place of trial. The basis of venue is CPLR § 503(a). Plaintiffs' principal place of business is located at 199 Lee Avenue, #693, Brooklyn, New York 11211.

Dated: New York, New York
      October 2, 2020

                     **BLANK ROME LLP**

                     By: */s/ Stephen E. Tisman*
                        Stephen E. Tisman
                        Craig M. Flanders
                     1271 Avenue of the Americas
                     New York, NY 10020
                     (212) 885-5000
                     *Attorneys for Plaintiffs*

FILED: KINGS COUNTY CLERK 10/02/2020 05:20 PM
INDEX NO. 518781/2020

NYSCEF DOC. NO. 1          19-23957-rdd    Doc 78    Filed 01/11/21    Entered 01/11/21 20:45:33    Main Document    RECEIVED NYSCEF: 10/02/2020

Pg 74 of 74

**TO:**

Grand Living II LLC
679 Driggs Avenue
Brooklyn, New York 11211

GL Merger Partner, LLC
679 Driggs Avenue
Brooklyn, New York 11211

Yechial Michael Lichtenstein
324 Avenue I
Brooklyn, New York 11211

Moshe Dov Schweid
160 Rutledge Street
Brooklyn, New York 11211

**NOTICE:**   This action arises, in part, out of the purported, unauthorized and *ultra vires*, merger of  Defendant Grand Living II, LLC ("Grand Living") with GL Merger Partner, LLC ("GLMP"), in a failed attempt to "squeeze out" Plaintiff, the owner of the largest membership interest in Grand Living.  Defendants, Yechial Michael Lichtenstein ("Lichtenstein") and Moshe Dov Schweid ("Schweid"), acting as the purported sole managers of Grand Living under color of an operating agreement which itself is *void ab initio* purported to authorize the merger, for their sole benefit at the expense of Grand Living and at the expense of Plaintiff.  The members that purportedly authorized the merger are subject to a pending bankruptcy proceeding and lacked the authority to consent.  Lichtenstein and Schweid lacked authority to authorize any merger between Grand Living and GLMP mandating declaratory relief to declare that the merger is void *ab initio* and all acts on behalf of the allegedly newly merged entity are void.   Schweid and Lichtenstein further caused Grand Living to divert funds and other opportunities from Plaintiffs to Schweid and Lichtenstein personally or entities they owned and/or controlled in violation of their fiduciary duties and in breach of the governing operating agreement.

Take notice that the nature of this action and the relief sought is for: declaratory relief, fraud, breach of contract, breach of common law and statutory fiduciary duty, fraud, fraudulent transfer under the N.Y. Debtor and Creditor Law, unjust enrichment, and promissory estoppel.

The relief sought is declaratory relief declaring the purported merger void *ab initio* and all acts taken under color of such merger *ultra vires* acts, restitution, an accounting, constructive trust, and at least $15,000,000 in monetary damages together with interest, attorneys' fees, costs and disbursements.

Upon your failure to appear, Plaintiffs will move for judgment against Defendants by default as set forth above.