**HEARING DATE AND TIME: JANUARY 6, 2022 AT 10:00 A.M.**
**OBJECTION DEADLINE DATE AND TIME: DECEMBER 29, 2021 AT 4:00 P.M.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MY 2011 Grand LLC, *et al.*, [1]<br><br>                      Debtors. | Chapter 11<br><br>Case No. 19-23957 (RDD)<br>(Jointly Administered) |

### NOTICE OF ZOOM® HEARING ON VERIFIED OBJECTION TO CLAIM OF 215 MOORE STREET MEZZANINE LENDER LLC, OR, ALTERNATIVELY, MOTION TO COMPEL EQUITABLE MARSHALING
### [CLAIM NUMBER 4]

**PLEASE TAKE NOTICE** that upon the annexed *Verified Objection to Claim* (the "Claim Objection") *of 215 Moore Street Mezzanine Lender LLC, or, Alternatively, Motion to Compel Equitable Marshaling [Claim Number 4]* (the "215 Moore Claim"), pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3003 and 3007, MY 2011 Grand LLC ("2011 Grand") and S&B Monsey LLC ("S&B"), the jointly administered debtors herein (each a "Debtor" and collectively, the "Debtors"), will move this Court, before the Honorable Robert D. Drain, United States Bankruptcy Judge, or as soon thereafter as counsel may be heard, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York, NY 10601, on **January 6, 2022 at 10:00 a.m. (ET),** for an order (i) expunging the 215 Moore Claim in its entirety on fraudulent conveyance grounds or to estimate the 215 Moore Claim for voting and distribution purposes at $0, or, alternatively, (ii) requiring

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification numbers are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).

1

the Claimant to assert the sums due under the 215 Moore Claim first against S&B's co-obligor,

215 Moore Street Development LLC, before seeking recovery against S&B.

**PLEASE TAKE FURTHER NOTICE** that pursuant to General Order M-543, dated

March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), the Hearing will be conducted via

Zoom®.  Any party who wishes to attend the hearing must register an appearance utilizing the

Electronic Appearance portal on the Court's website at https://ecf.nysb.uscourts.gov/cgi-

bin/nysbAppearances.pl.  A link to the Zoom® hearing will be provided by the Court by email in

advance of the hearing. Zoom® for Government instructions can be found at

https://www.nysb.uscourts.gov/zoom-video-hearing-guide.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned

from time to time without further notice other than an announcement of the adjourned date or dates

at the Hearing or at a later hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Claims Objection shall

be filed and served no later than **December 29, 2021 at 4:00 p.m. (ET),** must be made in writing,

state with particularity the grounds therefore, shall conform to the United States Bankruptcy Rules

and the Local Rules of the Bankruptcy Court, include in the upper right hand corner of the caption,

the ECF docket number to which the filing relates, and shall be filed with the Bankruptcy Court

electronically in accordance with General Order M-399 (with an hard copy sent to the Chambers

of Robert D. Drain), and served via e-mail upon the undersigned counsel for the Debtors together

with proof of service thereof.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the

Hearing **telephonically** so long as General Order M-543 is in effect or unless otherwise ordered

by the Bankruptcy Court. Failure to appear may result in relief being granted as requested.

60748841;8

**PLEASE TAKE FURTHER NOTICE** that unless responses are received by that time,

the relief may be granted as requested.

Dated:  New York, New York
        November 19, 2021

                                       **AKERMAN LLP**

                                       By: *   /s/Mark S. Lichtenstein*
                                            Mark S. Lichtenstein
                                            Joshua D. Bernstein
                                            Benjamin R. Joelson
                                            1251 Avenue of the Americas
                                            37th Floor
                                            New York, NY 10020
                                            Tel. (212) 880-3800
                                            E-mail: mark.lichtenstein@akerman.com
                                            E-mail: joshua.bernstein@akerman.com
                                            E-mail: benjamin.joelson@akerman.com

                                       *Co-Counsel for the Debtors*

                                            -and-

                                       **BACKENROTH FRANKEL & KRINSKY, LLP**
                                       Mark Frankel
                                       800 Third Avenue
                                       New York, New York 10022
                                       Tel. No.: (212) 593-1100
                                       E-mail: mfrankel@bfklaw.com

                                       *Counsel for Debtors*

60748841;8

**HEARING DATE AND TIME: JANUARY 6, 2022 AT 10:00 A.M.**
**OBJECTION DEADLINE DATE AND TIME: DECEMBER 29, 2021 AT 4:00 P.M.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MY 2011 Grand LLC, et al.,[2]<br><br>                Debtors. | Chapter 11<br><br>Case No. 19-23957 (RDD)<br>(Jointly Administered) |

## VERIFIED OBJECTION TO CLAIM OF 215 MOORE STREET MEZZANINE LENDER LLC, OR, ALTERNATIVELY, MOTION TO COMPEL EQUITABLE MARSHALING
### [CLAIM NUMBER 4]

> **THIS IS AN OBJECTION TO YOUR CLAIM.  THIS OBJECTION ASKS THE COURT TO EXPUNGE THE CLAIM OR ESTIMATE THE CLAIM FOR VOTING AND DISTRIBUTION PURPOSES.  IF YOU DO NOT FILE A RESPONSE BY THE OBJECTION DEADLINE, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING**.

MY 2011 Grand LLC ("2011 Grand") and S&B Monsey LLC ("S&B"), the jointly administered debtors herein (each a "Debtor" and collectively, the "Debtors"), pursuant to sections 105 and 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 3007 and 3018 of the Federal Rules of Bankruptcy Procedure, submit their (i) objection to the secured proof of claim filed in S&B's bankruptcy case by 215 Moore Street Mezzanine Lender LLC (the "Claimant" or "Moore Mezz Lender") [Claim Number 4] (the "215 Moore Claim") in its entirety on fraudulent conveyance grounds or to estimate the 215 Moore Claim for voting and distribution purposes at $0 (the "Objection"), or, alternatively, (ii) motion (the "Motion") for entry of an order requiring the Claimant to assert the sums due under the 215 Moore Claim first against S&B's co-

---

[2] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification numbers are as follows:  MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).

60748841;8

obligor, 215 Moore Street Development LLC ("Moore Development"), before seeking recovery against S&B.   In support of the Objection and Motion, the Debtors respectfully represent as follows:

## PROCEDURAL HISTORY

1.      On November 6, 2019 ("Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). [ECF No. 1]

2.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On August 24, 2020, the Claimant filed the 215 Moore Claim in the amount of $17,848,567.56. Pursuant to the 215 Moore Claim, the Claimant is seeking full payment from S&B under a mezzanine loan which the Claimant improperly claims was made jointly and severally to S&B and Moore Development on November 18, 2016 (the "Mezzanine Loan").   A true copy of the 215 Moore Claim (Claim No. 4 against S&B) is annexed hereto as **Exhibit A**.

4.       As a threshold matter, S&B requests that the 215 Moore Claim be disallowed in its entirety based on fraudulent conveyance grounds because none of the loan proceeds were remitted to  S&B or for the benefit of any of S&B's assets.  In fact, as the Claimant is well aware, S&B  was simply a nominal signatory on the Mezzanine Loan Documents (as defined below) relating to the Moore Property (a defined below) for tax reasons described below.  The sole purpose of S&B's execution of the Mezzanine Loan Documents was to allow the Moore Mezz Lender, in the event of foreclosure on Moore Development, to collect on 100% of the interests in the Moore Development borrower, inclusive of the 3% TIC interest that was nominally held at the time of the Mezzanine Loan in the name of S&B solely for tax purposes.

60748841;8

5.      This TIC interest was formally transferred to Moore Development on June 6, 2018. As the Claimant is well aware (having overlapping loan participants in the loan made to the Debtors by the 227 Grand Street Mezz Lender LLC (the "227 Grand Mezz Lender"), the senior mezzanine lender with respect to the Debtors equity interests in Grand Living II, LLC ("GL II"), at the date of the signing of the Mezzanine Loan, the S&B units in Grand Living LLC were already fully pledged to the 2011 Grand Mezz Lender. It is highly atypical for two (2) mezzanine loans to encumber the same equity collateral unless agreed to by all parties.  This is the reason that there is no mention in any of the Moore Mezzanine Loan documents of an obligation, guarantee, or security interest in anything other than the equity interests relating to the Moore Property, including absolutely no mention of a pledge of S&B's substantial equity in GL II.

6.      Surely, there was never an intent to encumber S&B's previously encumbered equity in GL II because S&B and GL II received absolutely no benefit from the loan, such that the obligations of S&B to the Mezzanine Lender could be challenged as a fraudulent conveyance. The fatal infirmities of the 215 Moore Claim are further underscored by the fact that, because the tax structure resulting in S&B's temporary holding of a 3% TIC interest in Moore Development was unecessary, S&B conveyed the 3% interest to Moore Development in 2018.

7.      Although the Claimant disingenuously claims that S&B was meant to be a signatory to the full extent of its Property other than the tax-based 3% interest in Moore Development, if the Court is disinclined to dismiss the 215 Moore Claim outright on fraudulent conveyance grounds, the 215 Moore Claim should, at a minimum, be estimated at zero ($0) for voting and distribution purposes. S&B received no proceeds of the Mezzanine Loan and only arguably and temporarily benefited from such loan to the extent of its 3% ownership interest in Moore Development. Given that (i) the alleged granting by S&B of a lien upon S&B's interests in GL II and the obligation of

S&B under the Mezzanine Loan constitute a fraudulent conveyance, as such transfer certainly was not for anything close to reasonably equivalent value and left S&B in an entirely unintentionally insolvent position, (ii) if the 215 Moore Claim is permitted to be asserted against S&B before the Claimant exhausts its remedies against Moore Development, the creditors of the Debtors will be irreparably harmed by the Debtors' likely inability to confirm a plan, and (iii) the 215 Moore Claimant has recourse against Moore Development where it is oversecured by $20-30 million, such that the 215 Moore Claim against S&B should be estimated at zero ($0) for voting and distribution purposes (and in no event greater than 3% of the Mezzanine Loan balance). It is axiomatic that the Claimant should not be entitled to a lien where it did not provide reasonably equivalent value to S&B, and the claim as against S&B therefore constitutes a fraudulent conveyance.

8.    As discussed more fully below, the Claimant has claims against each of Moore Development and S&B while numerous other creditors, including another mezzanine lender comprised of common participants with the Claimant, have claims solely against the Debtors, including S&B.  Accordingly, if the Court is not inclined to disallow the 215 Moore Claim on fraudulent conveyance grounds or to estimate the 215 Moore Claim at zero ($0) for voting and distribution purposes, S&B respectfully requests that the Court compel the Claimant to seek payment of the sums due under the Mezzanine Loan in the first instance from the co-obligor, Moore Development, which is owned and controlled by the principals of the Debtors.[3]

---

[3] The Debtors expressly reserve the right to amend, modify or supplement this Objection and to file additional substantive or non-substantive objections to the 215 Moore Claim, or any other claims (filed or not) which may be asserted against the Debtors.  Should one or more of the grounds stated in this Objection be overruled, the Debtors reserve their rights to object on other stated grounds or on any other grounds that the Debtors discover.

60748841;8

## STATEMENT OF FACTS

9.      On November 18, 2016,  Moore Development and S&B executed loan documents

evidencing the Mezzanine Loan and the loan proceeds were provided to Moore Development.  At

the inception of the Mezzanine Loan, S&B held a 3% ownership interest in  certain real property

located at 207-215 Moore Street, Brooklyn New York (the "Moore Property").  S&B executed the

Moore Mezzanine Loan documents based on its 3% nominal ownership interest in the Moore

Property  although it received no loan proceeds therefrom for the benefit of the Grand Property (as

defined hereinafter). The payment of the Mezzanine Loan debt is guaranteed by Toby Moskovits

and Michael Lichtenstein, as the majority principals of  both Moore Development and the Debtors.

10.      On November 18, 2016, Moore Development and S&B executed a promissory note

(the "Note"), a loan agreement styled 'Mezzanine Loan Agreement' (the "Loan Agreement"), and

a Pledge and Security Agreement  (the "Security Agreement", together with the Note, Loan

Agreement and all documents executed in connection therewith, collectively, the "Mezzanine

Loan Documents"), securing payment of the Note in the original principal amount of $9,850,000.

11.      The terms of the Mezzanine Loan Documents provide the Claimant with a first

priority security interest in  all of Moore Development's and S&B's respective membership

interests in the Moore Property only. Notably, there is no mention in any of the Mezzanine Loan

Documents of any security interest in the equity interests of any property other than the Moore

Property.  It is also very telling that, contrary to what one might expect in sophisticated commercial

dealings regarding mezzanine loan financings, there is no mention in the Mezzanine Loan

Documents of a junior lien upon S&B's interests in GL II, and no intercreditor provisions

governing the relative priority, rights, duties and remedies of the  Grand Street Mezz Lender (as

defined below) and the Claimant.

60748841;8

12.    On April 3, 2018, the terms and conditions of the Loan Agreement were amended pursuant to a First Omnibus Loan Modification Agreement (the "Modification"). The Modification memorialized a new principal balance of the Mezzanine Loan of $15,000,000. Significantly, there is no mention in the Modification of a security interest in favor of Claimant upon S&B's equity interest in GL II, nor is there any mention of a junior lien upon S&B's interests in GL II or of any intercreditor provisions.

13.    The Mezzanine Loan was obtained for the acquisition and development of the Moore Property. The Moore Property is owned by 215 Moore St. Acquisition LLC ("Moore Acquisition").  As set forth above, at the time the Mezzanine Loan was made, Moore Development held a **97%** ownership interest in the Moore Acquisition and S&B previously held the remaining **3%** of the equity interests in the Moore Property.  S&B's previous indirect ownership of 3% of the Moore Property was structured for tax planning purposes in the furtherance of a 1031 tax free exchange. Ultimately the tax structuring was undone and S&B transferred the 3% ownership to Moore in June 6, 2018. See Assignment of Membership Interest attached hereto as **Exhibit B.** Although S&B's prior *de minimis* interest in the Moore Property required S&B's involvement in the Mezzanine Loan, it was clear to all parties that the sole and exclusive obligor and source of repayment would be Moore Development.[4] Moore Development is the true beneficiary of the Mezzanine Loan and S&B received no proceeds therefrom.

14.    The Moore Property is encumbered by a mortgage held previously by BOFI Federal Bank in the principal amount of $35,000,00.00.

---

[4] Indeed, the inclusion of S&B as a joint and several obligor of the Mezzanine Loan may very well have been a scrivener's error as the borrowers utilized a different law firm than their usual counsel for the Mezzanine Loan transaction.

60748841;8

15.     The value of the Moore Property is $100,000,000. Thus, there is substantial equity in the Moore Property and the Mezzanine Loan is oversecured by $20-30 million, as the senior and the mezzanine loans on the Moore Property total approximately $50,000,000.  Thus, even with default rate interest, the lenders are oversecured.   Therefore, the Claimant is substantially oversecured and will be fully repaid by Moore Development without the need for any pursuit of S&B, which has not been an owner of Moore Acquisition for the past three and half years, and prior to that was at best only a *de minimis* owner of 3% of the Moore Property which received no benefit from the Mezzanine Loan for **all** sums due under the Mezzanine Loan (emphasis added).

16.     Nevertheless, the Claimant seeks full payment of its $17,848,567.56 claim from S&B's  interest in the Moore Property when S&B's only connection to the Moore Property is that it was the previous nominal holder of a 3% interest in Moore Development. Further, S&B received no Mezzanine Loan proceeds and not a single Mezzanine Loan document referred to S&B's indirect interest in the Grand Property as a potential source of repayment. The alleged security interest against S&B's equity interest in GL II is an archetypal fraudulent conveyance.

17.     Conversely, the Grand Mezz Lender holds a security interest in the membership interests held by both Debtors in GL II in the asserted amount of approximately $10 million excluding the 20.8% participation interest held by Ms. Moskovits' father's probate estate. Additionally, Madison Capital holds a senior mortgage lien on the real property owned by a subsidiary of the Debtors located at 227 Grand Street Brooklyn, NY 11211 (the "Grand Property") in the amount of approximately $19 million.

18.     Additionally, S&B has legitimate unsecured creditors with aggregate claims of $248,854.63 and $20 million of claims by Yoel Goldman and All Year Management LLC, which are subject to a pending claims objection [ECF No. 95]. The owner of the Grand Property is also

60748841;8

obligated to pay the sum of $4.7 million to All Year Holdings Ltd. upon the effective date of the Debtors' plan.

19.    Thus, if Claimant is allowed to assert its $17,848,567.56 claim against S&B's estate, the Debtors' secured and unsecured creditors will be severely prejudiced and may recover mere pennies on the dollar, rather than material payments as contemplated under the Plan.

## RELIEF REQUESTED

20.    S&B respectfully requests that the 215 Moore Claim against S&B be disallowed in its entirety, as the 215 Moore Claim is based on a clear fraudulent conveyance or that the Court estimate the 215 Moore Claim against S&B at zero ($0) for distribution and voting purposes and be capped at 3% of the 215 Moore Claim reflecting S&B's previous ownership of the Moore Property.  If the Court is disinclined to dismiss the 215 Moore Claim  entirely or estimate it at zero ($0) for voting and distribution purposes, then the Debtors respectfully request that the Claimant be first required to satisfy its claim from co-obligor Moore Development, before proceeding against S&B pursuant to the equitable doctrine of marshaling.

## JURISDICTION

21.    This Court has jurisdiction over the Objection and Motion under 28 U.S.C. §§ 157 and 1334.  Venue of this matter in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

## ARGUMENT

I.    **The 215 Moore Claim Should be Dismissed Entirely Based on Fraudulent Conveyance Grounds or Estimated at Zero, but in no event should the 215 Moore Claim exceed 3% of the total claimed amount**

   **(a)  Fraudulent Conveyance**

60748841;8

22.    Section 502(a) of the Bankruptcy Code provides that "[a] claim of interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest…objects." 11 U.S.C. § 502(a).  A chapter 11 debtor has the duty to object to the allowance of any claim that is improper. 11 U.S.C. §§ 704(a)(5), 1106(a)(1) and 1107(a).  A claimant's proof of claim is entitled to the presumption of *prima facie* validity under Bankruptcy Rule 3001(f) only until an objecting party refutes at least one of the allegations that is essential to the claim's legal sufficiency.  *In re Starnes*, 231 B.R. 903, 912 (N.D. Tex. 1998).  Once such an allegation is refuted, "then the party asserting the claim bears the burden of proof and must establish the validity of its claim by a preponderance of the evidence."  *In re 804 Congress, L.L.C.*, 529 B.R. 213, 219 (Bankr. W.D. Tex. 2015); *see also Cavu/Rock Props. Project I, L.L.C. v. Gold Star Constr., Inc.* (*In re Cavu/Rock Props Project I, L.L.C.*), 516 B.R. 414, 422 (Bankr. W.D. Tex. 2014). "The ultimate burden of proof always lies with the claimant."  *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006).

23.    As discussed above, the Claimant wrongly asserts a lien upon all of S&B's assets (not just the formerly owned 3% of Moore) based on the Mezzanine Loan, while the 215 Moore Claim constitutes a fraudulent conveyance and should be avoided and disallowed.

24.    The Mezzanine Loan was obtained for the acquisition and development of the Moore Property. At the inception of the Mezzanine Loan, the Moore Property was owned by Moore Acquisition and S&B Moore Acquisition.  As set forth above, Moore Development held a **97%** ownership interest in the Moore Property (which is wholly owned and operated by Moore and its principals) and S&B,  held the remaining  **3%** of the equity interests in Moore, which was nominally owned by S&B and its principals. As set forth above, S&B's previous indirect ownership of  3% of the Moore Property was structured  for tax planning purposes to facilitate a 1031 tax free

exchange, but the tax structuring was voluntarily undone and S&B ultimately transferred its 3%

ownership stake to Moore in June 6, 2018.  However, S&B's *de minimis* interest in the Moore

Property required S&B's execution of the Mezzanine Loan documents although it was clear to all

parties that the sole and exclusive obligor and source of repayment of the Mezzanine Loan was

Moore Development (and the loan documents refer to Moore Development exclusively). Moore

Development is the true beneficiary of the Mezzanine Loan and S&B received no proceeds

therefrom.

      25.     Under 11 U.S.C. § 544(b)(1), a trustee or debtor in possession may avoid a transfer

by a debtor by showing that the transfer could have been avoided by an unsecured creditor under

the New York Debtor and Creditor Law ("NYDCL").

      26.     Under sections 273, 274, and 275 of the NYDCL, the transfer is avoidable if it was:

> made without "fair consideration," as defined in the statute, and any of the
> following conditions is met: 1) the transferor is insolvent or will be rendered
> insolvent by the transfer in question; . . . 3) the transferor is engaged or is about
> to engage in a business transaction for which its remaining property constitutes
> unreasonably small capital; or 4) the transferor believes that it will incur debts
> beyond its ability to pay.

*See Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 302 B.R. 760,

778 (E.D.N.Y. 2003) aff'd 403 F.3d 43 (2d Cir.2005). *See also Kittay v. Flutie New York Corp. (In*

*re Flutie New York Corp.)*, 310 B.R. 31, 52-55 (Bankr. S.D.N.Y. 2004) (Lifland, J.).

      27.     Under the NYDCL, fair consideration is given for property, or obligation,

> a. When in exchange for such property, or obligation, as a fair equivalent
> therefor, and in good faith, property is conveyed or an antecedent debt is
> satisfied, or
>
> b. When such property, or obligation is received in good faith to secure a
> present advance or antecedent debt in amount not disproportionately small
> as compared with the value of the property, or obligation obtained.

*See* NYDCL § 272.

28.    Similarly under Section 548 of the Bankruptcy Code, a transfer of may be avoided as a fraudulent conveyance if such transfer is made while the transferor (S&B in this case) was insolvent or rendered insolvent thereby and the transfer was for less than equivalent value. Thus, under both Section 548 of the Bankruptcy Code and under applicable state law, the transfer of a lien on all of S&B's assets, which according to Claimant's disingenuous claim includes S&B's interests in GL II, was made for less than fair consideration (actually no consideration) and rendered S&B insolvent. It is beyond dispute that S&B's approximately 30% interest in GL II is subject only to the legitimate debts of the Debtors and their subsidiaries. However, if the Mezzanine Loan is allowed to be asserted against S&B either at the present time or at the inception of the Loan, any equity existing in favor of the owners of S&B will be fully extinguished and S&B will be deemed insolvent.

29.    Critically, the 215 Moore Claim must be disallowed as the Claimant is the clear recipient of a fraudulent conveyance. Section 502(d) of the Bankruptcy Code provides for the disallowance of any claim asserted by a creditor that is subject to an avoidance claim, including one based on fraudulent conveyance such as the 215 Moore Claim asserted herein by Claimant:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

**(b) Claim Estimation**

30.    Pursuant to 11 U.S.C. § 502(c), this Court may estimate any contingent or unliquidated claim "the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." *In re Rhead*, 179 B.R. 169 (Bankr. D. Ariz. 1995) (finding that a debt is unliquidated where the debtors had "filed objections, challenging certain aspects of the Proof of

Claim filed by [the creditor]"). *In re Barnett*, 42 B.R. 254, 257 (N.Y.S.D. 1984) (noting that a

guarantee is a classic illustration of a contingent claim).

31.     Even if the Court is not inclined to disallow the 215 Moore Claim based upon the

clear fraudulent conveyance grounds, the Debtors respectfully submit that the 215 Moore Claim

should be estimated to zero. While Moore Development and S&B are legally "co-obligors," from

an equitable perspective this case has far more similarities to cases involving a guarantor of an

obligation where the principal obligor has the requisite financial strength and asset value such that

the Claimant is substantially oversecured by the primary source of recovery. Thus, following the

multiple cases estimating guaranty claims at zero[5], the Debtors request that the Court analogize

S&B's obligation to that of a guaranty.  Moreover, without the estimation at zero, or, at the very

least, reduction of the 215 Moore Claim, the Debtors' ability to confirm a plan will be severely

impaired. Therefore, estimation at zero is appropriate under these circumstances.

32.     Additionally, under Fed. R. Bankr. P. 3018(a), this Court may "temporarily allow

[a] claim or interest in an amount which the court deems proper for the purpose of accepting or

rejecting a plan." "Neither the Code nor the Federal Rules of Bankruptcy Procedure provide any

procedures or guidelines for estimation." *See In re Windsor Plumbing Supply Co.*, 170 BR. 503,

519 (Bankr. E.D.N.Y. 1994). Bankruptcy judges may use whatever method is best suited to the

particular contingencies at issue and therefore Judges must fashion their own procedures. *Id*.

Consequently, the court is bound only by "the legal rules which may govern the ultimate value of

the claim and those general principles which should inform all decisions made pursuant to the

Code." *Id.* at 520. However, "whatever the procedure the court chooses to estimate a claim, it must

be consistent with the policy underlying Chapter 11, that a "reorganization must be accomplished

---

[5] *In re Fox,* 64 B.R. 148 (Bankr. N.D. Ohio 1986); *In re Zucker,* 1979 Bankr. LEXIS 891 (Bankr. S.D.N.Y. July 2, 1979); and *In re Kaplan,* 186 B.R. 871 (Bankr. D.N.J. 1995).

quickly and efficiently." *Id*. The bankruptcy court "only needs to reasonably estimate the probable value of the claim." *Falk v. Falk (In re Falk)*, 2013 Bankr. LEXIS 4645, *23 (9th Cir. BAP Sep. 26, 2013). Thus, this Court is certainly permitted, under the Code, to consider the ability of the principal obligor to pay the obligation, and the value of the property underlying the obligation in estimating the 215 Moore Claim at zero for voting and distribution purposes. *In re Fox*, 64 B.R. 148 (Bankr. N.D. Ohio 1986); *In re Kaplan,* 186 B.R. 871 (Bankr. D.N.J. 1995).

II.    **Principles of equity require that Claimant satisfy its claim from co-obligor Moore Development before proceeding against Debtors.**

33.    S&B held a mere 3% interest in the Moore Property and received **no** proceeds of the Mezzanine Loan. Additionally, as set forth above, the 215 Moore Claim is fully secured by the membership interests held by Moore Development. The Mezzanine Loan was never once contemplated to encompass S&B's interests in the Grand Property, Further, S&B transferred whatever nominal ownership it had to Moore years ago, and, in any event, the 215 Moore Claim will be fully satisfied by Moore Development.  Conversely, if the 215 Moore Claim is permitted to be asserted against S&B at this time, the Debtors will likely be unable to confirm their proposed plan.  As a result, other creditors, which only have claims against the Debtors, rather than against the Debtors and Moore Development, will be severely harmed. Failure to compel equitable marshaling under these circumstances will result in irreparable harm to all other creditors of the Debtors while Claimant is fully protected in all scenarios by the dual recovery sources available to it.  Accordingly, S&B requests that the Court apply the equitable doctrine of marshaling to prevent Claimant from proceeding against S&B's assets without first exhausting its remedies against the claimed co-obligor, Moore Development.

60748841;8

### a. Debtors have standing to invoke the equitable doctrine of marshaling

34.     A debtor in possession has standing to invoke the marshaling doctrine. It is well established that a trustee, as a hypothetical lien creditor, is empowered to invoke the doctrine under 28 U.S.C. § 544(a). *In re Borges*, 184 B.R. 874, 878 (Bankr. D. Conn. 1995) (collecting cases). A debtor in possession has all rights and powers of a trustee. 28 U.S.C. § 1107(a); *Topcon Instrument Corp. of Am. v. West Coast Optical Instruments (In re West Coast Optical Instruments)*, 177 B.R. 720, 722 (M.D. Fla. 1992); *In re Harbor Pointe Office Park, Ltd., I*, 83 B.R. 44, 46 (Bankr. D. Colo. 1988) (finding that a DIP has all rights and powers of a trustee including the "strong-arm" lien avoidance powers under Section 544(a)). Therefore, a debtor in possession has standing to invoke the doctrine of marshaling. *In re Borges*, 184 B.R. at 878 (holding that debtor in possession has standing to invoke the marshaling doctrine).

35.     Under the facts of this case, equity necessitates application of the marshaling doctrine. Marshaling rests on the equitable principle that "a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Sowell v. Federal Reserve Bank*, 268 U.S. 449, 457 (1925). The application of equitable marshaling prevents "the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237 (1963).

36.     The traditional elements of marshalling have consisted of: (1) the existence of two secured creditors with a common debtor, (2) the existence of two funds belonging to the debtor, also known as the *common debtor* prong[6], (3) the right of the senior secured creditor to receive payment from more than one fund while the junior secured creditor can only resort to one fund,

---

[6] At common law a common debtor was required for application of the doctrine. *Meech v. Allen*, 17 N.Y. 300 (1858)

60748841;8

and (4) lack of prejudice the rights of third parties, including the lien holders. *Borges*, 184 B.R. at 879.

> **b. The capital contribution and alter ego exception satisfy the common debtor prong**.

37.     Courts, including the United States Bankruptcy Court for the Southern District of New York, have recognized that equity may require deviation from stringent adherence to the traditional application of the doctrine. *In re Tampa Chain Co. Inc.*, 53 B.R. 772 (Bankr. S.D.N.Y. 1985); *In re Wm. Pietsch Co., Inc.*, 200 B.R. 207, 210 - 212 (Bankr. E.D. Wisc. 1996); *In re Multiple Services Industries, Inc.*, 18 B.R. 635 (Bankr. E.D. Wisc. 1982). Thus, courts have applied the doctrine in the absence of two secured creditors and for the interest of unsecured creditors. *Id.*; *In re Jack Green's Fashions for Men — Big & Tall, Inc.*, 597 F.2d 130 (8th Cir. 1979) (applying marshaling for the equitable purpose of preserving a distribution for the debtor's unsecured creditors); *In re Hale*, 141 B.R. 225, 228 (Bankr. N.D. Fla. 1992) (finding marshaling of assets appropriate when allowing the claim against the debtor would result in unsecured creditors inequitably paying the balance of the claims).

38.     Courts have also provided a series of noted exceptions to the common debtor prong. One exception is pledging another party's assets directly to secure a loan to the debtor which constitutes a contribution of capital to the debtor, thus satisfying the requirement of the existence of two funds belonging to the debtor. *In re Tampa Chain Co. Inc.*, 53 B.R. 772 at 779; *In re Wm. Pietsch Co., Inc.*, 200 B.R. 207, 210, 212 (Bankr. E.D. Wis. 1996); *In re Multiple Services Industries, Inc.*, 18 B.R. 635 (Bankr. E.D. Wisc. 1982); *Moser Paper Co. v. North Shore Pub. Co.*, 83 Wis.2d 852, 864 (1978) (finding non-debtor mortgages that secured loan proceeds used as working capital for debtor as creating a fund which equity will consider a fund of debtor).

39.     The United States Bankruptcy Court for the Southern District of New York recognized this exception to the common debtor prong. *In re Tampa Chain Co. Inc.*, 53 B.R. 772 at 779. In *Tampa Chain*, this Court noted that "[s]everal courts have held that when a guarantor who is also a controlling shareholder provides the lender with the primary collateral needed to obtain a working capital loan to either initiate or continue the operation of the debtor corporation, the "common debtor" requirement is satisfied and the equitable remedy of marshaling is available." *Id*.; *see also In re Wm. Pietsch Co., Inc., 200 B.R. 207,* 210, 212 (Bankr. E.D. Wis. 1996) (chapter 7 trustee successfully asserted a marshaling claim against a secured creditor, who held as collateral a lien on accounts, as well as a guaranty secured by real estate), *In re Multiple Services Industries, Inc.*, 18 B.R. 635 (Bankr. E.D. Wisc. 1982) (ordering marshaling in favor of unsecured creditors, requiring the lender to first proceed against a personal residence before pursuing life insurance proceeds and a certificate of deposit). This exception has been used to reach personal real estate pledged by the principal of a corporation for the debt of the corporation. *Id*. The same principles extend to the circumstances at hand as S&B, as a co-obligor, according to Claimant, pledged assets as collateral for Moore Development's effectively primary obligation.

40.     In *In re Universal Elec. Sign Co.*, the Western District of Wisconsin, considered this exception in the context of settling an estate's claim for marshalling of assets under facts very similar to this case. *See In re Universal Elec. Sign Co.*, 255 B.R. 732, 735 (Bankr. E.D. Wisc. 2000). In *In re Universal Elec. Sign Co.*, a debtor and co-debtor executed a loan and security agreement with a lender. *Id*. Each company received a loan, but the loan agreement provided that all assets of each corporation were pledged as collateral for funds advanced to both companies. *Id*. In addressing creditor's objection to settlement of the marshaling claim, the Court reasoned that the co-debtors pledged their assets to secure the claim, thus making a direct contribution to the

capital of the sister corporation and giving the lender access to two funds of the debtor, and satisfying the common debtor prong. *Id*.

