**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
Fred B. Ringel, Esq.
Steven B Eichel, Esq.
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. Co.: (212) 603-6300
*Attorneys for 227 Grand Street Mezz Lender LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:                                               Chapter 11

**MY 2011 GRAND LLC,**[1]
                                                     Case No.  19-23957 (RDD)
                 Debtor.
-----------------------------------------------------------X

### DECLARATION OF GREGORY PREIS IN OPPOSITION TO VERIFIED OBJECTION TO CLAIMS OF 227 GRAND STREET MEZZ LENDER LLC OR ON THE ALTERNATIVE MOTION TO EQUITABLY SUBORDIANTE CLAIM

Gregory Preis, being duly sworn, deposes and says:

1.    I am the Authorized Signatory of 227 Grand Street Mezz Lender LLC ("Lender"), and 215 Moore Street Mezzanine Lender LLC ("Moore Lender"), which are secured creditors and interested parties in the above captioned bankruptcy cases and I have personal knowledge of the facts of these cases and the events that transpired to date based upon the files maintained by the Lender and Moore Lender

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' taxpayer identification numbers are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070)

{01142157.DOCX;5 }{01101399.DOCX;2}

in the ordinary course of their businesses. As a result, I am fully familiar with the facts and circumstances of these cases.

2. As part of my responsibilities for the Lender, I am familiar with the type of records maintained in connection with the loan made by the Lender. Unless stated otherwise, the information in this declaration is taken from the Lender's business records, and I have personal knowledge of the Lender's procedures for creating these records. They are (a) made at or near the time that the occurrence of the matters recorded by a person with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge, and (b) kept in the course of the Lender's regularly conducted business activities. It is the regular practice of the Lender to make such records.

3. I submit this declaration in opposition to the verified objection of My 2011 Grand LLC ("Grand") and S&B Monsey LLC ("Monsey" together with Grand, the "Debtors") to claims of the Lender or in the alternative, motion to equitably subordinate claim ("Objection").

4. The Lender made a loan to Grand ("Mezz Loan") evidenced by, among other things, a promissory note ("Grand Note") dated December 29, 2016 made, executed and delivered by debtor Grand to Lender in the principal sum of $7,200,000. The Debtors have attached the two proofs of claim filed by Lender in these cases and attached them as composite Exhibit A to the Objection. A copy of the Grand Note is attached as Exhibit B to the proof of claim.

5.      On December 29, 2016, to secure the repayment of the indebtedness evidenced by the Grand Note, Grand executed and delivered a Mezzanine Loan Agreement ("Grand Mezzanine Loan Agreement") between it and Toby Moskovits ("Moskovits") as borrowers (collectively, "Borrowers"), and Lender, as Administrative Agent and Collateral Agent, and the Lender Parties identified in the Grand Mezzanine Loan Agreement. A copy of the Grand Mezzanine Loan Agreement is attached to the proof of claim as Exhibit C.

6.      The Grand Mezzanine Loan Agreement provides that Grand is the legal and beneficial owner of 26.75% of the membership interests of Grand Living II, LLC ("Grand Living II" or "Pledged Entity"), and Moskovits is the legal and beneficial owner of 5% of the membership interest of Grand Living II. I am advised that Debtors' counsel has made a representation at the June 10, 2020 hearing in these cases that prior to the Debtors' petition date Moskovits transferred her 5% interest to Grand. Grand Living II owns 100% of the membership interest in Grand Living LLC, which owns the real property located at 227 Grand Street, Brooklyn, New York 11211 ("Property").

7.      On December 29, 2016, to further secure repayment of the indebtedness, Grand executed and delivered a Pledge and Security Agreement ("Grand Pledge and Security Agreement") to Lender. A copy of the Grand Pledge and Security Agreement is attached to the proof of claim as Exhibit D.

