ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.
Fred B. Ringel, Esq.
Steven B Eichel, Esq.
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. Co.: (212) 603-6300
*Attorneys for 227 Grand Street Mezz Lender LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:                                                    Chapter 11

**MY 2011 GRAND LLC**,[1]
                                                          Case No.  19-23957 (RDD)
                        Debtor.
------------------------------------------------------------X

### DECLARATION OF ALLAN LEBOVITS IN OPPOSITION TO DEBTORS' VERIFIED OBJECTION TO CLAIMS OF 227 GRAND STREET MEZZ LENDER LLC, OR IN THE ALTERNATIVE, MOTION TO EQUITABLY SUBORDINATE CLAIM

**Allan Lebovits**, being duly sworn, deposes and says:

1.    I am a partner in a group that invested in a loan to MY 2011 Grand LLC ("Grand"), under Jeffrey Zwick & Associates, as nominee, which has a participation interest in 227 Grand Street Mezz Lender LLC ("Lender")[2].  I have personal knowledge of the facts of these bankruptcy cases and the events that transpired to date based upon my (i) interaction with the Debtors and co-investor Hutton, and (ii) files maintained in the ordinary course of business.  As a result, I am fully familiar with the facts and circumstances of these cases.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' taxpayer identification numbers are as follows:  MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).
[2] The other investors are Hutton Ventures, LLC ("Hutton") and the Estate of Abraham Schwartzman (the "Estate").

{01143256.DOCX;5 }1

2.   I submit this Declaration in Opposition to the Debtors' Verified Objection to Claims of 227 Grand Street Mezz Lender LLC or in the Alternative Motion to Equitably Subordinate Claim (the "Objection").

3.   In the Objection, Grand and S&B Monsey ("Monsey" and together with Grand, the "Debtors") seek to reduce or equitably subordinate the Lender's claim alleging, among other things, that (i) the Lender repeatedly attempted to "deliberately block the pay-off of its loan" by refusing to provide a payoff letter as to the loan from the Lender to Grand ("Mezz Loan"), (ii) the Lender sought to improperly obtain ownership of real property located at 225-227 Grand Street, Brooklyn, New York (the "Property"), (iii) I blocked and interfered with the sale of non-debtor property located at 232-244 Siegel Street, Brooklyn, New York ("Seigel Property"), which resulted in blocking the Lender's payoff of the Mezz Loan, (iv) the Lender sought to "torpedo" the Debtors' efforts to refinance the senior mortgage debt on the Property, (v) the Lender interfered with the Debtors' post-petition refinancing efforts, and (vi) Lender schemed to cause financial damage to Debtors by burying them in debt, while actively resisting and obstructing the Debtors' efforts to effectuate a payoff of the indebtedness, with the ultimate goal of me obtaining ownership of the Debtors' Property.

4.   The Objection is replete with a plethora of false accusations against the Lender and me by a desperate Debtor unable to confirm a plan of reorganization. I will not address each and every false accusation specifically; however, I deny, on behalf of the Lender and myself, each and every allegation of the purported

improper conduct asserted in the Objection, the declaration of Ms. Moskovits ("Moskovits Declaration"), and the affidavits of Mr. Abraham Leifer ("Leifer") and Ms. Gross that were filed in another bankruptcy case (the Moskovits Declaration and the affidavits are collectively, the "Declarations"). These baseless allegations are pure fiction, and certain of them conflate alleged acts purportedly taken by two different borrowers in two separate bankruptcy cases—these cases and the bankruptcy cases of *In re Seigel Development, et al.* Case No. 20-22844 (RDD)("Seigel Bankruptcy Cases"), which is also pending before this Court.

### Lender Has First Lien on Membership Interests in Grand Living II, LLC

5. Although a more complete summary of the Lender's Mezz Loan to the Debtors and the corresponding loan documents is set forth in the Declaration of Gregory Preis in Opposition to Debtor's Verified Objection to Claims of 227 Grand Street Mezz Lender LLC or in the Alternative Motion to Equitably Subordinate Claim ("Preis Declaration")[3], the Debtors raised an issue as to who has a senior lien on Monsey's membership interest in Grand Living II, LLC ("Grand Living II"). The answer is the Lender.

