**ROBINSON BROG LEINWAND**
  **GREENE GENOVESE & GLUCK P.C**.
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.: 212-603-6301
Fred B. Ringel, Esq.
Steven B. Eichel, Esq.

<u>Hearing Date:</u>  May 24, 2022 at 10:00 a.m.
<u>Objection Due:</u>  May 17, 2022 at 5:00 p.m.

*Attorneys for 227 Grand Street Mezz Lender LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:

**MY 2011 GRAND LLC,** [1]

                                   Debtors.
-------------------------------------------------------------X

Chapter 11

Case No. 19-23957 (RDD)
Jointly Administered


### MOTION OF 227 GRAND STREET MEZZ LENDER LLC FOR AN ORDER  CONVERTING THE DEBTORS' CASES TO CASES <u>UNDER CHAPTER 7 OF THE BANKRUPTCY CODE</u>

**227 Grand Street Mezz Lender LLC** ("Lender"), a secured creditor and party in

interest, through its counsel**, Robinson Brog Leinwand Greene Genovese & Gluck P.C.**,

submits this motion (the "Motion") seeking the entry of an order (the "Order") under

Sections 105 and 1112(b) of  Chapter 11, Title 11, United States Code 11 U.S.C. Section 101

et seq. (the "Bankruptcy Code") and Rules 1017 and 2002(a)(4) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") converting the above captioned Chapter 11

---

[1]The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: MY 2011 Grand LLC (0415)("Grand") and S&B Monsey LLC (7070) ("Monsey").

cases to cases under Chapter 7 of the Bankruptcy Code. In support of the Motion, the Lender

respectfully represents:

## JURISDICTION

1.        The Court has jurisdiction to consider this matter under 28 U.S.C.§§157 and

1334.  This is a core proceeding under 28 U.S.C. §157(b).  Venue is proper before this Court

under 28 U.S.C. §§1408 and 1409.  The relief requested is based on §1112(b) of the

Bankruptcy Code.

## PRELIMINARY STATEMENT

2.        These bankruptcy cases are almost two-and-one half years old and are stalled

because the Debtors cannot confirm a plan of reorganization.  During this time, the Debtors

(and their principals) have continued to blame everyone but themselves for their failure to

confirm a plan.  The Debtors blamed the obstructive behavior of Mr. Goldman and his

entities (collectively, "Goldman") until they settled their litigations with Goldman's entity

All Year Holdings Limited ("AYHL")[2], then it was the claim of 215 Moore Street Mezzanine

Lender LLC ("Moore Mezz Lender") that prevented confirmation,[3] and most recently, the

Debtors contend that the Lender prevented MY 2011 Grand LLC ("Grand") and S&B

Monsey LLC ("Monsey", together with Grand, the "Debtors") from obtaining the requisite

---

[2]Under the settlement between the Debtors and AYHL, (i) AYHL will be paid $4.7 million, (ii) AYHL shall have no further interest in Grand Living II, LLC ("Grand Living II"), and (iii) AYHL shall accrue additional principal and interest after December 31, 2021 and be given a subordinated lien on the underlying property located at 225-227 Grand Street, Brooklyn, New York ("Property").

[3]At the February 10, 2022 hearing on the objection to the claim of Moore Mezz Lender, Debtors' counsel stated that without the objection to the claim of Moore Mezz Lender and the adversary proceeding with respect to the fraudulent conveyance and equitable marshalling claim, the bankruptcy case will not be successful. (2/10/22 Hearing Transcript, at p. 10:9-14).  Moreover, at the March 31, 2022 hearing, Debtors' counsel stated that "the plan really won't be feasible until we have more clarity on these claims."  3/31/22 Tr. at 5:20-21.

financing, and thus filing and confirming a plan.[4] The Debtors have even blamed a different lender – Bridge City Capital -- in the *In re Seigel Development* bankruptcy cases for their inability to confirm a plan in these bankruptcy cases.[5]

3.      While the Debtors were blaming others for their issues and took an inordinate amount of time to resolve their dispute with AYHL, interest continued to accrue on the claims of the Lender and on the Property's senior lender Madison Realty ("Senior Lender"). Meanwhile, the Debtors' (i) monthly operating reports reflected that the Debtors were not generating revenue during these cases, and (ii) proposed plans of reorganization (with accompanying disclosure statements) were defective because they failed to include: (a) the full amount of the Lender's claim, (b) the full amount of the Moore Mezz Lender Claim and in some proposed plans any amount of the claim,[6] and (c) binding loan commitments evidencing the required financing to confirm the Debtors' proposed joint plans of reorganization. See Fourth Amended Disclosure Statement [Dkt. 172].  In fact, at the February 10, 2022 hearing on approval of the Debtors' Fourth Amended Disclosure Statement, the Court acknowledged that the current version of the plan filed cannot be confirmed. 2/10/22 Tr. at 47:23 ("…but [the plan] fails either way").

4.      The Debtors have also admitted that unless they are able to resolve the Moore Mezz Lender Claim, they cannot confirm a plan of reorganization.[7]  Although there were

---

[4]See Debtors Verified Objection to Claim of 227 Grand Street Mezz Lender LLC, or, in the Alternative, Motion to Equitably Subordinate Claim ("227 Grand Claims Objection") [Dkt. 176].
[5]In the bankruptcy cases of *In re Seigel Development, et al,* Case No. 20-22844 ("RDD") ("Seigel Bankruptcy Cases"), Ms. Moskovits, though her entity Heritage Equity partners, alleged that Bridge City Capital and Fortress Investment Group colluded to ruin the developer's chances at securing financing for the 232 Seigel Street project.  A copy of the article from the Real Deal setting forth this allegation is attached hereto as Exhibit A. See also 227 Grand Claims Objection.
[6]See Amended Joint Disclosure Statement [Dkt. 104].
[7]See footnote 3 *supra.*

settlement communications between the parties, it does not appear that that the claim of the Moore Mezz Lender or Lender will be consensually resolved.  Without the resolution of these claims, the Debtors will be unable to confirm any proposed plan of reorganization.