41.    In approving the settlement of the marshalling claim, the Court considered the cost of litigating the marshaling claim, and the sub-optimal prospect of the potential liquidation of the co-debtor corporation (*i.e*, S&B), as that would destroy a viable company and harm co-debtor's unsecured creditors. *Id.* at 737.  Moreover, the collateral exception has been applied to co-debtors' that pledged their assets to secure a claim. *See In re Universal Elec. Sign Co.*, 255 B.R. 732 at 735. The reservations noted by the *Universal Elec. Sign Co.* court are not present here. First, litigating the marshaling claim would not deplete Debtors' resources as compared to the potential benefit to Debtors' estate. Additionally, Moore does not have any employees and would not be liquidated if Claimant is required to seek satisfaction from Moore's assets. Therefore, the common debtor prong is satisfied through the collateral exception.

42.    Another relevant exception to the common debtor prong is the "alter-ego" exception. Under New York law, an "alter-ego" is established when (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 324 (S.D.N.Y. 2009) (citing *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001).

43.    The first inquiry, domination and control, evaluates a number of factors touching on "corporate formalities, capitalization, ownership, and control, among other factors." *Id*. With respect to control over certain transactions, New York courts have required "not mere majority or complete  stock control, but complete domination, not only of finances but of policy and business

practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." (emphasis added) *Id*. (citing *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985)). The New York Court of Appeals has made it clear that the decision to pierce the corporate veil must be based on the "attendant facts and equities" of each separate case, and cannot be reduced to a set of formulas and factors with pre-determined weights. *See Matter of Morris v. New York State Department of Taxation & Finance*, 82 N.Y.2d 135, 142 (1993).

44.     Here, all elements of the marshalling doctrine are satisfied. S&B has multiple creditors, both secured and unsecured. Claimant's lien rights are superior to the rights of unsecured creditors. Moreover, Claimant may satisfy its claim from two funds: its security interests in Moore Development or in S&B. Only the Claimant has access to both funds.

45.     The common debtor prong is equally satisfied. First, the principals of S&B and Moore Development are substantially similar. For purposes of analyzing the "common debtor" issue, this case is sufficiently analogous to the cases where the doctrine has been used to reach personal real estate pledged by the principal of a corporation for the debt of the corporation. *In re Jack Green's Fashions for Men — Big & Tall, Inc.*, 597 F.2d at 133; *In re Wm. Pietsch Co., Inc.*, 200 B.R. at 212.

46.     Additionally, the facts of this case warrant a holding, for marshaling purposes *only*, and with respect to the Mezzanine Loan *only*, that S&B is Moore Development's alter ego. Moore Development and S&B share the same principals. Moore Development is, effectively, the sole obligor and exclusive recipient of the proceeds of the Mezzanine Loan.

47.     Ultimately, "marshalling assets is an equitable doctrine developed to prevent injustice to junior creditors and foster fair dealing, justice and common honesty." 53 Am.Jur.2d

Marshalling Assets § 4 (1970) (footnotes omitted). Likewise, "[m]arshalling is not bottomed on the law of contracts or liens. It is not in any sense a vested right or lien, but only an equity, to be administered as such. It rests upon equitable principles only and the discretion or benevolence of the court…" *Id.*

48.    The principles underlying the doctrine of marshaling fall squarely withing the circumstances at hand. As the former 97% owner of the Moore Property (and now 100% owner), Moore Development is the true beneficiary of the Loan. The Claimant should not be allowed full recourse of its $17,848,567.56 claim from S&B, when S&B previously held only, at most,  a 3% interest in Moore Property, did not receive any funds from the Mezzanine Loan, and no longer has any interest in Moore.

49.    In summary, Claimant is trying take advantage of being the recipient of fraudulent conveyance, which even based on the 215 Moore Claim arising from a fraudulent conveyance should be estimated at zero, or at 3% at most. In any case, based on the marshalling  doctrine, Claimant should be prevented from  realizing prematurely upon assets that S&B as its estate needs to preserve value for other creditors.

50.    Most importantly, equity demands that Claimant be prevented from taking arbitrary action counter to fundamental principles of the Bankruptcy Code — prioritizing the best interest of the creditors and providing debtors a fair opportunity to reorganize.

## CONCLUSION

WHEREFORE, for these reasons set forth herein, S&B respectfully requests an order (i) disallowing the 215 Moore Claim in its entirety or estimating the 215 Moore Claim against S&B at zero ($0) for distribution and voting purposes, and capping the 215 Moore Claim amount at most at 3% of the claim, or alternatively, (ii)  compelling Claimant to satisfy the 215 Moore Claim

from co-obligor Moore Development before proceeding against S&B's assets and, and (iii)

granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 19, 2021

                      **AKERMAN LLP**

                      By:    */s/Mark S. Lichtenstein*
                            Mark S. Lichtenstein
                            Joshua D. Bernstein
                            Benjamin R. Joelson
                            1251 Avenue of the Americas, 37th Floor
                            New York, NY 10020
                            Tel. (212) 880-3800
                            E-mail: mark.lichtenstein@akerman.com
                            E-mail: joshua.bernstein@akerman.com
                            E-mail: benjamin.joelson@akerman.com

                      *Co-Counsel for Debtors*

                               -and-

                      **BACKENROTH FRANKEL & KRINSKY, LLP**
                      Mark Frankel
                      800 Third Avenue
                      New York, New York 10022
                      Tel. No.: (212) 593-1100
                      E-mail: mfrankel@bfklaw.com
                      *Counsel for Debtors*

## VERIFICATION

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | ) ss.: |
| **COUNTY OF NEW YORK** | ) |

I, Yechial Michael Lichtenstein, declare under penalty of perjury:

1.      I am a member of the Debtor MY 2011 Grand LLC and have full authority on behalf of MY 2011 Grand LLC to make this verification.

2.      I have read the foregoing *Verified Objection to Claim of 215 Moore Street Mezzanine Lender LLC, or Alternatively, Motion to Compel Equitable Marshaling [Claim Number 4]* and know the contents thereof. The same is true to my own knowledge, except to matters stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____
Yechial Michael Lichtenstein

Sworn to and subscribed before me this
_17_ day of November 2021.

_____
NOTARY PUBLIC

MOSHE SCHEPANSKY
Notary Public, State of New York
Reg. No. 01SC6327934
Qualified in Queens County
Commission Expires 10/15/2023

{26842273;3}

# EXHIBIT A

# 215 MOORE CLAIM
# [CLAIM NO. 4]

60748841;8

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | S & B Monsey LLC |
| Debtor 2 (Spouse, if filing) | |

United States Bankruptcy Court for the:  Southern District of New York  ☑

Case number  19-23959

---

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

215 Moore Street Mezzanine Lender LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Robinson Brog c/o Fred B. Ringel
Name

875 Third Ave., 9th Fl.
Number        Street

875 Third Avenue        NY        10022
City        State        ZIP Code

Contact phone  212 603 6300

Contact email  fbr@robinsonbrog.com

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number        Street

_____
City        State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

Official Form 410        **Proof of Claim**        page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|--------------------------------------------------------------------|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7.** **How much is the claim?**   $_____17,848,567.56___   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Loaned

**9.** **Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:   See Attached

**Basis for perfection:**   See Attached

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $____TBD____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  08/23/2020
                   MM / DD / YYYY

Signature: *Ron Friedman*

**Print the name of the person who is completing and signing this claim:**

| Name | Ron Friedman | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Authorized Signatory | | |
| Company | 215 Moore Street Mezzanine Lender LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 207 West 25th Street, 9th Fl. | | |
| | Number        Street | | |
| | New York | NY | 10001 |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | _____ |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------x
In re:                                                          Chapter 11

      MY2011 Grand LLC[1],                          Case no.  19-23957 (RDD)
                                                     Jointly Administered

                          Debtors.
---------------------------------------------------------x

## RIDER TO PROOF OF CLAIM

1.       As set forth in the payoff letter attached hereto as **Exhibit A**, S&B Monsey LLC ("Monsey") is indebted to 215 Moore Street Mezzanine Lender LLC (the "Lender") in an amount no less than $17,848,567.56 as of November 6, 2019 (the "Petition Date").  The amount asserted by the Lender in this proof of claim and in the payoff letter does not include additional interest and fees, including legal fees, which may have accrued since the date of Monsey's bankruptcy filing.

2.       The Lender seeks to pursue its rights and remedies in connection with the loan (the "Loan") evidenced by, among other things, a promissory note (the "Note") dated November 18, 2016 made, executed and delivered by Monsey and 215 Moore St Development LLC ("215 Moore") to Lender in the principal sum of $9,850,000.  A copy of the Note is attached hereto as **Exhibit B**.

3.       On November 18, 2016, to secure the repayment of the indebtedness evidenced by the Note, Monsey and 215 Moore executed and delivered a Mezzanine Loan Agreement (the "Mezzanine Loan Agreement") between them and the Lender, as Administrative Agent.  A copy of the Mezzanine Loan Agreement is attached hereto as **Exhibit C**.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070)

4.      On November 18, 2016, to further secure repayment of the indebtedness, Monsey executed and delivered a Pledge and Security Agreement (the "Pledge and Security Agreement") to Lender.  A copy of the Pledge and Security Agreement is attached hereto as **Exhibit D**.

5.      On April 3, 2018, Monsey and 215 Moore entered into the First Omnibus Loan Modification Agreement (the "Loan Modification Agreement") and Amended and Restated Promissory Note (the "Amended Note') , which increased S&B and Monsey's indebtedness to the Lender under the Note and Mezzanine Loan Agreement to $15,000,000.  A copy of the Loan Modification Agreement and Amended Note are attached as **Exhibits E** and **F**, respectively.

6.      Lender reserves all of its rights, including with respect to determination of the value of its collateral for any purpose relating to Monsey's chapter 11 cases.   Lender reserves the right to amend this proof of claim or this rider as necessary or appropriate to amend, revise, increase or correct the amounts and/or details of the various claims set forth herein and/or to include any and all other claims that Lender may now have or may have in the future against Monsey arising under, related to, or in connection with the matters referred to herein, including without limitation the right to seek such appropriate relief as may be required in connection with any of the claims described herein. Nothing contained herein shall be deemed a waiver of any rights that Lender has or may have, including any rights against Monsey, including but not limited to rights to recover fees and interest accruing after the Petition Date.

7.      The filing of this proof of claim is not and shall not be deemed or construed a a waiver or release of the Lender's rights against any person, entity, or property, or a waiver of the right to compel Monsey to return property of the Lender currently in the possession of the Debtor.

# EXHIBIT A

215 Moore Street Mezzanine Lender LLC
207 W 25th Street, 9th Floor
New York, NY 10001
212.494.9022



| | **PAYOFF AS OF:** 11/6/2019 |
|---|---|

**BILL TO:**

215 Moore St Development LLC

S&B Monsey LLC

c/o Heritage Equity Partners

711 Fifth Avenue, 16th Floor

New York, New York 10022

Attention: Toby Moskovits

| DESCRIPTION | TOTAL |
|---|---|
| Principal Balance | $15,000,000.00 |
| Note Interest | $1,743,750.00 |
| Default Interest | $941,250.00 |
| Late Fees | $134,250.00 |
| Legal Fees | $29,317.56 |
| | |
| **TOTAL AMOUNT DUE AS OF 11/6/2019:** | **$17,848,567.56** |

**SEND WIRE TO:**

| | |
|---|---|
| Beneficiary: | 215 Moore Street Mezzanine Lender LLC |
| | 207 W 25th Street, 9th Floor |
| | New York, NY 10001 |
| Account #: | ████9859 |
| Bank: | Cross River Bank |
| | 885 Teaneck Road |
| | Teaneck, NJ 07666 |
| ABA #: | ████ |

If you have any questions concerning this payoff statement,
please contact Gregory Preis, 212.494.9022, gpreis@huttoncm.com

# **EXHIBIT B**

COPY

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.  THIS NOTE MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS NOTE UNDER SAID ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (B) AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS.**
**THIS NOTE IS REGISTERED WITH THE AGENT (AS DEFINED BELOW) PURSUANT TO SECTION 12.3(o) OF THE LOAN AGREEMENT (AS DEFINED BELOW).  TRANSFER OF ALL OR ANY PORTION OF THIS NOTE IS PERMITTED SUBJECT TO THE PROVISIONS SET FORTH IN SUCH SECTION 12.3(o) WHICH REQUIRE, AMONG OTHER THINGS, THAT NO TRANSFER IS EFFECTIVE UNTIL THE TRANSFEREE IS REFLECTED AS SUCH ON THE REGISTRY MAINTAINED WITH THE AGENT PURSUANT TO SUCH SECTION 12.3(o).**

<u>PROMISSORY NOTE</u>

$9,850,000.00                                                                                    New York, New York
November 18, 2016

FOR VALUE RECEIVED, 215 MOORE ST DEVELOPMENT LLC, a New York limited liability company, having its principal place of business c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("<u>Heritage Borrower</u>") and S&B MONSEY LLC, a New York limited liability company, having its principal place of business c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("<u>S&B Borrower</u>", together with Heritage Borrower, individually and collectively, jointly and severally, "<u>Borrower</u>"), hereby unconditionally promises to pay to the order of 215 MOORE STREET MEZZANINE LENDER LLC, a New York limited liability company, having an address at 333 7th Avenue, 3rd FL New York, New York 10001, as administrative and collateral agent (in such capacity, together with its successors and assigns, "<u>Administrative Agent</u>") for the Lenders (as defined in the Loan Agreement referred to below), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of Nine Million Eight Hundred and Fifty Thousand and 00/100 Dollars ($9,850,000.00) or so much thereof as is advanced, in lawful money of the United States of America, with interest thereon to be computed from the date of this Promissory Note (as the same may be further amended, supplemented, restated, replaced or otherwise modified from time to time, this "<u>Note</u>") at the Note Rate, and to be paid in accordance with the terms of this Note and that certain Mezzanine Loan Agreement dated the date hereof between Borrower, Administrative Agent and Lenders (as the same may be amended, modified, restated, supplemented, replaced or otherwise modified from time to time, the "<u>Loan Agreement</u>").  All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

## ARTICLE 1:  PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article II of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

## ARTICLE 2:  DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Administrative Agent if any payment required in this Note is not paid on or prior to the date when due (subject to any grace period provided in the Loan Agreement or herein) or if not paid on the Maturity Date or on the happening of any other Event of Default.

## ARTICLE 3:  LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.  In the event of a conflict or inconsistency between the terms of this Note, the Security Instrument and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4:  SAVINGS CLAUSE

Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Administrative Agent are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lenders shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lenders, and (c) if through any contingency or event, Lenders receive or are deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lenders, or if there is no such indebtedness, shall immediately be returned to Borrower.

## ARTICLE 5:  NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Administrative Agent, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6:  WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive valuation, appraisement, presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and nonpayment and all other notices of any kind, except for notices expressly required by the Loan Agreement, delays in collection or enforcement of this Note and the benefit of all applicable law affording any right or redemption or cure.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Administrative Agent, Lenders or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of

Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Administrative Agent to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. Borrower acknowledges that this Note and Borrower's obligations under this Note are and shall at all times continue to be personal, absolute and unconditional in all respects. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers, directors or members relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement or any other Loan Document.)

## ARTICLE 7:  TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Administrative Agent may deliver all the collateral granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Administrative Agent and Lenders with respect thereto, and Administrative Agent and Lenders shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Administrative Agent and Lenders shall retain all rights hereby given to them with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8:  GOVERNING LAW

**(A) THE LOAN AGREEMENT, THIS NOTE, THE SECURITY INSTRUMENT AND EACH OF THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

**(B) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, LENDERS OR BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT ADMINISTRATIVE AGENT OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY, COUNTY AND STATE OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE**

AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

### ARTICLE 9:  LIABILITY

This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers, and shall be binding upon them and their successors and assigns.  If any payment under this Note is not made when due, Borrower agrees to pay all costs of collection when incurred, including reasonable attorneys' fees, which costs shall be added to the amount due under this Note and shall be receivable therewith.

### ARTICLE 10:  TIME OF THE ESSENCE

TIME IS OF THE ESSENCE with regard to Borrower's performance of all the terms, covenants and conditions of this Note.

### ARTICLE 11:  AUTHORITY

Borrower (and the undersigned representative of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note and that the Debt hereunder constitutes a valid and binding obligation of Borrower.

### ARTICLE 12:  NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 9.6 of the Loan Agreement.

### ARTICLE 13:  WAIVER OF JURY TRIAL

BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THE LOAN AGREEMENT, THIS NOTE, THE MORTGAGE OR THE OTHER LOAN DOCUMENTS OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH, THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE, EACH OF ADMINISTRATIVE AGENT AND LENDERS ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.

### ARTICLE 14:  SUCCESSORS AND ASSIGNS

This Note shall be binding upon, and shall inure to the benefit of, Borrower, Administrative Agent and Lenders and their respective successors and permitted assigns.

Lenders may sell, assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or a portion of its rights and obligations under this Note and the other Loan Documents to any Person.  Any assignee or transferee of Lenders shall be entitled to all the benefits afforded to Lenders under this Note.  Borrower shall not have the right to assign, delegate or transfer its rights or obligations under this Note without the prior written consent of Administrative Agent, and any attempted assignment, delegation or transfer without such consent shall be null and void.

## ARTICLE 15:  JOINT AND SEVERAL LIABILITY

If more than one Person has executed this Note as "Borrower," the obligations of all such Persons hereunder shall be joint and several.

## ARTICLE 16:  ADMINISTRATIVE AGENT

To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto and Borrower shall be protected in its reliance thereof.

## ARTICLE 17:  REGISTERED OBLIGATION

Registered Obligation.  This Note shall be registered (and such registration shall thereafter be maintained) as set forth in Section 12.3(o) of the Loan Agreement.  Notwithstanding any document, instrument or agreement relating to this Note to the contrary, transfer of this Note (or the right to any payments of principal or stated interest thereunder) may only be effected by (i) surrender of this Note and either the reissuance by the Borrower of this Note to the new holder or the issuance by the Borrower of a new instrument to the new holder or (ii) registration of such holder as an assignee in accordance with Section 12.3(o) of the Loan Agreement.

[NO FURTHER TEXT ON THIS PAGE]

- 5 -

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

215 MOORE ST DEVELOPMENT LLC, a New York limited liability company

By: _____ **COPY**
Name: Toby Moskovits
Title: Authorized Person

S&B MONSEY LLC, a New York limited liability company

By: _____ **COPY**
Name: Moshe Dov Schweid
Title: Manager

# EXHIBIT C

# MEZZANINE LOAN AGREEMENT

Dated as of November 18, 2016

Between

### 215 MOORE ST DEVELOPMENT LLC
and
### S&B MONSEY LLC
collectively, as Borrower,

and

### 215 MOORE STREET MEZZANINE LENDER LLC
as Administrative Agent,

and

### THE LENDERS PARTY HERETO

| | |
|---|---|
| Addresses: | 208 Seigel Street, Brooklyn, New York 11206 |
| | 216-224 Seigel Street, Brooklyn, New York 11206 |
| | 228-230 Seigel Street, Brooklyn, New York 11206 |
| | 33-39 White Street, Brooklyn, New York 11206 |
| | 201-205 Moore Street, Brooklyn, New York 11206 |
| | 207-209 Moore Street, Brooklyn, New York 11206 |
| | 203-205 Moore Street, Brooklyn, New York 11206 |
| | 197, 207 & 195 Moore Street, Brooklyn, New York 11206 |
| | 199 Moore Street, Brooklyn, New York 11206 |
| | 191 Moore Street, Brooklyn, New York 11206 |
| County: | Kings |
| Block: | 3100 |
| Lot(s): | 26, 32, 47, 56, 61, 63, 66, 67, 68 |
| Parcels | 22, 26, 32, 47, 63, 56, 61, 66, 67 and 68. |

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ............................................2
    Section 1.1     Definitions...................................................................................................2
    Section 1.2     Principles of Construction.........................................................................15
    Section 1.3     Presumption. ...........................................................................................15

ARTICLE II. GENERAL TERMS ...........................................................................................15
    Section 2.1     Loan Commitment; Advance to Borrower. ...............................................15
    Section 2.2     Interest; Loan Payments...........................................................................15
    Section 2.3     Loan Payments.........................................................................................17
    Section 2.4     Prepayments. ...........................................................................................21
    Section 2.5     Release on Payment in Full......................................................................22

ARTICLE III. REPRESENTATIONS AND WARRANTIES.....................................................22
    Section 3.1     Borrower Representations.........................................................................22
    Section 3.2     Survival of Representations. ....................................................................33

ARTICLE IV. BORROWER COVENANTS.............................................................................33
    Section 4.1     Affirmative Covenants.............................................................................33
    Section 4.2     Negative Covenants. ................................................................................41

ARTICLE V. RESERVED .......................................................................................................45
ARTICLE VI. CONDITIONS PRECEDENT............................................................................45
    Section 6.1     Representations and Warranties; Compliance with Conditions.................45
    Section 6.2     Reserved..................................................................................................45
    Section 6.3     Further Documents...................................................................................45

ARTICLE VII. RESERVED .....................................................................................................46
ARTICLE VIII. RESERVED ....................................................................................................46
ARTICLE IX. LINE ITEMS ....................................................................................................46
    Section 9.1     Reserved..................................................................................................46
    Section 9.2     Identity of Interest...................................................................................46
    Section 9.3     Interest Reserve.......................................................................................46
    Section 9.4     Reserved..................................................................................................46
    Section 9.5     Reserved..................................................................................................46

ARTICLE X. INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS........46
    Section 10.1    Insurance.................................................................................................46
    Section 10.2    Casualty..................................................................................................51
    Section 10.3    Condemnation. ........................................................................................51
    Section 10.4    Restoration. ............................................................................................52

ARTICLE XI. DEFAULTS .......................................................................................................56
    Section 11.1    Event of Default......................................................................................56
    Section 11.2    Remedies.................................................................................................60
    Section 11.3    Remedies Cumulative; Waivers................................................................61

ARTICLE XII. SPECIAL PROVISIONS ................................................................62
   Section 12.1    Sale of Notes. ....................................................................62
   Section 12.2    Servicer. ............................................................................62
   Section 12.3    Administrative Agent. .......................................................63
   Section 12.4    Certain Additional Rights of Administrative Agent. .......69

ARTICLE XIII. MISCELLANEOUS ......................................................................73
   Section 13.1    Survival. ............................................................................73
   Section 13.2    Administrative Agent's Discretion. ..................................73
   Section 13.3    Governing Law. .................................................................73
   Section 13.4    Modification, Waiver in Writing. .....................................74
   Section 13.5    Delay Not a Waiver. .........................................................74
   Section 13.6    Notices. .............................................................................74
   Section 13.7    Trial by Jury. ....................................................................75
   Section 13.8    Headings. ..........................................................................75
   Section 13.9    Severability. .....................................................................76
   Section 13.10   Preferences. ......................................................................76
   Section 13.11   Waiver of Notice. .............................................................76
   Section 13.12   Remedies of Borrower. .....................................................76
   Section 13.13   Expenses; Indemnity. .......................................................76
   Section 13.14   Further Assurances. ..........................................................78
   Section 13.15   Waiver of Statute of Limitations. .....................................79
   Section 13.16   Schedules, Exhibits and Cover Page Incorporated. .........79
   Section 13.17   Offsets, Counterclaims and Defenses. ..............................79
   Section 13.18   No Joint Venture or Partnership; No Third Party Beneficiaries. ....................79
   Section 13.19   Reserved. ..........................................................................80
   Section 13.20   Waiver of Marshalling of Assets. .....................................80
   Section 13.21   Waiver of Counterclaim. ..................................................80
   Section 13.22   Conflict; Construction of Documents; Reliance. .............80
   Section 13.23   Counterparts. ....................................................................81
   Section 13.24   Brokers and Financial Advisors. ......................................81
   Section 13.25   Prior Agreements. ............................................................82
   Section 13.26   Joint and Several. .............................................................82


SCHEDULES

Schedule I      Property Description
Schedule II     Organizational Chart of Borrower and Mortgage Borrower
Schedule III    Lenders
Schedule IV    Intentionally Deleted
Schedule V     Disclosed Litigation
Schedule VI    Mortgage Loan Documents

EXHIBITS

Exhibit A      Pending Advance Clause
Exhibit B      Current Leases

Exhibit C        Intentionally Deleted
Exhibit D        Filed Liens

## MEZZANINE LOAN AGREEMENT

THIS MEZZANINE LOAN AGREEMENT, dated as of November 18, 2016 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between (1) the Lenders (as hereinafter defined), (2) 215 MOORE STREET MEZZANINE LENDER LLC, a New York limited liability company, having an address at 333 7th Avenue, 3rd FL, New York, NY 10001, as administrative agent and collateral agent for the Lenders (in such capacity, and together with its successors and assigns, "Administrative Agent" or "Agent"), (3) 215 MOORE ST DEVELOPMENT LLC, a New York limited liability company, having its principal place of business at c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("Heritage Borrower") and (4) S&B MONSEY LLC, a New York limited liability company, having its principal place of business at c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("S&B Borrower", together with Heritage Borrower, individually and collectively, jointly and severally, "Borrower").  All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

## W I T N E S S E T H:

WHEREAS, KCOF-215 MOORE LLC, a Delaware limited liability company ("Mortgage Lender"), has made a loan in the original principal amount of $35,000,000.00 (the "Mortgage Loan") to 215 Moore St Acquisition LLC, a New York limited liability company ("Moore St Acquisition") and S&B Moore LLC, a New York limited liability ("S&B Moore") company (individually and collectively, jointly and severally, "Mortgage Borrower") pursuant to that certain Term Loan Agreement dated as of the date hereof (as the same may be amended, restated, replaced, extended, renewed, supplemented, or otherwise modified from time to time, the "Mortgage Loan Agreement"), which Mortgage Loan is evidenced by that certain Secured Promissory Note dated as of the date hereof made by Mortgage Borrower and payable to Mortgage Lender in the face principal amount of $35,000,000.00 (as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, the "Mortgage Note") and secured by, among other things, that certain Mortgage, Consolidation and Modification Agreement dated as of the date hereof made by Mortgage Borrower in favor of Mortgage Lender (as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, the "Mortgage") pursuant to which Mortgage Borrower has granted the Mortgage Lender a mortgage lien on, among other things, the real property and other collateral as more fully described on Schedule I annexed hereto and made a part hereof (collectively, the "Property");

WHEREAS, (i) Heritage Borrower, as the sole member of Moore St Acquisition, is the legal and beneficial owner of 100% of the membership interests of Moore St Acquisition and (ii) S&B Borrower, as the sole member of S&B Moore, is the legal and beneficial owner of 100% of the membership interests of S&B Moore (collectively, the "Pledged Membership Interests");

WHEREAS, Borrower has requested that Lender make a mezzanine loan to it in the aggregate principal amount of $9,850,000.00; and

WHEREAS, as a condition precedent to the obligation of Lender to make the Loan to Borrower, each Borrower has entered into a Pledge and Security Agreement, dated as of the date

hereof, in favor of Lender (as amended, supplemented or otherwise modified from time to time, the "Security Instrument"), pursuant to which Borrower has granted to Lender a first priority security interest in the Collateral as collateral security for the Debt (as defined below).

NOW THEREFORE, in consideration of the making of the Loan (as hereinafter defined) by Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION

### Section 1.1    Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Access Laws" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities (as same may be amended from time to time).

"Account Collateral" shall mean: (i) the Accounts, and all Cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) all interest, dividends, Cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iii) to the extent not covered by clauses (i) - (ii) above, all "proceeds" (as defined under the Uniform Commercial Code as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"Accounts" shall mean, collectively the Interest Reserve Funds and any escrow accounts and reserve accounts established by the Loan Documents with such banking institution selected by Lender.

"Additional Indemnified Liabilities" shall have the meaning set forth in Section 13.13(b) hereof.

"Administrative Agent" or "Agent" shall have the meaning set forth in the introductory paragraph hereto.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, owns more than ten percent (10%) of, is in control of, is controlled by or is under common ownership or control with such Person or is a director, officer, member or partner of such Person or of an Affiliate of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the introductory paragraph hereto.

- 2 -

"ALTA" shall mean American Land Title Association, or any successor thereto.

"Applicable Laws" shall mean all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders.

"Assignment of Agreements, Licenses, Permits and Contracts" shall mean the Assignment of Agreements, Licenses, Permits and Contracts dated as of the date hereof, made by Borrower to Administrative Agent.

"Assignment of Management Agreement" shall mean an assignment of the Management Agreement, if any, between Borrower and Borrower's Manager (if any) in favor of the Administrative Agent for the performance of management services at the Property.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall mean Title 11 U.S.C. § 101 *et seq.*, and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"Borrower" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Business Day" shall mean any day of the year other than (i) Saturday, Sunday, (ii) any day observed by the federal or New York State government as a legal holiday, (iii) any other day on which commercial banks in New York State are required by law to be closed, and (iv) any Jewish Holiday. The term "Jewish Holiday" means the two days of Rosh Hashana, Yom Kippur, the nine days comprising Succot, Shemini Atzeret and Simchat Torah, the eight days of Passover and the two days of Shavuot. If any date herein set forth for the performance of any obligations by any party or for the delivery of any such instrument or notice as herein provided should fall on a date described in clauses (i) through (iv) of this definition, the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such date described in clauses (i) through (iv) of this definition.

"Cash" shall mean coin or currency of the United States of America or immediately available federal funds, including such fund delivered by wire transfer.

"Cash Flow" means all cash, revenue, proceeds and compensation from the operation, lease, business and management of the Property, including, without limitation, all Rents received from the Leases, by Borrower or Guarantor and any Affiliate of Borrower or Guarantor

"Casualty" shall have the meaning set forth in Section 10.2 hereof.

"Casualty Consultant" shall have the meaning set forth in Section 10.4(b)(iii) hereof.

"Casualty Retainage" shall mean an amount equal to ten percent (10%), of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed.

"Closing Date" shall mean the date of the funding of the Loan.

- 3 -

"Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" shall have the meaning set forth in the Security Instrument.

"Commitment" means, as to any Lender, the obligation of such Lender to make its Percentage share of the Loan hereunder in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule III, as the same may be reduced or adjusted from time to time pursuant to the terms hereof.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Condemnation Proceeds" shall have the meaning set forth in Section 10.4(b) hereof.

"Construction Documents" shall mean any and all documents, agreements and/or contacts which affect the Property that relate to any Work or construction at the Property and/or that are required to be delivered under the Mortgage Loan Documents to Mortgage Lender relating to any Work or construction at the Property.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Notes together with all interest accrued and unpaid thereon and all other sums due to Lenders in respect of the Loan under the Notes, this Agreement, the Security Instrument or any other Loan Document, including, without limitation, all Reserve Funds.

"Debt Service" shall mean, with respect to any particular period of time, the aggregate interest payments due under the Notes and the Loan Documents for such period.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) twenty-four percent (24%) per annum.

- 4 -

"Dollars" or "$" shall mean lawful money of the United States of America.

"Embargoed Person" shall have the meaning set forth in Section 3.1.40 hereof.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement dated of even date herewith executed by Borrower and Guarantor in connection with the Loan in favor of Administrative Agent for the benefit of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Law" shall mean any federal, State and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, that, at any time, apply to Borrower and Guarantor or the Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act.

"Environmental Liens" shall have the meaning set forth in Section 4.1.17(a) hereof.

"Equipment" shall have the meaning set forth in of the Security Instrument with respect to the Property.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"Event of Default" shall have the meaning set forth in Section 11.1(a) hereof.

"Extended Maturity Date" shall have the meaning set forth in Section 2.3.3 hereof.

"Extension Interest Reserve Payment" shall have the meaning set forth in Section 2.3.3 hereof.

"Extension Term" shall have the meaning set forth in Section 2.3.3 hereof.

"First Extension Interest Reserve Date" shall mean, if the Loan is extended pursuant to Section 2.3.3, the date two (2) months following the Maturity Date.

"First Interest Funding Amount" shall have the meaning set forth in Section 2.3.1(a) hereof.

"First Interest Reserve Date" shall mean the Payment Date of calendar month that is six (6) months following date hereof.

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"Flood Insurance Act" shall have the meaning set forth in Section 10.1(b)(vii) hereof.

"Fourth Interest Reserve Date" shall mean the Payment Date of calendar month that is two (2) months following date of the Third Interest Reserve Date.

- 5 -

"Future Advance" shall mean any future advance made pursuant to Section 2.3.1(g) and Section 2.3.1(c).

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report or cash accounting principles consistently applied.

"Governmental Authority" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"Guarantor" shall mean, jointly and severally, Toby Moskovits, Michael Lichtenstein and any other Person or entity guaranteeing any payment or performance obligation of Borrower.