8.      Pursuant to the Grand Pledge and Security Agreement, Grand pledged and granted to Lender, as collateral security for the prompt and complete payment

{01142157.DOCX;5 }                              3

and performance when due (whether stated maturity, by acceleration or otherwise) of the debt, a first priority security interest in all of Grand's right, title and interest in, to and under the following (collectively, "Grand Collateral"):

 (i)  all Pledged Equity[2];

 (ii)  all Equity Interests, securities, monies or property representing dividends or interest on any of the Pledged Equity, or representing a distribution in respect of the Pledged Equity, or resulting from a split-up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity;

 (ii)  all collateral described in Section 5(a) [of the Grand Pledge and Security Agreement];

 (iv)  any policy of insurance payable to Pledgor [Grand] by reason of loss or damage to the Pledged Equity and any other Collateral;

 (v)  all "accounts", "general intangibles", "instruments" and "investment property" (in each case as defined in the Code) in the name of and belonging to Pledgor constituting or relating to the foregoing; and

 (vi)  all Proceeds of any of the foregoing property.

9. To further secure the repayment of the debt, on December 29, 2016, an Irrevocable Proxy was entered into by and among Grand, Grand Living II and Lender ("Grand Irrevocable Proxy Agreement"). A copy of the Grand Irrevocable Proxy Agreement is attached to the proof of claim as Exhibit E.

10. Pursuant to the Grand Irrevocable Proxy Agreement, Grand irrevocably appointed Lender as its true and lawful proxy to vote its 26.75%

---

[2] Pledged Equity means the Pledged Membership Interests, which is the limited liability company membership interest in Grand Living II, together will all membership interest certificate, Equity Interests in Grand Living II, options or rights of any nature whatsoever which may be issues or granted by Grand Living II to Grand.

membership interest in Grand Living II ("Grand Pledged Interests") and any and all other equity interests in Grand Living II by Grand whether directly or indirectly, beneficially or of record, now owned or hereinafter acquired ("Grand Pledged Interests together with all such other equity interests, the "Grand Pledgor's Interests") with respect to any action, decision, determination, or election by Grand Living II or its member(s) that its membership interest or other equity interests, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the Uniform Commercial Code, and all other matters related to any such action, decision, determination or election.

11.    On December 29, 2016, Moskovits and Michael Lichtenstein ("Lichtenstein" and together with Moskovits, the "Guarantors") entered into a guaranty agreement in favor of Lender ("Guaranty Agreement"). Under the Guaranty Agreement, the Guarantors irrevocably and unconditionally guaranteed as primary obligor the payment and performance of the obligations or liabilities of the Borrowers as and when it shall become due and payable. A copy of the Guaranty Agreement is attached to the proof of claim as Exhibit F.

12.    In addition, to secure repayment of indebtedness evidenced by the Grand Note, Monsey executed and delivered two separate Pledge and Security Agreements (collectively, "Monsey Pledge and Security Agreement") to Lender.[3]

---

[3] One Monsey Pledge and Security Agreement provides that Monsey is the beneficial and record holder of 16.51% of Grand Living and the second one provides that Monsey is the beneficial and record holder of 16.49% of the membership interest in Grand Living II.

Copies of each Monsey Pledge and Security Agreement are attached to the proofs of claim as Exhibit G and H, respectively.

13. Under the Monsey Pledge and Security Agreement, Monsey pledged and granted to Lender as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the debt, a first priority security interest in all of Monsey's right, title and interest in, to and under the Monsey Collateral[4], including all pledged membership interests in Grand Living II ("Monsey Pledged Membership Interests").

14. Contrary to Debtors' contention, Moore Lender does not have a first priority lien on Monsey's membership interest in Grand Living II because it never received a pledge of Monsey's membership interest in Grand Living II. Instead, in connection with its loan to Monsey, it received, a pledge of (i) Monsey's membership interest in S&B Moore, and (ii) Moore St. Development LLC's membership interest in 215 Moore St. Acquisition LLC. As set forth above, Only the Lender was pledged Monsey's membership interest in Grand Living II.

15. To further ensure the repayment of the debt, on December 29, 2016, two separate Irrevocable Proxy Agreement were entered into by and among Monsey, Grand Living II and Lender (collectively, "Monsey Irrevocable Proxy Agreement"). Copies of each Monsey Irrevocable Proxy Agreement are attached to the proof of claim as Exhibits I and J, respectively.