6. On December 29, 2016, in connection with the Mezz Loan, the Lender and Grand entered into, among other things, the Grand Pledge and Security Agreement, which pledged to the Lender a first priority security interest in all of Grand's right, title and interest in and to, among other things, the Grand's Pledged Membership Interests in Grand Living II.

---
[3]Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Preis Declaration.

{01143256.DOCX;5 } 3

7. Similarly, to secure re-payment of the Grand Note, Monsey executed two separate Pledge and Security Agreements (collectively, "Monsey Pledge and Security Agreement"). Under the Monsey Pledge and Security Agreement, Monsey pledged and granted to Lender a first priority security interest in all of Monsey's right, title and interest, in, to and under the Monsey Collateral, which includes all pledged membership interests in Grand Living II ("Monsey Pledged Membership Interests"). As Monsey pledged the Monsey Pledged Membership Interest to the Lender and Grand pledged the Grand Pledge Membership Interest to the Lender, the only entity that has a lien on Grand's and Monsey's equity interest in Grand Living II is the Lender. Moreover, the pledge of the membership interests were certificated securities, which are held by the Lender's pre-petition counsel on its behalf.

8. In contrast, in a separate loan with a separate lender 215 Moore Street Mezzanine Lender ("215 Moore Street Mezzanine Lender"), an entity of which I have no economic or other interest, Monsey pledged its membership interest in its subsidiary 215 Moore St. Development LLC ("215 Moore") to 215 Moore Street Mezzanine Lender ("215 Moore Mezz Lender"). Specifically, as set forth in the Preis Declaration, section 2 of the Pledge and Security Agreement between Monsey and 215 Moore Mezz Lender ("215 Moore Pledge and Security Agreement") provides that Monsey pledges and grants to 215 Moore Street Mezzanine Lender as collateral security for the prompt and complete payment and performance when due of the debt, a first priority security interest in Monsey's right, title and interest to, among

{01143256.DOCX;5 }4

other things, the Pledged Equity, which is the 100% membership interest in S&B Moore[4]. Monsey did not pledge any of its interest in Grand Living II to 215 Moore Mezz Lender. See 215 Moore Pledge and Security Agreement, which is attached as Exhibit D to the 215 Moore Mezz Lender proof of claim against Monsey [Claim No. 4]. Thus, contrary to the Debtors' contention, 215 Moore Mezz Lender does not have a first priority lien (or any lien) with respect to Grand Living II, and the Lender has the first priority lien on Grand's and Monsey's membership interest in Grand Living II.

### There Was No Interference With Debtors' Pre-petition Attempt to Refinance Santander Loan

9. Contrary to Debtor's contentions, neither the Lender nor I interfered with the Debtors' attempt to refinance Santander Bank's senior loan ("Santander Loan") on the underlying Property, which the Debtors assert would have been sufficient to satisfy the Santander Loan and the Mezz Loan.

10. The facts demonstrate that rather than attempt to interfere with the Debtors' attempted refinancing of the Santander Loan, the Lender gave the Debtors over one year to refinance the defaulted Mezz Loan. The maturity date of the Mezz Loan was initially June 29, 2017, which was extended pursuant to the First Omnibus Loan Modification Agreement to June 28, 2018. The Lender did not exercise its remedies for over one year after Grand defaulted on the Mezz Loan to give the Debtors an opportunity to refinance their obligations to Santander Bank, the senior lender, and pay-off the Mezz Loan to the Lender. The Mezz Loan

---

[4] In the 215 Moore Pledge and Security Agreement, the term "Pledged Equity" means Pledged Membership Interests, which means the limited liability interests in S&B Moore.

matured on June 28, 2018 by its terms without acceleration. After the Debtors defaulted on the Loan at 12:01 a.m. on June 29, 2018 for failure to make the required payments under the loan documents, the Lender entered into discussions with the Debtors that lasted over one year. After the parties were unable to reach a resolution on the payoff of the Mezz Loan, in August 2019 (more than a year after the default), the Lender exercised its remedies (which are set forth in more detail in the Preis Declaration). Preis Declaration at ¶¶ 21-32. Contrary to the Debtors' contentions, the Lender acted in good faith in connection with the Debtors' alleged refinancing process. Waiting for over a year without exercising its remedies (while the Debtors filed for bankruptcy the day after they could no longer delay repaying the Mezz Loan) are not the actions of a predatory lender or lender that made a loan to own. They are not even the actions of an aggressive lender, but they are the actions of a bad borrower that was unable to repay the Mezz Loan, despite its repeated promises to the Lender that it would.