5.      The Court is now faced with the realization that the only reasonable alternative is to convert these cases to Chapter 7 and let a Chapter 7 trustee implement the Debtors' settlement with AYHL and sell the underlying Property with the sale proceeds to be distributed to pay the Senior Lender and AYHL (pursuant to the Court approved settlement agreement), with the balance of the sale proceeds to be distributed in these cases in accordance with the priority scheme of the Bankruptcy Code.  Otherwise, interest will continue to accrue on the claims of the Senior Lender, AYHL and the Lender, to the detriment of the Debtors' creditors, including the Lender.

6.      Based on the above and as set forth in more detail herein, the Court should grant the Motion and convert these cases to Chapter 7 of the Bankruptcy Code pursuant to Section 1112(b)(4) because:

> a. as a result of the continuing accrual of interest on the claims of the Senior Lender, AYHL, and the Lender, as well as continuing administrative expenses of Debtors' counsel[8], there is a substantial or continuing loss or diminution of the Debtors' estates and an absence of a reasonable likelihood of rehabilitation;

---

[8]The Fourth Amended Disclosure Statement estimates the Debtors' administrative expenses in this case in the approximate amount of $250,000 through confirmation date. See Fourth Amended Disclosure Statement at p. 17, ¶68. Given that (i) the case is almost two- and one-half years old, (ii) the Third Amended Joint Disclosure Statement filed on January 5, 2022 [Dkt. No. 165] estimated the amount of legal fees in the same amount of $250,000 as the Fourth Amended Disclosure Statement, (iii) both of Debtors' counsel have signed many of the pleadings in this case and both attend hearings, (iv) the $250,000 estimation in the Third Amended Disclosure Statement did not include the February 10th hearing, the 227 Grand Claims Objection or their reply or the hearings on the objections to claim, and (v) the Debtors have not yet filed the adversary proceedings that will have to be commenced in order for the Debtors to seek to substantially reduce the claims of the Lender and Moore Mezz Lender, the Lender believes that the amount of the Debtors' legal fees will be substantially higher in these cases, all without a source of funding other than the sale of the Property.  As the Debtors have failed to disclose the actual amount of legal fees incurred each month in their monthly operating reports, it is impossible to know the actual amount of accrued fees and expenses that the Debtors have incurred in this case with two law firms.

b.  the Debtors have been unable to confirm a plan in almost two and one-half years and will be unable to do so within a reasonable time.

c.  the Debtors have failed to timely comply every month with the Court's Order dated June 17, 2020 [Dkt. No. 33] ("June 2020 Order")[9], which required  Debtors to certify to Lender's counsel with respect to previous month (a) payment of service on the mortgage on the Property, and (b) payment or real estate tax obligations due on the Property or funding of the escrow for real estate taxes with the holder of the first mortgage on the Property, as applicable; and

d.  The Debtors failed to timely file many of their required monthly operating reports.

7.      Thus, based on the above and as set forth in more detail herein, the Lender has demonstrated "cause" to convert these cases to cases under Chapter 7 of the Bankruptcy Code, and such conversion is in the best interests of the Debtors' creditors and these estates.

## **BACKGROUND**

8.      The Court is fully familiar with the facts of this case and the Lender will not repeat all of them, but merely highlight those that are relevant to this Motion.

9.      The Debtors commenced these cases under Chapter 11 of the Bankruptcy Code on November 6, 2019 (the "Petition Date") after they were unable to repay the Lender's loan to Grand ("Mezz Loan").  A detailed summary of the background of the Mezz Loan is set forth in the Declaration of Gregory Preis in Opposition to Verified Objection to Claims of 227 Grand Street Lender LLC, or in the Alternative, Motion to Equitably Subordinate Claim, previously filed with this Court on March 24, 2022 ("Preis Declaration") [Dkt. No. 181], which is incorporated herein by reference.

---

[9]The June 2020 Order was in the context of the Court's denial of the Lender's motion to lift the automatic stay under section 362 of the Bankruptcy Code.

10.     The Debtors have filed several joint plans of reorganization with accompanying disclosure statements.  The most recent are the Fourth Amended Joint Plan of Reorganization and Fourth Amended Joint Disclosure Statement, filed on February 7, 2022 [Dkt. No. 172].  At the March 31, 2022 hearing in these cases, the Court asked Debtors' counsel whether a hearing on confirmation of the plan has been scheduled.  Debtors' counsel responded "No, Judge, we have to get the disclosure statement finalized, and then schedule a hearing.  But the plan won't be feasible until we have more clarity on these claims.  So it's a chicken and egg problem now."  3/31/22 Tr. at 5:15-22.  Debtors' counsel received its clarity from the Court, including with respect to post-petition default interest, where the Court stated "[s]o it's an uphill fight I think, unless you can show the thwarting point, to contend that the equities would preclude the Lender from having default interest." 3/31/22 Tr. at 17:8-10.

11.     The Debtors have not commenced an adversary proceeding against the Lender or Mezz Lender and have not filed a Fifth Amended Joint Plan of Reorganization and accompanying disclosure statement.

## RELIEF REQUESTED

12.     By this Motion, the Lender seeks the entry of an order under sections 105 and 1112(b) of the Bankruptcy Code seeking the entry of an order converting these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

## ARGUMENT

13.     The Lender is a secured party and a party in interest and, therefore, "has standing to request the conversion from Chapter 11 to Chapter 7 pursuant to [Section] 1112(b)." *In re Johnston*, 149 B.R. 158, 161 (B.A.P. 9th Cir. 1992). *See In re East Coast Airways, Ltd.,* 146 B.R. 325, 335 (Bankr. E.D.N.Y. 1992) (a creditor with only a disputed

claim against the Chapter 11 estate has standing to bring a motion to convert pursuant to 11

U.S.C. §1112(b)).

14.     Section 1112(b)(1) of the Bankruptcy Code provides for mandatory

conversion or dismissal of a Chapter 11 case to Chapter 7 upon a showing of cause:

> Except as provided in paragraph (2) and subsection (c), on request of
> a party in interest, and after notice and a hearing, the court shall
> convert a case under this chapter to a case under chapter 7 or dismiss
> a case under this chapter, whichever is in the best interests of creditors
> and the estate, for cause unless the court determines that the
> appointment under section 1104(a) of a trustee or an examiner is in
> the best interests of creditors and the estate.