"Guaranty" shall mean that certain Guaranty dated of even date herewith, from Guarantor for the benefit of Administrative Agent for the Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Hazardous Materials" shall mean (i) petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; (ii) explosives; (iii) flammable materials; (iv) radioactive materials; (v) polychlorinated biphenyls ("PCBs") and compounds containing them; (vi) lead and lead-based paint; (vii) asbestos or asbestos-containing materials in any form that is or could become friable; (viii) underground or above-ground storage tanks, whether empty or containing any substance; (ix) mold (defined as the presence of any form of (a) multicellular fungi that live on plant or animal matter and an indoor environment (including without limitation Cladosporium, Penicillium, Alternaria, Aspergillus, Fusarium, Trichoderma, Memnoniella, Mucor, and Stachybotrys chartarum (SC) often found in water damaged building materials), (b) spores, scents or byproducts produced or released by fungi, including mycotoxins and (c) microbial matter which reproduces through mold, mildew and viruses, whether or not such microbial matter is living); (x) any substance the presence of which on the Property is prohibited by any federal, State or local authority; (xi) any substance that requires special handling; and (xii) any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law.

"Heritage Borrower Party" shall mean, collectively, Moore St Acquisition, Heritage Borrower, Northside Moore LLC, a New York limited liability company, GTLG 310 North 7 LLC, a New York limited liability company, ER 215 Moore Holdings LLC, a Delaware limited liability company, TLG 310 LLC, a New York limited liability company, Northside Partners LLC, a New York limited liability company, S&B Moore LLC, a New York limited liability company, any Guarantor or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, or controlling Person of any of the foregoing.

"Improvements" shall mean any buildings and structures located on or to be erected at the Property.

- 6 -

"Indemnified Parties" shall mean Administrative Agent, Lenders, any Affiliate of Administrative Agent or Lenders who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lenders' assets and business).

"Initial Term" shall mean the period beginning on the Closing Date through and including the Maturity Date.

"Insurance Premiums" shall have the meaning set forth in Section 10.1(c) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 10.4(b) hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement entered into on the date hereof by and between the Mortgage Lender and the Administrative Agent, on behalf of the Lenders.

"Interest Rate" shall mean interest at the annual rate equal to (i) 19.67% per annum from the date of this Agreement through and including the First Interest Reserve Date and (ii) 18.11% per annum from the date immediately following the First Interest Reserve Date through and including the Maturity Date or the Extended Maturity Date, as applicable.

"Interest Reserve" shall have the meaning set forth in Section 9.3 hereof.

"Investor" shall have the meaning set forth in Section 4.1.9(e) hereof.

"Leases" shall mean any lease, any sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"Legal Requirements" shall mean, with respect to the Property, all federal, State, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the zoning, construction, use, alteration, occupancy or operation thereof, or any

- 7 -

part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lender(s)" means, individually and collectively, any Person that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto in each case together with its successors and/or permitted assigns.

"Lenders Percentage Split" shall mean sixty-three and eighty-fifths percent (63.85%) to Mortgage Lender and thirty-six and fifteenth percent (36.15%) to Lender.

"Licenses" shall have the meaning set forth in Section 3.1.21 hereof.

"Lien" shall mean, with respect to the Property, any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Loan" shall mean the loan made by Lenders to Borrower pursuant to this Agreement and the other Loan Documents as the same may be amended or split pursuant to the terms hereof.

"Loan Documents" shall mean, collectively, this Agreement, the Notes, the Security Instrument, the Environmental Indemnity, the Guaranty, Assignment of Agreements, Licenses, Permits and Contracts and all other documents executed and/or delivered in connection with the Loan.

"Loan to Value Ratio" shall mean the ratio, as of a particular date, in which the numerator is equal to sum of the outstanding principal balance of the Loan, the outstanding principal balance of the Mortgage Loan and any proposed new Indebtedness, and the denominator is equal to the appraised value of the Property, as determined by Lender in its sole but reasonable discretion.

"Make-Whole Date" shall have the meaning set forth in Section 2.4.1(a) hereof.

"Management Agreement" shall mean, with respect to the Property, the management agreement, if any, entered into by and between Borrower and Manager, pursuant to which the Manager is to provide management and other services with respect to the Property.

"Manager" shall mean any property manager hired by Borrower to manage the Property or, if the context requires, a Replacement Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"Maturity Date" shall mean May 18, 2018 (as the same may be extended by the Borrower in accordance with Section 2.3.3 hereof) or such other date on which the final payment of

- 8 -

principal of the Notes becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"Maximum Legal Rate" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Notes and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Mortgage Borrower" shall have the meaning set forth in the recitals to this Agreement.

"Mortgage Borrower Operating Agreement" shall mean the Operating Agreement of Mortgage Borrower, dated as of the date hereof, by Borrower, as sole member.

"Mortgage Lender" shall have the meaning set forth in the recitals to this Agreement.

"Mortgage Loan" shall have the meaning set forth in the recitals to this Agreement.

"Mortgage Loan Agreement" shall have the meaning set forth in the recitals to this Agreement.

"Mortgage Loan Debt Service" shall mean, with respect to any particular period of time, interest payments due under the Mortgage Loan Documents for such period.

"Mortgage Loan Default" shall mean a "Default" under and as defined in the Mortgage Loan Agreement.

"Mortgage Loan Documents" shall mean, collectively, the Mortgage Note, the Mortgage Loan Agreement, the Mortgage and any and all other documents defined as "Loan Documents" in the Mortgage Loan Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"Mortgage Loan Event of Default" shall have the meaning ascribed to the term "Event of Default" in the Mortgage Loan Agreement.

"Mortgage Note" shall have the meaning set forth in the recitals to this Agreement.

"Net Cash Flow" shall mean, as determined in the sole but reasonable discretion of Administrative Agent, the sum of the aggregate monthly Cash Flow during a Net Cash Flow Test Period, as determined by the Leases in effect on the Net Cash Flow Test Date and during the Net Cash Flow Test Period LESS the sum of the aggregate monthly Operating Expenses during the Net Cash Flow Test Period consistent with the prior three-month average of Operating Expenses for the Property LESS the sum of leasing commissions payable during the Cash Flow Test Period LESS the sum of Taxes accrued during the cash flow test period.

"Net Cash Flow Test" shall mean, as determined on the applicable Net Cash Flow Test Date, the projected amount of Net Cash Flow for the following Net Cash Flow Test Period.

- 9 -

"<u>Net Cash Flow Test Date</u>" shall mean, as applicable, the date that is (i) thirty (30) days prior to the First Interest Reserve Date, (ii) thirty (30) days prior to the Second Interest Reserve Date, (iii) thirty (30) days prior to the Third Interest Reserve Date, (iv) thirty (30) days prior to the Fourth Interest Reserve Date, (v) if applicable, thirty (30) days prior to the First Extension Interest Reserve Date, (vi) if applicable, thirty (30) days prior to the Second Extension Interest Reserve Date and (vii) if applicable, thirty (30) days prior to the Third Extension Interest Reserve Date.

"<u>Net Cash Flow Test Period</u>" shall mean, as applicable, from (i) the First Interest Reserve Date up to the day immediately prior to the Second Interest Reserve Date, (ii) the Second Interest Reserve Date up to the day immediately prior to the Third Interest Reserve Date, (iii) the Third Interest Reserve Date up to the day immediately prior to the Fourth Interest Reserve Date, (iii) the Fourth Interest Reserve Date up to the day immediately prior to the Maturity Date, (iv) the Maturity Date up to the day immediately prior to the First Extension Interest Reserve Date, (v) the First Extension Interest Reserve Date up to the day immediately prior to the Second Extension Interest Reserve Date, (vii) the Second Extension Interest Reserve Date Extension Interest Reserve Date up to the day immediately prior to the Third Extension Interest Reserve Date, or (viii) the Third Extension Interest Reserve Date up to and including the Extended Maturity Date.

"<u>Net Proceeds</u>" shall have the meaning set forth in Section 10.4(b) hereof.

"<u>Net Proceeds Deficiency</u>" shall have the meaning set forth in Section 10.4(b)(vi) hereof.

"<u>Notes</u>" shall mean (i) that certain Promissory Note dated of even date herewith in the original principal amount of $_____, made by Borrower in favor of 215 Moore Street Mezzanine Lender LLC, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"<u>Notice</u>" shall have the meaning set forth in Section 13.6 hereof.

"<u>Obligations</u>" means (a) the payment when and as due and payable of the Debt; (b) the payment of all other expenses, costs, advances and indebtedness which the Security Instrument by its terms secures; (c) the performance and observance of the covenants and agreements contained in this Agreement and each of the other Loan Documents; and (d) all obligations to perform or forbear from performing acts, and agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications and restatements thereof, and all out-of-pocket reasonable expenses and attorneys' fees actually incurred by Agent or Lenders hereunder or any other document, instrument or agreement related to any of the foregoing, in all instances whether such obligations are direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including interest and fees that accrue after the commencement by or against a Borrower or any Affiliate thereof of any proceeding under any Debtor Relief Laws whether or not such interest or fees are allowed claims in such proceeding.

"<u>Officer's Certificate</u>" shall mean a certificate delivered to Administrative Agent by Borrower which is signed by a Responsible Officer of Borrower.

- 10 -

"<u>Operating Expenses</u>" shall mean, for any period, without duplication, all expenses actually paid or payable by Borrower during such period in connection with the operation, management, maintenance, repair and use of the Property, determined on a cash basis consistently applied.  Operating Expenses specifically shall include (i) all expenses incurred in the immediately preceding twelve (12) month period based on financial statements delivered to Lender in accordance with <u>Section 4.1.9 hereof</u>, (ii) all payments required to be made pursuant to any Operations Agreements, (iii) property management fees in an amount equal to the management fees actually paid under any Management Agreement, (iv) administrative, payroll, security and general expenses for the Property, (v) the cost of utilities, inventories and fixed asset supplies consumed in the operation of the Property, (vi) a reasonable reserve for uncollectible accounts, (vii) costs and fees of independent professionals (including, without limitation, legal, accounting, consultants and other professional expenses), technical consultants, operational experts (including quality assurance inspectors) or other third parties retained to perform services required or permitted hereunder, (viii) cost of attendance by employees at training and manpower development programs, (ix) association dues, (x) computer processing charges, (xi) operational equipment and other lease payments, (xii) Taxes and Other Charges (other than income taxes or Other Charges in the nature of income taxes) and insurance premiums and (xiii) all underwritten reserves required by Lender hereunder (without duplication).  Notwithstanding the foregoing, Operating Expenses shall not include (1) depreciation or amortization, (2) income taxes or Other Charges in the nature of income taxes, (3) any expenses (including legal, accounting and other professional fees, expenses and disbursements) incurred in connection with the making of the Loan or the sale, exchange, transfer, financing or refinancing of all or any portion of the Property or in connection with the recovery of Insurance Proceeds or Awards which are applied to prepay the Note, (4) Debt Service, and (5) any item of expense which would otherwise be considered within Operating Expenses pursuant to the provisions above but is paid directly by any tenant.

"<u>Operations Agreements</u>" shall mean any easements, declarations or agreements of record relating to the operation or use of the Property, together with all amendments, modifications or supplements thereto.

"<u>Organizational Documents</u>" shall mean, as to any Person, the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable state law) and operating agreement with respect to a limited liability company; the certificate of limited partnership and partnership agreement with respect to a limited partnership; the trust agreement with respect to a trust, or any other organizational, governing or constituent documents of such Person.

"<u>Other Charges</u>" shall mean all maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"<u>Payment Date</u>" shall mean the first (1st) day of each calendar month during the term of the Loan, provided that if such day is not a Business Day, the Payment Date shall be the preceding Business Day.

- 11 -

"<u>Percentage</u>" means for each Lender the percentage of the aggregate Commitments represented by its Commitment, or, if the Commitments have been terminated or expired, the percentage held by such Lender of the aggregate principal amount of the Loan outstanding.

"<u>Permitted Encumbrances</u>" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents and the Mortgage Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent and (d) such other title and survey exceptions as Administrative Agent has approved or may approve in writing in Administrative Agent's sole discretion.

"<u>Permits</u>" shall mean all licenses, permits, authorizations, certificates, registrations, permits and/or approvals (including, without limitation, zoning and construction approvals) necessary for the development, operation, use and occupancy of the Property, the construction of any Improvements and the conduct of the Work.

"<u>Person</u>" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department, authority, public corporation, or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"<u>Plan</u>" shall mean, in the context of ERISA, an employee benefit plan (as defined in section 3(3) of ERISA) whether or not subject to ERISA or a plan or other arrangement within the meaning of section 4975 of the Code.

"<u>Plan Assets</u>" shall mean assets of a Plan within the meaning of section 29 C.F.R. section 2510.3-101, as modified by section 3(42) of ERISA, or similar law.

"<u>Pledged Membership Interests</u>" shall have the meaning set forth in the recitals to this Agreement.

"<u>Policy</u>" or "<u>Policies</u>" shall have the meaning set forth in Section 10.1(c) hereof.

"<u>Prohibited Person</u>" shall mean any Person:

(i)      listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(ii)     that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    with whom Lenders are prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

- 12 -

(iv)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(vi)    who is an Affiliate of or affiliated with a Person listed above.

"Property" shall have the meaning set forth in the recitals to this Agreement.

"Qualified Insurer" shall have the meaning set forth in Section 10.1(c) hereof.

"Related Parties" means, with respect to any Person, such Person's partners, members, directors, officers, employees, agents, trustees, administrators, managers and advisors.

"Release" of any Hazardous Materials shall mean any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"Rents" shall have the meaning set forth in Article 1 of the Security Instrument.

"Replacement Manager" shall have the meaning set forth in Section 4.1.16.

"Required Lenders" means, as of the date of any determination thereof, (i) if there shall be a single Lender under this Agreement, such Lender and (ii) if at such time there shall be two (2) or more Lenders under this Agreement, at least two (2) Lenders holding, in the aggregate, more than 66-2/3% of the aggregate outstanding principal balance of the Loan; *provided that*, for purposes of determining the number of Lenders under this Agreement or the number of Lenders making any determination under this Agreement, Lenders that are Affiliates shall be considered a single Lender.

"Reserve Funds(s)" shall mean the Interest Reserve and any escrow accounts and reserve accounts established by the Loan Documents.

"Responsible Officer" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, secretary, treasurer or vice president-finance of such Person.

"Restoration" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation.

"Restricted Party" shall mean any Heritage Borrower Party and/or any S&B Borrower Party.

"S&B Borrower Party" shall mean, collectively, S&B Moore, S&B Borrower, Claire Benedikt, an individual, The Schweid Shelter Irrevocable Trust, a New York irrevocable trust,

- 13 -

any Guarantor or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, or controlling Person of any of the foregoing.

"Sale or Pledge" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a direct or indirect legal or beneficial interest.

"Second Extension Interest Reserve Date" shall mean, if the Loan is extended pursuant to Section 2.3.3, the date two (2) months following the First Extension Interest Reserve Date.

"Second Interest Funding Amount" shall equal One Million Seven Hundred Forty-Six Thousand Two Hundred Forty-Three Dollars ($1,746,243.00).

"Second Interest Reserve Date" shall mean the Payment Date of calendar month that is six (6) months following date of the First Interest Reserve Date.

"Security Instrument" shall have the meaning set forth in the recitals to this Agreement.

"State" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"Survey" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Administrative Agent and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Administrative Agent.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"Tenant" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"Term" shall mean the collective time of the Initial Term and the Extension Term.

"Third Extension Interest Reserve Date" shall mean, if the Loan is extended pursuant to Section 2.3.3, the date two (2) months following the Second Extension Interest Reserve Date.

"Third Interest Reserve Date" shall mean the Payment Date of calendar month that is two (2) months following date of the Second Interest Reserve Date.

"Title Company" shall mean Riverside Abstract or any other national recognized title company.

"Title Insurance Policy" shall mean, as applicable, (i) the ALTA mortgagee title insurance policy issued to Mortgage Lender with respect to the Property upon the closing of the Mortgage Loan and insuring the lien of the Mortgage encumbering the Property and/or (ii) the UCC Plus Insurance Policy issued to Lender with respect to the Collateral upon the closing of the Loan and insuring the lien of the Security Instrument encumbering the Collateral.

- 14 -

"Transfer" shall have the meaning set forth in Section 4.2.10(a) hereof.

"UCC" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"Work" shall mean the construction, furnishing and equipping at the Property in accordance with all Legal Requirements.

### Section 1.2    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

### Section 1.3    Presumption.

This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement and all other Loan Documents shall be construed as if the words or phrase so stricken out or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated.

## ARTICLE II.  GENERAL TERMS

### Section 2.1    Loan Commitment; Advance to Borrower.

2.1.1    Agreement to Lend and Borrow.  Subject to and upon the terms and conditions set forth herein, Lenders hereby agree to make and Borrower hereby agrees to accept the Loan on the Closing Date.

2.1.2    Advance to Borrower.  Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3    The Notes, Security Instrument and Loan Documents.  The Loan shall be evidenced by the Notes and secured by the Security Instrument and the other Loan Documents.

2.1.4    Use of Proceeds.  Borrower shall use the proceeds of the Loan to (a) make an equity contribution to the Mortgage Borrower in order to cause the Mortgage Borrower to use such amounts for any use permitted pursuant to the terms of the Mortgage Loan Documents, (b) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein or in

- 15 -

the other Loan Documents and (c) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Administrative Agent.

### Section 2.2    Interest; Loan Payments.

2.2.1    Interest/Interest Rate.  Interest on the principal balance of the Loan outstanding from time to time shall accrue from and including the date hereof up to and including the Maturity Date (and the Extended Maturity Date, if applicable) at the Interest Rate; provided, however, that during any period that an Event of Default is continuing, interest shall accrue at the Default Rate as is set forth in Section 2.2.3 below.

2.2.2    Interest Calculation.  Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on the Interest Rate or the Default Rate, as applicable, divided by a three hundred sixty (360) day year by (c) the outstanding principal balance.

2.2.3    Default Interest Rate.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default without regard to any grace or cure periods contained herein.  This Section 2.2.3 shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lenders by reason of the occurrence of any Event of Default; the acceptance of any payment by Administrative Agent, for the account of the respective Lenders to which such payment is owed shall not be deemed to cure or constitute a waiver of any Event of Default; and Lenders retain their rights under the Notes to accelerate and to continue to demand payment of the Debt upon the occurrence of any Event of Default, despite any payment accepted by Administrative Agent, for the account of the respective Lenders to which such payment is owed.

2.2.4    Usury Savings.  This Agreement and the Notes are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Administrative Agent, for the account of the respective Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.5    Intentionally Omitted.

- 16 -

**Section 2.3**      **Loan Payments.**

2.3.1          *Debt Service Payment*.

(a)      On the Closing Date, the Lenders shall fund from the Loan to Administrative Agent, for the account of the respective Lenders, an amount of interest on the outstanding principal amount of the Loan funding on the Closing Date from the Closing Date up to and including the First Interest Reserve Date (the "<u>First Interest Funding Amount</u>") to be held in the Interest Reserve and distributed in the amount of monthly Debt Service on each Payment Date to Administrative Agent pursuant to this Section 2.3.1.  Such payment shall be paid in full on the Closing Date and, if for any reason Borrower shall prepay the Loan prior to the First Interest Reserve Date, such amount shall become a yield maintenance penalty to Lender and shall not be refunded in any way to Borrower.

(b)      On or prior to the First Interest Reserve Date, Lenders shall fund from the Loan to Administrative Agent, for the account of the respective Lenders, the Second Interest Funding Amount to be held in the Interest Reserve and distributed pursuant to the Lenders Percentage Split in the amount of monthly Debt Service on each Payment Date to Administrative Agent and Mortgage Lender, as applicable, pursuant to this Section 2.3.1.  In addition, on or prior to the First Interest Reserve Date, Borrower shall make payment to Administrative Agent, such amount equal to that amount necessary to equal the full interest amount of the aggregate outstanding principal balance of the Loan and the Mortgage Loan for such time period from the First Interest Reserve Date up to the day immediately prior to the Second Interest Reserve Date less (A) the Second Interest Funding Amount and (B) the aggregate amount of the then Net Cash Flow Test for the applicable Net Cash Flow Test Period, as calculated by Administrative Agent in its sole but reasonable discretion on the applicable Net Cash Flow Test Date, to be paid monthly on each Payment Date by Borrower from the First Interest Reserve Date until the Payment Date prior to the Second Interest Reserve Date, to be held in the Interest Reserve and distributed pursuant to the Lenders Percentage Split in the amount of monthly Debt Service as applicable on each Payment Date to Administrative Agent and Mortgage Lender, as applicable, pursuant to this Section 2.3.1.  All such payments made to Administrative Agent under this Section 2.3.1(b) shall be paid in full on the First Interest Reserve Date and if for any reason Borrower shall prepay the Loan prior to the Second Interest Reserve Date, such prepaid interest amount shall become a yield maintenance penalty to Lender and shall not be refunded in any way to Borrower.  For the avoidance of doubt, Borrower shall pay directly to the Administrative Agent the Lenders Percentage Split of the then calculated monthly Net Cash Flow Test amount on each Payment Date from the First Interest Reserve Date until the Payment Date prior to the Second Interest Reserve Date.

(c)      On or prior to the Second Interest Reserve Date, Borrower shall make payment to Administrative Agent, such amount equal to that amount necessary to equal the full interest amount of the aggregate outstanding principal balance of the Loan and the Mortgage Loan for such time period from the Second Interest Reserve Date up to the day immediately prior to the Third Interest Reserve Date less the aggregate amount of the then Net Cash Flow Test for the applicable Net Cash Flow Test Period, as calculated by Administrative Agent in its sole but reasonable discretion on the applicable Net Cash Flow Test Date, to be paid monthly on each Payment Date by Borrower from the Second Interest Reserve Date until the Payment Date prior

- 17 -

to the Third Interest Reserve Date, to be held in the Interest Reserve and distributed pursuant to the Lenders Percentage Split in the amount of monthly Debt Service as applicable on each Payment Date to Administrative Agent and Mortgage Lender, as applicable, pursuant to this Section 2.3.1. All such payments made to Administrative Agent under this Section 2.3.1(c) shall be paid in full on the Second Interest Reserve Date and if for any reason Borrower shall prepay the Loan prior to the Second Interest Reserve Date, such prepaid interest amount shall become a yield maintenance penalty to Lender and shall not be refunded in any way to Borrower. For the avoidance of doubt, Borrower shall pay directly to the Administrative Agent the Lenders Percentage Split of the then calculated monthly Net Cash Flow Test amount on each Payment Date from the Second Interest Reserve Date until the Payment Date prior to the Third Interest Reserve Date.

(d)    On or prior to the Third Interest Reserve Date, Borrower shall make payment to Administrative Agent, such amount equal to that amount necessary to equal the full interest amount of the aggregate outstanding principal balance of the Loan and the Mortgage Loan for such time period from the Third Interest Reserve Date up to the day immediately prior to the Fourth Interest Reserve Date less the aggregate amount of the then Net Cash Flow Test for the applicable Net Cash Flow Test Period, as calculated by Administrative Agent in its sole but reasonable discretion on the applicable Net Cash Flow Test Date, to be paid monthly on each Payment Date by Borrower from the Third Interest Reserve Date until the Payment Date prior to the Fourth Interest Reserve Date, to be held in the Interest Reserve and distributed pursuant to the Lenders Percentage Split in the amount of monthly Debt Service as applicable on each Payment Date to Administrative Agent and Mortgage Lender, as applicable, pursuant to this Section 2.3.1. All such payments made to Administrative Agent under this Section 2.3.1(d) shall be paid in full on the Third Interest Reserve Date and if for any reason Borrower shall prepay the Loan prior to the Third Interest Reserve Date, such prepaid interest amount shall become a yield maintenance penalty to Lender and shall not be refunded in any way to Borrower. For the avoidance of doubt, Borrower shall pay directly to the Administrative Agent the Lenders Percentage Split of the then calculated monthly Net Cash Flow Test amount on each Payment Date from the Third Interest Reserve Date until the Payment Date prior to the Fourth Interest Reserve Date.

(e)    On or prior to the Fourth Interest Reserve Date, Borrower shall make payment to Administrative Agent, such amount equal to that amount necessary to equal the full interest amount of the aggregate outstanding principal balance of the Loan and the Mortgage Loan for such time period from the Fourth Interest Reserve Date up to the day immediately prior to the Maturity Date less the aggregate amount of the then Net Cash Flow Test for the applicable Net Cash Flow Test Period, as calculated by Administrative Agent in its sole but reasonable discretion on the applicable Net Cash Flow Test Date, to be paid monthly on each Payment Date by Borrower from the Fourth Interest Reserve Date until the Payment Date prior to the Maturity Date, to be held in the Interest Reserve and distributed pursuant to the Lenders Percentage Split in the amount of monthly Debt Service as applicable on each Payment Date to Administrative Agent and Mortgage Lender, as applicable, pursuant to this Section 2.3.1. All such payments made to Administrative Agent under this Section 2.3.1(e) shall be paid in full on the Fourth Interest Reserve Date and if for any reason Borrower shall prepay the Loan prior to the Fourth Interest Reserve Date, such prepaid interest amount shall become a yield maintenance penalty to Lender and shall not be refunded in any way to Borrower. For the avoidance of doubt, Borrower

- 18 -

shall pay directly to the Administrative Agent the Lenders Percentage Split of the then calculated monthly Net Cash Flow Test amount on each Payment Date from the Fourth Interest Reserve Date until the Payment Date prior to the Maturity Date.

(f)    Pursuant to the provisions of <u>Sections 2.3.1(b)</u>, the Lenders hereby agree to make to Administrative Agent the Second Interest Funding Amount.  Once funded, the Second Interest Funding Amount shall be treated uniformly as with the Loan without regard to whether the Loan was funded on the Closing Date or with the Second Interest Funding Amount.  The obligation of Lender to make the Second Interest Funding Amount is subject to the satisfaction by or on behalf of Borrower of the following conditions precedent no later than date of funding the Second Interest Funding Amount: (A) there shall exist no Default or Event of Default on the funding date of the Second Interest Funding Amount or immediately after giving effect to the making of the Second Interest Funding Amount on the funding date of the Second Interest Funding Amount; (B) the representations and warranties made by the Borrower and Guarantor in the Loan Documents shall be true and correct in all material respects on such date; (C) Borrower shall have paid all reasonable out-of-pocket third party costs and expenses incurred by Administrative Agent and of which Administrative Agent has notified Borrower (including reasonable attorneys' fees and expenses) in connection with the Second Interest Funding Amount or as otherwise then due under this Agreement; (D) Administrative Agent shall have received an Eagle 9 Insurance Policy or UCC Plus Policy dated as of the applicable date, which shall (i) provide coverage in the amount of the Loan and (ii) insure Administrative Agent that the Security Instrument creates a valid, first priority Lien on the Collateral; and (F) Administrative Agent or its counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or its counsel may have requested including, without limitation, modifications to the Loan Documents, new notes, a new mortgage and estoppel certificates, each in form and substance satisfactory to Administrative Agent and its counsel.

(g)    Notwithstanding the provisions of this <u>Section 2.3.1</u>, if Borrower fails to make any such monthly interest payment under the terms of this Agreement, Lender may, in its sole discretion, make any such monthly interest payments required hereunder as a Future Advance under this Agreement.

(h)    Payments shall be applied first to accrued and unpaid interest and the balance to principal.

2.3.2    <u>Payment on Maturity Date</u>.  On the Maturity Date or on such earlier date that the Debt is paid in full or on such earlier date that the payment of the Debt has been accelerated pursuant to the terms hereof, Borrower shall pay to Administrative Agent, for the account of the respective Lenders (i) the outstanding principal balance of the Loan, (ii) all accrued and unpaid interest and (iii) all other amounts due hereunder and under the Notes, the Security Instrument and the other Loan Documents.

2.3.3    <u>Extension of Maturity Date</u>.  Borrower will have one (1) option to extend the Maturity Date of the Loan for a single six (6) months month period (the "<u>Extension Term</u>").  In order to exercise the extension right, Borrower shall deliver to Administrative Agent written notice of its intent to exercise such extension no later than ten (10) days prior to the original

- 19 -

Maturity Date and, upon giving of such notice of extension, and subject to the satisfaction of the conditions set forth below in this Section 2.3.3 on or before the original Maturity Date, the Maturity Date as theretofore in effect will be extended to November 18, 2018 (the "Extended Maturity Date"). The Maturity Date shall be extended pursuant to Borrower's notices as aforesaid, provided that the following conditions are satisfied: (i) no Event of Default shall be in existence hereunder either at the time of Borrower's notice or at the then-current Maturity Date, (ii) on the First Extension Interest Reserve Date, the Second Extension Interest Reserve Date and the Third Extension Interest Reserve Date, as applicable, Borrower shall, less the aggregate amount of the then Net Cash Flow Test for the applicable Net Cash Flow Test Period, as calculated by Administrative Agent in its sole but reasonable discretion on the applicable Net Cash Flow Test Date, immediately make payment to Administrative Agent, such amount necessary to equal the interest on the aggregate outstanding principal balance of the Loan and the Mortgage Loan (provided that the Mortgage Loan remains outstanding) from (I) the Maturity Date up to and including the First Extension Interest Reserve Date, (II) the First Extension Interest Reserve Date up to and including the Second Extension Interest Reserve Date, (III) the Second Extension Interest Reserve Date Extension Interest Reserve Date up to and including the Third Extension Interest Reserve Date, or (IV) the Third Extension Interest Reserve Date up to and including the Extended Maturity Date, as applicable, to be held in the Interest Reserve and distributed pursuant to the Lenders Percentage Split in the amount of monthly Debt Service as applicable on each Payment Date to Administrative Agent and Mortgage Lender, as applicable, pursuant to this Section 2.3.1, on the Maturity Date, the First Extension Interest Reserve Date, the Second Extension Interest Reserve Date and the Third Extension Interest Reserve Date, as applicable (each an "Extension Interest Reserve Payment"), (iii) Borrower shall have paid to Administrative Agent all expenses (including reasonable legal fees and disbursements) incurred by Administrative Agent in connection with Borrower's exercise of the extension option, and (iv) Borrower shall have paid to Administrative Agent the sum one percent (1%) of the principal balance of the Loan. Notwithstanding the preceding provisions of this Section 2.3.3, each Extension Interest Reserve Payment shall be paid in full on such applicable date and if for any reason Borrower shall prepay the Loan prior to the Extended Maturity Date, such prepaid interest amount shall become a yield maintenance penalty to Lender and shall not be refunded in any way to Borrower. For the avoidance of doubt, Borrower shall pay directly to the Administrative Agent the Lenders Percentage Split of the then calculated monthly Net Cash Flow Test amount on each Payment Date from (I) the Maturity Date up to and including the First Extension Interest Reserve Date, (II) the First Extension Interest Reserve Date up to and including the Second Extension Interest Reserve Date, (III) the Second Extension Interest Reserve Date Extension Interest Reserve Date up to and including the Third Extension Interest Reserve Date, or (IV) the Third Extension Interest Reserve Date up to and including the Extended Maturity Date, as applicable.

2.3.4    Late Payment Charge. If any principal, interest or any other sum due under the Loan Documents, is not paid by Borrower on the date on which it is due, Borrower shall pay to Administrative Agent upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Administrative Agent or Lenders in handling and processing such delinquent payment and to compensate Lenders for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instrument and the other Loan Documents.

- 20 -

2.3.5   Method and Place of Payment.   (a)   Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Notes shall be made to Administrative Agent, for the account of the respective Lenders, not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Administrative Agent's office, and any funds received by Administrative Agent after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)   Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the immediately preceding Business Day, including the payment of principal due on the Maturity Date.

(c)   All payments required to be made by Borrower hereunder or under the Notes or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

**Section 2.4   Prepayments.**

2.4.1   Voluntary Prepayments.   Borrower may not prepay the loan in whole or in part prior to the Maturity Date, except as set forth below:

(a)   Provided no Event of Default has occurred and is continuing, Borrower at its option and upon ten (10) days prior notice to Administrative Agent (or such shorter period of time as may be permitted by Administrative Agent in its sole discretion), may prepay the Debt in whole, but not in part, on any Business Day, upon payment to Administrative Agent of (i) the outstanding principal balance of the Loan, (ii) if the prepayment date is within twelve (12) months of the date hereof (the "Make-Whole Date"), all accrued and unpaid interest thereon to and including the date which is the later to occur of (A) the date of such prepayment and, if such prepayment is made on a date other than a Payment Date, all interest which would have accrued on the amount of the Loan through such prepayment date, (B) thirty (30) days from the date that Administrative Agent received Borrower's notice of prepayment required pursuant to the terms of this Section 2.4.1(a) and (C) the Make-Whole Date, and (iii) all other amounts due hereunder and under the Notes, Security Instrument and the other Loan Documents.

(b)   If Borrower shall have exercised its option to extend the Maturity Date as provided in Section 2.3.3 hereinabove, Borrower may, following the Maturity Date and during the Extension Term, provided no Event of Default has occurred and is continuing, at its option and upon ten (10) days prior notice to Administrative Agent (or such shorter period of time as may be permitted by Administrative Agent in its sole discretion), prepay the Debt in whole, but not in part, on any Business Day, upon payment to Administrative Agent of (i) the outstanding principal balance of the Loan, (ii) all accrued and unpaid interest thereon, and (iii) all other amounts due hereunder and under the Notes, the Security Instrument and the other Loan Documents.