---

[4]The Monsey Collateral is comprised of the same categories of collateral as the Grand Collateral. The Grand Collateral and Monsey Collateral are collectively referred to as the "Collateral."

16.     Pursuant to the Monsey Irrevocable Proxy Agreement, pledgor Grand irrevocably appointed Lender as its true and lawful proxy to vote its 33% of the membership interest in Grand Living II ("Pledged Interests") and any and all other equity interests in Grand Living II by Grand whether directly or indirectly, beneficially or of record, now owned or hereinafter acquired (the Pledged Interests, together with all such other equity interests, the "Pledgor's Interests") with respect to any action, decision, determination, or election by Grand Living II or its member(s) that its membership interest or other equity interest, or any of them, be or cease to be, a "security" as defined in and governed by Article 8 of the Uniform Commercial Code, and all other matters related to any such action, decision, determination or election.

17.     In connection with the Mezz Loan, on December 29, 2016, an escrow agreement was entered into by and among the Pledged Entity, Monsey, the Lender and Rosenberg & Estis, P.C., as escrow agent ("Monsey Escrow Agreement"). A copy of the Monsey Escrow Agreement is attached to the proof of claim as Exhibit K.

18.     The Monsey Escrow Agreement provides that Monsey is the owner of 33% of the limited liability company interest in Grand Living II, of which (i) 16.49% will be pledged to Lender in connection with the Mezz Loan and (ii) 16.51% ("Escrowed Membership Interests") will be held in escrow pursuant to the terms of the Monsey Escrow Agreement. The pledgor Monsey, the Pledged Entity and the Lender delivered to the escrow agent (i) the Monsey Pledge and Security Agreement, (ii) the Monsey Irrevocable Proxy Agreement, and (iii) Certificate for

the Escrow Member Interest (collectively with all the UCC Financing Statements required by the Lender, "Escrowed Documents").

19. On December 29, 2017, Grand, Moskovits and Lender entered into the First Omnibus Loan Modification Agreement ("Modification Agreement"). A copy of the Modification Agreement is attached to the proof of claim as Exhibit L. Pursuant to the Modification Agreement, the loan maturity date deadline was extended to June 28, 2018, and upon satisfaction of certain requirements, it would be extended to December 29, 2018. However, as the Borrowers never paid the extension fee, the loan maturity date was not further extended, and remained June 28, 2018.

20. On June 28, 2018, the Borrowers failed to make the required payments under the Grand Note, the Grand Mezzanine Loan Agreement and the Modification Agreement ("Default"). As the Mezz Loan matured on June 28, 2018, Grand defaulted on the Mezz Loan at 12:01 AM on June 29, 2018. The Mezz Loan was not accelerated.

21. After the Borrowers failed to pay the loan at maturity, the Lender entered into discussions with the Borrowers regarding resolving the obligation owed to the Lender. The discussions, which extended over approximately one year, did not resolve the debt. Therefore, in August 2019, the Lender exercised its remedies as set forth below.

22. By letter dated August 26, 2019, the Lender served the Escrow Release Notice (as defined in the Escrow Agreement) upon Rosenberg & Estis, the escrow agent, and copied Monsey, Grand and Grand Living II. The letter advised

the escrow agent that (i) an event of Default has occurred, and (ii) it should immediately release the Escrowed Documents for recording at the Office of the City Register of the City of New York ("Recording Office"), and (iii) deliver to Pledgor, Borrowers and Pledged Entity written notification of receipt of the Escrow Release Notice from Lender and the intent of escrow agent to release the Escrowed Documents from escrow and submit the applicable Escrowed Documents for recording at the Recording Office. A copy of the August 26, 2019 letter is attached hereto as Exhibit 1.

23.     By letter dated as of August 27, 2019, Rosenberg & Estis advised Monsey, Grand Living II and the Borrowers that it received the Escrow Release Notice from Lender and that it complied with the request and released the Escrowed Documents and submitted the applicable Escrowed Documents for recording at the Recording Office, and delivered to Monsey, the Borrowers and the Pledged Entity written notification of receipt of the Escrow Release Notice from the Lender and its intent to release the Escrowed Documents from escrow and submit the applicable Escrowed Documents for recording at the Recording Office. A copy of the August 27, 2019 letter is attached hereto as Exhibit 2.