11.    On September 27, 2019, the Lender, through Hutton, sent a pay-off statement for amounts owed through October 11, 2019, which was in the amount of $10,272,229.45. October 11th was the last day for which that pay-off letter was valid. A copy of the pay-off statement is attached as Exhibit 6 to the Preis Declaration.

12.    On November 5, 2019, a pay-off statement was sent to Grand in the amount of $8,019,736.12, which was a settlement of the full amount owed to the

Lender.  The November 5th pay-off statement was valid until 5:00 p.m. on November 5, 2019, at which time it was no longer in effect.  Preis Declaration, Exhibit 7.

13. On the same day, the Lender sent Grand and Moskovits (and counsel) an updated pay-off letter reflecting settlement negotiations and the Lender's willingness to waive certain amounts due in exchange for pay-off in the amount of $7,923,536.12 being received by November 6, 2019 at 9:59 a.m.  No timely payment was received.  The updated pay-off statement extended the pay-off deadline to 4:00 p.m. on November 6, 2019.  See Preis Declaration at ¶ 31, Exhibit 9.

14. On November 5, 2029, in an act of good faith and based upon the representation of Grand, Monsey and Moskovits that they intended to and expected to pay-off the amount due no later than 4:00 p.m. on November 6, 2019, Lender sent a Withdrawal of Notification of Disposition of Collateral without prejudice. It stated that if the pay-off was not received by 4:00 p.m. on November 6th, the pay-off letter shall be null and void *ab initio*, and no waiver of any monies due and owing shall be deemed effective against the Lender and the public sale of the Collateral will take place at a date, time, and place determined by the Lender.   See Preiss Declaration at ¶32, Exhibit 10.

15. On November 6, 2019, Grand and Monsey filed for bankruptcy protection.  The Lender acted in good faith by providing the Debtors with over a year (between June 2018 and November 2019) to allow it to complete its refinancing. Contrary to the Debtors' fabrications, at no time did the Lender or I block, obstruct or sabotage the Debtors' efforts to pay-off the Mezz Loan in order to

take possession of the Property via foreclosure, which could not have occurred because the Lender had a lien on the membership interests in Grand Living II—not the underlying Property.  It was the Debtors that did not act in good faith by making representations to Lender that the Mezz Loan would be paid off, which Lender relied upon to its detriment, and then avoided making the required payment by filing their bankruptcy cases on November 6, 2019.

### There Was No Interference With The Prepetition Sale of Seigel Property

16. Contrary to Debtors' allegations, neither the Lender, Bridge City Capital LLC ("BridgeCity"), an entity in which I am a member, nor I (i) blocked or interfered with the sale of the Seigel Property or (ii) attempted to block the Debtors' ability to pay-off the mezz loan on the Seigel Property.

17. Debtors assert that in or around September 2019, I informed Moskovits that I (presumably on behalf of BridgeCity) would not be financing the construction of a hotel on the Seigel Property.  Moskovits Declaration at ¶11; Objection at ¶6. The Debtors and Moskovits conveniently omitted that prior to September 2019, BridgeCity's loan to 232 Seigel Acquisition LLC was in default. On August 26, 2019, I sent an email to Mr. Lichtenstein and copied Moskovits. In that email, I specifically told them (i) that there is no relationship between the (a) Seigel Property and loan and (b) the Property and loan in these cases, and (ii) due to their failure to timely proceed and close on the Seigel term sheet, we are longer interested in proceeding with the Seigel loan.  A copy of that email is attached hereto as Exhibit A.  Shortly thereafter on the same day, I advised Mr. Lichtenstein, Ms.

Moskovits and others by email that the term sheet was executed by the borrower on June 6, 2019 and the Seigel loan still had not closed due to borrower's failure to provide the requisite lender requested items and/or display to lender that it has the funds necessary to close and satisfy its equity requirements, nor had the good faith deposit been funded by borrower in spite of numerous requests. In that email, I further advised that should the Seigel loan not close the following day, BridgeCity would walk away. A copy of this email is attached hereto as Exhibit B.