11 U.S.C. §1112(b)(1).

15.     Section 1112(b)(4), in turn, provides a non-exhaustive list of what constitutes

cause. *See In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997) ("It is important

to note that this list is illustrative, not exhaustive."); *In re Ameribuild Construction

Management Inc.,* 399 B.R 129, 130 (Bankr. S.D.N.Y. 2009) (grounds listed in statute are

non-exhaustive); *Carolin Corp.* v. *Miller*, 886 F.2d 693, 699 (4th Cir. 1989) ("The court will

be able to consider other factors as they arise, and to use its equitable powers to reach an

appropriate result in individual cases.") (citation and internal quotation omitted); *In re BH

S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).  "Accordingly, courts have

also determined that conversion or dismissal of a Chapter 11 case is warranted for other

reasons." *In re Babayoff,* 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); see 7 *Collier on

Bankruptcy*, ¶1112.04[4] at 1112-26 (16th ed. 2019) ("The Court may have discretion in

determining what additional circumstances, not enumerated in section 1112(b)(4) constitutes

cause") (citation omitted).

16.     Once the court determines that cause has been shown, it "has no choice, and no discretion, and must dismiss or convert the Chapter 11 case." *Lynch v. Barnard,* 590 B.R. 30, 36 (E.D.N.Y. 2018), *affd sub nom. In re Lynch*, 795 Fed. Appx. 57 (2d Cir. 2020) (internal citations omitted). "Once a party establishes cause, a court must examine whether dismissal or conversion of a case under chapter 7 is in the best interests of the creditors and the estate." *In re BH S&B  Holdings, LLC,* 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).

17.     Therefore, "[t]he Court will apply a two-step analysis in determining whether to dismiss or convert this case. First, it will consider whether "cause" exists for relief under the statute. If it does, the Court will determine whether dismissal or conversion of the case is in the best interest of the creditors and the estate." *In re Kuvykin*, 18-10760 (JLG), 2019 WL 989414, at *5 (Bankr. S.D.N.Y. Feb. 26, 2019) (quotations omitted).

18.     Once "cause" is shown, the burden of proof shifts to the party objecting to the requested relief to either:  "(a) demonstrate that unusual circumstances exist that show that dismissal or conversion unfavorable to the creditors or estate; or (b) establish that a plan will be confirmed and that the act or omission that forms the basis for the aforementioned cause to dismiss or convert will be cured within a reasonable time." *StellarOne Bank* v. *Lakewatch LLC  (In re Park)*, 436 B.R. 811, 815 (Bankr. W.D. Va. 2010) (citation omitted); *see also* 11 U.S.C. §1112(b)(2).

<u>**Cause Exists under Section 1112(b)(4)(A) to Convert the Bankruptcy Cases**</u>

19.     There is cause to dismiss these bankruptcy cases under §1112(b)(4)(A) if there is both (i) substantial or continuing loss to or diminution of the estate and (ii) absence of a reasonable likelihood of rehabilitation. *In re BH S&B Holdings, LLC,* 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) ("Under section 1112(b)(4)(A), cause for conversion or dismissal is

established if there is a 'substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.'") (quoting statute); *See Andover Covered Bridge LLC, 553 B.R. 162, 174-176 (BAP 1st Cir. 2016).* The two prongs for establishing cause to convert under §1112(b)(4)(A) are present here.

(a)    <u>Substantial or Continuing Loss to or Diminution of the Estate</u>

20.    On the first prong, the section refers to either "substantial" or "continuing" in the disjunctive. Accordingly, when discussing whether there is substantial or continuing loss to or diminution of the estate, "[t]here need not be a significant diminution in the estate to satisfy Section 1112(b)[1]."[10] *In re East Coast Airways, Ltd.*, 146 B.R. 325, 336 (Bankr.E.D.N.Y.1992); *In re Kanterman,* 88 B.R. 26, 29 (S.D.N.Y. 1988)("All that need be found is that the estate is suffering some diminution in value."); *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 516 (8th Cir. 2004)("In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow-including that resulting only from administrative expenses - effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of §1112(b)(1)."); *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) ("Obviously, if the debtor has negative cash flow after entry of the order for relief in the chapter 11 case, [the elements of §1112(b)(1) are] satisfied") (citation omitted).

---

[10]Section 1112(b) was redrafted by Congress as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, 119 Stat. 23 (2005)("BAPCA"). *In re Emergystat of Sulligent, Inc.,* No. 07-51394, 2008 WL 597613, at *5 (Bankr. S.D. Tenn. Feb 29, 2008). Section 1112(b)(1) and (2) were revised, and the statutory language was changed from permissive to mandatory. *Id.* Pre-BAPCA, section 1112(b) listed ten illustrative examples of "cause" for a chapter 11 case to be dismissed or converted to chapter 7 liquidation, while BAPCA now sets forth 16 illustrative examples in section 1112(b)(4). *Id. See In re Herb Philipson's Army*, Case No. 18-61376, 2019 WL 11031654 (Bankr. N.D.N.Y. Dec. 19, 2019) ("Following BAPCA's amendment of § 1112(b)(1), once cause has been demonstrated under § 1112(b)(4)(A),. . . the Court must either dismiss or convert a chapter 11 case.").