2.4.2   Mandatory Prepayments.   On the next occurring Payment Date following the date on which Borrower actually receives any Net Proceeds, if and to the extent

- 21 -

Administrative Agent is not obligated to make such Net Proceeds available to Borrower for the Restoration of the Property, Borrower shall prepay the outstanding principal balance of the Notes in an amount equal to one hundred percent (100%) of such Net Proceeds.  Such prepayment shall be applied, first, to interest on the outstanding principal balance of the Loan that would have accrued at the Interest Rate and then to all other amounts then due to Administrative Agent under this Agreement or any of the other Loan Documents and then to the outstanding principal balance of the Loan.

2.4.3    <u>Prepayments After Default</u>.  If, following an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lenders after such Event of Default (which tender Lenders may reject to the extent permitted under applicable Legal Requirements), such tender or recovery shall be deemed a voluntary prepayment by Borrower and Borrower shall pay, in addition to the debt, (i) all accrued and unpaid interest calculated at the Note Rate on the amount of principal being prepaid through and including the Prepayment Date together with an amount equal to the interest that would have accrued at the Note Rate; and (ii) all other sums due under this Agreement, the Notes or the other Loan Documents in connection with a partial or total prepayment.

2.4.4    <u>Application of Prepayments</u>. All prepayments received pursuant to this Section 2.4 and Section 2.5 shall be applied, at Administrative Agent's sole discretion: (i) first, to payment of accrued and unpaid interest, if any; (ii) second, to payment of any principal then due, if any; (iii) third to late charges, if any; (iv) fourth, to reasonable attorney's fees and costs of collection; and (v) fifth, to reduce the outstanding principal balance of the Notes until such principal shall have been fully repaid.  All payments hereunder shall be made without offset, demand, counterclaim, deduction, abatement, defense, or recoupment, each of which Borrower hereby waives.

2.4.5    <u>Intercreditor Agreement</u>. Notwithstanding the provisions of this Section 2.4, all such payments provided for in Section 2.4 shall be made subject to the provisions of the Intercreditor Agreement.

**Section 2.5    <u>Release on Payment in Full</u>.**

Administrative Agent shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Notes and this Agreement, release the Lien of the Security Instrument on the Collateral.

**ARTICLE III.  REPRESENTATIONS AND WARRANTIES**

**Section 3.1    <u>Borrower Representations</u>.**

Borrower represents and warrants to Lenders and Administrative Agent as of the Closing Date that:

3.1.1    <u>Organization</u>. (a)  Borrower is duly organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own the Collateral and to transact the businesses in which it is now engaged.  Borrower is duly

- 22 -

RE\39820\0007\646179v7

qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Collateral, its businesses and operations. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Collateral and to transact the businesses in which it is now engaged. Attached hereto as Schedule II is an organizational chart of Borrower.

(b)     Mortgage Borrower is duly organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own the Property and to transact the businesses in which it is now engaged. Mortgage Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Property, its businesses and operations. Mortgage Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Property and to transact the businesses in which it is now engaged. Attached hereto as Schedule II is an organizational chart of Mortgage Borrower.

(c)     Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement. Borrower is an organization of the type specified in the first paragraph of this Agreement. Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Administrative Agent in writing at least thirty (30) days prior to the date of such change). Borrower's federal tax identification number is 47-2581619. Borrower is not subject to back-up withholding taxes.

(d)     Mortgage Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement. Mortgage Borrower is an organization of the type specified in the first paragraph of this Agreement. Mortgage Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement. Mortgage Borrower's principal place of business and chief executive office, and the place where Mortgage Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Mortgage Borrower) and will continue to be the address of Mortgage Borrower set forth in the first paragraph of this Agreement (unless Borrower or Mortgage Borrower notifies Administrative Agent in writing at least thirty (30) days prior to the date of such change). Mortgage Borrower's federal tax identification number is 47-2544545. Mortgage Borrower is not subject to back-up withholding taxes.

3.1.2     Proceedings. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding Obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable

- 23 -

bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

3.1.3    No Conflicts.  With the exception of the Mortgage Loan Documents, the execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement, or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of the Collateral, the Property or any of Borrower's other assets, or any license or other approval required to operate the Property, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

3.1.4    Litigation.  Except as set forth on Schedule V, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or threatened in writing against or affecting Borrower, Mortgage Borrower, the Collateral or the Property, which actions, suits or proceedings, if determined against Borrower, Mortgage Borrower, the Collateral or the Property, might materially adversely affect the condition (financial or otherwise) or business of Borrower or Mortgage Borrower or the condition or ownership of the Collateral or the Property, as applicable, or which involve the validity or enforceability of the Security Instrument or the priority of the Lien thereof, at law or in equity, or before or by any Governmental Authority and neither Borrower nor Mortgage Borrower is in default with respect to any order, ruling or decree of any court, arbitration body, or Governmental Authority.

3.1.5    Agreements.  Borrower is not a party to any agreement or instrument or subject to any restriction which might materially and adversely affect Borrower or the Collateral, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the Obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Collateral is bound.  Borrower has no material financial obligation under any indenture, pledge agreement, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and operation of Borrower's business and (b) obligations under the Loan Documents.  Borrower is not in breach of, in default under, or in violation of any agreement or instrument to which the Collateral securing the Loan is subject, or of any Legal Requirement applicable to the Collateral.

- 24 -

3.1.6    <u>Solvency</u>.  Borrower (a) has not entered into the transaction or executed the Notes, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of Obligations of Borrower).  No petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against Borrower or any constituent Person in the last seven (7) years, and neither Borrower nor any constituent Person in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.  Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

3.1.7    <u>Full and Accurate Disclosure</u>.  No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Borrower or Mortgage Borrower which has not been disclosed to Administrative Agent which materially and adversely affects, or might materially and adversely affect, the Property, the Collateral or the business, operations or condition (financial or otherwise) of Borrower or Mortgage Borrower.

3.1.8    <u>No Plan Assets</u>.  Borrower is not a Plan and none of the assets of Borrower constitute or will constitute, by virtue of the application of 29 C.F.R. §2510.3-101(f) as modified by section 3(42) of ERISA, "Plan Assets" of one or more Plans.  In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Borrower are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

3.1.9    <u>Compliance</u>.  Mortgage Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, all Environmental Laws, building and zoning ordinances and codes.  Mortgage Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.  There has not been committed by Mortgage Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Mortgage Borrower's obligations under any of the Mortgage Loan Documents.

- 25 -

3.1.10    <u>Financial Information</u>.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Administrative Agent in respect of Borrower, Mortgage Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, Mortgage Borrower and the Property, as applicable, as of the date of such reports, and (iii) have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein.  Except for Permitted Encumbrances, neither Borrower  nor Mortgage Borrower has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower or Mortgage Borrower and reasonably likely to have a materially adverse effect on the Collateral, the Property or the operation thereof as a warehouse and office space except as referred to or reflected in said financial statements.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or Mortgage Borrower from that set forth in said financial statements.

3.1.11    <u>Condemnation</u>.  No Condemnation or other similar proceeding has been commenced or, to the best of Borrower's and Mortgage Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

3.1.12    <u>Federal Reserve Regulations</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

3.1.13    <u>Utilities and Public Access</u>.  The Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended use.  All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy.  All roads necessary for the use of the Property for its current purpose have been completed, are physically open and are dedicated to public use and have been accepted by all Governmental Authorities.

3.1.14    <u>Not a Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

3.1.15    <u>Separate Tax and Zoning Lot</u>.  The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and is not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

3.1.16    <u>Assessments</u>.    There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there, to

- 26 -

Borrower's knowledge, any contemplated improvements to the Property that may result in such special or other assessments.

3.1.17    <u>Enforceability</u>.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

3.1.18    <u>No Prior Assignments</u>. With the exception of the Mortgage Loan Documents, there are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

3.1.19    <u>Insurance</u>.  Borrower has obtained and has delivered (or has caused Mortgage Borrower to obtain and deliver) to Administrative Agent certified copies of all insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No Person, including Borrower or Mortgage Borrower, has done, by act or omission, anything which would impair the coverage of any such policy.

3.1.20    <u>Use of Property</u>.  The Property is used exclusively for commercial purposes and other appurtenant and related uses.

3.1.21    <u>Certificate of Occupancy; Licenses</u>.  All certifications, permits, licenses and approvals, if any, including without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property by Borrower (collectively, the "<u>Licenses</u>"), when obtained shall remain in full force and effect and not subject to revocation, suspension or forfeiture.  Borrower shall keep and maintain all Licenses necessary for the operation of the Property.

3.1.22    <u>Flood Zone</u>.  None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, the flood insurance required pursuant to Section 10.1(b)(vii) is in full force and effect.

3.1.23    <u>Physical Condition</u>.  To the extent currently existing on the date of this Agreement, the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.  The Property is free from damage covered by fire or other casualty.  All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Legal Requirements.

- 27 -

3.1.24 <u>Boundaries</u>. All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements.

3.1.25 <u>Leases</u>. Except as set forth on <u>Exhibit B</u>, the Property is not subject to any Leases. Except for the Tenants listed on Exhibit B, no Person has any possessory interest in the Property or right to occupy the same.

3.1.26 <u>Survey</u>. The Survey for the Property delivered to Administrative Agent in connection with this Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

3.1.27 <u>Filing and Recording Taxes</u>. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid.

3.1.28 <u>Intentionally Omitted</u>.

3.1.29 <u>Illegal Activity</u>. No portion of the Property has been or will be purchased with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to any controlled substances at the Property.

3.1.30 <u>No Change in Facts or Circumstances; Disclosure</u>. All information submitted by Borrower and Mortgage Borrower to Administrative Agent and in all financial statements, rent rolls, reports, certificates and other documents submitted by or on behalf of Borrower in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower and Mortgage Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or would likely materially and adversely affect the use, operation or value of the Property or the business operations or the financial condition of Borrower or Mortgage Borrower. Borrower and Mortgage Borrower have disclosed to Administrative Agent all material facts and has not failed to disclose any material fact that could cause any information described in this Section 3.1.30 or any representation or warranty made herein to be materially misleading.

3.1.31 <u>Investment Company Act</u>. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company"

- 28 -

within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money.

3.1.32    <u>Organizational Chart</u>.  The organizational chart attached as <u>Schedule II</u> hereto, relating to Borrower, Mortgage Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

3.1.33    <u>Single Purpose Entity</u>.  Each Borrower covenants and agrees that its Organizational Documents shall provide (and shall incorporate this Loan, the Loan Documents and the Debt in the same manner and content as the Mortgage Loan) that it has not, and shall not, until such time as the Mortgage Loan and the Debt shall be paid in full, without the prior written consent of Administrative Agent:

(a)    fail to establish and maintain an office through which its business shall be conducted separate and apart from that of any of its Affiliates;

(b)    fail to allocate fairly and reasonably any overhead for shared office space;

(c)    fail to maintain separate records, books and accounts from those of any Affiliate or any other Person;

(d)    commingle funds or assets with those of any Affiliate or any other Person;

(e)    fail to conduct its business and hold its assets in its own name;

(f)    fail to maintain financial statements, accounting statements and prepare tax returns separate from any Affiliate or any other Person;

(g)    fail to pay any liabilities out of its own funds, including salaries of any employees, rather than out of the funds of any Affiliate, or maintain a sufficient number of employees in light of its contemplated business operations;

(h)    fail to maintain adequate capital in light of its contemplated business operations;

(i)    fail to maintain an arm's length relationship with any Affiliate;

(j)    assume or guarantee or become obligated for the debts of any other entity, including any Affiliate, or hold out its credit as being available to satisfy the obligations of others;

(k)    have any of its obligations guaranteed by any partners, members or shareholders or Affiliates, except the Guarantor;

(l)    pledge its assets for the benefit of any other Person or entity (other than Lenders) or make an advance or loan to any Person or entity, including any Affiliate;

- 29 -

(m)     acquire obligations or securities of its partners, members or shareholders or any Affiliate;

(n)     fail to use stationery, invoices and checks separate from any Affiliate or any other Person;

(o)     fail to hold itself out as an entity separate and distinct from any Affiliate and not as a division, department or part of any other Person or entity;

(p)     identify its members or any Affiliates as a division or part of it;

(q)     fail to correct any known misunderstanding regarding its separate identity;

(r)     fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other entity;

(s)     share a common logo with any Affiliate or any other Person;

(t)     acquire or own any material assets other than the Collateral;

(u)     fail to maintain its books, records, resolutions and agreements as official records;

(v)     fail to hold regular meetings, as appropriate, to conduct its business and observe all organizational formalities (including, without limitation, failing to preserve its existence as an entity duly organized, validly existing and in good standing under the applicable law of the State of New York) and record keeping;

(w)     convert Borrower into a partnership, limited partnership, corporation or other form of entity; or

(x)     merge into or consolidate with any other person or entity, or, to the fullest extent permitted by law, dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure.

3.1.34    Business Purposes.   The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

3.1.35    Taxes.   Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

3.1.36    Forfeiture.   Neither Borrower, Mortgage Borrower nor any other Person in occupancy of or involved with the operation or use of the Property has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's Obligations under the Notes, this Agreement or the other Loan Documents.

- 30 -

Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

        3.1.37    <u>Environmental Representations and Warranties</u>.  Borrower represents and warrants that, to Borrower's knowledge and except as set forth in the Environmental Site Assessment obtained by Administrative Agent: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property or each tenant's respective business at the Property as set forth in their respective Leases, or (B) held by a tenant for sale to the public in its ordinary course of business, (b) there are no past, present or threatened Releases of Hazardous Materials in violation of any Environmental Law and which would require remediation by a Governmental Authority in, on, under or from the Property; (c) there is no threat of any Release of Hazardous Materials migrating to the Property; (d) there is no past or present non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with the Property; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) relating to Hazardous Materials in, on, under or from the Property; and (f) Borrower has truthfully and fully provided to Administrative Agent, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

        3.1.38    <u>No Other Debt</u>.  Borrower has not borrowed or received debt financing (other than permitted pursuant to this Agreement) that has not been heretofore repaid in full.

        3.1.39    <u>OFAC</u>.  Borrower represents and warrants that neither Borrower, Mortgage Borrower, Guarantor nor any of their respective Affiliates is a Prohibited Person, and Borrower, Mortgage Borrower, Guarantor and their respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

        3.1.40    <u>Embargoed Person</u>.  As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Mortgage Borrower and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower, Mortgage Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lenders is in violation of law ("<u>Embargoed Person</u>"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Mortgage Borrower or Guarantor, as applicable, with the result that the investment in Borrower, Mortgage Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the

- 31 -

funds of Borrower, Mortgage Borrower or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Mortgage Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

3.1.41    Title. Mortgage Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Security Instrument, when properly recorded in the appropriate records, together with any UCC financing statements required to be filed in connection therewith, will create (i) a valid, subordinate priority, perfected Lien on Borrower's interest in the Collateral, subject only to Permitted Encumbrances, and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances. There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may be Liens prior to, or equal or coordinate with, the Lien of the Mortgage or the Security Instrument except as set forth in Exhibit D. None of the Permitted Encumbrances, individually or in the aggregate, (a) materially interfere with the benefits of the security intended to be provided by the Security Instrument and this Agreement, (b) materially and adversely affect the value of the Property or the Collateral, (c) impair the use or operations of the Property and ownership of the Collateral, or (d) impair Borrower's ability to pay its Obligations in a timely manner.

3.1.42    Consents. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

3.1.43    Purchase Options. Neither the Property nor any part thereof are subject to any purchase options or other similar rights in favor of third parties.

3.1.44    Felony Criminal Offense. Borrower represents that no Guarantor or member, shareholder, director, officer or partner of Borrower has ever been convicted of a felony criminal offense.

3.1.45    Intentionally Omitted.

3.1.46    Mortgage Loan. The Mortgage Loan Documents are identified on Schedule V. Borrower has provided to Lender true and complete copies of the Mortgage Loan Documents. The Mortgage Loan Documents have not been amended or modified except as disclosed on Schedule V, true and complete copies of which amendments and modifications have been provided to Lender by Borrower. Mortgage Borrower has not requested any waiver of its respective obligations under the Mortgage Loan Documents. None of the Mortgage Borrower, Borrower, Guarantor or any of their respective Affiliates is a holder of the Mortgage Loan Documents or any right, title or interest therein, is a participant in the Mortgage Loan or a holder of a Lien encumbering the Mortgage Loan or any right, title or interest therein or in any

- 32 -

participation therein. Mortgage Borrower has fully complied in all material respects with all of its respective obligations under the Mortgage Loan Documents. No notice of default has been given under the Mortgage Loan Documents that remains uncured. No Mortgage Loan Default or Mortgage Loan Event of Default has occurred which remains uncured and no fact, circumstance, event or condition has occurred or exists which may ripen into any such Mortgage Loan Default or Mortgage Loan Event of Default.

### Section 3.2    Survival of Representations.

Borrower agrees that all of the representations and warranties of Borrower set forth in Section 3.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lenders under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Administrative Agent and Lenders notwithstanding any investigation heretofore or hereafter made by Administrative Agent, Lenders or on their behalf.

## ARTICLE IV.  BORROWER COVENANTS

### Section 4.1    Affirmative Covenants.

From the date hereof and until payment and performance in full of all Obligations of Borrower under the Loan Documents or the earlier release or assignment of the Lien of the Security Instrument encumbering the Collateral (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lenders that:

### 4.1.1    Existence; Compliance with Legal Requirements.

(a)    Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply, in all material respects, with all Legal Requirements applicable to it and the Property. There shall never be committed by Borrower, Mortgage Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any State or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall (or cause Mortgage Borrower) at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto. Borrower shall (or cause Mortgage Borrower to) keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

- 33 -

(b)    Borrower agrees that the Property shall at all times comply with the requirements of the Access Laws, to the extent such Access Laws are applicable to the Property. Notwithstanding any provisions set forth herein or in any other documents regarding Administrative Agent's approval or alterations of the Property, neither Borrower nor Mortgage Borrower shall alter the Property in any manner which would materially increase Mortgage Borrower's responsibilities for compliance with the applicable Access Laws without the prior written approval of Administrative Agent. The foregoing shall apply to tenant improvements constructed by Mortgage Borrower or any tenants. Administrative Agent may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Administrative Agent. Borrower agrees to give prompt notice to Administrative Agent of the receipt by Borrower or Mortgage Borrower of any written complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

4.1.2    <u>Taxes and Other Charges</u>.    Borrower shall pay (or cause Mortgage Borrower to pay) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower shall furnish to Administrative Agent receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged or bonded over, or provide an escrow with the Title Company, any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay (or cause Mortgage Borrower to pay) for all utility services provided to the Property. After Borrower's prior written notice to Administrative Agent, Mortgage Borrower, at its own expense, but subject to the terms, provisions and limitations of the Mortgage Loan Documents, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower (or Mortgage Borrower) shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Administrative Agent, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Administrative Agent, on behalf of the Lenders, may apply such security or part thereof held by Administrative Agent at any time when, in the judgment of Administrative Agent, the validity or applicability of such Taxes or Other Charges are established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

4.1.3    <u>Litigation</u>. Borrower shall give prompt written notice to Administrative Agent of any litigation or governmental proceedings pending or threatened in writing against

- 34 -

Borrower or Mortgage Borrower which would likely materially adversely affect Borrower's condition (financial or otherwise) or business or the Property.

4.1.4    Access to the Property.  Borrower shall or shall cause Mortgage Borrower to permit agents, representatives and employees of Administrative Agent to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

4.1.5    Notice of Default.  Borrower shall promptly advise Administrative Agent of any material adverse change in Borrower's or Mortgage Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower or Mortgage Borrower has knowledge.

4.1.6    Cooperate in Legal Proceedings.  Borrower shall cooperate fully with Administrative Agent and Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights of Lenders hereunder or any rights obtained by Lenders under any of the other Loan Documents and, in connection therewith, permit Administrative Agent and Lenders, at Administrative Agent's or Lenders' sole election, to participate in any such proceedings.

4.1.7    Award and Insurance Benefits.  Borrower shall cooperate with Administrative Agent and Lenders in obtaining for Lenders the benefits of any Awards or Insurance Proceeds, but subject to the provisions and limitations of the Mortgage Loan Documents, lawfully or equitably payable in connection with the Property, and Administrative Agent and Lenders shall be reimbursed for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Administrative Agent and Lenders in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Award or Insurance Proceeds.

4.1.8    Intangible Taxes.  Borrower shall pay all State, county and municipal recording, and intangible, and all other taxes imposed upon the execution and recordation/filing of the UCC financing statement evidencing the Security Instrument and/or upon the execution and delivery of the Notes.

4.1.9    Financial Reporting.  Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with sound cash accounting principles consistently applied, reflecting the financial affairs of Borrower and Mortgage Borrower. Administrative Agent shall have the right from time to time during normal business hours upon reasonable prior written notice to Borrower to examine such books and records at the office of Borrower, Mortgage Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Administrative Agent shall reasonably desire.  After the occurrence of an Event of Default and during the continuance thereof, Borrower shall pay any costs and expenses incurred by Administrative Agent to examine Borrower and Mortgage Borrower's accounting records with respect to the Collateral and the Property, as Administrative Agent shall determine to be necessary or appropriate in the protection of Lenders' interest.

- 35 -

(a)      Borrower shall furnish Administrative Agent annually, within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Borrower's and Mortgage Borrower's (i) annual financial statements reviewed by Berdon LLP, Norensberg & Associates, Inc. or another accountant approved by Administrative Agent, in Administrative Agent's sole discretion, in accordance with GAAP (or such other accounting basis acceptable to Administrative Agent) covering the Property for such Fiscal Year and (ii) State and Federal income tax returns (within thirty (30) days following filing), and within forty-five (45) days following the end of each Fiscal Quarter, a complete copy of Borrower's quarterly financial statements, reviewed by Berdon LLP, Norensberg & Associates, Inc. or another accountant approved by Administrative Agent, in Administrative Agent's sole discretion, in accordance with GAAP (or such other accounting basis acceptable to Administrative Agent) covering the Property for such Fiscal Quarter (provided that after the occurrence and continuance of an Event of Default, the foregoing quarterly statement shall be provided monthly). Annual financial statements shall include statements of income and expense and cash flow for Borrower and Mortgage Borrower and the Property and a balance sheet for Borrower and Mortgage Borrower. All annual and quarterly financial statements shall be accompanied by a certificate executed by the chief financial officer or other authorized and qualified Person of Borrower stating that such annual or quarterly financial statement presents fairly the financial condition and the results of operations of Borrower and Mortgage Borrower. Together with such annual and quarterly financial statements, Borrower shall furnish to Administrative Agent an Officer's Certificate certifying as of the date thereof whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower or Mortgage Borrower under the Loan Documents or Mortgage Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same. In addition to the foregoing, Borrower shall provide prompt notice to Administrative Agent of any material changes in the financial or physical condition of the Collateral or the Property, as reasonably determined by Borrower.

(b)      Borrower shall furnish to Administrative Agent, within thirty (30) days prior to the end of each Fiscal Year, a detailed annual budget materially similar in form and substance to the budget provided to Lender prior to the date hereof, provided that the overall budget amount shall not have increased more than five percent (5%) from the preceding calendar year budget, accompanied by a certificate from the chief financial officer of Borrower, certifying that such report is true, correct, accurate, and complete.  If such delivered annual budget increased more than five percent (5%) from the preceding calendar year budget, Lender shall be permitted to approve such annual budget in its sole discretion.

(c)      Borrower shall furnish to Administrative Agent, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the Collateral and the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Administrative Agent.

(d)      Borrower agrees that Administrative Agent may forward to each purchaser, transferee, assignee, Servicer, participant or investor in all or any portion of the Loan, all documents and information which Administrative Agent now has or may hereafter acquire relating to the Debt and to Borrower, Mortgage Borrower, any Guarantor, the Collateral and the Property, whether furnished by Borrower, Mortgage Borrower, any Guarantor or otherwise, as

- 36 -

Administrative Agent determines necessary or desirable. Borrower irrevocably waives any and all rights it may have under any Applicable Laws to prohibit such disclosure, including, but not limited, to any right of privacy.

4.1.10    Business and Operations.  Borrower will remain in good standing under the laws of each jurisdiction the extent required for the ownership, maintenance, management and operation of the Property.

4.1.11    Costs of Enforcement.  In the event (a) that the Security Instrument securing the Collateral is foreclosed in whole or in part or that the Pledge Agreement is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of the Security Instrument which proceeding Lenders are made a party, and/or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Administrative Agent, Lenders or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

4.1.12    Estoppel Statement.  (a)  After request by Administrative Agent, not more than two (2) times in any Fiscal Year, Borrower shall within ten (10) Business Days furnish Administrative Agent with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Notes, (ii) the unpaid principal amount of the Notes, (iii) the Interest Rate of the Notes, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Notes, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)    Borrower shall cause Mortgage Borrower to deliver to Administrative Agent any tenant estoppel certificates from each Tenant at the Property delivered to Mortgage Lender.

4.1.13    Loan Proceeds.  Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1.4. hereof.

4.1.14    Performance by Borrower.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Administrative Agent.

4.1.15    Leasing Matters.  (a)  Borrower shall furnish Administrative Agent with executed copies of all Leases (including new Leases or the renewal or extension of an existing Lease) within ten (10) days from full execution of such Leases (including, such renewal and extension).

- 37 -

(b)     Subject to the rights of Mortgage Lender as set forth in the Mortgage Loan Documents, Borrower (i) shall, or cause Mortgage Borrower to, observe and perform all the Obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of any of the Leases as security for the Debt; (ii) shall, or cause Mortgage Borrower to, promptly send copies to Administrative Agent of all notices of default or other material matters which Mortgage Borrower shall send or receive with respect to the Leases; (iii) shall, or cause Mortgage Borrower to, enforce in a commercially reasonable manner all of the material terms, covenants and conditions contained in the Leases upon the part of the tenant thereunder to be observed or performed; (iv) shall not, nor permit Mortgage Borrower to, collect any of the Rents more than one (1) month in advance (except Security Deposits shall not be deemed Rents collected in advance); (v) shall not execute any other assignment of the lessor's interest in any of the Leases or the Rents; and (vi) shall not consent to any assignment of or subletting under any Leases not in accordance with their terms, without the prior written consent of Administrative Agent.

(c)     Notwithstanding anything contained herein to the contrary, Borrower shall not and shall not permit Mortgage Borrower to, without the prior written consent of Administrative Agent, enter into any Lease with (i) a base rent less than $45.00/square feet and (ii) a Tenant that is not an independent unaffiliated third party.

4.1.16   Management Agreement.   Borrower represents and warrants that Mortgage Borrower self-manages the Property. Borrower shall not cause or permit Mortgage Borrower to engage a property manager without Administrative Agent's prior consent, which will not be unreasonably withheld, delayed or conditioned. In the event that a Manager is retained at the Property, Borrower shall cause Mortgage Borrower to cause Manager to manage the Property in accordance with a Management Agreement and to execute and deliver to Administrative Agent an Assignment of Management Agreement in form acceptable to Administrative Agent, which includes an agreement of Manager to attorn to Administrative Agent in the event Administrative Agent takes possession of the Property by foreclosure, deed in lieu of foreclosure or otherwise. Notwithstanding any provisions of this Section 4.1.16, subject to the rights of Mortgage Lender provided in the provisions of the Mortgage Loan Documents, if at any time, (i) the Manager shall become insolvent or a debtor in a bankruptcy proceeding; (ii) an Event of Default has occurred and is continuing; or (iii) a default has occurred and is continuing under Management Agreement (beyond all applicable notice and cure periods), Borrower shall or shall cause Mortgage Borrower to, at the request of Administrative Agent (in the sole discretion of Administrative Agent), terminate the Management Agreement upon thirty (30) days' prior notice to the Manager, as applicable and replace the Manager with a manager approved in writing by Administrative Agent (the "Replacement Manager").

4.1.17   Environmental Covenants.  (a)  Borrower covenants and agrees that so long as the Loan is outstanding (i) all uses and operations on or of the Property, whether by Borrower, Mortgage Borrower or any other Person, shall be in compliance in all material respects with all Environmental Laws and permits issued pursuant thereto; (ii) there shall be no Releases of Hazardous Materials in, on, under or from the Property; (iii) there shall be no Hazardous Materials in, on, or under the Property, except those that are both (A) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (B) (1) in amounts not in excess of that necessary to operate the Property or (2)

- 38 -

fully disclosed to and approved by Administrative Agent in writing; (iv) Borrower shall, or cause Mortgage Borrower to, keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "Environmental Liens"); (v) Borrower shall, or cause Mortgage Borrower to, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to paragraph (b) below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (vi) Borrower shall, or cause Mortgage Borrower to, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Administrative Agent, upon Administrative Agent's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Administrative Agent the reports and other results thereof, and Administrative Agent, Lenders and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (vii) Borrower shall, or cause Mortgage Borrower to, at its sole cost and expense, comply with all written requests of Administrative Agent to (A) effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (B) comply with any Environmental Law; (viii) Borrower shall not allow any tenant or other user of any of the Property to violate any Environmental Law; and (ix) Borrower shall immediately notify Administrative Agent in writing after it, or Mortgage Borrower, has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials.

(b)     Administrative Agent and any other Person designated by Administrative Agent, including but not limited to any representative of a Governmental Authority, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Administrative Agent's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall, and shall cause Mortgage Borrower to, cooperate with and provide access to Administrative Agent and any such Person designated by Administrative Agent.

4.1.18     Reserved.

4.1.19     OFAC.     At all times throughout the term of the Loan, Borrower, Guarantor, Mortgage Borrower and their respective Affiliates shall be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

4.1.20     Reserved.

- 39 -

4.1.21    <u>Interest in the Collateral</u>.  Borrower will warrant and defend the validity and priority of Lenders' security interest in the Collateral.

4.1.22    <u>Completion of the Work</u>.  Borrower shall, or shall cause Mortgage Borrower to, cause the Work to be prosecuted with diligence and continuity in a good, workmanlike manner so as to complete the Work in accordance with all Legal Requirements. All Work shall be completed free and clear of liens and claims for liens for materials supplied and for labor or services performed in connection with the Work or otherwise.

4.1.23    <u>Intentionally Omitted</u>.

4.1.24    <u>Vouchers; Receipts, etc</u>.  Borrower shall, or shall cause Mortgage Borrower to, deliver to Administrative Agent, on demand, any contracts, bills of sale, statements, receipted vouchers or other agreements under which Borrower and/or Mortgage Borrower claims title to any materials, fixtures or articles incorporated in the Improvement or subject to the Lien of the Security Instrument.

4.1.25    <u>Construction Documents</u>.  Borrower hereby covenants to deliver to Administrative Agent, simultaneously with delivery to Mortgage Lender, any Construction Documents (including, without limitation, any material modification or amendment to any Construction Document and/or the addition of any new material construction agreement) required to be delivered to Mortgage Lender under the Mortgage Loan or that are applicable to the Property at any time during the term of the Loan.

4.1.26    <u>Lease Related Covenants</u>.

(a)    <u>Rent Roll</u>.  Borrower shall, or shall cause Mortgage Borrower to, furnish to Administrative Agent, simultaneously with delivery to Mortgage Lender, a copy of any rent roll delivered to Mortgage Lender.

(b)    <u>Tenant Estoppel Certificates</u>.  Borrower shall, or shall cause Mortgage Borrower to, furnish to Administrative Agent, simultaneously with delivery to Mortgage Lender, copies of the certificates with respect to the status of the Leases delivered to Mortgage Lender.

(c)    <u>Copies of Leases</u>.  Upon the execution thereof, Borrower shall, or shall cause Mortgage Borrower to, furnish to Administrative Agent, simultaneously with delivery to Mortgage Lender, true and complete copies of all Leases at the Property including all amendments thereto or extensions thereof, and any guarantees thereof.

4.1.27    <u>UCC Searches; Continuation</u>.  Administrative Agent shall have the right to order UCC, judgment and lien searches against Borrower, Mortgage Borrower and Guarantor at any time at Borrower's sole cost and expense.  Borrower shall also be responsible for all costs incurred by Administrative Agent to continue the UCC-1 Financing Statements heretofore delivered by Borrower in favor of Administrative Agent from time to time.

4.1.28    <u>Rights of Mortgage Lender</u>. Subject to the active rights of the Mortgage Lender under the Mortgage Loan Documents, Borrower shall provide Lender with any and all

- 40 -

deliveries required to be delivered to Mortgage Lender under the Mortgage Loan Documents, regardless of whether the Mortgage Loan remains outstanding, during the term of the Loan.

**Section 4.2**    **Negative Covenants.**

From the date hereof until payment and performance in full of all Obligations of Borrower under the Loan Documents or the earlier release or assignment of the Lien of the Security Instrument in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Administrative Agent and Lenders that it will not do, directly or indirectly, any of the following:

4.2.1    <u>Liens</u>.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Collateral or permit any such action to be taken, except for Permitted Encumbrances.  Neither Borrower nor any Restricted Party shall take any action that would impair the Lien created under this Agreement, the Security Instrument or any other Loan Document.