24.     On August 27, 2019, a UCC Financing Statement was filed on behalf of the Lender against the Collateral that was pledged to it, including the Pledged Membership Interests. A copy of the UCC Financing Statement is attached to the proof of claim as Exhibit M.

{01142157.DOCX;5 }                                  9

25. By letter dated August 27, 2019 ("Akerman August 27 Letter"), Akerman LLP, counsel for Monsey, Grand Living II, Grand and the Borrowers, attempted to stop the release of the Escrowed Documents. A copy of the Akerman August 27, 2019 Letter is attached hereto as Exhibit 3.

26. In response to the Akerman August 27 Letter, by letter dated as of August 28, 2019, Rosenberg & Estis, notified Akerman LLP that it complied with all of its obligations of escrow agent under Section 4 of the Escrow Agreement, released the Escrowed Documents and submitted the applicable Escrowed Documents for recording at the Recording Office and delivered to Pledgor, Borrowers, and the Pledged Entity written notification of receipt of the Escrow Release Notice from Lender and the intent of the Escrow Agent to release the Escrowed Documents from escrow and submit the applicable Escrowed documents for recording at the Recording Office. A copy of the August 28, 2019 Letter is attached hereto Exhibit 4.

27. As a result of the failure to cure the default, the Lender scheduled a UCC sale of the Collateral for November 6, 2019. By a Notification of Disposition of Collateral, dated September 6, 2019 ("Notification of Disposition"), Lender informed pledgors Grand, Monsey and Moskovits that it intended to hold a sale of the collateral (as described in the Notification of Disposition) on November 6, 2019 at 10 am at the offices of Rosenberg & Estis. A copy of the Notification of Disposition is attached hereto as Exhibit 5.

28.   Prior to the commencement of the bankruptcy case, the Lender sent several payoff letters to Grand, Moskovits and counsel, which varied depending upon the negotiations at the time. On September 27, 2019, Lender, through Hutton Ventures LLC, sent a pay-off statement that (i) the amount owed to Lender through October 11, 2019 was $10,272,229.45, and (ii) the pay-off statement was only valid until the close of business on October 11, 2019, at which time the pay-off statement was no longer effective. This payoff statement is a full payoff based on the full $7.2 million loan amount. A copy of this pay-off statement is attached hereto as Exhibit 6.

29.   On November 5, 2019, a pay-off statement ("November 5 Pay-off Statement"), was sent to Grand showing that the amount owed to the Lender through November 5, 2019 was $8,019,736.12, which was a settlement of the full amount owed to the Lender. The November 5 Pay-off Statement provided that it was only valid and in effect until the close of business, 5 PM on November 5, 2019, at which time it is no longer in effect. This settlement was based on the Estate of Abraham Schwartzman accepting only $500,000 and waiving $1million of principal. A copy of the November 5 Pay-off Statement is attached hereto as Exhibit 7.

30.   On November 5, 2019, the Lender, through Hutton Ventures LLC, sent Grand and Moskovits (and counsel), an updated pay-off letter reflecting settlement negotiations and the Lender's willingness to waive certain amounts due in exchange for payoff in the amount of $7,923,536.12 being received by November 6, 2019 at

9:59 a.m. ("Updated November 5th Pay-off Statement"). The cover email indicated that (i) if the payoff is not received by that time, the Updated November 5th Pay-off Statement shall be deemed null and void, *ab initio*, and no waiver of monies due and owing shall be effective against the Lender, and (ii) the Lender reserves all its rights under the loan documents. This payoff letter differs from the prior payoff letter because the Estate of Schwartzman was willing to accept only $400,000 and waived $1.1 million on principal. A copy of the Updated November 5th Pay-off Statement and cover letter are attached hereto as Exhibit 8. No timely payment was received.