18. The Debtors further contend that after I would not fund the construction loan on the Seigel Property, they identified two potential purchasers for the Seigel Property, one of which was Leifer, who expressed a willingness to close on his acquisition of the Seigel Property before the end of 2019 at an $18 Million purchase price. The Debtors contend that Leifer received a call from me (without identifying when) informing him that as the mezz lender on the Seigel Property, I was about to foreclose on the Seigel Property and that he should not proceed with the purchase of the Seigel Property, as he could buy it cheaper from me. Contrary to the Objection and Leifer's Affidavit (which was originally filed in the Seigel Bankruptcy Cases), I never told Leifer "Don't waste your money. Wait until I foreclose, and you will buy it cheaper from me."[5] I deny these allegations as they are totally untrue.[6] If I was intending to foreclose on the Seigel Property, BridgeCity would not have assigned the mezz loan to DB 232 Seigel LLC, which I

---

[5] The Debtors are recycling baseless allegations as they have been raised before this Court in the Seigel Bankruptcy Cases, and before there was an opportunity to respond, this Court converted the case to Chapter 7 and the Chapter 7 Trustee decided to sell the Property and not pursue the baseless allegations asserted by the Debtors.

[6] I also deny that I advised an unnamed potential purchaser that I was about to foreclose on the Seigel Property.

{01143256.DOCX;5 } 9

believe is an affiliate of Fortress, effective as of December 17, 2019 before the loan matured in December 2019.

19. I have been advised that Leifer was forced to make these false statements, otherwise he would not receive his deposit back from Ms. Moskovits because he subsequently signed a contract to purchase the Seigel Property and put down a deposit. The fact that he was unable to close on the purchase of the Seigel Property has nothing to do with BridgeCity, the Lender or me. At no time was there any tortious interference with Leifer's attempted purchase of the Seigel Property. The Debtors are merely fabricating facts in an effort to avoid paying the Lender what it is owed.

20. Although the BridgeCity loan to 232 Seigel Acquisition LLC has nothing to do with the Lender or the Debtors in these bankruptcy cases, the Debtors conflate this bankruptcy case with the Seigel Bankruptcy Cases to create confusion. For instance, in the Moskovits Declaration, Ms. Moskovits attached an email dated October 29, 2019 requesting a payoff letter and complains that the responsive payoff letter that she receives is on November 14, 2019. This email relates to the Seigel Bankruptcy Cases and is unrelated to these cases. The Debtors also submitted the affidavit of Miriam Gross ("Gross Affidavit"), which was filed in the Seigel Bankruptcy Cases and has nothing to do with the Lender or the Debtors in these bankruptcy cases. It contains mostly hearsay, and to the extent that it states that I committed an improper act, I deny the allegations.

### There Was No Post-Petition Interference With Debtors' Refinancing Efforts

21. Debtors contend that the post-petition interference with their refinancing efforts stem are (i) Lebovits' refusal to provide a payoff letter during the period February 2020 to April 2020 in order to pay off the Mezz Loan, and (ii) Lender's actions stymied the Debtors' efforts to reorganize. I deny theses allegations.

22. In the Moskovits Declaration, Moskovits asserts that over the course of six weeks (without stating which six weeks), she and others repeatedly requested a payoff letter from me, but I refused to provide one. Moskovits Declaration at ¶17. The Moskovits declaration references exhibit D , which is an April 20, 2020 email, but it is neither an email to me nor appears to be a request for a payoff letter. I have no recollection of repeated requests for payoff letters in these cases and the Debtors have failed to produce any evidence that repeated requests for a payoff were sent to me and that I ignored them. Moreover, on April 24, 2020, the Lender filed a motion for an order granting relief from the automatic stay ("April 2020 Lift Stay Motion"). In connection therewith, Greg Preis, the manager of the Lender, filed a declaration in support of the April 2020 Lift Stay Motion.[Dkt. No. 19]. Paragraph 35 of that declaration provides that the amount owed to the Lender as of April 23, 2020 was $11,296,169.45. Thus, by this Court filing, the Debtors were aware of the payoff amount as of April 23, 2020. I am not aware of any request for additional information regarding the payoff amount after it was disclosed in the court filing.