21.     In determining whether the first prong of this test has been satisfied, the Court "must make a full evaluation of the present condition of the estate…." *In re AdBrite Corp.*, 290 B.R. at 215 (Bankr. S.D.N.Y. 2003) (citation omitted).   "The debtor, however, should not continue in control of the business beyond a point at which reorganization no longer remains realistic." *Id*.  Courts have held that a negative cash flow post-petition and an inability to pay current expenses satisfy the elements of section 1112(b)(4)(A).  *In re Route 202 Corp. t/a Lionti's* Villa, 37 B.R. 367, 374 (Bankr. E.D. Pa. 1984) ("Obviously, if the debtor has negative cash flow after entry of the order for relief in the chapter 11 case, the first two elements of section 1112(b)(1) is satisfied."); *In re Galvin,* 49 B.R. 665, 669 (Bankr. D.N.D. 1985) ("Post-petition negative cash flow is considered by the Courts to be evidence of continuing losses required by section 1112(b)(1)").  In fact, where "[d]ebtor has no income … even a modest increase in liabilities satisfies the first prong." *In re Herb Philipson's Army*, Case No. 18-61376, 2019 WL 11031654, at *6 (Bankr. N.D.N.Y. 2019). Here, the monthly operating reports show that the Debtors have no income; however, liabilities, such as interest and administrative expenses (as set forth below), continue to accrue, thereby satisfying the first prong.

22.     The costs of administering and winding up an estate are factored into the §1112(b)(4)(A) loss analysis.  *See In re Brutsche*, 476 B.R. 298, 305 (Bankr. D.N.M. 2012) ("professional services come at a cost, obviously, which cost needs to be factored in the calculation of gains and losses for the estate. And the hard fact is that these costs are rapidly mounting expenses for the estate that help put the estate in the position of continuing substantial losses"); *In re Gateway Access Sols., Inc.,* 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007) (evidence of "extensive administrative costs from professional fees that [were]

accumulating" supported a finding of "substantial and continuing diminution of the estate").

The Debtor's administrative expenses are allegedly $250,000 through confirmation, but given

the recent litigation, the Lender believes that the amount of the Debtors' administrative

expenses is substantially larger and will continue to increase.  The large administrative costs

incurred by the Debtors is materially reducing the Debtors' estates with no corresponding

income to offset it.

23.     Here, the Debtors hold membership interests in Grand Living II, which owns

Grand Living LLC, which owns the Property.[11]  The operating reports show that the Debtors

have not generated any income during the pendency of these cases.[12]  However, the Debtors

have continually accrued expenses that are not reflected in the monthly operating reports,

such as the interest expense accrued by the Lender and administrative expenses incurred by

Debtors' counsel.[13]  In determining the value of the estates, the Court should also consider

that interest continues to accrue on the loans held by the Senior Lender and on the claim of

AYHL pursuant to the Court approved settlement agreement.  The combination of (i) the

accrual of interest by the Lender, Senior Lender and AYHL and the continuing

administrative expenses by the Debtors' professionals, and (ii) no revenue having been

generated by the Debtors in almost two and one-half years, satisfies the first prong that there

is a substantial or continuing loss to or diminution of the estate.

---

[11]S&B Monsey also holds 100% of the membership interest in S&B Moore.  Prior to the Petition Date, S&B Monsey purportedly transferred its 100% interest in S&B Moore to 215 Moore Street Development LLC ("Development") in violation of loan documents.

[12]The Debtors' monthly operating reports show no income during these entire cases.  To the extent the rental income from the Property exceeded the debt on the senior loan, none of that excess cash flow has been distributed to the Debtors (according to the monthly operating reports).  There has been no accounting as to what happened to those excess proceeds, if any.

[13]By the Debtors reporting on a cash basis in the monthly operating report rather than on an accrual basis, the Debtors avoid showing the ever-increasing monthly accrual of liabilities.

24.    Moreover, on or about June 9, 2020, in opposition to the Lender's initial lift-stay motion, the Debtors filed an appraisal report showing a market value of $46,700,000 as of October 3, 2019 [Dkt. No. 32]. About a year later, on July 8, 2021, the Debtors filed a response to a subsequent lift-stay motion filed by the Lender.  In connection with that response, Debtors filed an appraisal with a market value of the Property in the amount of $42,400,00 [Dkt. No. 101].  Based on the Debtors' own appraisals, the value of the Property has decreased.

25.    Thus, based on all of the above, the Lender has satisfied the first prong.

**(b)    There is No Reasonable Likelihood of Rehabilitation**

26.    The second part of §1112(b)(4)(A) -- absence of any reasonable likelihood of rehabilitation -- also is easily satisfied because the Debtors' rehabilitation has not been demonstrated, and most likely impossible at this point.

27.    The concept of rehabilitation under §1112(b)(4)(A) has been interpreted as follows:

> Rehabilitation of the debtor's estate, as that term is used in §1112(b)(1), is not synonymous with reorganization as that term is used in Chapter 11. *Collier on Bankruptcy* explains the distinction between the terms:
>
> "Rehabilitate" has been defined to mean "to put back in good condition; re-establish on a firm, sound basis." Rehabilitation, as used in section 1112(b)(1), does not mean the same thing as reorganization, as such term is used in chapter 11. Since a debtor can be liquidated in chapter 11, the ability to confirm a plan of reorganization is considerably different than reaching a firm, sound financial base.
>
> *Collier on Bankruptcy*, ¶1112.03[i], p. 1112-15 (footnotes omitted). The distinction is significant. Rehabilitation of a debtor's estate implies the re-establishment of a sound financial basis, a concept which necessarily involves establishing a cash flow from which current obligations can be met. Reorganization, on the other hand, can involve simple liquidation and distribution of assets.

*In re Kanterman,* 88 B.R. 26, 29 (S.D.N.Y. 1988). *See In re Rundlett*, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992) ("[r]ehabilitation does not mean the same thing as reorganization for purposes of Chapter 11 because a reorganization may include a complete liquidation"); *In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003) (rehabilitation "signifies that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met"); *In re Herb Philipson's Army*, 18-61376 (DD), 2019 WL 11031654, at *7 (Bankr. N.D.N.Y. Dec. 19, 2019) ("rehabilitation is a different and much more demanding standard than reorganization").