4.2.2    <u>Dissolution</u>.  Borrower shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the Property or assets of Borrower except to the extent expressly permitted by the Loan Documents, (c) except as expressly permitted under the Loan Documents, modify, amend, waive or terminate its Organizational Documents or its qualification and good standing in any jurisdiction or (d) cause or permit the Mortgage Borrower or any other Restricted Party to (i) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which the Mortgage Borrower or any other Restricted Party would be dissolved, wound up or liquidated in whole or in part, or (ii) except as expressly permitted under the Loan Documents, amend, modify, waive or terminate the Organizational Documents of the Mortgage Borrower or any other Restricted Party, in each case, without obtaining the prior written consent of Administrative Agent.

4.2.3    <u>Change In Business</u>.  Borrower shall not enter into any line of business other than the ownership of membership interests in Mortgage Borrower, or make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

4.2.4    <u>Debt Cancellation</u>.  Borrower shall not cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

4.2.5    <u>Zoning</u>.  Borrower shall not permit Mortgage Borrower to initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other Applicable Law, without the prior written consent of Administrative Agent.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower shall not permit Mortgage Borrower to cause or permit

- 41 -

the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Administrative Agent. Borrower shall not permit Mortgage Borrower to establish any condominium or cooperative regime with respect to the Property without the prior written consent of Administrative Agent, nor shall Borrower permit Mortgage Borrower to initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Property or any portion thereof.

4.2.6    No Joint Assessment.  Borrower shall not permit Mortgage Borrower to suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

4.2.7    Name, Identity, Structure, or Principal Place of Business.  Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Administrative Agent thirty (30) days prior written notice.  Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth in Section 3.1.34, without, in each case, the consent of Administrative Agent.  Upon Administrative Agent's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lenders' security interest in the Collateral as a result of such change of principal place of business or place of organization.

4.2.8    ERISA.  During the term of the Loan or of any obligation or right hereunder, Borrower shall not be a Plan and none of the assets of Borrower shall constitute Plan Assets.

(a)    Borrower further covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Loan, as requested by Administrative Agent in its sole discretion and represents and covenants that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

(i)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3 101(b)(2);

(ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3 101(f)(2); or

- 42 -

(iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3 101(c) or (e).

4.2.9    Affiliate Transactions.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower, Mortgage Borrower, any Restricted Party or any of the partners of Borrower, Mortgage Borrower or any Restricted Party except in the ordinary course of business and on terms which are fully disclosed to Administrative Agent in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

4.2.10    Transfers.    (a)    Borrower shall not (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Collateral or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party or the Collateral or (ii) permit Mortgage Borrower to sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party or the Property (collectively, a "Transfer"), other than pursuant to Leases of space in any of the Improvements to tenants in accordance with the provisions of Section 4.1.15 hereof, without the prior written consent of Administrative Agent.

(b)    A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Collateral, the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Collateral or the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; or (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests.

- 43 -

(c)    Administrative Agent shall not be required to demonstrate any actual impairment of Lenders security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Section 4.2.10.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Administrative Agent has consented to any previous Transfer.  Notwithstanding anything to the contrary contained in this Section 4.2.10, (a) no transfer (whether or not such transfer shall constitute a Transfer) shall be made to any Prohibited Person,  and (b) in the event of any transfer (whether or not such transfer shall constitute a Transfer), results in any Person and its Affiliates owning in excess of ten percent (10%) of the ownership interest in a Restricted Party Borrower shall provide to Administrative Agent, not less than thirty (30) days prior to such transfer, the name and identity of each proposed transferee, together with the names of its controlling principals, the social security number or employee identification number of such transferee and controlling principals, and such transferee's and controlling principal's home address or principal place of business, and home or business telephone number.

4.2.11    Waste.  Borrower shall not, nor permit Mortgage Borrower to, commit or suffer any material physical waste of the Property or make any change in the use of the Property which shall in any way invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security for the Loan.  Borrower shall not, nor permit Mortgage Borrower to, without the prior written consent of Administrative Agent permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by law or in accordance with the orders of any Governmental Authorities having jurisdiction thereof.

4.2.12    Reciprocal Easement Agreement.  Borrower shall not, and shall not permit Mortgage Borrower to, enter into any reciprocal easement agreement after the date hereof without Administrative Agent's prior written consent.

4.2.13    Limitation on Securities Issuances.  None of Borrower, Mortgage Borrower or any Restricted Party shall issue any membership interests or other securities, other than those that have been issued as of the Closing Date without the prior written consent of Administrative Agent.

4.2.14    Subordinate Financing.  Except as permitted in the Intercreditor Agreement and limited solely to between the Mortgage Lender and Borrower, Borrower shall not (i) be permitted to place any subordinate financing on the Property or (ii) be permitted to place any subordinate financing, preferred equity, additional mezzanine financing or any other indebtedness on the Collateral.

4.2.15    Reserved.

4.2.16    Refinancing.  Borrower shall not consent to or permit a refinancing of the Mortgage Loan unless either (a) simultaneously with such refinance, Borrower repays the Loan in full or (b) Borrower obtains the prior consent of Lender, which consent shall be given or not in Lender's sole discretion.

- 44 -

4.2.17    <u>Property Level Debt</u>.  Borrower shall not permit Mortgage Borrower to incur Indebtedness in excess of the obligations under the Mortgage Loan or in the ordinary course of business provided that the Loan to Value Ratio after giving effect to such Indebtedness shall not be equal to a percentage in excess of eighty percent (80%). Solely for purposes of this Section 4.2.17, the term "Indebtedness" shall be deemed to include Indebtedness encumbering the Property or other of Mortgage Borrower's assets regardless of whether the terms of such Indebtedness provide that such Indebtedness is not a recourse obligation of the Mortgage Borrower.

4.2.18    <u>Mortgage Loan</u>.  Borrower shall not and will not permit Mortgage Borrower to (a) without Lender's consent (Lender's right to consent being subject to Lender's rights under the Intercreditor Agreement), modify or amend the Mortgage Loan Documents, (b) acquire any right, title or interest in the Mortgage Loan or Mortgage Loan Documents or become a participant therein or hold a lien on such Mortgage Loan or Mortgage Loan Documents without simultaneously paying off the Loan in full, or (c) without Lender's consent (Lender's right to consent being subject to Lender's rights under the Intercreditor Agreement), request any release, waiver, consent or approval under the Mortgage Loan Documents.

## ARTICLE V.  RESERVED

## ARTICLE VI.  CONDITIONS PRECEDENT

The obligation of Lenders to make the Loan hereunder is subject to the fulfillment by Borrower and Guarantor, as applicable, or waiver by Administrative Agent of the following conditions precedent by not later than the Closing Date:

### Section 6.1    <u>Representations and Warranties; Compliance with Conditions.</u>

The representations and warranties of Borrower and Mortgage Borrower contained in this Agreement, the other Loan Documents and the Mortgage Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and Administrative Agent shall have determined that no Default or an Event of Default shall have occurred and be continuing nor shall any Default or Event of Default occur immediately following the Closing Date and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement, in each other Loan Document and in each other Mortgage Loan Document on its part to be observed or performed.

### Section 6.2    <u>Reserved.</u>

### Section 6.3    <u>Further Documents.</u>

Administrative Agent or Administrative Agent's counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or Administrative Agent's counsel may have reasonably requested in form and substance reasonably satisfactory to Administrative Agent and Administrative Agent's counsel.

- 45 -

**ARTICLE VII.  RESERVED**

**ARTICLE VIII.  RESERVED**

**ARTICLE IX.  LINE ITEMS**

**Section 9.1    Reserved.**

**Section 9.2    Identity of Interest.**

If there is an "identity of interest" between Borrower and/or Mortgage Borrower and any contractor or subcontractor, any contract or subcontract between parties having such "identity of interest" shall be regarded solely as an estimate for the purpose of this Section.  There shall be deemed to be an "identity of interest" if Borrower or Mortgage Borrower acts as a contractor in Borrower's or Mortgage Borrower's own name or through a separate entity in which Borrower, Mortgage Borrower or any entity related to Borrower or Mortgage Borrower has a significant interest or control.

**Section 9.3    Interest Reserve.**

The First Interest Funding Amount, the Second Interest Funding Amount and all other amounts delivered to the Administrative Agent pursuant to Section 2.3.1 and Section 2.3.3 to be used to fund monthly debt service payments during the Initial Term and the Extension Term to the extent required under this Agreement (the "Interest Reserve") shall be pledged to Administrative Agent as additional collateral for the Loan.  Borrower hereby authorizes Lender to advance the Interest Reserve as needed to cover any payments of interest on the Loan.

**Section 9.4    Reserved.**

**Section 9.5    Reserved.**

**ARTICLE X. INSURANCE;   CASUALTY;   CONDEMNATION;   REQUIRED REPAIRS**

**Section 10.1    Insurance.**

(a)    Borrower shall obtain and maintain, or cause to be obtained and maintained, during the course of the Work, insurance for Borrower and/or Mortgage Borrower providing at least the following coverages:

(i)    construction coverage;

(ii)    architect's errors and omissions;

(iii)    commercial general liability insurance for all contractors and subcontractors engaged in the performance of the Work;

(iv)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such

- 46 -

insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000.00 and a per occurrence limit of not less than $1,000,000.00; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts. and (5) contractual liability covering the indemnities contained in Section 28 of the Security Instrument to the extent the same is available;

   (v) umbrella liability insurance in an amount not less than $10,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 10.1(a)(iv) hereof; and

   (vi) casualty insurance in the so-called "Builders' Risk Completed Value Non Reporting Form", which shall include protection against boiler and machinery risk, which after completion of the Work shall be converted into a regular fire and extended "all risk" coverage (including, without limitation, one year loss of rents and malicious mischief insurance coverage), in an amount equal to the full replacement cost of the Improvements, with a maximum deductible of $10,000 (or such other amount as Administrative Agent may agree to in Administrative Agent's sole and absolute discretion), full fire and casualty coverage without deduction for depreciation.

  (b) Borrower shall obtain and maintain, or cause to be obtained and maintained, after the completion of the Work, Policies for Borrower and/or Mortgage Borrower providing at least the following coverages:

   (i) comprehensive all risk insurance on the Improvements and the Equipment, in each case, (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, (B) containing an agreed amount endorsement with respect to the Improvements and Equipment waiving all co-insurance provisions; (C) providing for no deductible in excess of $50,000; and (D) providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements together with an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. The Full Replacement Cost shall be redetermined from time to time (but not more frequently than once in any twenty-four (24) calendar months) at the request of Administrative Agent by an appraiser or contractor designated and paid by Borrower and approved by Administrative Agent, or by an engineer or appraiser in the regular employ of the insurer. After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Administrative Agent to request any such ascertainment shall relieve Borrower of any of its obligations under this Subsection;

- 47 -

(ii)      commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000.00 and a per occurrence limit of not less than $1,000,000.00; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts. and (5) contractual liability covering the indemnities contained in Section 28 of the Security Instrument to the extent the same is available;

(iii)      business interruption/loss of rents insurance (A) with loss payable to Administrative Agent; (B) covering all risks required to be covered by the insurance provided for in Section 10.1(b)(i); (C) in an amount equal to 100% of the projected gross income from the Property (on an actual loss sustained basis) for a period continuing until the Restoration of the Property is completed; the amount of such business interruption/loss of rents insurance shall be determined prior to the Closing Date and at least once each year thereafter based on the greatest of: (x) Borrower's reasonable estimate of the gross income from the Property and (y) the highest gross income received during the term of the Notes for any full calendar year prior to the date the amount of such insurance is being determined, in each case for the succeeding twenty-four (24) month period and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Equipment has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twenty-four (24) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; All insurance proceeds payable to Administrative Agent pursuant to this Section 10.1(b)(iii) shall be held by Administrative Agent and shall be applied to the Obligations secured hereunder from time to time due and payable hereunder and under the Notes and this Agreement; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its Obligations to pay the Obligations secured hereunder on the respective dates of payment provided for in the Notes and this Agreement except to the extent such amounts are actually paid out of the proceeds of such business interruption/loss of rents insurance.

(iv)      at all times during which structural construction, repairs or alterations are being made with respect to the Improvements (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the insurance provided for in Section 10.1(d)(ii); and (B) the insurance provided for in Section 10.1(b)(i) shall be written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 10.1(b)(i), (3) shall include permission to occupy the Property, and (4) shall contain an agreed amount endorsement waiving co-insurance provisions;

- 48 -

(v)     workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with a limit of at least $2,000,000.00 per accident and per disease per employee, and $2,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Administrative Agent on terms consistent with the commercial property insurance policy required under Section 10.1(b)(i);

(vii)   if any portion of the Improvements is at any time located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or any successor law (the "Flood Insurance Acts"), flood hazard insurance of the following types and in the following amounts (A) coverage under Policies issued pursuant to the Flood Insurance Acts (the "Flood Insurance Policies") in an amount equal to the maximum limit of coverage available for the Property under the Flood Insurance Acts, subject only to customary deductibles under such Policies and (B) coverage under supplemental private Policies in an amount, which when added to the coverage provided under the Flood Act Policies, is not less than the Loan amount;

(viii)  umbrella liability insurance in an amount not less than $10,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 10.1(b)(ii) hereof;

(ix)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000); and

(x)     such other insurance and in such amounts as Administrative Agent from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(c)    All insurance provided for in Sections 10.1(a) and (b) hereof shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Administrative Agent, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Administrative Agent. The insurance companies must have a claims paying ability/financial strength rating of "A" or better by at least two rating agencies (one of which shall be S&P, for which an A- rating is acceptable) and/or a general policy rating of "A" or better and a financial class of XII or better by A.M. Best Company, Inc., provided however that insurers with A- ratings will be permitted if their trend rating as indicated by A.M. Best is stable or trending positive and if their potential liability for loss does not exceed 5% of their policy-holder surplus

- 49 -

(each such insurer shall be referred to below as a "<u>Qualified Insurer</u>").  Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Administrative Agent pursuant to Section 10.1(a) or (b), as applicable, Borrower shall deliver certified copies of the Policies marked "premium paid" or accompanied by evidence satisfactory to Administrative Agent of payment of the premiums due thereunder (the "<u>Insurance Premiums</u>").

(d)     Borrower shall not obtain and shall not permit Mortgage Borrower to obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Administrative Agent and Administrative Agent's interest is included therein as provided in this Agreement and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 10.1(a) or (b), as applicable, to be furnished by, or which may be reasonably required to be furnished by, Borrower and/or Mortgage Borrower.  In the event Borrower and/or Mortgage Borrower obtains separate insurance or an umbrella or a blanket policy, Borrower shall notify Administrative Agent of the same and shall cause certified copies of each Policy to be delivered as required in Section 10.1(a) or (b), as applicable.   Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 10.1(a) or (b), as applicable. Notwithstanding Administrative Agent's approval of any umbrella or blanket liability or casualty Policy hereunder, Administrative Agent reserves the right, in its sole discretion, to require Borrower to obtain or cause Mortgage Borrower to obtain a separate Policy in compliance with this Section 10.1.

(e)     All Policies provided for or contemplated by Section 10.1(a) and (b) hereof, except for the Policy referenced in Section 10.1(b)(v), shall name Administrative Agent, Borrower and Mortgage Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, and flood insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Administrative Agent providing that the loss thereunder shall be payable to Administrative Agent.

(f)     All Policies provided for in Sections 10.1(a) and (b) hereof shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower and/or Mortgage Borrower, or anyone acting for Borrower and/or Mortgage Borrower, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Administrative Agent is concerned;

(ii)     the Policy shall not be materially changed (other than to increase the coverage provided thereby) or cancelled without at least 30 days' written notice to Administrative Agent and any other party named therein as an insured;

- 50 -

(iii)    each Policy shall provide that the issuers thereof shall give written notice to Administrative Agent if the Policy has not been renewed thirty (30) days prior to its expiration; and

(iv)    Administrative Agent shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(g)    If at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Administrative Agent shall have the right, without notice to Borrower to take such action as Administrative Agent deems necessary to protect Lenders' interest in the Collateral, including, without limitation, the obtaining of such insurance coverage as Administrative Agent in its sole discretion deems appropriate, and all expenses incurred by Administrative Agent or Lenders in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Administrative Agent upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate.

(h)    In the event of a foreclosure of the Security Instrument, or other transfer of interest in the Collateral in extinguishment in whole or in part of the Debt all right, title and interest of Borrower and/or Mortgage Borrower in and to the Policies then in force and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Administrative Agent, Lenders or other transferee in the event of such other transfer of interest.

(i)    Borrower shall furnish to Administrative Agent, on or before thirty (30) days after the close of each of Borrower's fiscal years, a statement certified by Borrower or a duly authorized officer of Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if requested by Administrative Agent, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Administrative Agent.

## Section 10.2    Casualty.

If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), Borrower shall give prompt notice of such damage to Administrative Agent and shall promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Administrative Agent and otherwise in accordance with Section 10.4 hereof.  Borrower shall pay or cause to be paid all costs of such Restoration whether or not such costs are covered by insurance.  Administrative Agent may, but shall not be obligated to make proof of loss if not made promptly by Borrower.

## Section 10.3    Condemnation.

Borrower shall promptly give Administrative Agent notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Administrative Agent copies of any and all papers served in connection with such proceedings.  Administrative Agent may participate in any such proceedings, and Borrower shall

- 51 -

from time to time deliver to Administrative Agent all instruments requested by it to permit such participation. Borrower shall, or shall cause Mortgage Borrower to, at its expense, diligently prosecute any such proceedings, and shall consult with Administrative Agent, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Notes and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Administrative Agent, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lenders shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Notes. If the Property or any portion thereof is taken by a condemning authority, Borrower shall, or shall cause Mortgage Borrower to, promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 10.4 hereof. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Administrative Agent, on behalf of Lenders, of the Award, Administrative Agent shall have the right, whether or not a deficiency judgment on the Notes shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

### Section 10.4    Restoration.

The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds shall be less than Five Hundred Thousand and 00/100 Dollars ($500,000.00) and the costs of completing the Restoration shall be less than Five Hundred Thousand and 00/100 Dollars ($500,000.00), the Net Proceeds will be disbursed by Administrative Agent to Borrower upon receipt, provided that all of the conditions set forth in Section 10.4(c)(i) are met and Borrower delivers to Administrative Agent a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than Five Hundred Thousand and 00/100 Dollars ($500,000.00) or the costs of completing the Restoration is equal to or greater than Five Hundred Thousand and 00/100 Dollars ($500,000.00) Administrative Agent shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 10.4. The term "Net Proceeds" shall mean: (i) the net amount of all insurance proceeds received by Administrative Agent pursuant to either Section 10.1(a) or Section 10.1(b)(i), (iv), (vi), (vii) and (viii) as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Insurance Proceeds"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Condemnation Proceeds"), whichever the case may be.

(i)    The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:

- 52 -

(A)    no Default or Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are Insurance Proceeds, less than forty percent (40%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

(C)    Leases demising in the aggregate a percentage amount equal to or greater than seventy-five percent (75%) of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Administrative Agent evidence satisfactory to Administrative Agent that all tenants shall continue to operate their respective space at the Property after the completion of the Restoration;

(D)    Borrower shall, or shall cause Mortgage Borrower to, commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion in compliance with all Applicable Laws, including, without limitation, all applicable Environmental Laws;

(E)    Administrative Agent shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Notes, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 10.1(b)(iii), if applicable, or (3) by other funds of Borrower;

(F)    Administrative Agent shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months after the occurrence of such Casualty or Condemnation, or (2) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Section 10.4(c) to remain in effect subsequent to the occurrence of such Casualty or Condemnation and the completion of the Restoration, or (4) such time as may be required under Applicable Law, in order to repair and restore the

- 53 -

Property to the condition it was in immediately prior to such Casualty or Condemnation or (5) the expiration of the insurance coverage referred to in Section 10.1(b)(iii);

> (G)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Laws;

> (H)    Intentionally Omitted;

> (I)    such Casualty or Condemnation, as applicable, does not result in the total loss of access to the Property or the Improvements;

> (J)    Borrower shall deliver, or cause to be delivered, to Administrative Agent a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be acceptable to Administrative Agent; and

> (K)    the Net Proceeds together with any Cash or Cash equivalent deposited by Borrower with Administrative Agent are sufficient in Administrative Agent's discretion to cover the cost of the Restoration.

(ii)    The Net Proceeds shall be held by Administrative Agent in an non-interest bearing account and, until disbursed in accordance with the provisions of this Section 10.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents.  The Net Proceeds shall be disbursed by Administrative Agent to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Administrative Agent that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Collateral and/or the Property which have not either been fully bonded to the satisfaction of Administrative Agent and discharged of record or in the alternative fully insured to the satisfaction of Administrative Agent by the Title Company issuing the Title Insurance Policy and the Eagle 9 Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration, the cost of which is greater than $500,000.00, shall be subject to prior review and acceptance in all respects by Administrative Agent and by an independent consulting engineer selected by Administrative Agent (the "Casualty Consultant") unless such same plans and specifications were previously approved by Administrative Agent. Administrative Agent shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, the cost of which is greater than $500,000.00, as well as the contracts under which they

- 54 -

have been engaged, shall be subject to prior review and acceptance by Administrative Agent and the Casualty Consultant.  All costs and expenses incurred by Administrative Agent in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Administrative Agent be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage.  The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 10.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant certifies to Administrative Agent that the Restoration has been completed in accordance with the provisions of this Section 10.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Administrative Agent receives evidence satisfactory to Administrative Agent that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Administrative Agent will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Administrative Agent that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Administrative Agent or by the Title Company issuing the Title Insurance Policy for the Property and/or the Eagle 9 Insurance Policy for the Collateral, and Administrative Agent receives an endorsement to such Title Insurance Policy and/or Eagle 9 Insurance Policy, as applicable, insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement.  If required by Administrative Agent, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    Administrative Agent shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Administrative Agent in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Administrative Agent before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Administrative Agent shall be held by Administrative Agent and shall be disbursed for costs actually incurred in connection

- 55 -

with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 10.4(b) shall constitute additional security for the Debt and other obligations under the Loan Documents.

(vii)    The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Administrative Agent after the Casualty Consultant certifies to Administrative Agent that the Restoration has been completed in accordance with the provisions of this Section 10.4(b), and the receipt by Administrative Agent of evidence satisfactory to Administrative Agent that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Administrative Agent to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Notes, this Agreement or any of the other Loan Documents.

(c)    All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 10.4(b)(vii) may be retained and applied by Administrative Agent toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Administrative Agent in its sole discretion shall deem proper, or, at the discretion of Administrative Agent, the same may be paid, either in whole or in part, to Borrower for such purposes as Administrative Agent shall approve, in its discretion.  If Administrative Agent shall receive and retain Net Proceeds, the Lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Administrative Agent and actually applied by Administrative Agent in reduction of the Debt.

(d)    The provisions of subsection 4 of Section 254 of the New York Real Property Law covering the insurance of buildings against loss by fire shall not apply to this Agreement. In the event of any conflict, inconsistency or ambiguity between the provisions of Section 10.4 of this Agreement and the provisions of subsection 4 of Section 254 of the New York Real Property Law covering the insurance of buildings against loss by fire, the provisions of Section 10.4 of this Agreement shall control.  Notwithstanding the provisions of this Section 10.4, all such payments provided for in Section 10.4 shall be made subject to the provisions of the Intercreditor Agreement.

## ARTICLE XI.  DEFAULTS

### Section 11.1   Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)    if any portion of the Debt is not paid on or before the date the same is due and payable;

(ii)    if Borrower shall fail to pay any other sum hereunder or under any of the other Loan Documents when and as the same shall become due and payable;

(iii)    if any of the Taxes or Other Charges are not paid on or before the date when the same are due and payable;

- 56 -

(iv)    if the Policies are not kept in full force and effect or if certified copies of the Policies are not delivered to Administrative Agent on request;

(v)    if Borrower transfers or encumbers any portion of the Collateral and/or the Property in violation of the provisions of Section 4.2.10 hereof or Section 8 of the Security Instrument;

(vi)    if any representation or warranty made by Borrower, Mortgage Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Administrative Agent shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vii)    if Borrower, Mortgage Borrower or Guarantor shall make an assignment for the benefit of creditors;

(viii)    if a receiver, liquidator or trustee shall be appointed for Borrower, Mortgage Borrower or Guarantor or if Borrower, Mortgage Borrower or Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Mortgage Borrower or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower, Mortgage Borrower or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Mortgage Borrower or Guarantor, upon the same not being discharged, stayed or dismissed within sixty (60) days;

(ix)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(x)    if Borrower breaches any of its negative covenants contained in Section 4.2;

(xi)    if Borrower violates or does not comply with any of the provisions of Section 4.1;

(xii)    if an "Event of Default" shall have occurred under the Mortgage Loan Documents;

(xiii)    if Borrower or Mortgage Borrower violates or does not comply with any of the provisions of Section 3.1.33 hereof;

(xiv)    if the Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding, escrow with a Title Company or otherwise) for a period of sixty (60) days;

- 57 -

(xv)   if any federal tax Lien or state or local income tax Lien is filed against Borrower, Mortgage Borrower, Guarantor, the Collateral or the Property and same is not discharged of record or if under dispute, post in escrow with a Title Company, within thirty (30) days after same is filed;

(xvi)   (A)   Borrower fails to timely provide Administrative Agent with the written certification and evidence referred to in Section 4.2.8 hereof, (B) Borrower is a Plan or its assets constitute Plan Assets; or (C) Borrower consummates a transaction which would cause the Security Instrument or Administrative Agent or Lenders exercise of its rights under the Security Instrument, the Notes, this Agreement or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a State statute regulating governmental plans, subjecting Lenders to liability for a violation of ERISA, the Code, a State statute or other similar law;

(xvii)   if Borrower shall fail to deliver to Administrative Agent, within twenty (20) days after request by Administrative Agent, the estoppel certificates required pursuant to the terms of Section 4.1.11(a) hereof;

(xviii)   if any default occurs under any pledge, guaranty or indemnity executed in connection herewith (including, without limitation, the Security Instrument, the Guaranty and the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

(xix)   if Borrower shall be in default beyond applicable notice and grace periods under any mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Collateral and/or Property whether it be superior or junior in lien to the Security Instrument;

(xx)   with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xxi)   if Borrower shall breach any of the provisions of Article XIV;

(xxii)   if there shall be a default or a failure of Borrower to comply with a covenant or condition under the Security Instrument or any of the other Loan Documents, whether as to Borrower, Mortgage Borrower, the Collateral or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Administrative Agent or Lenders to accelerate the maturity of all or any portion of the Debt;

(xxiii)   if a judgment is filed against Borrower which is not vacated or discharged within ninety (90) days;

(xxiv)   if Borrower breaches any of its payment requirements contained in Section 2.3.1;

- 58 -

(xxv)   if Borrower executes any conditional bill of sale, chattel mortgage or other security instrument covering any personal property, or files a financing statement publishing notice of such security instrument, or purchases any of such Personal Property so that ownership of the same shall not vest unconditionally in Borrower (subject to the rights of Mortgage Lender under the Mortgage Loan Documents), free from encumbrances, on delivery to the Property; or if Borrower does not furnish to Administrative Agent, upon demand, the contracts, bills of sale, statements, receipted vouchers or agreements, or any of them, under which Borrower claims title to such Personal Property, and the same is not cured within thirty (30) days after Borrower receives notice of any such;

(xxvi) if any order or decree of judgment is rendered in any judicial or administrative proceeding declaring the Property (or any portion thereof) to be in violation of any Legal Requirements and the same is not cured within sixty (60) days of said order or decree or such longer period of time as provided in such order or decree;

(xxvii) if there shall be a default under the Security Instrument or any of the other Loan Documents beyond any applicable notice and cure periods contained in such documents, whether as to Borrower, Mortgage Borrower, the Collateral or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Administrative Agent to accelerate the maturity of all or any portion of the Debt;

(xxviii) Intentionally Omitted;

(xxix)  if Administrative Agent or their representatives are denied permission to enter upon the Property, inspect any Work and all materials, fixtures and articles used or to be used in the Work;

(xxx)   Reserved;

(xxxi)  if Borrower or Mortgage Borrower executes any conditional bill of sale, chattel mortgage or other security instrument covering any personal property, or files a financing statement publishing notice of such security instrument, or purchases any of such personal property so that ownership of the same shall not vest unconditionally in Borrower and/or Mortgage Borrower (subject to the rights of Mortgage Lender under the Mortgage Loan Documents), free from encumbrances, on delivery to the Property; or if Borrower does not furnish to Administrative Agent, upon demand, the contracts, bills of sale, statements, receipted vouchers or agreements, or any of them, under which Borrower and/or Mortgage Borrower claims title to such personal property;

(xxxii) unless Borrower simultaneously pays the Loan in full, if Borrower or its Affiliates acquire any right, title or interest in the Mortgage Loan or Mortgage Loan Documents or become a participant therein or hold a lien on such Mortgage Loan or Mortgage Loan Documents, or if Borrower permits Mortgage Loan Documents to be amended or modified without Administrative Agent's approval, subject to Administrative Agent's right to consent provided for in the Intercreditor Agreement;

- 59 -

(xxxiii) intentionally omitted;

(xxxiv) if any order or decree of judgment is rendered in any judicial or administrative proceeding declaring the Property (or any portion thereof), or the Work (or any portion thereof) to be in violation of any Legal Requirements and the same is not cured within sixty (60) days of said order or decree or such longer period of time as provided in such order or decree;

(xxxv) intentionally omitted; or

(xxxvi) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xxxv) above, for ten (10) days after notice to Borrower from Administrative Agent, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Administrative Agent in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days.

(b)     Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vii) or (viii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Administrative Agent may take such action, without notice or demand, that Administrative Agent deems advisable to protect and enforce its rights against Borrower and in and to the Collateral, including, without limitation, declaring the Debt to be immediately due and payable, and Administrative Agent and Lenders may enforce or avail themselves of any or all rights or remedies provided in the Loan Documents against Borrower and or any part of the Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## Section 11.2   **Remedies.**

(a)     Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Administrative Agent and/or Lenders against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Administrative Agent and/or Lenders at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Administrative Agent and/or Lenders shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all of the Property and/or the

- 60 -

Collateral. Any such actions taken by Administrative Agent and/or Lenders shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Administrative Agent and/or Lenders may determine in their sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Administrative Agent and/or Lenders permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Administrative Agent and/or Lenders are not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Administrative Agent and/or Lenders shall remain in full force and effect until Administrative Agent and/or Lenders have exhausted all of their remedies against Borrower, Mortgage Borrower, Guarantor, the Collateral and the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)    With respect to Borrower and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Administrative Agent and/or Lenders to resort to the Collateral for the satisfaction of any of the Debt, and Administrative Agent and/or Lenders may seek satisfaction out of the Collateral or any part thereof, in its absolute discretion in respect of the Debt.

(c)    Upon the happening of an Event of Default, subject to the rights of the Mortgage Lender under the Mortgage Loan, in addition to any other rights and/or remedies available to Lenders and Administrative Agent under this Agreement, the Security Instrument any other Loan Document or at law or equity, Lenders and Administrative Agent shall also have the right and is hereby given an unconditional and irrevocable license to enter, or to cause an independent contractor of Administrative Agent's selection to enter the Property, or any part thereof and perform any and all work and labor necessary to complete Work and to employ watchmen to protect the Property, and all sums expended and costs incurred by Lenders and Administrative Agent for such purposes shall be deemed to have been paid to Borrower and shall be secured by the Security Instrument.

## Section 11.3    Remedies Cumulative; Waivers.

The rights, powers and remedies of Administrative Agent or Lenders under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Administrative Agent or Lenders may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Administrative Agent or Lenders' rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Administrative Agent or Lenders may determine in their sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one or more Defaults or Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

- 61 -

## ARTICLE XII.  SPECIAL PROVISIONS

### Section 12.1    Sale of Notes.

Borrower acknowledges that Lenders may, without notice to Borrower, sell, transfer, pledge or assign all or any part of the Obligations, this Agreement, the Notes, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or the granting of participations therein, to one or more Persons on terms and conditions satisfactory to the transferring Lender in its sole and absolute discretion.  Borrower agrees to cooperate with Administrative Agent and each Lender in connection therewith, including, without limitation, (a) the delivery of an estoppel certificate and such other documents as may be reasonably requested by Administrative Agent, (b) the execution of such amendments to the Loan Documents as may be requested by the holder of the Notes, including, without limitation, bifurcation of any existing Note into two or more separate notes; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Notes, except in connection with a bifurcation of the Loan which may result in varying interest rates and amortization schedules on the component notes, but which shall have, in the aggregate, the same initial weighted average spread of the Notes immediately prior to such componentization, or (ii) in the reasonable judgment of Borrower, modify or amend any other material economic term of the Loan, or (iii) in the reasonable judgment of Borrower, materially increase Borrower's Obligations and liabilities under the Loan Documents, and (c) make changes to the organizational documents of Borrower and its principals and/or use its best efforts to cause changes to the legal opinions delivered by Borrower in connection with the Loan, provided, that such changes shall not result in a material adverse economic effect to Borrower.  Borrower shall also furnish and Borrower consents to Administrative Agent furnishing to such investors or such prospective investors any and all information concerning the Property, the Collateral, the Leases, the financial condition of Borrower as may be requested by Lender, any investor, any prospective investor in connection with any sale or transfer of the Loan.