31. Later that day, the Lender, through Hutton Ventures LLC, sent a revised payoff letter extending the deadline to 4 PM on November 6, 2019. The letter indicated that the payoff amount was valid until 4 PM, and after that time, the pay-off amount was no longer valid. This payoff letter is the same as Exhibit 8, except that the Lender extended the "good through" time from 9:59 AM to 4:00 PM. A copy of this letter is attached hereto as Exhibit 9.

32. On November 5, 2019, Lender sent to Grand, Monsey and Moskovits a Withdrawal of Notification of Disposition of Collateral ("Withdrawal Notification") without prejudice as a request of Grand, Monsey and Moskovits based upon their representation that they intend and expect to pay off amounts' due no later than 4:00 p.m. on November 6, 2019. The Withdrawal Notification provided that if the payoff amount was not received by 4 pm on November 6, 2019, the payoff amount shall be deemed null and void *ab initio*, and no waiver of any monies due and owing

shall be deemed effective against the Lender and the public sale of the Collateral will take place at a date, time, and place determined by the Lender. A copy of the Withdrawal Notification is attached hereto as Exhibit 10.

33. To avoid losing the Collateral in the UCC sale, on November 6, 2019 ("Petition Date"), Grand and Monsey each filed for bankruptcy under Chapter 11 of title 11 of the United States Code.

34. On January 6, 2020, Grand and Monsey filed a motion to dismiss their respective bankruptcy cases under the pretext that they would now be able to pay the Lender and their other creditors in full. Monsey and Grand abandoned that motion.

35. On April 24, 2020, the Lender filed its initial motion for an order granting relief from the automatic stay ("April 2020 Lift-Stay Motion"). Although the Court denied the April 2020 Lift-Stay Motion ("Order Denying April 2020 Lift Stay Motion"), it permitted the Lender to renew the Motion on Debtors' failure to certify that it paid the debt service on the Property each month and paid the real estate tax obligations due on the Property. Paragraph 35 of my declaration in support of that motion provided that the amount owed to Lender as of April 23, 2020 was $11,296,169.45.

36. The proofs of claim, each claim no. 3, in the amount of $10,281,719.45 were filed on August 24, 2020, and are attached to the Objection.

37. On July 1, 2021, the Lender filed a second motion for stay relief. Attached to my declaration in support of the motion was a payoff letter which

provided that as of July 15, 2021, the amount owed to the Lender was $13,607,948.93. This payoff letter is over a year and half later than the payoff letter in Exhibit 9 and is therefore a much higher amount owed with interest accruing at 24% and additional legal fees. A copy of that payoff letter is attached hereto as Exhibit 11.

38. Attached hereto as Exhibit 12 is a pay-off letter in the amount of $15,073,199.55 as of March 31, 2022, and a chart explaining the calculations.

39. The pay-off includes (i) pre-petition legal fees and expenses in the amount of $34,590.09, (ii) post-petition legal fees and expenses in the amount of $373,147.51, (iii) prepetition miscellaneous expenses in the amount of $34,219.45 related to the auction of the membership interest, which Lender cancelled based on the Debtors' and Moskovits' representation that they intend to pay off the Mezz Loan no later than November 6th at 4 PM, and (iv) postpetition expenses in the amount of $4,950 for appraisal services. The invoice from the auctioneer and appraiser are attached hereto as Exhibits 13 and 14, respectively. The Lender will provide the detailed time records in connection with the evidentiary hearing on the Objection.

40. In addition the above, pursuant to the Modification Agreement, the Lender was entitled to extension fees. Under the Modification Agreement, the Lender was entitled to receive $288,000 in extension fees. Of that amount, $120,000 was paid, leaving a balance of $168,000 owed on account of extension fees.

41. Based on the above, the Lender respectfully requests that this Court enter an Order denying the Objection in its entirety and allow the Lender's proof of claim (as supplemented by the pay-off statement and subsequent fees that may occur and interest that may accrue) in an amount to be determined by the Court.

I declare under penalty of perjury that the foregoing, in accordance with 28 U.S.C.§1746, is true and correct.

Dated: New York, New York
March 24, 2022

    /s/ Gregory Preis
**GREGORY PREIS**