23. In paragraph 18 of the Moskovits Declaration, Ms. Moskovits asserts that on November 12, 2019, Grand Living LLC sent an email to me and the "Hutton Team" requesting a payoff letter, but no response was provided. As evidence of this allegation, Ms. Moskovits refers to Exhibit E. which is an email appearing to relate to the Seigel Bankruptcy Cases - not these bankruptcy cases. In response that email in the Seigel Bankruptcy Cases, I indicated that would send a payoff letter that same week.

24. The Debtors' own emails do not support their misguided theory that they repeatedly requested for payoff letters and I ignored their request and that they had committed financing from SME Capital. Throughout the case, Debtors have claimed that loan financing has been available from SME Capital, but they have not demonstrated that they have a binding commitment.

25. Moreover, the Debtors' outlandish allegations with respect to my actions as it pertains to Santander Bank are not true. There was no loan to own scheme. The Lender did not refuse to provide a payoff letter; it just wants to get paid on account of its claim as the Mezz Loan matured almost four years ago.

26. Furthermore, with respect to Santander Bank, contrary to the Debtors' meritless allegations, I received a phone call from a broker Yosef Katz advising me that the Santander Loan held by Santander Bank was in maturity default and was being marketed for sale by Santander Bank. Mr. Katz advised me that the Lender, as the mezzanine lender, was in jeopardy of being extinguished or diluted by the senior mortgage being in default, thereby incurring default interest, and the

Property was heading toward foreclosure. In order to protect my interest, I advised Mr. Katz that I was willing to pay par for the senior loan. Several days later, Mr. Katz advised me that the senior loan was already sold or was in contract to be sold to Madison Realty Capital ("Madison"). Upon hearing that information, I called Mr. Josh Zegen of Madison to explain to him the jeopardy of the mezzanine loan and asked him if he would sell the loan so I could protect my interest. He declined to sell the senior loan. After that, there were no further discussions with Madison regarding the purchase of the senior loan.

27. Moreover, contrary to Debtors' allegation in paragraph 4 of the Objection, there is no truth to the statement that I assured Mr. Goldman that I was going to purchase the Santander Loan. Nor is there any truth to the Debtors assertion that the Lender orchestrated an obstruction with Goldman to sabotage any attempt to refinance the Santander Loan and Mezz Loan by providing inflated or inaccurate payoff amounts or refusing to provide payoff amounts to prevent the Debtors from refinancing

28. Furthermore, in paragraph 24 of the Moskovits Declaration, Moskovits asserts that Mr. Goldman's refusal to sign a credit authorization required to extend the maturity date of the Santander Loan, which purportedly resulted in the default of the Santander Loan and its acceleration, was part of a highly coordinated effort between Goldman (and/or his entities) and me to harass and pressure Santander Bank into selling the Santander Loan to me. I deny these baseless accusations. I

had no discussions or agreement with Mr. Goldman to harass and pressure Santander Bank to sell the Santander Loan to me.

### Motion Practice Was Reasonable and Necessary

29. Debtors complain that the Lender's motion practice resulted in an unreasonable amount of attorneys' fees. The motion was practice was necessary as the Mezz Loan matured in June 2018, and the Lender has been trying to get paid on account of its claim. As the Debtors were not progressing in this case, the Lender made objections and motions in these cases that it believed were necessary to protect its rights.

### Threats From Ms. Moskovits

30. Prior to the commencement of the bankruptcy case, I have received several threatening phone calls from Ms. Moskovits that she would use the court system to tie the Lender up in long term litigation and cause as much cost and aggravation should the Lender not acquiesce to her demands of a substantially discounted payoff. As I had read that Ms. Moskovits was very litigious, I believed her – and she did tie up the Lender in these bankruptcy cases, notwithstanding the Lender's offers for a discounted payoff prior to the bankruptcy cases.

### CONCLUSION

31. Based on the above, the Mezz Loan should not be reduced or equitably subordinated based on any alleged improper actions, and the Lender respectfully requests that the Lender Claim be allowed in the full amount and the Objection be denied in its entirety.

I declare under penalty of perjury that the foregoing, in accordance with 28 U.S.C. §1746, is true and correct.

Dated: New York, New York
March 23, 2022

      /s/ Allan Lebovits_____
**Allan Lebovits**