28.     The Debtors cannot "re-establish a sound financial basis" because the Debtors generate no income and there is insufficient value in the Property that would allow them to refinance the Property and confirm a plan, even if they had binding loan commitments to repay their obligations (which they don't appear to have).  The Court stated at the February 10th hearing that the Debtors' proposed plan does not work.[14]  Moreover, the two term sheets that were attached to the Fourth Amended Joint Disclosure Statement demonstrate that the Debtors do not have the necessary funding to confirm a plan.  The first term sheet attached to the Fourth Amended Disclosure Statement, dated August 27, 2021 ("SKW Term Sheet") is from SKW Funding, LLC ("SKW").  It provides that it is not a loan commitment and does not impose any obligations on behalf of the Lender.  The SKW Term Sheet provides that the loan is the lesser of (a) $32,600,000, (b) 6.5% of Debt Yield (which can't be calculated based on information provided) and (c) 80% of loan to value.  Assuming the value of the Property

---

[14] See paragraph 3, *supra.*

is $42,000,000 (based on paragraph 11 of the Fourth Amended Joint Disclosure Statement),
the maximum amount of the loan is $32,600,000.

29.    The second term sheet ("SME Term Sheet") is from SME Capital Ventures
("SME").  The SME loan would be $5 million or a maximum debt exposure of up to $37
million; however, the loan had to have closed by January 31, 2022 (which did not happen)
and a $45,000 deposit had to be given by January 15, 2022.[15]  Thus, it appears that the
proposed SME loan is no longer valid because, at a minimum, the transaction did not close
by January 31, 2022.

30.    Based on the Fourth Amended Disclosure Statement, the mortgage on the
Property was approximately $18,325,000 (although it is unknown as of what date this
calculation was made and the amount of interest that accrues each month with respect to the
mortgage).  According to the AYHL Settlement Order (summarized in the Fourth Amended
Joint Disclosure Statement), Grand Living shall pay $4.7 million to AYHL, interest on the
$4.7 million will accrue after December 31, 2021 at 12% per annum and the principal
amount of the payment owed will increase by $10,000 per month (with a $1.3 million cap).
Thus, as of March 31, 2020, there is an additional $141,000[16] in interest and $30,000 in
additional principal, thereby increasing the AYHL claim to $4,871,000.  Furthermore, in
connection with the Debtors' objection to claims of the Lender, the Lender submitted a pay-
off statement showing the pay-off amount of $15,073,199.55.  From that amount, if the claim
is reduced by the pre-petition and post-petition late fees (based on the Court's preliminary
views at the March 31, 2022 hearing), the claim is reduced to $14,375,873.70 as of March

---

[15]The Lender does not know whether the $45,000 deposit was made.
[16]The $141,000 is calculated by multiplying $4.7 million by 12% per annum by 3 months.

31st. Thus, the claims of the Senior Lender, AYHL and the Lender total at least $37,571,873[17] (excluding attorneys' fees for March 2022), which exceeds the maximum amount of the Debtors' proposed financing (even if the terms sheet were binding commitments which they are not). Also, the refinancing does not consider the claim of Moore Mezz Lender, which is in excess of $26 million[18]. The proposed refinancing also does not cover the Debtors' administrative expenses. Thus, the Debtors will be unable to refinance their debt and meet their obligations. Here, the Debtors have no hard assets, no operations, no employees (based on their reporting no expenses in the monthly operating reports), and there is no ongoing business to rehabilitate. Thus, they are lacking a reasonable likelihood of rehabilitation. *In re Briggs-Cockerham, L.L.C.,* 10-34222-BJH-11, 2010 WL 4866874, at *5 (Bankr. N.D. Tex. Nov. 23, 2010) (holding that a debtor that had "no `hard' assets, no operations, no employees, and no ongoing business to rehabilitate" lacked reasonable likelihood of rehabilitation); *In re Bay Area Material Handling, Inc.,* 76 F.3d 384 (9th Cir. 1996) (the debtor's "lack of operations, income, inventory, and employees, and its liquidation of assets all indicated 'continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation.'"). *In re AdBrite Corp.,* 290 B.R. 209, 217-219 (Bankr. S.D.N.Y. 2003) (holding that cause existed to convert the Chapter 11 case filed by the debtor with no business, no employees, and who owned a single asset and had a negative cash flow post-petition).

---

[17]The $37,571,873 is comprised of (i) the $18,325,000 senior loan, (ii) the $4,871,000 AYHL claim and (iii) $14,375,873 Lender claim. This total increases every month.
[18]See Declaration of Gregory Preis in Support of Response of 215 Moore Street Mezzanine Lender LLC to Debtors' Verified Objection to Claim of 215 Moore Street Mezzanine Lender LLC, or Alternatively, Motion to Compel Equitable Marshalling at ¶3 and Exhibit A thereto [Dkt. No. 157].

31.    Here, the Debtors have no reasonable likelihood of rehabilitation because they cannot pay all the claims asserted against the Debtors as they have been unable to reach a consensual resolution with the Lender and Moore Mezz Lender, and as a result, they cannot propose a refinancing plan that will enable them to retain an equity interest in the Debtors, which own Grand Living II, which owns Grand Living, which owns the Property.

32.    Here, the accrual of interest and expense coupled with the Debtors' performance so far in this case, including, but not limited to, failing to (i) abide by a court order, (ii) obtain requisite financing to confirm a plan, (iii) file plans of reorganization without including the full amount of all claims in it, (iv) amend Monsey's schedules to acknowledge the improper transfer of S&B Monsey's interest in S&B Moore to Development, and (v) include the Moore Mezz Lender claim in Monsey's schedules, does not give the Lender the confidence that any rehabilitative effort will be forthcoming.  The Debtors' current financial picture is bleak and illustrates that rehabilitation is unlikely.  There is no realistic prospect of rehabilitating the Debtors' business (which is just holding membership interests) and returning it to profitability within a reasonable period of time. Without such a showing, there is no likelihood of rehabilitation within the meaning of Section 1112.

33.    It is clear to the Lender that there is no realistic prospect of rehabilitating the Debtors' business and returning it to profitability within a reasonable period of time and that these Debtors are not capable of reorganizing.  Conversion is necessary if the secured and unsecured creditors are to have the chance the Bankruptcy Code provides to them for a recovery on their claims.