All third party costs and expenses incurred by Administrative Agent in connection with Borrower's complying with requests made under this Section 12.1 shall be paid by Administrative Agent.

### Section 12.2    Servicer.

12.2.1    At the option of Administrative Agent, the Loan may be serviced by Hutton Ventures, LLC (the "Servicer") and Administrative Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Administrative Agent and Servicer.  Borrower shall not be responsible for any set-up fees or any other initial costs relating to or arising under the Servicing Agreement, nor shall Borrower be responsible for payment of the monthly servicing fee due to the Servicer under the Servicing Agreement.  Such appointment of Services shall not be irrevocable and the Administrative Agent, or any successor thereto, may terminate such appointment and designate a replacement servicer hereunder.

- 62 -

12.2.2    Upon notice thereof from Administrative Agent, Servicer shall have the right to exercise all rights of Administrative Agent and enforce all Obligations of Borrower pursuant to the provisions of this Agreement, the Notes and the other Loan Documents.

12.2.3    Provided Borrower shall have been given notice of Administrative Agent's address by Administrative Agent, Borrower shall deliver to Administrative Agent duplicate originals of all notices and other instruments which Borrower may or shall be required to deliver to Administrative Agent pursuant to this Agreement, the Notes and the other Loan Documents (and no delivery of such notices or other instruments by Borrower shall be of any force or effect unless delivered to Administrative Agent and Servicer as provided above).

### Section 12.3  Administrative Agent.

(a)    Appointment and Authority. Each Lender hereby appoints Hutton Ventures LLC, to act on its behalf as administrative and collateral agent hereunder and under the other Loan Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Section 12.3 are solely for the benefit of Administrative Agent and the Lenders, and Borrower shall not have rights as a third-party beneficiary of any of such provisions. The provisions of this Section 12.3 may be modified without Borrower's consent so long as such modifications do not materially alter any of Borrower's rights or obligations under this Agreement or any of the other Loan Documents or otherwise alter the economic terms of the Loan or the Loan Documents (*provided*, *however* that Borrower shall be given notice of any such modification). It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. Agent shall, promptly upon (but in no event longer than one (1) Business Day thereafter) Agent's receipt of any payments from Borrower on account of Obligations owing to the Lenders, transfer each Lender's allocable portion of each such payment to such applicable Lender.

(b)    Rights as a Lender. The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Borrower or any Affiliate thereof as if such Person were not Administrative Agent hereunder and without any duty to account therefor to the Lenders.

(c)    Exculpatory Provisions.

(i)    Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall

- 63 -

be administrative in nature.    Without limiting the generality of the foregoing, Administrative Agent:

>  (A)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

>  (B)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); _provided_ that Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and

>  (C)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity.

(ii)    Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.3(m) and 11.2), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.    Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to Agent in writing by Borrower or a Lender.

(iii)    Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to Agent.

(d)    Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing

- 64 -

(including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, Agent may presume that such condition is satisfactory to such Lender unless Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(e)     Reliance by Administrative Agent. Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Agent. Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.

(f)     Delegation of Duties. Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Agent. Agent shall use its reasonable judgment in the selection of a sub-agent and shall reasonably monitor the performance of such sub-agent in the performance of its designated duties. Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Loan as well as activities as Agent. Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines that Agent acted with gross negligence or willful misconduct in the selection and/or monitoring of such sub-agents.

(g)     Resignation or Removal of Agent.

(i)     Agent may at any time give notice of its resignation to the Lenders and Borrower. Lenders may at any time, upon the consent of the Required Lenders, give notice to Agent, Lenders and Borrower of their removal of the Agent as Administrative Agent. Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, without the prior written consent of Borrower to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) or is removed (the "Resignation or Removal Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation or Removal Effective Date.

- 65 -

(ii)     With effect from the Resignation or Removal Effective Date (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, and (ii) except for any indemnity payments owed to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender (including to the retiring or removed Agent in its capacity as a Lender, if applicable) directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent (other than any rights to indemnity payments owed to the retiring or removed Agent), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Section 12.3 and Section 13.13 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

(iii)     If for any reason the Required Lenders shall vote to remove the initial Administrative Agent as Agent, then such Administrative Agent shall have the right to buyout all of the Required Lenders as Lenders to the Loan, within forty-five (45) days from receipt by such Administrative Agent of written notice as to such vote.  Such election by Administrative Agent shall be required to be exercised within twenty (20) days of its receipt of notice of removal and to the extent election is made to buyout, closing of buyout shall be consummated within thirty (30) days of receipt of notice of removal for a purchase price equal to all outstanding principal, interest and fees then owing by Borrower to such Required Lenders.  Nothing in this Section 12.3(g)(iii) shall be deemed to otherwise delay or suspend the Required Lenders' right to remove the Administrative Agent as provided in Section 12.3(g)(i) above.

(h)     <u>Non-Reliance on Agent and Other Lenders</u>. Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(i)     <u>No Other Duties, Etc</u>. Anything herein to the contrary notwithstanding, the initial Administrative Agent shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as Agent or a Lender hereunder.

- 66 -

(j)     <u>Agent May File Proofs of Claim</u>. In case of the pendency of any proceeding under any Debtor Relief Law, Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Agent shall have made any demand on Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loan and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and Agent and their respective agents and counsel and all other amounts due the Lenders and Agent under <u>Sections 2.3.5</u> and <u>13.13</u>) allowed in such judicial proceeding; and

(ii)     to collect and receive for the ratable benefit of all Lenders any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Agent and, in the event that Agent shall consent to the making of such payments directly to the Lenders, to pay to Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Agent and its agents and counsel, and any other amounts due Agent under <u>Sections 2.3.5</u> and <u>13.13</u>.

(k)     <u>Collateral and Guaranty Matters</u>.

(i)     The Lenders irrevocably authorize Agent, at its option and in its discretion, to release any lien on any property granted to or held by Agent under any Loan Document (x) upon termination of the Commitments and payment in full of all Obligations (other than contingent indemnification obligations), (y) that is sold or to be sold as part of or in connection with any sale permitted under the Loan Documents, or (z) subject to <u>Section 12.1</u>, if approved, authorized or ratified in writing by the Required Lenders.  Upon request by Agent at any time, the Required Lenders will confirm in writing Agent's authority to release its interest in particular types or items of property.

(ii)     Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any collateral for the Obligations, the existence, priority or perfection of Agent's lien thereon, or any certificate prepared by Borrower or any Guarantor in connection therewith, nor shall Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the collateral for the Obligations.

(l)     <u>Authorization to Enter into, and Enforcement of, the Loan Documents</u>.  Agent is hereby irrevocably and exclusively authorized by each Lender to execute and deliver the Loan Documents on behalf of each Lender and to take such action and exercise such powers under the Loan Documents as Agent considers appropriate, *provided* Agent shall not amend the Loan Documents in any material respect unless such amendment is agreed to in writing by the Required Lenders, or all the Lenders as provided in <u>Section 12.1</u>.  Each Lender acknowledges

- 67 -

and agrees that it will be bound by the terms and conditions of the Loan Documents upon the execution and delivery thereof by Agent. Except as otherwise specifically provided for herein, no Lender (or its Affiliates) other than Agent shall have the right to institute any suit, action or proceeding in equity or at law for the foreclosure or other realization upon the Property or any other security for the Obligations or any or for the execution of any trust or power in respect of the Property or any other security for the Obligations or any Guaranty or for the appointment of a receiver or for the enforcement of any other remedy under the Loan Documents or any Guaranty; it being understood and intended that no one or more of the Lenders (or their Affiliates) shall have any right in any manner whatsoever to affect, disturb or prejudice the rights or interests of Agent in the Property or any security for the Obligations (or any security trustee or receiver therefor) under the Loan Documents by its or their action or to enforce any right thereunder, and that all proceedings at law or in equity shall be instituted, had, and maintained by Agent (or its security trustee or receiver) in the manner provided for in the relevant Loan Documents for the benefit of the Lenders. At all times when there is more than one Lender, (i) Borrower shall be entitled to rely on all written agreements, approvals and consents received from Agent as being that also of the Lenders, without obtaining separate acknowledgment or proof of authorization of same, (ii) shall make all payments under the Loan Documents to Agent, as set forth herein and (iii) all notices required under the Loan Documents will be provided to Agent.

(m)    Approvals of Lenders. All communications from Agent to any Lender requesting such Lender's determination, consent, approval or disapproval (a) shall be given in the form of a written notice to such Lender and (b) shall be accompanied by a description of the matter or issue as to which such determination, approval, consent or disapproval is requested, or shall advise such Lender where information, if any, regarding such matter or issue may be inspected, or shall otherwise describe the matter or issue to be resolved, (c) shall include, if reasonably requested by such Lender and to the extent not previously provided to such Lender, written materials and a summary of all oral information provided to Agent by Borrower in respect of the matter or issue to be resolved, and (d) shall include Agent's recommended course of action or determination in respect thereof. Each Lender shall reply promptly, but in any event within ten (10) Business Days (or such lesser or greater period as may be specifically required under this Agreement or the Loan Documents) of receipt of such communication. Unless a Lender shall give written notice to Agent that it specifically objects to the recommendation or determination of Agent (together with a written explanation of the reasons behind such objection) within the applicable time period for reply, such Lender shall be deemed to have conclusively approved of or consented to such recommendation or determination.

(n)    Notice of Defaults. Agent shall not be deemed to have knowledge or notice of the occurrence of a Default or an Event of Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of the Lenders, unless Agent has received notice from a Lender or Borrower referring to this Agreement, describing with reasonable specificity such Default or Event of Default and stating that such notice is a "notice of default." If any Lender (excluding the Lender which is also serving as Agent) becomes aware of any Default or Event of Default, it shall promptly send to Agent such a "notice of default." Further, if Agent receives such a "notice of default", Agent shall give prompt notice thereof to the Lenders but in any event within ten (10) Business Days after receipt of such "notice of default". Agent may (but shall not be obligated to) take such action, or refrain from

- 68 -

taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

(o)  Register.  Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain at one of its offices in the United States a copy of each assignment and assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and the principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and Borrower, Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

### Section 12.4   Certain Additional Rights of Administrative Agent.

(a)  Notwithstanding anything to the contrary contained herein, for so long as the Loan is outstanding, Administrative Agent shall have:

(i)  the right, in accordance with the terms of this Agreement, to visit and inspect any of the properties of Borrower and its subsidiaries and examine (and request copies of) the books and records of Borrower and its subsidiaries relating to the Collateral and/or the Property at any time upon reasonable notice and to request monthly rent rolls, leasing schedules and reports, operating statements and other leasing information;

(ii)  the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding Indebtedness, together with an auditor's report;

(iii)  intentionally omitted;

(iv)  the right, without restricting any other right of Administrative Agent under this Agreement (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrower's or Mortgage Borrower's payments of management consulting, director or similar fees to Affiliates of Borrower or Mortgage Borrower (or their personnel);

(v)  intentionally omitted;

(vi)  intentionally omitted; and

(vii)  the right, without restricting any other rights of Administrative Agent under this Agreement (including any similar right), to restrict the transfer of voting interests in Borrower held by its members, and the right to restrict the transfer of interests in such members, except for any Transfer that is expressly permitted pursuant to Section 4.2.10 hereof.

- 69 -

(b)    The rights described above may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Administrative Agent.

**Section 12.5    Special Mezzanine Loan Provisions.**    Notwithstanding anything to the contrary contained herein, Borrower hereby agrees as follows:

12.5.1    Borrower shall cause Mortgage Borrower to:  (i) pay all principal, interest and other sums required to be paid by Mortgage Borrower under and pursuant to the provisions of the Mortgage Loan Documents; (ii) diligently perform and observe all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed and observed; (iii) promptly deliver to Administrative Agent a true and complete copy of any notice by Mortgage Lender to Mortgage Borrower under the Mortgage Loan Documents and of any other material written correspondence (including electronically transmitted items) given or received by Mortgage Borrower to or from the Mortgage Lender or its respective agents; (iv) not enter into or be bound by any Mortgage Loan Documents after the date hereof, agree to any amendment, modification, consolidation, restatement, supplement, termination or waiver of any existing Mortgage Loan Documents, grant to Mortgage Lender any consent or waiver, or exercise any remedy available to Mortgage Borrower under the Mortgage Loan Documents or any right or election under the Mortgage Loan Documents, in each case without the prior written approval of Administrative Agent, subject to Administrative Agent's right to consent provided for in the Intercreditor Agreement; and (v) provide Administrative Agent with a copy of any amendment or modification of, or waiver or consent granted under, the Mortgage Loan Documents within five (5) days after its receipt thereof.

12.5.2    Borrower agrees to notify Administrative Agent promptly upon the occurrence of any Mortgage Loan Event of Default.  If any Mortgage Loan Event of Default occurs, Borrower agrees that Administrative Agent shall have the immediate right, without prior notice to Borrower, but shall be under no obligation to (A) pay all or any part of the Mortgage Loan and any other sums that are then due and payable, and perform any act or take any action on behalf of Borrower as may be appropriate, to cause all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed thereunder to be promptly performed or observed, and (B) pay any other amounts and take any other action as Administrative Agent, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Administrative Agent in the Loan and/or the Collateral.  Borrower shall not impede, interfere with, hinder or delay, and shall not permit, cause or allow Mortgage Borrower to impede, interfere with, hinder or delay, any effort or action on the part of Administrative Agent to cure any default or asserted default under the Mortgage Loan, or to otherwise protect or preserve Administrative Agent's interest in the Loan and the Collateral following a Mortgage Loan Event of Default.  In the event that Administrative Agent makes any payment in respect of the Mortgage Loan, Administrative Agent shall be subrogated to all of the rights of the Mortgage Lender under the Mortgage Loan Documents against the Property, the Collateral and Mortgage Borrower in addition to all other rights Administrative Agent may have under the Loan Documents or applicable law.

12.5.3    Borrower shall cause Mortgage Borrower to grant Administrative Agent and its designees the right to enter upon the Property at any time following the occurrence and during the continuance of any Mortgage Loan Event of Default for the purpose of taking any

RE\39820\0007\646179v7

such action or to appear in, defend or bring any action or proceeding to protect Administrative Agent's interest. Administrative Agent may take such action as Administrative Agent deems reasonably necessary or desirable to carry out the intents and purposes of this Section (including communicating with Mortgage Lender with respect to any Mortgage Loan defaults), without prior notice to, or consent from, Borrower or Mortgage Borrower. Administrative Agent shall not have any obligation to complete any cure or attempted cure undertaken or commenced by Administrative Agent. All sums so paid and the costs and expenses incurred by Administrative Agent in exercising rights under this Section (including, without limitation, reasonable attorneys' and other professional fees), with interest at the Default Rate, for the period from the date of demand by Administrative Agent to Borrower for such payments to the date of payment to Administrative Agent, shall constitute a portion of the Debt, shall be secured by the Security Instrument and shall be due and payable to Administrative Agent within two (2) Business Days following demand therefor.

12.5.4    If Administrative Agent shall receive a copy of any notice of default under the Mortgage Loan Documents sent by Mortgage Lender, such notice shall constitute full protection to Administrative Agent for any action taken or omitted to be taken by Administrative Agent, in good faith, in reliance thereon.

12.5.5    Unless Borrower simultaneously pays the Loan in full, none of Borrower, Mortgage Borrower or any of their respective Affiliates shall acquire or agree to acquire the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Mortgage Loan, via purchase, transfer, exchange, operation of law, or otherwise, and any breach or attempted breach of this subsection shall constitute an immediate Event of Default hereunder. If, solely by operation of applicable subrogation law, Borrower, Mortgage Borrower or any of their respective Affiliates shall have failed to comply with the foregoing, then Borrower shall (i) immediately notify Administrative Agent of such failure, and (ii) cause any and all such prohibited parties acquiring any interest in the Mortgage Loan Documents (A) not to enforce the Mortgage Loan Documents, and (B) upon the request of Administrative Agent, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly (1) cancel the promissory note evidencing the Mortgage Loan, (2) reconvey and release the liens securing the Mortgage Loan and any other collateral under the Mortgage Loan Documents, and (3) discontinue and terminate any enforcement proceeding(s) under the Mortgage Loan Documents.

12.5.6    Administrative Agent shall have the right at any time to acquire all or any portion of the Mortgage Loan or any interest in any holder of, or participant in, the Mortgage Loan without notice or consent of Borrower, Mortgage Borrower or any Affiliate thereof, in which event Administrative Agent shall have and may exercise all rights of Mortgage Lender thereunder (to the extent of its interest), including the right (i) to declare that the Mortgage Loan is in default and (ii) to accelerate the Mortgage Loan indebtedness, in accordance with the terms thereof and (iii) to pursue all remedies against any obligor under the Mortgage Loan Documents. In addition, Borrower hereby expressly agrees that any claims, counterclaims, defenses, offsets, deductions or reductions of any kind which Mortgage Borrower or any other Person may have against Mortgage Lender relating to or arising out of the Mortgage Loan shall be the personal obligation of the Mortgage Lender, and in no event shall Mortgage Borrower be entitled to bring, pursue or raise any such claims, counterclaims, defenses, offsets, deductions or reductions

- 71 -

against Administrative Agent or any Affiliate of Administrative Agent or any other Person as the successor holder of the Mortgage Loan or any interest therein, <u>provided</u> that Mortgage Borrower may seek specific performance of its contractual rights under the Mortgage Loan Documents.

12.5.7    Without the express prior written consent of Administrative Agent, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into, execute, deliver, or consent to, as the case may be, any deed-in-lieu or consensual foreclosure with or for the benefit of Mortgage Lender or any of its Affiliates or designees unless Borrower simultaneously pays the Loan in full.  Unless Borrower simultaneously pays the Loan in full, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into any consensual sale or other transaction in connection with the Mortgage Loan which could diminish, modify, terminate, impair or otherwise adversely affect the interests of Administrative Agent or Borrower, the Collateral or any portion thereof or any interest therein or of Mortgage Borrower in the Property or any portion thereof or any interest therein.

12.5.8    On each date on which amounts are required to be disbursed to an account as specified by Administrative Agent pursuant to the terms of the Loan Documents or are required to be paid to Lender pursuant to the terms of any of the Loan Documents, Borrower shall exercise its rights under the Mortgage Borrower Operating Agreement to cause Mortgage Borrower to make to Borrower a distribution of any unrestricted funds in Mortgage Borrower's possession or control up to the aggregate amount required to be so disbursed to the account as specified by Administrative Agent or so paid to Administrative Agent on such date; provided that such distribution is permitted under the Mortgage Loan Documents.

12.5.9    Borrower hereby acknowledges and agrees that (i) the risks of the Mortgage Lenders in making the Mortgage Loan are different from the risks of the Lender in making the Loan, (ii) in determining whether to grant, deny, withhold or condition any requested consent or approval, the Mortgage Lender on the one hand and Administrative Agent on the other may reasonably reach different conclusions, and (iii) Administrative Agent has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on their own point of view, but subject to the standards of consent set forth herein.  Furthermore, the denial by Administrative Agent of a requested consent or approval shall not create any liability or other obligation of Administrative Agent if the denial of such consent or approval results directly or indirectly in a default under the Mortgage Loan, and Borrower hereby waives any claim of liability against Administrative Agent arising from any such denial unless Administrative Agent have not complied with any applicable standard for consent.

### Section 12.6    <u>Intercreditor Agreement.</u>

Mortgage Lender and Administrative Agent are parties to the Intercreditor Agreement memorializing their relative rights and obligations with respect to the Loan, the Mortgage Loan, Borrower, the Mortgage Borrower and the Property.  Borrower and Mortgage Borrower hereby acknowledge and agree that (i) such Intercreditor Agreement is intended solely for the benefit of Mortgage Lender and Administrative Agent and (ii) Borrower and Mortgage Borrower are not intended third-party beneficiaries of any of the provisions therein and shall not be entitled to rely on any of the provisions contained therein.

- 72 -

## ARTICLE XIII.  MISCELLANEOUS

### Section 13.1  Survival.

This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lenders of the Loan and the execution and delivery to Administrative Agent of the Notes, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Administrative Agent and Lenders.

### Section 13.2  Administrative Agent's Discretion.

Whenever pursuant to this Agreement, Administrative Agent exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, other than as may be directed in writing to agent by the Required Lenders (if any), the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Administrative Agent and shall be final and conclusive.

### Section 13.3  Governing Law.

(a)    THIS AGREEMENT, THE NOTES, THE SECURITY INSTRUMENT AND EACH OF THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

(b)    WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THIS AGREEMENT, THE NOTES, OR THE OTHER LOAN DOCUMENTS, BORROWER (A) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, AND (B) IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING ON VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTES OR THE OTHER LOAN DOCUMENTS BROUGHT IN ANY SUCH COURT, IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  NOTHING IN THIS AGREEMENT, THE NOTES OR THE OTHER LOAN DOCUMENTS INSTRUMENT WILL BE DEEMED TO PRECLUDE ADMINISTRATIVE AGENT OR LENDERS FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

- 73 -

### Section 13.4    Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Notes, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

### Section 13.5    Delay Not a Waiver.

Neither any failure nor any delay on the part of Administrative Agent or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Notes or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Notes or any other Loan Document, Administrative Agent and Lenders shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Notes or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

### Section 13.6    Notices.

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | 215 Moore St Development LLC |
| | S&B Monsey LLC |
| | c/o Heritage Equity Partners |
| | 711 Fifth Avenue, 16th Floor |
| | New York, New York 10022 |
| | Attention: Toby Moskovits |
| | |
| With a copy to: | Cohen & Gresser LLP |
| | 800 Third Avenue |
| | New York, New York 10022 |
| | Attention: Nicholas Kaiser, Esq. |

- 74 -

| If to Lenders: | 215 Moore Street Mezzanine Lender LLC |
| | c/o Hutton Ventures LLC |
| | 333 7th Avenue, 3rd Floor |
| | New York, New York 10001 |
| | Attention: Robert Schechter, Esq. |

| With a copy to: | Rosenberg & Estis P.C. |
| | 733 Third Avenue |
| | New York, New York  10017 |
| | Attention:  Adam R. Sanders, Esq. |

| If to Administrative Agent: | Hutton Ventures LLC |
| | 333 7th Avenue, 3rd Floor |
| | New York, New York 10001 |
| | Attention: Robert Schechter, Esq. |

| With a copy to: | Rosenberg & Estis P.C. |
| | 733 Third Avenue |
| | New York, New York  10017 |
| | Attention:  Adam R. Sanders, Esq. |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

### Section 13.7    Trial by Jury.

BORROWER, ADMINISTRATIVE AGENT AND LENDERS EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.    EACH OF LENDERS, ADMINISTRATIVE AGENT, AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS.

### Section 13.8    Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

- 75 -

**Section 13.9   Severability.**

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 13.10   Preferences.**

Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lenders, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lenders.

**Section 13.11   Waiver of Notice.**

Borrower shall not be entitled to any notices of any nature whatsoever from Administrative Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Administrative Agent or Lenders with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower.

**Section 13.12   Remedies of Borrower.**

In the event that a claim or adjudication is made that Administrative Agent or Lenders have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Administrative Agent, Lenders or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that Administrative Agent, Lenders and Administrative Agent's and Lenders' agents shall not be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Administrative Agent or Lenders has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 13.13   Expenses; Indemnity.**

(a)      Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Administrative Agent or Lenders within fifteen (15) days of receipt of written notice from

- 76 -

Administrative Agent or Lenders for all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Administrative Agent or Lenders in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Administrative Agent as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Collateral); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Administrative Agent or Lenders' ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Administrative Agent; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Administrative Agent all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Administrative Agent pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Collateral, or any other security given for the Loan; and (viii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Collateral or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Administrative Agent or Lenders.

(b)      Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Indemnified Parties in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Indemnified Parties shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Indemnified Parties in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "Additional Indemnified Liabilities"); provided, however, that Borrower shall not have any obligation to Indemnified Parties hereunder to the extent that such Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Indemnified Parties.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is

- 77 -

permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all
Additional Indemnified Liabilities incurred by the Indemnified Parties.

(c)     Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify,
release and hold harmless the Indemnified Parties from and against any and all any and all other
liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs,
expenses and disbursements of any kind or nature whatsoever (including, without limitation, the
reasonable fees and disbursements of counsel for Indemnified Parties in connection with any
investigative, administrative or judicial proceeding commenced or threatened, whether or not
Indemnified Parties shall be designated a party thereto) imposed upon or incurred by or asserted
against any Indemnified Parties and directly or indirectly arising out of or in any way relating to
any tax on the making of the Security Instrument, the Notes or any of the other Loan Documents,
but excluding any income, franchise or other similar taxes.

(d)     Borrower shall, at its sole cost and expense, protect, defend, indemnify, release
and hold harmless Indemnified Parties from and against any and all losses (including, without
limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and
settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited
loan, and in obtaining any individual prohibited transaction exemption under ERISA, the Code,
any State statute or other similar law that may be required, in Administrative Agent's sole
discretion) that the Indemnified Parties may incur, directly or indirectly, as a result of a default
under Sections 3.1.8 or 4.2.8 hereof.

(e)     The obligations and liabilities of Borrower under this Section 13.13 shall fully
survive indefinitely (notwithstanding any termination, satisfaction, or assignment of the Security
Instrument).

### Section 13.14 **Further Assurances.**

13.14.1     Replacement and Corrective Documents.  Upon receipt of an affidavit of
an officer of Administrative Agent as to the loss, theft, destruction or mutilation of the Notes or
any other Loan Document which is not of public record, and, in the case of any such mutilation,
upon surrender and cancellation of such Notes or other Loan Document, Borrower, Mortgage
Borrower and Guarantor, as applicable, shall issue, in lieu thereof, a replacement Notes or other
Loan Document, dated the date of such lost, stolen, destroyed or mutilated Notes or other Loan
Document in the same principal amount thereof and otherwise of like tenor.  Borrower,
Mortgage Borrower and Guarantor hereby consent and agree that in the event that any of the
Loan Documents misstate or inaccurately reflect the true and correct terms and provisions of the
Loan and said misstatement or inaccuracy is due to the mistake on the part of Administrative
Agent or clerical error, then in such event Borrower, Mortgage Borrower and Guarantor shall,
within ten (10) days after written request of Administrative Agent and in order to correct such
misstatement or inaccuracy, execute such new documents as Administrative Agent may deem
necessary to remedy said inaccuracy or mistake.

13.14.2     Further Acts, Etc.  Borrower, Mortgage Borrower and Guarantor shall, at
the cost and expense of Borrower, Mortgage Borrower and Guarantor, and without expense to
Administrative Agent or Lenders, do, execute, acknowledge and deliver all and every further

- 78 -

acts, deeds, conveyances, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Administrative Agent shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lenders the Collateral and rights hereby granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower, Mortgage Borrower or Guarantor may be or may hereafter become bound to convey or assign to Lenders, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing or registering of the Security Instrument, or for complying with all Legal Requirements. Borrower, Mortgage Borrower and Guarantor, on demand, shall deliver, and in the event Borrower or Guarantor shall fail to so deliver, hereby authorizes Administrative Agent to file, in the name of Borrower, Mortgage Borrower and Guarantor, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lenders in the Collateral. Borrower, Mortgage Borrower and Guarantor grant to Lenders and Administrative Agent an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lenders or Administrative Agent at law and in equity, including without limitation, such rights and remedies available to Lenders or Administrative Agent pursuant to this Section 13.14.2.

Section 13.15 <u>Waiver of Statute of Limitations</u>.

Borrower, Mortgage Borrower and Guarantor hereby expressly waive and release, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other obligations set forth in the Loan Documents.

Section 13.16 <u>Schedules, Exhibits and Cover Page Incorporated</u>.

The Schedules, Exhibits and Cover Page annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 13.17 <u>Offsets, Counterclaims and Defenses</u>.

Any assignee of Lenders' interest in and to this Agreement, the Notes and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 13.18 <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>.

(a)     Borrower, Administrative Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Administrative Agent and Lenders nor to grant Administrative Agent or Lenders any interest in the Collateral other than that of beneficiary or

- 79 -

lender. Borrower, Mortgage Borrower and Guarantor hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waive and relinquish all claims, demands, counterclaims and/or defenses alleging the existence of any partnership, joint venture or other fiduciary relationship between Administrative Agent or Lenders and Borrower and Borrower shall hold Lenders, Administrative Agent, Lenders' and Administrative Agent's successors and assigns, harmless from and against any and all losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments and any other actual out-of-pocket fees, costs and expenses that Administrative Agent or Lenders may sustain as a result of any such allegation by any person or entity whatsoever.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Lenders, Administrative Agent and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lenders, Administrative Agent and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.   All conditions to the obligations of Lenders to make the Loan hereunder are imposed solely and exclusively for the benefit of Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lenders if, in Administrative Agent's or Lenders' sole discretion, Administrative Agent or Lenders deems it advisable or desirable to do so.

**Section 13.19  Reserved.**

**Section 13.20  Waiver of Marshalling of Assets.**

To the fullest extent permitted by Applicable Law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Collateral, or to a sale in inverse order of alienation in the event of foreclosure of all or part of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lenders under the Loan Documents to a sale of the Collateral for the collection of the Debt without any prior or different resort for collection or of the right of Lenders to the payment of the Debt out of the net proceeds of the Collateral in preference to every other claimant whatsoever.

**Section 13.21  Waiver of Counterclaim.**

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lenders or Administrative Agent or Lenders' or Administrative Agent's agents.

**Section 13.22  Conflict; Construction of Documents; Reliance.**

- 80 -

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Administrative Agent or Lenders or any parent, subsidiary or Affiliate of Administrative Agent or Lenders. Lenders shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lenders of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lenders' or Administrative Agent's exercise of any such rights or remedies. Borrower acknowledges that Lenders engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

### Section 13.23 **Counterparts.**

This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.

### Section 13.24 **Brokers and Financial Advisors.**

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower hereby agrees to indemnify, defend and hold the Indemnified Parties harmless from and against any and all claims, liabilities, costs and expenses of any kind (including the Indemnified Parties attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower, Administrative Agent or Lenders in connection with the transactions contemplated herein. The provisions of this Section 13.24 shall survive the expiration and termination of this Agreement and the payment of the Debt.

- 81 -

**Section 13.25  Prior Agreements.**

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and/or its Affiliates and Administrative Agent, Lenders, or any of Administrative Agent's or Lenders' Affiliates are superseded by the terms of this Agreement and the other Loan Documents.

**Section 13.26  Joint and Several.**

If more than one Person has executed this Agreement as "Borrower", the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.


[Signature Pages Follow]


- 82 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

215 MOORE ST DEVELOPMENT LLC, a New York limited liability company

By: _____

Name: Toby Moskovits
Title:   Authorized Signatory


S&B MONSEY LLC, a New York limited liability company

By: _____

Name: Moshe Dov Schweid
Title:   Manager


[SIGNATURES CONTINUE ON THE FOLLOWING PAGES]

STATE OF NEW YORK          )
                           )   ss.:
COUNTY OF NEW YORK         )


On the _10_ day of November, 2016, before me, the undersigned, a Notary Public in and for said State, personally appeared Toby Moskovits, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


STATE OF NEW YORK          )
                           )   ss.:
COUNTY OF NEW YORK         )


On the _10_ day of November, 2016, before me, the undersigned, a Notary Public in and for said State, personally appeared Moshe Dov Schweid, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


-Notary Page to Mezzanine Loan Agreement-

ADMINISTRATIVE AGENT:

215 MOORE STREET MEZZANINE LENDER LLC

By: _____
Name: Ron Friedman
Title: Authorized Signatory

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF NEW YORK | ) |

On the 14 day of November, 2016, before me, the undersigned, a Notary Public in and for said State, personally appeared _Ron Friedman_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ADAM R. SANDERS
Notary Public, State of New York
No. 02SA6125994
Qualified in New York County
Commission Expires June 17, 2017

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

LENDER:

215 MOORE STREET MEZZANINE LENDER
LLC

By: _____

Name: Ron Friedman

Title: Authorized Signatory

| STATE OF NEW YORK | ) | |
| COUNTY OF NEW YORK | ) | ss.: |
| | ) | |

On the 14 day of November, 2016, before me, the undersigned, a Notary Public
in and for said State, personally appeared ___Ron Friedman___, personally known to me
or proved to me on the basis of satisfactory evidence to be the individual whose name is
subscribed to the within instrument and acknowledged to me that he executed the same in his
capacity, and that by his signature on the instrument, the individual, or the person upon behalf of
which the individual acted, executed the instrument.