**Cause Exists to Convert These Cases Because Debtors Have Been
Unable To Confirm A Plan In Almost Two and One-Half Years
And Will Be Unable To Do So Within A Reasonable Time**

34.     As set forth in paragraph 15 above, cause is not limited to the enumerated

items in Section 1112(b)(4).  Here, the Debtors have been in bankruptcy for over two and

one-half years and are finally addressing claims of the Lender and Moore Mezz Lender that

were filed in August 2020 – more than one and one-half years ago.  The proposed plans of

reorganization filed by the Debtors were not confirmable on their face for the reasons set

forth in the various objections to the various disclosure statements,[19] including failing to

include the full and amount of all claims and attaching evidence of binding committed loan

financing, and for the reasons set forth herein.  Even as recent as February 16, 2022, Lender's

counsel sent an email to Debtors' counsel asking whether they had binding loan

commitments to demonstrate that they have financing at confirmation.  Debtors ignored the

request, and have provided no information to Lender's counsel, thereby demonstrating that

they do not have the requisite unexpired binding financing to confirm a plan.  A copy of the

email from Lender's counsel to Debtors' counsel is attached as Exhibit A to the Declaration

of Steven Eichel ("Eichel Declaration").

35.     As (i) the case is almost two and one-half years old, (ii) the Debtors do not

have the financial ability to confirm a plan and thus are unable to do so, and (iii) the Debtors

are required to commence adversary proceedings to seek to substantially reduce the claims of

the Lender and Moore Mezz Lender (which adversary proceedings have not been filed yet),

the Debtors will be unable to confirm a plan within a reasonable time, especially given their

requirement to sell the Property under their settlement agreement with AYHL. Thus, cause

exists to convert these cases to Chapter 7 so that a trustee can enforce the AYHL settlement and sell the underlying Property for the benefit of the Secured Lender, AYHL, the Lender and the Debtors' unsecured creditors.

### There Is Cause To Convert The Case Under Section 1112(b)(4)(E) For Failure To Comply With A Court Order

36.     Section 1112(b)(4)(E) provides that a debtor's failure to comply with an order of the court "is cause to convert or dismiss a Chapter 11 case". 11 U.S.C. §1112(b)(4)(E) "[C]ompliance with court orders is a fundamental obligation of any party." *In re Babayoff,* 445 B.R. at 80. "Section 1112(b)(4)(E) does not require that the debtor's failure be willful or the product of bad faith or fraud." *Id.*

37.     Here, the Debtors failed to comply each month with the June 2020 Order, which required Debtors to notify Lender's counsel with respect to the previous month (a) payment of debt service on the mortgage on the Property, and (b) payment of real estate tax obligations due on the Property or funding of the escrow for real estate taxes with the holder of the first mortgage on the Property, as applicable. Debtors provided evidence periodically, but not every month. In fact, on February 7, 2022, Lender's counsel requested certification for the period from June 2021 to January 2022, which Debtors' counsel sent to Lender's counsel a few days later. If not requested by Lender's counsel, counsel would likely not have received the information, as demonstrated by the fact that no certification has been sent by Debtors' counsel to Lender's counsel for February 2022 and March 2022. The Debtors had a continuing obligation to comply with the June 2020 Order every month, which they failed to comply with. This factor establishes cause to convert these cases.

---

[19]See Lender's Objection to disclosure statements at docket number 68, 119 and 159.

**Cause Exists To Convert These Cases From Chapter 11 To
Chapter 7 Because Debtors Have Failed To Timely File A
<u>Significant Number of Monthly Operating Reports</u>**

38.    Section 1112(b)(4)(F) of the Bankruptcy Code provides that "cause" to dismiss or convert a Chapter 11 case includes the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter."  11 U.S.C. §1112(b)(4)(F).  The U.S. Trustee Operating Guidelines requires that monthly operating reports are to be filed by the 20th day of the month following the reporting period, except that operating reports for the Southern District of New York are due on the 15th of the month.

39.    "Monthly reports and the financial disclosures contained within them 'are the life blood of the Chapter 11 process' and are more than 'mere busy work.'"  *In re Whetten,* 473 B.R. 380, 383 (Bankr. D. Colo. 2012).  "The reporting requirements provide the primary means for monitoring the debtor's compliance with the Code's requirements and they serve as a litmus test for a debtor's ability to reorganize."  *Id. at 384.*  Non-compliance is not a "mere technicality."  *<u>Id.</u>*  "Habitual non-compliance…calls into question a debtor's ability to effectively reorganize.  *Id.* (citations omitted).  In *Whetten*, the court held that the debtor's persistent failure to file the periodic complete and accurate operating reports and summaries required of Chapter 11 debtors constituted cause to dismiss or convert under 11 U.S.C. §1112(b)(4)(F).  *Id. at 383.* The *Whetten* Court noted that "[t]he late filing of catch-up monthly reports does not "satisfactorily explain or excuse failure to satisfy [a debtor's] duties as a chapter 11 debtor." *Id.* "Filing catch-up reports is akin to locking the barn doors after the horses have already gotten out." *Id.*

40.    Similarly, in *In re Babayoff,* 445 B.R. 64, 81 (Bankr. E.D.N.Y. 2011), the Court found cause to convert or dismiss under 1112(b)(4)(F) where, among other things, the debtor failed to file monthly operating reports with the court or filed them in a single batch, weeks or months late. *Id. at 81.*

41.    Here, the Debtors have been both deficient in timely filing operating reports and have also filed numerous catch-up reports at one time in order to try to cover up their breach of the requirements to file monthly operating reports.  Although the case was filed on November 6, 2019, no operating report was originally filed for November 2019, and the first operating report was filed in this case seven (7) months after the case was commenced, on June 3, 2020 for the period December 2019 [Dkt. No. 23].  That operating report contained almost no information.

42.    On the same day, the Debtors filed catch-up monthly operating reports for January 2020 through May 2020 [See Dkt. Nos. 23 through 28].  Some of these reports were only one page and merely provided that there were no receipts and no disbursements.  It was not until August 10, 2020 that the Debtors filed Amended Operating Reports for November through May 2020 [Dkt. Nos. 45-52].  On the same date, Debtors filed the operating report for June 2020.  All of these operating reports were not timely filed.