_____

Notary Public

ADAM R. SANDERS
Notary Public, State of New York
No. 02SA6125994
Qualified in New York County
Commission Expires June 17, 2017

[END OF SIGNATURES]

-Notary Page to Mezzanine Loan Agreement-

SCHEDULE I

PROPERTY DESCRIPTION

SCHEDULE II

ORGANIZATIONAL CHART OF BORROWER AND MORTGAGE BORROWER

(see annexed)

SCHEDULE III

LENDERS

| LENDER | NOTE AMOUNT | PERCENTAGE |
|---|---|---|
| Hutton Ventures LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTALS** | **$9,850,000.00** | **100%** |

SCHEDULE IV

Intentionally Deleted

SCHEDULE V

Disclosed Litigation

EXHIBIT A

Pending Advances Clause

Pending disbursement of the full proceeds of the loan secured by the insured mortgage described herein, this policy insures only to the extent of the amount actually disbursed plus interest accrued thereon but increases up to the face amount of the policy as disbursements are made in good faith and without knowledge of any defects in, or encumbrances prior to, the lien of the insured mortgage other than exceptions on Schedule B of this policy not insured against hereunder.

Title shall be continued down to the date of each disbursement and the Company shall furnish to the Insured a continuation report which shall note (1) the new effective date and amount of the policy, (2) all assessments, taxes, liens, encumbrances, leases, mortgages, easements and setback violations then affecting the insured Property which have been filed of record or discovered by the Company since the original date of the policy regardless of whether they affect the lien of the insured mortgage, (3) which of the aforesaid items have been filed or recorded since the date of the last preceding continuation report, and (4) which of said items are intended to be added as exceptions to the coverage of the policy as to (a) all amounts secured by the insured mortgage, and (b) only amounts secured by the insured mortgage advance on or after the new effective date of the policy.

In addition, each continuation search shall notify Administrative Agent of any liens which have been discharged by bonding, court deposit or any other means other than full payment.

In the event that the lien of the insured mortgage described herein is insured by more than one insurer, this Company agrees that it shall be bound by the continuation reports of a single company specified as "lead" insurer herein.

EXHIBIT B

Current Leases

EXHIBIT C

Intentionally Deleted

EXHIBIT D

Filed Liens

# **EXHIBIT D**

PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT, dated as of November 18, 2016, is made by S&B MONSEY LLC, a New York limited liability company, having its principal place of business c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("Pledgor") and 215 MOORE STREET MEZZANINE LENDER LLC, a New York limited liability company, having an address at 333 7th Avenue, 3rd FL, New York, NY 10001, as administrative agent and collateral agent for the Lenders (in such capacity, together with its successors and assigns, "Administrative Agent" or "Mortgagee") for the Lenders (as defined in the Loan Agreement referred to below).

RECITALS

WHEREAS, KCOF-215 MOORE LLC, a Delaware limited liability company ("Mortgage Lender"), has made a loan in the original principal amount of $35,000,000.00 (the "Mortgage Loan") to 215 Moore St Acquisition LLC, a New York limited liability company ("Moore St Acquisition") and S&B Moore LLC, a New York limited liability ("S&B Moore") company (individually and collectively, jointly and severally, "Mortgage Borrower") pursuant to that certain Term Loan Agreement dated as of the date hereof (as the same may be amended, restated, replaced, extended, renewed, supplemented, or otherwise modified from time to time, the "Mortgage Loan Agreement"), which Mortgage Loan is evidenced by that certain Secured Promissory Note dated as of the date hereof made by Mortgage Borrower and payable to Mortgage Lender in the face principal amount of $35,000,000.00 (as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, the "Mortgage Note") and secured by, among other things, that certain Mortgage, Consolidation and Modification Agreement dated as of the date hereof made by Mortgage Borrower in favor of Mortgage Lender (as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, the "Mortgage") pursuant to which Mortgage Borrower has granted the Mortgage Lender a mortgage lien on, among other things, the real property and other collateral as more fully described in the Mortgage (collectively, the "Property");

WHEREAS, Pledgor is the legal and beneficial owner of 100% of the membership interests in S&B Moore as the sole member;

WHEREAS, the Pledgor has requested Lender to make a loan to Pledgor and 215 Moore St Development LLC ("Moore St Development", and together with Pledgor, collectively, the "Borrower") in the maximum principal amount of $9,850,000.00 (the "Loan") evidenced by that certain Promissory Note dated the date hereof (the "Note"); and

WHEREAS, it is a condition precedent to the obligation of Lender to make the Loan to the Borrower, as borrower under the Loan Agreement, that Pledgor shall have executed and delivered this Agreement to Lender.

NOW, THEREFORE, in consideration of the foregoing recitals (which are incorporated into the operative provisions of this Agreement by this reference) and to induce

Lender to make its Loan under the Loan Agreement, Pledgor hereby agrees with Lender as follows:

1.    <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings set forth in or incorporated by reference below:

"<u>Agreement</u>" means this Pledge and Security Agreement, as amended, supplemented or otherwise modified from time to time.

"<u>Code</u>" means the Uniform Commercial Code from time to time in effect in the State of Delaware.

"<u>Collateral</u>" has the meaning ascribed to such term in Section 2 hereof,

"<u>Equity Interests</u>" means (a) partnership interests (whether general or limited) in an entity which is a partnership; (b) membership interests in an entity which is a limited liability company; (c) the shares or stock interests in an entity which is a corporation, or (d) any other instrument, certificate, option or other evidence of ownership, legal or beneficial title, or other proprietary interest in the applicable entity.

"<u>Lender</u>" has the meaning ascribed to such term in the introductory paragraph.

"<u>Loan</u>" has the meaning ascribed to such term in the Recitals.

"<u>Loan Agreement</u>" means the Mezzanine Loan Agreement of even date herewith between the Borrower and Lender, as the same may hereafter be amended, amended and restated or otherwise modified from time to time.

"<u>Loan Documents</u>" means the Note, the Loan Agreement, this Agreement, the UCC-1 Financing Statements and the other documents and instruments entered into by Pledgor in connection with the Loan.

"<u>Mortgage</u>" has the meaning ascribed to such term in the Recitals.

"<u>Mortgage Borrower</u>" has the meaning ascribed to such term in the Recitals.

"<u>Mortgage Borrower Operating Agreement</u>" means the Operating Agreement of S&B Moore, dated as of November __, 2016 by Pledgor (as the same may be further amended, supplemented, restated, replaced or otherwise modified from time to time).

"<u>Note</u>" has the meaning ascribed to such term in the Recitals.

"<u>Pledged Entity</u>" means S&B Moore.

"<u>Pledged Equity</u>" means the Pledged Membership Interests.

"<u>Pledged Membership Interests</u>" means the limited liability company membership interests in the Pledged Entity listed on <u>Schedule 1</u> hereto, together with all membership interest certificates, Equity Interests in the Pledged Entity, options or rights of any nature whatsoever

- 2 -

which may be issued or granted by the Pledged Entity to Pledgor while this Agreement is in effect.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the Uniform Commercial Code in effect in the State of New York on the date hereof and, in any event, shall include, without limitation, all dividends or other income from the Pledged Equity, collections thereon or distributions with respect thereto.

Terms used herein but not otherwise defined herein shall have the respective meanings ascribed to them in the Loan Agreement.

(i)     The words "hereof, "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(ii)     The word "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to."

2.     Pledge; Grant of Security Interest.  Pledgor hereby pledges and grants to Lender, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Debt, a first priority security interest in all of Pledgor's right, title and interest in, to and under the following (collectively, the "Collateral"):

(i)     all Pledged Equity;

(ii)     all Equity Interests, securities, moneys or property representing dividends or interest on any of the Pledged Equity, or representing a distribution in respect of the Pledged Equity, or resulting from a split-up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity;

(iii)     all collateral described in Section 5(a) hereof;

(iv)     any policy of insurance payable to Pledgor by reason of loss or damage to the Pledged Equity and any other Collateral;

(v)     all "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the Code) in the name of and belonging to Pledgor constituting or relating to the foregoing; and

(vi)     all Proceeds of any of the foregoing property.

3.     Certificated Securities.  On or before the Closing Date, Pledgor will (i) execute and deliver to Lender for filing one or more financing statements in connection with the Collateral in the form required to properly perfect Lender's security interest in the Collateral in

- 3 -

all jurisdictions deemed appropriate by Lender, to the full extent that such security interest in the Collateral may be perfected by such a filing, (ii) with respect to the Pledged Equity that is represented by a partnership certificate, member certificate or stock certificate, or any other instrument, note, chattel paper or certificate qualifying as Investment Property ("Certificated Securities"), deliver to Lender such Certificated Securities in the Pledged Entity, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, or enter into such other arrangement, as necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (iii) with respect to any Pledged Equity not represented by a Certificated Security, enter into such control agreements or other arrangements with Lender and with any Pledged Entity as necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, and (iv) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.

    4. <u>Representations and Warranties</u>.  Pledgor represents and warrants as of the date hereof that:

      (i) no authorization, consent of or notice to any other Person (including, without limitation, any shareholder, partner or creditor of Pledgor or Mortgage Borrower) that has not been obtained or given, is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement including, without limitation, the assignment and transfer by the Pledgor of any of the Collateral to Lender or the subsequent transfer thereof by Lender pursuant to the terms hereof;

      (ii) the Pledged Membership Interests listed on <u>Schedule 1</u> hereto constitute all the issued and outstanding Equity Interests in the Pledged Entity;

      (iii) Pledgor is the record and beneficial owner of, and has good and marketable title to, the Pledged Equity listed on <u>Schedule 1</u> hereto and the other Collateral, free of any and all Liens or options in favor of, or claims of, any other Person, except the Lien created by this Agreement;

      (iv) all of the Pledged Equity has been duly authorized and validly issued and is fully paid and non assessable, and is subject to no options to purchase or similar rights of any Person and Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto;

      (v) (i) upon delivery to Lender of the Certificated Securities evidencing the Pledged Membership Interests, the Lien granted pursuant to this Agreement will constitute a valid, perfected first priority lien on the Pledged Membership Interests and related proceeds, enforceable as such against all creditors of Pledgor and any person or entity purporting to purchase any Pledged Membership Interests or related proceeds from Pledgor and (ii) upon the filing of the Form UCC-1 financing statements referred to in Section 12 with the Secretary of State of the State of New York, the Lien granted pursuant to this Agreement will constitute a valid, perfected first priority Lien on the Collateral (other than the Pledged Equity), enforceable

- 4 -

as such against all creditors of Pledgor and any person or entity purporting to purchase any such Collateral from Pledgor;

(vi)     the principal place of business and chief executive office of Pledgor is, and for the immediately preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Pledgor), has been, located at the address set forth in the preamble hereto;

(vii)     the exact name of Pledgor is S&B Monsey LLC;

(viii)     Pledgor is organized under the laws of the State of New York;

(ix)     all of the Pledged Equity is issued in the form of Certificated Securities, and covenants and agrees that it shall not permit any Pledged Entity to convert existing Pledged Equity, or issue new Pledged Equity, other than as Certificated Securities. Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Pledged Equity with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law.  Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder, and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Pledged Equity which are not Certificated Securities promptly upon request of Lender; and

(x)     Upon the transfer of the Pledged Equity or any portions thereof, to any party in accordance with the terms hereof, Mortgage Borrower shall continue in existence and the Mortgage Borrower Operating Agreement provides for such confirmation.

5.     Covenants.  Pledgor covenants and agrees with Lender that, from and after the date of this Agreement until the Debt (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note) is paid in full:

(i)     Acknowledgements of Parties.  If Pledgor shall, as a result of its ownership of the Pledged Equity, become entitled to receive or shall receive any Equity Interests in a Pledged Entity or other securities or property by way of distribution or dividend in respect of the Pledged Equity or by way of split, spin-off, recapitalization, reclassification, combination of Equity Interests or similar rearrangement or any consolidation, merger, exchange, conveyance of assets, exercise of options, contribution of capital, liquidation or similar reorganization, or any stock certificate or limited partnership or regular membership certificate, as applicable (including, without limitation, any certificate representing any of the foregoing), options or rights of any kind or nature, whether in addition to, in substitution of, as a conversion of, or in exchange for any shares of the Pledged Equity, or otherwise in respect thereof, Pledgor shall accept the same as Lender's agent, hold the same in trust for Lender and deliver the same forthwith to Lender in the exact form received, duly endorsed by Pledgor to Lender, if required, together with an undated stock, regular membership or limited partnership interest power covering such certificate duly executed in blank and with, if Lender so requests, signature

- 5 -

guaranteed, to be held by Lender hereunder as additional security for the Debt.  Any sums paid upon or in respect of the Pledged Equity upon the liquidation or dissolution of the Pledged Entity shall be paid over to Lender to be held by it hereunder as additional security for the Debt, and in case any distribution of capital shall be made on or in respect of the Pledged Equity or any property shall be distributed upon or with respect to the Pledged Equity pursuant to the recapitalization or reclassification of the capital of the Pledge Entity or pursuant to the reorganization thereof, the property so distributed shall be delivered to Lender to be held by it, subject to the terms hereof, as additional security for the Debt.  If any sums of money or property so paid or distributed in respect of the Pledged Membership Interests shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of Pledgor, as additional security for the Debt.

        (ii)      Without the prior written consent of Lender, Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit, the Pledged Entity to issue any limited partnership or membership interests or shares, as applicable, or to issue any other securities convertible into or granting the right to purchase or exchange for any membership interests in the Pledged Entity, or (ii) except as permitted by the Loan Agreement, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Collateral, or any interest therein, except for the Lien provided for by this Agreement.  Pledgor shall defend the right, title and interest of Lender in and to the Collateral against the claims and demands of all Persons whomsoever.

        (iii)     At any time and from time to time, upon the written request of Lender, and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as Lender may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including without limitation filing UCC financing or continuation statements, provided that the amount of the Debt shall not be increased thereby.  Pledgor hereby authorizes Lender to file any such financing statement or continuation statement without the signature of Pledgor to the extent permitted by law.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such note, instrument or chattel paper shall be promptly delivered to Lender, duly endorsed in a manner satisfactory to Lender, to be held as Collateral pursuant to this Agreement.

        (iv)     <u>Limitation on Liens</u>.  Pledgor will not create, incur or permit to exist, will defend the Pledged Equity against, and will take all such other action as is necessary to remove, any Lien or claim on or to the Pledged Equity or the other Collateral, other than the Liens created hereby, and will defend the right, title and interest of Lender in, to and under the Pledged Equity and the other Collateral against the claims and demands of all Persons whomsoever.

        (v)     <u>Further Identification of Collateral</u>.  Pledgor will furnish to Lender from time to time statements and schedules further identifying and describing the Pledged Equity

RE\39820\0007\648655v1

or the other Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail.

(vi)     <u>Changes in Location, Name, etc</u>.  Pledgor will not, unless (i) it shall have given sixty (60) days' prior written notice to such effect to Lender and (ii) all action necessary or advisable, in Lender's opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Equity shall have been taken, (A) change the location of its chief executive office or principal place of business from that specified in Section 4(f), or (B) change its name, identity or structure, or (c) reorganize or reincorporate under the laws of another jurisdiction.

(vii)     Pledgor shall pay, and save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement, unless caused by the gross negligence or willful misconduct of Lender.

6.     <u>Certain Understandings of Parties; Recognition Agreement.</u>

(i)     (i) It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property; and (ii) Pledgor therefore represents, warrants, covenants and agrees that (A) Pledgor shall take, and shall cause the Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC, (B) the Pledged Equity is not and will not be dealt in or traded on securities exchanges or securities markets, and (C) the Pledged Equity is not and will not be investment company securities within the meaning of Section 8-103 of the Code.

(ii)     <u>Recognition Agreement</u>.  To better assure the perfection of the security interest of Lender in the Pledged Equity, concurrently with the execution and delivery of this Agreement, Pledgor and Lender are entering into that certain Recognition Agreement of even date, which Recognition Agreement is acknowledged and agreed to by Mortgage Borrower.

7.     <u>Voting Rights; Cash Distributions</u>.  (a) Subject to the provisions of the Loan Agreement, and unless an Event of Default shall have occurred, Pledgor shall be permitted to exercise all voting and general partnership, limited partnership and/or regular membership interests or corporate rights with respect to the Pledged Equity, provided that no vote shall be cast or right exercised or other action taken which, in Lender's judgment, would impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Note, this Agreement or any other Loan Documents.

(b)     After the occurrence of an Event of Default, any cash distributions, dividends, interest and other cash payments payable to Pledgor with respect to the Collateral then held or thereafter received by Pledgor shall immediately be remitted to Lender, and until so remitted shall be received and held by Pledgor in trust for Lender.

8.     <u>Rights of Lender</u>.

RE\39820\0007\648655v1

(i)         If an Event of Default shall occur, Lender shall have the right to receive any and all income, cash dividends, distributions, proceeds or other property received or paid in respect of the Pledged Equity and make application thereof to the Debt, in such order as Lender, in its sole discretion, may elect, in accordance with the Loan Documents.  If an Event of Default shall occur, then all such Pledged Equity, at Lender's option, shall be registered in the name of Lender or its nominee (if not already so registered), and Lender or its nominee may thereafter exercise (i) all voting, and all corporate, regular membership or limited partnership, as applicable, and other rights pertaining to the Pledged Equity and (ii) any and all rights of conversion, exchange, and subscription and any other rights, privileges or options pertaining to such Pledged Equity as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of Mortgage Borrower, or upon the exercise by Pledgor or Lender of any right, privilege or option pertaining to such Pledged Equity, and in connection therewith, the right to deposit and deliver any and all of the Pledged Equity with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine), all without liability except to account for property actually received by it, but Lender shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(ii)        The rights of Lender under this Agreement shall not be conditioned or contingent upon the pursuit by Lender of any right or remedy against Pledgor or against any other Person which may be or become liable in respect of all or any part of the Debt or against any other security therefor, guarantee thereof or right of offset with respect thereto.  Lender shall not be liable for any failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so, nor shall it be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

(iii)       Upon satisfaction in full of the Debt and payment of all amounts owed on the Note, Lender's rights under this Agreement shall terminate and Lender shall execute and deliver to Pledgor UCC-3 termination statements or similar documents and agreements to terminate all of Lender's rights under this Agreement and all other Loan Documents.

(iv)        Pledgor also authorizes Lender, at any time and from time to time, to execute, in connection with the sale provided for in Sections 9 or 10 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(v)         The powers conferred on Lender hereunder are solely to protect Lender's interest in the Collateral and shall not impose any duty upon Lender to exercise any such powers.  Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Pledgor for any act or failure to act hereunder, except for its or their gross negligence or willful misconduct.

RE\39820\0007\648655v1

(vi)     If Pledgor fails to perform or comply with any of its agreements contained herein and Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the reasonable expenses of Lender incurred in connection with such performance or compliance, together with interest at the Default Rate if such expenses are not paid on demand, shall be payable by Pledgor to Lender on demand and shall constitute obligations secured hereby.

9.     <u>Remedies</u>.  If an Event of Default shall occur, Lender may exercise, in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt:

(i)     all rights and remedies of a secured party under the Code (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Lender were the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right);

(ii)     Lender may make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

(iii)     Lender in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so.

Without limiting the generality of the foregoing, Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below or otherwise required hereby) to or upon Pledgor, Mortgage Borrower or any other Person (all and each of which demands, presentments, protests, advertisements and notices, or other defenses, are hereby waived to the extent permitted under applicable law), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best in its sole discretion, for cash or on credit or for future delivery without assumption of any credit risk. Lender shall have the right, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be adjourned without further notice.  Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor, which

- 9 -

right or equity of redemption is hereby waived or released.  Lender shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Lender hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Debt, in such order as Lender may elect, and only after such application and after the payment by Lender of any other amount required by any provision of law, including, without limitation, Sections 9-610 and 9-615 of the Code, need Lender account for the surplus, if any, to Pledgor.  To the extent permitted by applicable law, Pledgor waives all claims, damages and demands it may acquire against Lender arising out of the exercise by Lender of any of its rights hereunder, except for any claims, damages and demands it may have against Lender arising from the willful misconduct or gross negligence of Lender or its affiliates, or any agents or employees of the foregoing.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

(iv)    Notwithstanding anything else herein to the contrary, Lender shall be entitled to exercise its rights under Section 8 of this Agreement to register the Pledged Equity in the name of Lender or its nominee (if not already so registered) or Section 9 of this Agreement to collect, receive, appropriate and realize upon the Collateral only upon the expiration of a period of ten (10) days commencing on the date on which notice of such intention to exercise any of such rights shall have been given by Lender to Pledgor in accordance with Section 18(e) of this Agreement, which notice may, at Lender's option, be included within any notice furnished by Lender to Pledgor under Section 9.6 of the Loan Agreement.

(v)    The rights, powers, privileges and remedies of Lender under this Agreement are cumulative and shall be in addition to all rights, powers, privileges and remedies available to Lender at law or in equity.  All such rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of Lender hereunder.

10.    <u>Private Sales</u>.  Pledgor recognizes that Lender may be unable to effect a public sale of any or all of the Pledged Equity, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale.  Lender shall be under no obligation to delay a sale of any of the Pledged Equity for the period of time necessary to permit Mortgage Borrower or Pledgor to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if Mortgage Borrower or Pledgor would agree to do so.

- 10 -

(i)      Pledgor further shall use its best efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Pledged Equity pursuant to this Section 10 valid and binding and in compliance with any and all other requirements of applicable law.  Pledgor further agrees that a breach of any of the covenants contained in this Section 10 will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 10 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Loan Agreement.

(ii)      Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. The Pledgor hereby waives any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Debt, even if Lender accepts the first offer received and does not offer any Collateral to more than one offeree, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

11.      <u>Limitation on Duties Regarding Collateral</u>.  Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Code or otherwise, shall be to deal with it in the same manner as Lender deals with similar securities and property for its own account.  Neither Lender nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or otherwise.

12.      <u>Financing Statements; Other Documents</u>.  On the date hereof, Pledgor shall deliver to Lender (a) the membership certificates with respect to the Pledged Membership Interests owned by it, and (b) UCC-1 financing statements with respect to the Collateral suitable for filing in such jurisdictions as Lender shall request.  Pledgor agrees to deliver any other document or instrument which Lender may reasonably request with respect to the Collateral for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.

13.      <u>Attorney-in-Fact</u>.  Without limiting any rights or powers granted by this Agreement to Lender, Lender is hereby appointed for so long as the Loan is outstanding, which appointment as attorney-in-fact is irrevocable and coupled with an interest, the attorney-in-fact of Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes hereof including, without limitation:

- 11 -

(i)      to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(ii)      to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (a) above;

(iii)      to file any claims or take any action or institute any proceedings that the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender, with respect to any of the Collateral; and

(iv)      to execute, in connection with the sale provided for in Section 9 or 10, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Collateral.

If so requested by Lender, Pledgor shall ratify and confirm any such sale or transfer by executing and delivering to Lender at the Pledgor's expense all proper deeds, bills of sale, instruments of assignment, conveyance of transfer and releases as may be designated in any such request.

14.     <u>Additional Covenants of Pledgor Relating to Affirmative Covenants of the Mortgage Borrower</u>.  Pledgor covenants and agrees with Lender that, from and after the date of this Agreement until the Debt (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note) is paid in full, Pledgor shall take and shall cause Mortgage Borrower to take, (i) any and all actions either necessary or reasonably requested by Lender to ensure complete compliance with Section 4.1 of the Loan Agreement, (ii) such actions as are required by or to comply with the terms of the Mortgage Loan Documents, in each case, applicable to it, and shall not take any actions that violate any such documents and (iii) such actions that are necessary to ensure that Mortgage Borrower shall not apply amounts disbursed to the Mortgage Borrower pursuant to the requirements of the Mortgage Loan in a manner contrary to the requirements of the Mortgage Loan Documents.

15.     <u>Additional Covenants of Pledgor Relating to Negative Covenants of the Mortgage Borrower</u>.  Pledgor covenants and agrees with Lender that, from and after the date of this Agreement until the Debt (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note) is paid in full, Pledgor shall take and shall cause Mortgage Borrower to take any action to ensure compliance with Section 4.2 of the Loan Agreement.

16.     <u>Intentionally Omitted</u>.

17.     <u>Indemnity</u>.  Pledgor agrees to indemnify Lender from and against any and all claims, losses and liabilities growing out of or resulting from enforcement of this Agreement that are incurred thereby (including without limitation enforcement of this Agreement), except claims, losses or liabilities resulting from Lender's gross negligence or willful misconduct.

18.     <u>Miscellaneous</u>.

- 12 -

(i)       Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(ii)      Headings.   The headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

(iii)     No Waiver; Cumulative Remedies.   Lender shall not by any act (except by a written instrument pursuant to Section 18(d)), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Lender would otherwise have on any future occasion.  The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers or privileges provided by law.

(iv)      Waivers and Amendments; Successors and Assigns; Governing Law.  None of the terms or provisions of this Agreement may be waived, amended, or otherwise modified except by a written instrument executed by the party against which enforcement of such waiver, amendment, or modification is sought.  This Agreement shall be binding upon and shall inure to the benefit of Pledgor and the respective successors and assigns of Pledgor and shall inure to the benefit of Lender and its successors and assigns; provided no Pledgor shall have any right to assign its rights hereunder.  The rights of Lender under this Agreement shall automatically be transferred to any permitted transferee to which Lender transfers the Note and Loan Agreement.  This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, without regard to principles of conflict laws.

(v)       Notices.  All notices or other written communications hereunder shall be delivered in accordance with Section 9.6 of the Loan Agreement.

(vi)      Agents.   Lender may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for their actions except for the gross negligence or willful misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(vii)     Irrevocable Authorization and Instruction to the Mortgage Borrower.  Pledgor hereby authorizes and instructs Mortgage Borrower and any servicer of the Loan to comply with any instruction received by it from Lender in writing that (i) states that an Event of Default has occurred and is continuing and (ii) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from Pledgor, and Pledgor agrees that the Mortgage Borrower and any servicer shall be fully protected in so complying.

(viii) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and all the counterparts taken together shall be deemed to constitute one and the same instrument.

(ix) <u>Submission To Jurisdiction; Waivers</u>. To the extent permitted by applicable law, Pledgor hereby irrevocably and unconditionally:

(i) submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Courts of the State of New York, the courts of the United States of America in the State of New York, and appellate courts from any thereof;

(ii) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; and

(iii) agree that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

(x) <u>WAIVER OF JURY TRIAL, DAMAGES, JURISDICTION</u>. PLEDGOR AND LENDER EACH HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY DEALINGS BETWEEN PLEDGOR AND LENDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. PLEDGOR AND LENDER EACH ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO A BUSINESS RELATIONSHIP WITH PLEDGOR. PLEDGOR REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH WAIVER IS KNOWINGLY AND VOLUNTARILY GIVEN FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED, EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, REPLACEMENTS, REAFFIRMATIONS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, OR ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

- 14 -

WITH RESPECT TO ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, PLEDGOR SHALL AND HEREBY DOES SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF NEW YORK (AND ANY APPELLATE COURTS TAKING APPEALS THEREFROM).  PLEDGOR HEREBY WAIVES AND AGREES NOT TO ASSERT, AS A DEFENSE IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, (A) THAT IT IS NOT SUBJECT TO SUCH JURISDICTION OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN THOSE COURTS OR THAT THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS MAY NOT BE ENFORCED IN OR BY THOSE COURTS OR THAT IT IS EXEMPT OR IMMUNE FROM EXECUTION, (B) THAT THE ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR (C) THAT THE VENUE OF THE ACTION, SUIT OR PROCEEDING IS IMPROPER.  IN THE EVENT ANY SUCH ACTION, SUIT, PROCEEDING OR LITIGATION IS COMMENCED, PLEDGOR AGREES THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER PLEDGOR OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH LITIGATION UPON PLEDGOR AT THE ADDRESS OF PLEDGOR AND TO THE ATTENTION OF SUCH PERSON AS SET FORTH IN THIS SECTION 18.

No claim may be made by Pledgor against Lender, its affiliates and its respective directors, officers, employees, or attorneys for any special, indirect or consequential damages ("Special Damages") in respect of any breach or wrongful conduct (whether the claim therefor is based on contract, tort or duty imposed by law) in connection with, arising out of, or in any way related to the transactions contemplated or relationship established by this Agreement, or any act, omission or event occurring in connection herewith or therewith; and to the fullest extent permitted by law Pledgor hereby waives, releases and agrees not to sue upon any such claim for Special Damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(xi)    Joint and Several Liability.  If Pledgor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]

- 15 -

   IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date set forth above.

PLEDGOR:

S&B MONSEY LLC, a New York limited liability company

By: _Moshe Dov Schweid_

   Name:   Moshe Dov Schweid
   Title:   Manager

LENDER:

215   MOORE   STREET   MEZZANINE LENDER LLC, a New York limited liability company

By:_____
   Name:
   Title:

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date set forth above.

PLEDGOR:

S&B MONSEY LLC, a New York limited liability company

By:_____
    Name:  Moshe Dov Schweid
    Title:   Manager

LENDER:

215 MOORE STREET MEZZANINE LENDER LLC, a New York limited liability company

By:_____
    Name:  Ron Friedman
    Title:   Authorized Signatory

SCHEDULE 1

<u>To Pledge Agreement</u>

DESCRIPTION OF PLEDGED EQUITY

| Issuer | Owner | Class of Membership Interest | Percentage of Membership Interests |
|--------|-------|------------------------------|------------------------------------|
| S&B MONSEY LLC, a New York limited liability company | Pledgor | Membership Interest | 100% |

# <u>EXHIBIT E</u>

## FIRST OMNIBUS LOAN MODIFICATION AGREEMENT

THIS FIRST OMNIBUS LOAN MODIFICATION AGREEMENT (this "**Agreement**") dated as of April 3, 2018 by and between 215 MOORE ST DEVELOPMENT LLC, a New York limited liability company ("**Heritage Borrower**"), S&B MONSEY LLC, a New York limited liability company ("**S&B Borrower**", together with Heritage Borrower, individually and collectively, jointly and severally, "**Borrower**") and 215 MOORE STREET MEZZANINE LENDER LLC, a New York limited liability company, as administrative agent ("**Administrative Agent**") and Lenders (as defined in the Loan Agreement).

### RECITALS:

1.      Pursuant to that certain Mezzanine Loan Agreement by and among Lenders, Administrative Agent and Borrower, dated as of November 18, 2016 (as amended hereby and as the same may be further amended, modified, restated, supplemented, replaced or otherwise modified from time to time, the "**Loan Agreement**"), Lenders made a loan to Borrower in the aggregate principal amount of up to $9,850,000.00 (the "**Loan**"), which Loan is evidenced by, among other things, that certain Promissory Note dated as of November 18, 2016 in the original principal amount of $9,850,000.00, made by Borrower in favor of Administrative Agent, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time (the "**Note**") and which Loan is jointly and severally guaranteed pursuant to that certain Guaranty, dated as of November 18, 2016, (the "**Guaranty**") by Toby Moskovits and Michael Lichtenstein (collectively, "**Guarantor**") in favor of Administrative Agent and the Lenders.

2.      Capitalized terms used and not defined herein have the meaning ascribed to them in the Loan Agreement.

3.      The Loan Agreement, the Note, the Environmental Indemnity Agreement made by Borrower and Guarantor in favor of Administrative Agent and the Lenders (the "**Environmental Indemnity**"), the Guaranty and the other instruments, documents and agreements that evidence and secure the Loan are collectively referred to as the "**Loan Documents**".

4.      On the date hereof, Mortgage Borrower is refinancing the Mortgage Loan, currently held by KCOF-215 MOORE LLC, a Delaware limited liability company, with a new mortgage loan made by BOFI FEDERAL BANK, a federal savings bank, as mortgage lender, in the aggregate amount of $35,000,000.00.

5.      Borrower, Administrative Agent and Lenders agree to enter into this Agreement in order to amend the Loan Documents in order to, among other things, increase the amount of the Loan and increase the Interest Rate pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Borrower, Administrative Agent and Lenders hereby covenant and agree as follows:

1.    <u>Acknowledgment of Outstanding Principal Balance; Outstanding Payments</u>. Borrower, Administrative Agent and Lenders agree that as of the date hereof, the outstanding principal balance of the Loan is $9,850,000.00.

2.    <u>Conditions Precedent</u>.  This Agreement shall become effective on the date the following conditions are satisfied:

(a)    Borrower shall have executed and delivered this Agreement to Administrative Agent.

(b)    Borrower shall have taken, or caused to be taken such other actions and executed and delivered such other documentation as may be reasonably requested by Administrative Agent or its counsel in order to give effect to this Agreement, and to perform, preserve and protect the continued priority and effectiveness of the Loan Documents, as hereby amended.

(c)    Borrower shall have paid all fees and expenses of counsel to Administrative Agent.