43.    On October 13, 2020, the Debtors filed the operating report for July and August 2020 [See Dkt. Nos. 64 and 65].  Eleven months after the commencement of these cases, the Debtors failed to file one timely operating report, and the operating reports contained *di minimis* information.

44.    On the same day, the first timely operating report was filed for the month ending September 2020 [Dkt No. 66].

45.     For the next three and one-half months, the Debtors again failed to file operating reports.  On February 4, 2021, the Debtors filed monthly operating reports for the period October 2020 through December 2020 [Dkt. Nos. 80-85].  Again, these operating reports were not timely, did not provide for accrued liabilities and were filed in batches.

46.     On March 15, 2021, the Debtors filed the January 2021 operating report [Dkt. Nos. 89].  This report was not timely filed.  As of April 4, 2022, the last operating report filed on the docket was for the period ending January 31, 2022.  This operating report (like the Debtors' other operating reports) merely shows that the Debtors had no income and expenses, because the report is filed on a cash basis.  Moreover, the bank statements and/or bank reconciliations for the reporting period in the operating reports are purposely blurred without an order allowing the Debtors to file the bank statements under seal. There is no explanation why the substance of the bank statements are concealed without a court order. All of the operating reports have one thing in common – they provide no real information about the Debtors' accrued expenses in the Chapter 11 cases.  For the reasons set forth in *Whetten* and *Babayoff*, the Debtors failure to file timely monthly operating reports and the filing of operating reports in batches is cause to convert these cases to cases under Chapter 7.

47.     Based on the above, the Debtors have demonstrated cause to convert the Chapter 11 cases to cases under Chapter 7 for each reason independently, and for all the reasons collectively.

### **Lender Has Established Cause and Court Should Convert these Cases to Chapter 7**

48.     "Once a party establishes cause, a court must examine whether dismissal or conversion of a case under chapter 7 is in the interests of the creditors and the estate." *BH S&B Holdings, LLC,* 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (citing 7 *Collier on*

*Bankruptcy* ¶1112.04[6] 16th ed 2009).  The *BH S&B* Court stated: "[c]ourts have looked to

multiple factors to determine which action better serves the interests of creditors and the

estate.  Collier identifies ten such factors:"

    a.  Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.

    b.  Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.

    c.  Whether the debtor would simply file a further case upon dismissal.

    d.  The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors.

    e.  In assessing the interest of the estate, whether conversion or dismissal would maximize the estate's value as an economic enterprise.

    f.  Whether any remaining issues would be better resolved outside the bankruptcy forum.

    g.  Whether the estate consists of a "single asset."

    h.  Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

    i.  Whether a plan has been confirmed and whether any property remains in the estate to be administered.

    j.  Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*Id*. at 346-37.

    49.    Based on the above factors, conversion, and not dismissal, is in the best

interests of the Debtors' estates.  If the cases are converted:

    a.  the chapter 7 trustee would  be able to reach assets for the benefit of Debtors'[20] creditors by enforcing the Debtors' court approved settlement with AYHL and sell

---

[20]Grand's sole asset is its 100% membership interest in Grand Living II.  Monsey has two assets: its membership interest in Grand Living II and S&B Moore. S&B Monsey also engaged in prepetition misconduct by transferring

the Property with payments to be made to the Senior Lender, AYHL, and the Debtors' creditors (including the Lender) in the order of priority under the Bankruptcy Code;

b.  the distribution by the trustee in section above would maximize the  estates' value for the benefit of creditors; and

c.  the Senior Lender, AYHL, the Lender and the unsecured creditors would receive a distribution in the order of priority under the Bankruptcy Code;

50.    In contrast, if the cases are dismissed:

a.  creditors would not receive a distribution;

b.  the Lender would be forced to spend more money to notice and conduct a UCC sale to enforce its rights (which would likely lead to another Chapter 11 filing by the Debtors);

c.  the Debtors would likely just refile a bankruptcy case after a new UCC sale is noticed, with the result of (i) more delay by the Debtors further preventing the Lender from getting paid on its Mezz Loan that matured in 2018, and (ii) perhaps allowing the Debtors to commence litigation that they are currently barred from bringing under section 546 of the Bankruptcy Code against the Moore Mezz Lender;

d.  the Debtors' settlement with AYHL would be breached as the underlying Property would not be sold in accordance with this Court's prior order;

e.  the Court's time over the last two- and one-half years along with significant time and money incurred by the Lender and Mezz Lender would be wasted;

f.  the administrative creditors may not be paid;

g.  Debtors would likely try to relitigate issues decided by this Court either in a subsequent state court litigation or in a new bankruptcy filing;

h.  the Debtors' prepetition violation of the loan documents with Moore Mezz Lender and any other potential self-dealing by and among the Debtors, principals or affiliates would not be examined; and

i.  the Debtors would be rewarded for not complying with their obligations to file timely substantive monthly operating reports and for not being able to confirm a

---

Moore's interest in the underlying property to Development without consent of the Moore Mezz Lender and in violation of the loan documents.

case by causing the Debtors' creditors to continue to chase the Debtors for payment that is long overdue.

51.    Accordingly, conversion, and not dismissal, is in the best interest of the Debtors' creditors and their estates.  However, in the event that the Court dismisses these cases, the dismissal order should include a provision that the Debtors are not allowed to file a bankruptcy petition for two years or be the subject of an involuntary petition.  Otherwise, the Debtors failure to finance this case allows them to start over with a new case, further delay the Lender and perhaps commence actions that they are currently foreclosed upon from commencing under section 546 of the Bankruptcy Code.

## The "Unusual Circumstances" Exception Does Not Apply

52.    Section 1112(b)(1) provides for two exceptions to the mandatory conversion of the chapter 11 case to chapter 7 or dismissal for cause.

53.    First, Section 1112(b)(2) provides that:

> The court may not convert [or dismiss the chapter 11 case] if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)— (i) for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court.

1112(b)(2).  See *In re BH S & B Holdings, LLC,* 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) (quoting statute).