(d)    Borrower shall have paid to Administrative Agent an extension fee in the amount of $325,000.00.

3.    <u>Modification to the Loan Agreement</u>.

(a)    The first "Whereas" Clause is hereby deleted in its entirety and replaced with the following:

"WHEREAS, BOFI FEDERAL BANK, a federal savings bank ("<u>Mortgage Lender</u>"), has made a loan in the aggregate principal amount of $35,000,000.00 (the "<u>Mortgage Loan</u>") to 215 Moore St Acquisition LLC, a New York limited liability company ("<u>Moore St Acquisition</u>") and S&B Moore LLC, a New York limited liability company ("<u>S&B Moore</u>") (individually and collectively, jointly and severally, "<u>Mortgage Borrower</u>") pursuant to that certain (i) Loan Agreement and (ii) Construction Loan Agreement, each dated as of the date hereof (as the same may be amended, restated, replaced, extended, renewed, supplemented, or otherwise modified from time to time, collectively, the "<u>Mortgage Loan Agreement</u>"), which Mortgage Loan is evidenced by that certain (i) Secured Promissory Note dated as of the date hereof made by Mortgage Borrower and payable to Mortgage Lender in the face principal amount of $32,600,000.00 (as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, the "<u>First Mortgage Note</u>") and (ii) Secured Construction Loan Promissory Note dated as of the date hereof made by Mortgage Borrower and payable to Mortgage Lender in the face principal amount of $2,400,000.00 (as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, the "<u>Construction Note</u>", together with the First Mortgage Note, collectively, the "<u>Mortgage Note</u>") and secured by, among other things, that certain (i) Mortgage, Assignment of Rents, Security Agreement and Fixture Filing and (ii)

Construction Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, each dated as of the date hereof made by Mortgage Borrower in favor of Mortgage Lender (as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, collectively, the "Mortgage") pursuant to which Mortgage Borrower has granted the Mortgage Lender a mortgage lien on, among other things, the real property and other collateral as more fully described on Schedule I annexed hereto and made a part hereof (collectively, the "Property");"

(b)  The following definitions are hereby inserted in the appropriate alphabetical order:

""Closing Date" shall mean the date of the First Omnibus Loan Modification Agreement, by and between, Borrower and Administrative Agent."

""Deferred Modification Fee" shall mean (i) if paid by Borrower to Administrative Agent on or before October 3, 2018, an amount equal to $250,000.00 or (ii) if paid by Borrower to Administrative Agent at any time following October 3, 2018, an amount equal to $375,000.00; provided in either case that Mortgage Borrower has received Mortgage Lender's prior written consent to such payment as required by the Mortgage Loan Agreement, such consent not to be unreasonably withheld, conditioned or delayed."

""First Extended Maturity Date" shall have the meaning set forth in Section 2.3.3 hereof."

""Interest Reserve Date" shall mean the date upon which the then current amount of interest held in the Interest Reserve fails to account for the amount of interest due upon the immediately following Payment Date and, upon Administrative Agent's request, the Interest Reserve shall be fully replenished by Borrower at an Interest Funding Amount as calculated by Administrative Agent and delivered by Borrower to Administrative Agent to be held in the Interest Reserve in accordance with Section 2.3.1."

""Initial Interest Funding Amount" shall have the meaning set forth in Section 2.3.1(a)."

""Interest Funding Amount" shall have the meaning set forth in Section 2.3.1(b)."

"Mortgage Loan Equity Payment" shall have the meaning set forth in Section 2.3.1(d)."

""Option Agreement" shall have the meaning set forth in Section 2.3.1(d)."

""Second Extended Maturity Date" shall have the meaning set forth in Section 2.3.3 hereof."

(c)  The following defined terms and the definitions associated therewith are hereby deleted in their entirety:

- 3 -

(i)  "Extension Interest Researve Payment";

(ii)  "First Extension Interest Reserve Date";

(iii)  "First Interest Funding Amount";

(iv)  "First Interest Reserve Date";

(v)  "Fourth Interest Reserve Date";

(vi)  "Lenders Percentage Split";

(vii)  "Net Cash Flow";

(viii)  "Net Cash Flow Test";

(ix)  "Net Cash FlowTest Date";

(x)  "Net Cash Flow Test Period";

(xi)  "Second Extension Interest Reserve Date";

(xii)  "Second Interest Funding Amount";

(xiii)  "Second Interest Reserve Date";

(xiv)  "Third Extension Interest Reserve Date";

(xv)  "Third Interest Reserve Date".

(d)  The definition of "Interest Rate" is hereby deleted in its entirety and replaced with the following:

""Interest Rate" shall mean interest at the annual rate equal to 15.00% per annum."

(e)  The definition of "Maturity Date" is hereby deleted in its entirety and replaced with the following:

""Maturity Date" shall mean October 3, 2019, the First Extended Maturity Date, the Second Extended Maturity Date or such other date on which the final payment of principal of the Notes becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise."

(f)  Section 2.3.1 is hereby deleted in its entirety and replaced with the following:

"2.3.1  Debt Service Payment.

- 4 -

(a)     On the Closing Date, the Lenders shall fund from the Loan to Administrative Agent, for the account of the respective Lenders, an amount of interest equal to $850,000.00 (the "Initial Interest Funding Amount"), to be held in the Interest Reserve and distributed in the amount of monthly Debt Service on each Payment Date to Administrative Agent.  Such payment shall be paid in full on the Closing Date and, if for any reason Borrower shall prepay the Loan prior to the next Interest Reserve Date, such Initial Interest Funding Amount shall become a yield maintenance penalty to Administrative Agent and shall not be refunded in any way to Borrower.

(b)     On or prior to each Interest Reserve Date, Borrower shall make payment to Administrative Agent an amount equal to that amount necessary to equal the full interest amount of the aggregate outstanding principal balance of the Loan for such time period from the prior Interest Reserve Date up to the day immediately prior to the immediately following Interest Reserve Date (each an "Interest Funding Amount"), as calculated by Administrative Agent in its sole but reasonable discretion, to be held in the Interest Reserve and distributed in the amount of monthly Debt Service as applicable on each Payment Date to Administrative Agent.  All such payments made to Administrative Agent under this Section 2.3.1(b) shall be paid in full on each applicable Interest Reserve Date and if for any reason Borrower shall prepay the Loan prior to the immediately following Interest Reserve Date, such prepaid Interest Funding Amount shall become a yield maintenance penalty to Administrative Agent and shall not be refunded in any way to Borrower.

(c)     Notwithstanding the provisions of this Section 2.3.1, if Borrower is unable to make or fails to make any monthly interest payment or any other payment required pursuant to the terms of this Agreement and/or the Mortgage Loan Documents, Lender may, in its sole discretion, assist with or make any such payments required hereunder or under the Mortgage Loan Documents as a Future Advance under this Agreement.  The amount of such Future Advance shall be (i) added to the Debt, (ii) payable on demand of Administrative Agent and (iii) bear interest until repaid at the Default Rate; provided, however, that the failure of Borrower to make any such payment within ten (10) days after notice from Administrative Agent that the same is overdue shall constitute an Event of Default under this Agreement.

(d)     Notwithstanding the provisions of Section 2.3.1(c) above, if Borrower shall fail to make any portion of the "Borrower Equity Funds" payment under the Mortgage Loan Agreement and Administrative Agent shall, at Administrative Agent's sole discretion and not as an obligation in any way under the Loan Agreement, make any or all of such "Borrower Equity Funds" payment under the Mortgage Loan Agreement (the "**Mortgage Loan Equity Payment**"), Lender shall be permitted to release and date the fully executed option agreement, attached hereto as Exhibit 2.3.1(d) (the "**Option Agreement**") that provides Administrative Agent (or a designee of Administrative Agent) with the right to purchase thirty-three percent (33%) of the membership interests in Heritage Borrower if Borrower fails to repay Administrative Agent the Mortgage Loan Equity Payment (including any and all Default Interest and costs and expenses incurred by Administrative Agent (including all reasonable attorneys fees)) and redeem such membership interests purchase option within six (6) months from the date that Administrative Agent makes the Lender Equity Payment to Mortgage Lender.  The amount of the Mortgage Loan Equity Payment that Lender makes under the Mortgage Loan Agreement to Mortgage Lender shall be, subject to the terms of the Option Agreement, (i) added to the Debt, (ii) payable on demand of Administrative Agent and (iii) bear interest until repaid at the Default Rate.  Notwithstanding the provisions of

- 5 -

this Section 2.3.1(d), the election to exercise any rights by Administrative Agent under the Option Agreement shall in no way limit and/or waive any rights and/or remedies available to Administrative Agent or Lender under the Loan Agreement or any other Loan Documents.

(e)     Payments shall be applied first to accrued and unpaid interest and the balance to principal.

(f)     For avoidance of doubt, Borrower hereby acknowledges and agrees that on each Payment Date, Borrower shall pay to Administrative Agent any deficient amount of the Interest Funding Amount as calculated by Administrative Agent."

(g)     Section 2.3.2 is hereby deleted in its entirety and replaced with the following:

"2.3.2  Payment on Maturity Date.  On the Maturity Date or on such earlier date that the Debt is paid in full or on such earlier date that the payment of the Debt has been accelerated pursuant to the terms hereof, Borrower shall pay to Administrative Agent, for the account of the respective Lenders (i) the outstanding principal balance of the Loan, (ii) all accrued and unpaid interest, (iii) the applicable Deferred Modification Fee (if not previously paid), and (iv) all other amounts due hereunder and under the Notes, the Security Instrument and the other Loan Documents."

(h)     Section 2.3.3 is hereby deleted in its entirety and replaced with the following:

"2.3.3  Extension of Maturity Date.  Borrower will have two (2) options to extend the Maturity Date of the Loan each for a single six (6) months month period (as applicable, the "Extension Term"). In order to exercise each extension right, Borrower shall deliver to Administrative Agent written notice of its intent to exercise such extension no later than ten (10) days prior to the then Maturity Date and, upon giving of such notice of extension, and subject to the satisfaction of the conditions set forth below in this Section 2.3.3 on or before the then Maturity Date, the Maturity Date as theretofore in effect will be extended to April 3, 2020 and October 3, 2020, as applicable (the then "Extended Maturity Date"). The Maturity Date shall be extended pursuant to Borrower's notices as aforesaid, provided that the following conditions are satisfied: (i) no Event of Default shall be in existence hereunder either at the time of Borrower's notice or at the then-current Maturity Date, (ii) on each Interest Reserve Date during each Extension Term, as applicable, Borrower shall deliver to Administrative Agent an Interest Funding Amount equal the interest on the aggregate outstanding principal balance of the Loan, as calculated by Administrative Agent in its sole but reasonable discretion, (iii) Borrower shall have paid to Administrative Agent all expenses (including reasonable legal fees and disbursements) incurred by Administrative Agent in connection with Borrower's exercise of the extension option, and (iv) with respect to each exercise of Borrower's option to the extend the then Maturity Date, Borrower shall have paid to Administrative Agent the sum $162,500.00. Notwithstanding the preceding provisions of this Section 2.3.3, each Interest

- 6 -

Funding Amount during each Extension Term shall be paid in full on such applicable date and if for any reason Borrower shall prepay the Loan prior to the Extended Maturity Date, such prepaid interest amount shall become a yield maintenance penalty to Administrative Agent and shall not be refunded in any way to Borrower."

(i)     Section 2.4.1(a) is hereby deleted in its entirety and replaced with the following:

"Provided no Event of Default has occurred and is continuing, Borrower at its option and upon ten (10) days prior notice to Administrative Agent (or such shorter period of time as may be permitted by Administrative Agent in its sole discretion), may prepay the Debt in whole, but not in part, on any Business Day, upon payment to Administrative Agent of (i) the outstanding principal balance of the Loan, (ii) if the prepayment date is on or before April 3, 2019 (the "Make-Whole Date"), all accrued and unpaid interest thereon to and including the date which is the later to occur of (A) (x) if such prepayment occurs on or before the fifteenth (15th) day of the applicable calendar month, the date of such prepayment, or (y) if such prepayment occurs after the fifteenth (15th) day of the applicable calendar month, all interest which would have accrued on the amount of the Loan through the following Payment Date, and (B) the Make-Whole Date, (iii) the applicable Deferred Modification Fee (if not previously paid) and (iv) all other amounts due hereunder and under the Notes, Security Instrument and the other Loan Documents."

(j)     Section 9.3 is hereby deleted in its entirety and replaced with the following:

"**Section 9.3    Interest Reserve**. The Initial Interest Funding Amount, each following Interest Funding Amount and all other amounts delivered to the Administrative Agent pursuant to Section 2.3.1 and Section 2.3.3 to be used to fund monthly debt service payments during the Initial Term and each Extension Term to the extent required under this Agreement (the "Interest Reserve") shall be pledged to Administrative Agent as additional collateral for the Loan. Borrower hereby authorizes Administrative Agent to advance the Interest Reserve as needed to cover any payments of interest on the Loan."

4.      Modification to the Loan Documents.

(a)     All references to "$9,850,000.00" and/or "Nine Million Eight Hundred Fifty Thousand and 00/100 Dollars" shall be replaced with "$15,000,000.00" and/or "Fifteen Million and 00/100 Dollars", as applicable.

5.      No Defenses, Counterclaims or Rights of Offset. As a material inducement to Lenders and Administrative Agent to enter into this Agreement, Borrower hereby acknowledges, admits, and agrees that, as of the date of the execution and delivery of this Agreement, there exists no rights of offset, defense, counterclaims, claims, or objections in favor of Borrower against the Lenders or Administrative Agent with respect to the Loan Documents, as amended to date or

- 7 -

alternatively, that any and all such rights of offset, defenses, counterclaims, claims, or objections are hereby unconditionally and irrevocably waived and released.

6.    No Other Changes or Modification.  Nothing contained in this Agreement shall (a) be deemed to cancel, extinguish, release, discharge or constitute payment or satisfaction of the Note or to affect the obligations represented by the Note, or (b) be deemed to impair in any manner the validity, enforceability or priority in the Loan Agreement any other Loan Document or any lien thereof.

7.    Confirmation and Reaffirmation.  All of the terms, covenants, conditions, waivers and consents contained in the Loan Documents shall, remain in full force and effect.  The Loan Documents, as hereby amended, and the indebtedness evidenced thereby are hereby ratified and confirmed, and each and every grant, provision, covenant, condition, obligation, right and power contained therein or existing with respect thereto shall continue in full force and effect.  Borrower hereby acknowledges and agrees that the Loan Documents, as amended, are enforceable against Borrower in accordance with their terms.

8.    Further Assurances.  Upon request of the Administrative Agent, Borrower shall make, execute, and deliver (or shall cause to be made, executed, and delivered) to Administrative Agent any and all such other documents and instruments that they may consider reasonably necessary to correct any errors in or omissions from this Agreement, or any of the Loan Documents, or to effectuate, complete, perfect, continue or preserve their respective obligations thereunder or any of the liens, security interests, grants, rights, or other interests of or in favor of Administrative Agent thereunder.  Borrower shall take all such actions that Administrative Agent may reasonably request from time to time in order to accomplish and satisfy the provisions of this Agreement.

9.    Representations.  Borrower represents and warrants that (i) Borrower has full power, authority and legal right to execute this Agreement and to keep and observe all of the terms of this Agreement on its part to be observed or performed and (ii) the representations and warranties set forth in Article III of the Loan Agreement (as amended hereby) and in the other Loan Documents are true and correct in all material respects as of the date hereof (unless expressly stated to relate to an earlier date, in which case such representations and warranties are true and correct in all material respects as of such earlier date).  Each of Borrower and Guarantor hereby represents and warrants that as of the date hereof there has been no Transfer of, or Lien placed on, (x) any Collateral or (y) the direct and/or indirect membership interests in Borrower, in each case except as expressly permitted pursuant to the terms of the Loan Agreement.

10.    Pledgor Reaffirmation.

(a)    Heritage Borrower, as pledgor under that certain Pledge and Security Agreement, dated as of November 18, 2016 (the "Heritage Pledge"), hereby agrees and confirms that this Agreement and the modification of the Heritage Pledge pursuant to this Agreement shall not in any manner affect and/or modify its obligations as pledgor pursuant to the terms and provisions of the Heritage Pledge. Heritage Borrower hereby acknowledges and agrees that the Heritage Pledge, as amended, is enforceable against Heritage Borrower in accordance with its terms.

- 8 -

(b)    S&B Borrower, as pledgor under that certain Pledge and Security Agreement, dated as of November 18, 2016 (the "S&B Pledge"), hereby agrees and confirms that this Agreement and the modification of the S&B Pledge pursuant to this Agreement shall not in any manner affect and/or modify its obligations as pledgor pursuant to the terms and provisions of the S&B Pledge. S&B Borrower hereby acknowledges and agrees that the S&B Pledge, as amended, is enforceable against S&B Borrower in accordance with its terms.

11.    Guarantor Reaffirmation. Guarantor acknowledges, agrees and reaffirms (i) the Loan Documents, including, without limitation, the Guaranty and Environmental Indemnity in their entirety; (ii) that Guarantor is unconditionally indebted to the Administrative Agent and the Lenders as set forth in the Environmental Indemnity and the Guaranty, as herein amended, including, without limitation, with respect to the increase in the amount of the Loan from $9,850,000.00 to $15,000,000.00 pursuant to the terms of this Agreement, without defense, offset or counterclaim; and (iii) that the Loan Documents (including, but not limited to, the Guaranty and the Environmental Indemnity, as amended) are enforceable against Guarantor in accordance with their terms.  The Guarantor hereby releases the Administrative Agents and the Lenders from any and all claims, causes of action or counterclaims, whatsoever, in law or in equity, which it may have in connection with any actions taken by or on behalf of, or any omissions of, the Administrative Agent and/or the Lenders, or their respective employees, representatives or agents, on or prior to the date hereof, in respect of any of the Loan Documents (including, without limitation, the Guaranty, the Environmental Indemnity and/or any ancillary documents thereto), including, but not limited to, the administration and enforcement thereof.

12.    Inconsistencies.  In the event of any conflict or ambiguity between the terms, covenants and provisions of this Agreement and those of the Loan Agreement and the other Loan Documents, the terms, covenants and provisions of this Agreement shall control.

13.    Miscellaneous.

(a)    The caption and section headings in this Agreement are for convenience only and are not intended to define, alter, limit or enlarge in any way the scope of the meaning of this Agreement or any term or provisions set forth in this Agreement.

(b)    This Agreement may be executed simultaneously in any number of counterparts and sent via facsimile (and/or electronic email/pdf) to the parties, each of which when so executed and delivered shall be taken to be an original, but such counterparts shall together constitute but one and the same document. Telefacsimile transmissions (or such electronic copies) of any executed original counterpart signature page to this Agreement and/or retransmission of such any executed telefacsimile transmission (or such electronic copies) shall be deemed to be the same as the delivery of an executed original and the parties may not claim any defect based upon the other parties' inability to produce a "hard" signature copy.

(c)    This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement and obligations of such parties hereunder are and at all times shall be deemed to be for the exclusive benefit of such parties and their respective successors and assigns, and nothing set forth herein shall be deemed to be for the benefit of any other person.

- 9 -

(d)     This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

[Signature page follows]

RE\39820\0007\2349540v12

IN WITNESS WHEREOF this First Omnibus Loan Modification Agreement has been duly executed and delivered as of the date set forth in the introductory paragraph hereof.

BORROWER:

215 MOORE ST DEVELOPMENT LLC, a New York limited liability company

By: _____
    Name: Toby Moskovits
    Title: Authorized Signatory


S&B MONSEY LLC, a New York limited liability company

By: _____
    Name: Moshe Dov Schweid
    Title: Manager


ADMINISTRATIVE AGENT:

215 MOORE STREET MEZZANINE LENDER LLC


By: _____
    Name:
    Title:


LENDER:

215 MOORE STREET MEZZANINE LENDER LLC


By: _____
    Name:
    Title:

IN WITNESS WHEREOF this First Omnibus Loan Modification Agreement has been duly executed and delivered as of the date set forth in the introductory paragraph hereof.

BORROWER:

215 MOORE ST DEVELOPMENT LLC, a New York limited liability company

By: _____
    Name: Toby Moskovits
    Title:  Authorized Signatory

S&B MONSEY LLC, a New York limited liability company

By: _____
    Name: Moshe Dov Schweid
    Title:  Manager

ADMINISTRATIVE AGENT:

215 MOORE STREET MEZZANINE LENDER LLC

By: _____
    Name:  Ron Friedman
    Title:  Authorized Signatory

LENDER:

215 MOORE STREET MEZZANINE LENDER LLC

By: _____
    Name:  Ron Friedman
    Title:  Authorized Signatory

GUARANTOR HEREBY AGREES TO THE
TERMS OF THE FIRST OMNIBUS LOAN
MODIFICATION AGREEMENT AND
REAFFIRMS ALL OBLIGATIONS UNDER
THE LOAN DOCUMENTS TO WHICH
GUARANTOR IS A PARTY:

_____
Toby Moskovits

_____
Michael Lichtenstein

Exhibit 2.3.1(d)

Option Agreement

RE\39820\0007\2349540v12

# EXHIBIT F

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THIS NOTE MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS NOTE UNDER SAID ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (B) AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS.**

**THIS NOTE IS REGISTERED WITH THE AGENT (AS DEFINED BELOW) PURSUANT TO SECTION 12.3(o) OF THE LOAN AGREEMENT (AS DEFINED BELOW). TRANSFER OF ALL OR ANY PORTION OF THIS NOTE IS PERMITTED SUBJECT TO THE PROVISIONS SET FORTH IN SUCH SECTION 12.3(o) WHICH REQUIRE, AMONG OTHER THINGS, THAT NO TRANSFER IS EFFECTIVE UNTIL THE TRANSFEREE IS REFLECTED AS SUCH ON THE REGISTRY MAINTAINED WITH THE AGENT PURSUANT TO SUCH SECTION 12.3(o).**

<u>AMENDED AND RESTATED PROMISSORY NOTE</u>

$15,000,000.00                                                                                    New York, New York
                                                                                                          April 3, 2018

FOR VALUE RECEIVED, 215 MOORE ST DEVELOPMENT LLC, a New York limited liability company, having its principal place of business c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("<u>Heritage Borrower</u>") and S&B MONSEY LLC, a New York limited liability company, having its principal place of business c/o Heritage Equity Partners, 711 Fifth Avenue, 16th Floor, New York, New York 10022 ("<u>S&B Borrower</u>", together with Heritage Borrower, individually and collectively, jointly and severally, "<u>Borrower</u>"), hereby unconditionally promises to pay to the order of 215 MOORE STREET MEZZANINE LENDER LLC, a New York limited liability company, having an address at 333 7th Avenue, 3rd FL New York, New York 10001, as administrative and collateral agent (in such capacity, together with its successors and assigns, "<u>Administrative Agent</u>") for the Lenders (as defined in the Loan Agreement referred to below), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of Fifteen Million and 00/100 Dollars ($15,000,000.00) or so much thereof as is advanced, in lawful money of the United States of America, with interest thereon to be computed from the date of this Amended and Restated Promissory Note (as the same may be further amended, supplemented, restated, replaced or otherwise modified from time to time, this "<u>Note</u>") at the Note Rate, and to be paid in accordance with the terms of this Note and that certain Mezzanine Loan Agreement dated as of November 18, 2016, as amended by that certain First Omnibus Loan Modification Agreement, dated as of the date hereof, between Borrower, Administrative Agent and Lenders (as the same may be amended, modified, restated, supplemented, replaced or otherwise modified from time to time, the "<u>Loan Agreement</u>"). All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

This Note is intended to amend and restate and supersede that certain Promissory Note, dated as November 18, 2016, made by Borrower to Lender in the principal amount of up to $9,850,000.00 (the "<u>Existing Note</u>"), and is not intended to constitute a novation as to Borrower's obligations under the Existing Note, as such obligations are amended and restated hereby. Lender is the lawful owner and holder of the Existing Note.

## ARTICLE 1: PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article II of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

## ARTICLE 2: DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Administrative Agent if any payment required in this Note is not paid on or prior to the date when due (subject to any grace period provided in the Loan Agreement or herein) or if not paid on the Maturity Date or on the happening of any other Event of Default.

## ARTICLE 3: LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note, the Security Instrument and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4: SAVINGS CLAUSE

Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Administrative Agent are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lenders shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lenders, and (c) if through any contingency or event, Lenders receive or are deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lenders, or if there is no such indebtedness, shall immediately be returned to Borrower.

## ARTICLE 5: NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Administrative Agent, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6: WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive valuation, appraisement, presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and

- 2 -

notice of protest and nonpayment and all other notices of any kind, except for notices expressly required by the Loan Agreement, delays in collection or enforcement of this Note and the benefit of all applicable law affording any right or redemption or cure.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Administrative Agent, Lenders or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Administrative Agent to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  Borrower acknowledges that this Note and Borrower's obligations under this Note are and shall at all times continue to be personal, absolute and unconditional in all respects.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers, directors or members relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder.  (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement or any other Loan Document.)

## ARTICLE 7:  TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Administrative Agent may deliver all the collateral granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Administrative Agent and Lenders with respect thereto, and Administrative Agent and Lenders shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Administrative Agent and Lenders shall retain all rights hereby given to them with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8:  GOVERNING LAW

**(A)  THE LOAN AGREEMENT, THIS NOTE, THE SECURITY INSTRUMENT AND EACH OF THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

- 3 -

**(B)** ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, LENDERS OR BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT ADMINISTRATIVE AGENT OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY, COUNTY AND STATE OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

### ARTICLE 9:  LIABILITY

This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers, and shall be binding upon them and their successors and assigns.  If any payment under this Note is not made when due, Borrower agrees to pay all costs of collection when incurred, including reasonable attorneys' fees, which costs shall be added to the amount due under this Note and shall be receivable therewith.

### ARTICLE 10:  TIME OF THE ESSENCE

TIME IS OF THE ESSENCE with regard to Borrower's performance of all the terms, covenants and conditions of this Note.

### ARTICLE 11:  AUTHORITY

Borrower (and the undersigned representative of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note and that the Debt hereunder constitutes a valid and binding obligation of Borrower.

### ARTICLE 12:  NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 9.6 of the Loan Agreement.

### ARTICLE 13:  WAIVER OF JURY TRIAL

BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THE LOAN AGREEMENT, THIS NOTE, THE MORTGAGE OR THE OTHER LOAN DOCUMENTS OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH, THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE, EACH OF ADMINISTRATIVE AGENT AND LENDERS ARE HEREBY AUTHORIZED TO

- 4 -

FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.

## ARTICLE 14:  SUCCESSORS AND ASSIGNS

This Note shall be binding upon, and shall inure to the benefit of, Borrower, Administrative Agent and Lenders and their respective successors and permitted assigns.  Lenders may sell, assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or a portion of its rights and obligations under this Note and the other Loan Documents to any Person.  Any assignee or transferee of Lenders shall be entitled to all the benefits afforded to Lenders under this Note.  Borrower shall not have the right to assign, delegate or transfer its rights or obligations under this Note without the prior written consent of Administrative Agent, and any attempted assignment, delegation or transfer without such consent shall be null and void.

## ARTICLE 15:  JOINT AND SEVERAL LIABILITY

If more than one Person has executed this Note as "Borrower," the obligations of all such Persons hereunder shall be joint and several.

## ARTICLE 16:  ADMINISTRATIVE AGENT

To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto and Borrower shall be protected in its reliance thereof.

## ARTICLE 17:  REGISTERED OBLIGATION

Registered Obligation.  This Note shall be registered (and such registration shall thereafter be maintained) as set forth in Section 12.3(o) of the Loan Agreement.  Notwithstanding any document, instrument or agreement relating to this Note to the contrary, transfer of this Note (or the right to any payments of principal or stated interest thereunder) may only be effected by (i) surrender of this Note and either the reissuance by the Borrower of this Note to the new holder or the issuance by the Borrower of a new instrument to the new holder or (ii) registration of such holder as an assignee in accordance with Section 12.3(o) of the Loan Agreement.

[NO FURTHER TEXT ON THIS PAGE]

- 5 -

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

215 MOORE ST DEVELOPMENT LLC, a New York limited liability company

By:

Name: Toby Moskovits
Title: Authorized Person

S&B MONSEY LLC, a New York limited liability company

By:

Name: Moshe Dov Schweid
Title: Manager

# EXHIBIT B

# ASSIGNMENT OF
# MEMBERSHIP INTEREST

60748841;8

## <u>ASSIGNMENT OF MEMBERSHIP INTEREST</u>

**THIS ASSIGNMENT OF MEMBERSHIP INTEREST** (the "**Assignment**") is made as of June 6, 2018, by S&B MONSEY LLC, a New York limited liability company having an address at 160 Rutledge Street, Brooklyn, New York 11211 ("**Assignor**"), to 215 MOORE DEVELOPMENT LLC, a New York limited liability company having an address at c/o Heritage Equity Partners, 679 Driggs Avenue, Brooklyn, New York 11211 ("**Assignee**").

ASSIGNOR HEREBY represents and warrants that immediately prior to the delivery of this Assignment, Assignor owns one hundred percent (100%) of the membership interest (the "Membership Interest") of S&B MOORE LLC, a New York limited liability company (the "**Company**"), that the Company was validly formed in accordance with all applicable laws and the Articles of Organization for the Company were duly filed with the State of New York Department of State, that Assignor is authorized to transfer its membership interests in the Company.

For good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, subject to the terms and conditions of this Assignment, Assignor hereby assigns, transfers and sets over unto Assignee, Assignor's right, title and interest in and to one hundred percent (100%) of Assignor's membership interest in the Company; to have and to hold the same unto Assignee and its successors and assigns from and after the date hereof for the remainder of the term of the Company.

As and for consideration for this Assignment, Assignee should assume in full all obligations of Assignor, directly or indirectly, relating to the Company and the Company's interest in the real property known as 215 Moore Street, Brooklyn, New York, which is designated as Block 3100, Lot(s) 22, 26, 32, 47, 56, 61, 63, 66, 67 and 68 Kings County, Brooklyn, New York, including, without limitation, all obligations of Assignor to 215 Moore Street Mezzanine Lender LLC.

This Assignment is made with full representation and warranty by the Assignor and shall reduce Assignor's membership interest in the Company to zero percent (0%).

Assignor hereby covenants and warrants to Assignee, that Assignor will at any time in the future execute any document or instrument necessary for Assignee to perfect the membership interest(s) being assigned and transferred hereby, if so requested by Assignee.

Assignor hereby resigns as a member of the Company and further resigns from any capacity that it held in the Company.

SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, Assignor has caused this Assignment of Membership Interest to be duly executed as of the date first above written.

Assignor:

S&B MONSEY LLC, a New York limited liability company

By: _Moshe Dov Schweid_

    Name:  Moshe Dov Schweid
    Title:    Manager

Assignee:

215 MOORE DEVELOPMENT LLC, a New York limited liability company

By: _____

    Name:  Michael Lichtenstein
    Title:    Manager

# PROPOSED ORDER

60748841;8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| MY 2011 Grand LLC, *et al.*, [7] | Case No. 19-23957 (RDD) (Jointly Administered) |
| Debtors. | |

## ORDER ON VERIFIED OBJECTION TO CLAIM OF 215 MOORE STREET MEZZANINE LENDER LLC, OR, ALTERNATIVELY, MOTION TO COMPEL EQUITABLE MARSHALING
### [CLAIM NUMBER 4]

THIS MATTER having been heard on January 6, 2022 upon the Objection of MY 2011

Grand LLC ("2011 Grand") and S&B Monsey LLC ("S&B"), the jointly administered debtors

herein (each a "Debtor" and collectively, the "Debtors"), to the claim of 215 Moore Street

Mezzanine Lender LLC ("215 Moore") (Claim No. 4) (the "215 Moore Claim") [**ECF No. __**],

wherein the Debtors sought to disallow the 215 Moore Claim in its entirety or estimate the 215

Moore Claim against S&B at zero ($0) for distribution and voting purposes, and capping the 215

Moore Claim amount at 3% of the claim, or alternatively, compelling 215 Moore to satisfy the 215

Moore Claim from co-obligor Moore Development before proceeding against S&B's assets (the

"Objection"); and no objections having been filed to the Objection; and it appearing to the Court

that (i) it has jurisdiction over the matters raised in the Objection pursuant to 28 U.S.C. § 157 and

1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested and

granted herein is in the best interests of the bankruptcy estate and its creditors; (iv) proper and

adequate notice of the Objection and the hearing thereon has been given and no other or further

---

[7] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification numbers are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).

60748841;8

notice is necessary; and (v) upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing, it is hereby ORDERED as follows:

1.      Claim No. 4 filed by 215 Moore Street Mezzanine Lender LLC is hereby expunged and disallowed in its entirety.

2.      The Debtors are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Order.

Dated: New York, New York
       January __, 2022

**PROPOSED**

_____
HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

60748841;8