54.    Second, Section 1112(c) provides that the court may not convert the Chapter 11 case to Chapter 7 "if the debtor is a farmer or a corporation that is not a moneyed,

business, or commercial corporation, unless the debtor requests such conversion." 11 U.S.C.

¶1112(c). The Debtors are neither a farmer nor a non-commercial venture; accordingly, this

exception is inapplicable.

55.    Because "cause" for conversion exists under Section 1112(b)(4)(A)

[substantial or continuing loss to or diminution of the estate], as per the language of the

statute, the Section 1112(b)(2) "unusual circumstances" exception simply does not apply.

See *In re Herb Philipson's Army*, at *7 n. 6 (Bankr. N.D.N.Y. Dec. 19, 2019)); *In re Andover

Covered Bridge, LLC,* 553 B.R. 162, 177 (BAP 1st Cir. 2016); *In re Burgess*, No. 11-1257,

2013 WL 5874616, at *3 (Bankr. N.D.W. Va. October 30, 2013). To the extent the Court

finds cause on different grounds, no unusual circumstances exist here that would establish

that converting the case is not in the best interests of creditors and the estate.

## CONCLUSION

56.    Here, cause exists to convert the Debtors' Chapter 11 Cases to Chapter 7

because:

> a.   as a result of the continuing accrual of interest on the claims of the
> Senior Lender, AYHL, and the Lender, as well as continuing
> administrative expenses of Debtors' counsel, there is a substantial or
> continuing loss or diminution of the Debtors' estates and an absence of
> a reasonable likelihood of rehabilitation;
>
> b.   the Debtors have been unable to confirm a plan in almost two and
> one-half years and will be unable to do so within a reasonable time.
>
> c.   the Debtors have failed to timely comply every month with the
> Court's Order dated June 17, 2020 [Dkt. No. 33] ("June 2020
> Order")[21], which required  Debtors to certify to Lender's counsel with
> respect to previous month (a) payment of service on the mortgage on
> the Property, and (b) payment or real estate tax obligations due on the

---

[21]The June 2020 Order was in the context of the Court's denial of the Lender's motion to lift the automatic stay
under section 362 of the Bankruptcy Code.

Property or funding of the escrow for real estate taxes with the holder
of the first mortgage on the Property, as applicable; and

d.   the Debtors failed to timely file many of their required monthly
operating reports; and

**WHEREFORE**, the Lender respectfully requests (a) entry of the Order converting

the Debtors' Chapter 11 cases to cases under Chapter 7; and (b) such other and further relief

as the Court deems just and proper.

**DATED:**  New York, New York
April 11, 2022

> **ROBINSON BROG LEINWAND GREENE
> GENOVESE & GLUCK P.C.**
> *Attorneys for 227 Grand Street Mezz Lender LLC*
>
> By: /s/ Fred B. Ringel
>       Fred B. Ringel
>       Steven B. Eichel
> 875 Third Avenue, 9th Floor
> New York, NY 10022
> Tel. No.:  (212) 603-6301

# **EXHIBIT A**



# Heritage suing lender over planned Bushwick Hotel

*Developer claims predatory practices by Fortress Investment Group Social: The developer claims Fortress Investment Group engaged in predatory practices*

New York                                            March 22, 2022 11:40 AM

TRD Staff



*Heritage Equity Partner's Toby Moskovits (Heritage Equity Partners, iStock)*

Toby Moskovits' Heritage Equity Partners is taking aim at its lender behind the planned Bushwick Hotel, alleging predatory practices spiked the development.

The developer filed a lawsuit against Fortress Investment Group, alleging it colluded with Heritage's original mortgage lender to ruin its chances at securing the financing for the project, Crain's reported. Bridge City Capital is the original mortgage lender for the site at 232 Seigel Street.

The lawsuit alleged Fortress and Bridge City colluded to deny the construction loan and force Heritage into default so the former could seize the development site. Fortress also owns the loan behind the adjacent 215 Moore Street, another site owned by Heritage.

Heritage alleged it tried to sell the proposed hotel site to satisfy its mortgage, only to be sabotaged by Bridge City, according to Crain's. Bridge City instead sold the loans to Fortress, allegedly encouraging buyers to get the site from Fortress at a cheaper cost.

Fortress purchased the hotel site loan in December 2019, according to Crain's, It proceeded to hold Heritage in default for failing to complete construction and filed to foreclose

(https://therealdeal.com/2021/06/02/fortress-files-to-foreclose-on-toby-moskovits-bushwick-hotel-site/) on the property in June.

## Read more

- Toby Moskovits pitches Bronx project rescue, financed by [redacted]
- Fortress files to foreclose on Toby Moskovits' Bushwick hotel site
  (https://therealdeal.com/2021/06/02/fortress-files-to-foreclose-on-toby-moskovits-bushwick-hotel-site/)
- Creditors are banging on Toby Moskovits' door    (https://therealdeal.com/2020/03/06/creditors-are-banging-on-toby-moskovits-door/)

The two properties are part of Heritage's Bushwick Generator development, which includes creative and tech offices. Numerous legal disputes   (https://therealdeal.com/2020/03/06/creditors-are-banging-on-toby-moskovits-door/) have roiled progress at the complex, as Moskovits has previously accused its lenders of predatory practices.

In the summer of 2020, a judge allowed for the appointment of a receiver for the Moore Street property. One month later, the Seigel Street property filed for Chapter 11 bankruptcy protection after a prospective buyer failed to close on a deal due to the pandemic.

Moskovits and Michael Lichtenstein have been scrambling to save   (https://therealdeal.com/2021/12/08/toby-moskovits-pitches-bronx-project-rescue-financed-by-redacted/) a residential development in the Bronx at 286 Rider Avenue. Late last year, the partners claimed they secured up to $14 million to pull the property out of bankruptcy. Key details, however, such as the investor's name, firm, previous investments in Heritage projects and contact information were redacted.

[Crain's   (https://www.crainsnewyork.com/commercial-real-estate/facing-bankruptcy-heritage-sues-lender-over-bushwick-hotel-site) ] — *Holden Walter-Warner*

Contact Holden Walter-Warner