Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                  Chapter 11

      MY 2011 GRAND LLC[1]                    Case no.  19-23957 (RDD)
                               Jointly Administered
                      Debtors.

--------------------------------------------------------x

## FIFTH AMENDED JOINT DISCLOSURE STATEMENT

       **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

       **THIS AMENDED DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CREDITORS AND PARTIES IN INTEREST OF MY 2011 GRAND LLC AND S&B MONSEY LLC, (EACH A DEBTOR, AND COLLECTIVELY, THE "DEBTORS").**

       **THIS AMENDED DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT CREDITORS' DECISIONS TO ACCEPT OR REJECT THE AMENDED PLAN OF REORGANIZATION, A COPY OF WHICH IS ANNEXED HERETO AS EXHIBIT A.**

       **ALL CREDITORS ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY.  ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS CONTAINED IN THE AMENDED PLAN OF REORGANIZATION.**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070)

## **<u>INTRODUCTION</u>**

1.      MY 2011 GRAND LLC ("MY 2011") and S&B MONSEY LLC,

("Monsey") (each a "Debtor," and collectively, the "Debtors") submit this joint amended

disclosure statement ("Disclosure Statement") in connection with their joint amended plan of

reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the

Plan is attached hereto as Exhibit A.  All Creditors are urged to review the Plan, in addition to

reviewing this Disclosure Statement.  All capitalized terms used but not defined shall have the

meaning set forth in the Plan.

2.      This Disclosure Statement is not intended to replace a review and analysis

of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the Plan.  To the

extent a Creditor has questions, the Debtors urge you to contact Debtors' counsel, Mark Frankel,

Esq., at 212.593.1100 or mfrankel@bfklaw.com and every effort will be made to assist you.

3.      On _____, 2022, after notice and a hearing, the

Bankruptcy Court entered an order approving this Disclosure Statement as containing

information of a kind and in sufficient detail, as far as is reasonably practicable in light of the

nature and history of the Debtors and the condition of the Debtors' books and records, to enable

Creditors whose votes are being solicited to make an informed judgment whether to accept or

reject the Plan.

4.      EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO

REPRESENTATIONS CONCERNING THE DEBTORS, THEIR ASSETS, THEIR PAST OR

FUTURE OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH

REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH

RESPECT TO THE PLAN.

5.       THE INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT HAS BEEN SUPPLIED BY THE DEBTORS.  THE DEBTORS' BOOKS AND

RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE

DEBTORS' FINANCIAL CONDITION AS SET FORTH IN THE DISCLOSURE

STATEMENT.  BASED UPON THE INFORMATION MADE AVAILABLE, DEBTORS'

COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION

DISCLOSED HEREIN IS INACCURATE.  NEITHER THE DEBTORS NOR DEBTORS'

COUNSEL, HOWEVER, IS ABLE TO STATE DEFINITIVELY THAT THERE IS NO

INACCURACY HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE

INFORMATION CONTAINED HEREIN INACCURATE.

6.       After reviewing this Disclosure Statement indicate your vote to accept or

to reject the Plan on the enclosed ballot, and return the ballot to counsel for the Debtors to be

received by _____, 2022.

7.       The Bankruptcy Court has entered an Order fixing

_____, 2022, at _____ a.m., at the United States Bankruptcy Court,

300 Quarropas Street, White Plains, NY 10601−5008, as the date, time and place for the

Zoom.Gov hearing on confirmation of the Plan and fixing _____, 2022, as

the last date for the filing and serving of any objections to confirmation of the Plan.  A copy of

any objection to confirmation of the Plan must be filed with the Court, served on Debtors'

counsel and delivered to Judge Robert D. Drain's chambers at the United States Bankruptcy

Court, 300 Quarropas Street, White Plains, NY 10601−5008 on or before such date.

## BACKGROUND

8.      On November 6, 2019, each Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

9.      My2011 owns a 31.75% membership interest in Grand Living LLC II. Monsey owns a 33% membership interest in Grand Living LLC II.  All Year Holdings Limited ("All Year"), an entity that was controlled by Yoel Goldman ("Goldman") on the Petition Date, holds the remaining 35.25% membership interest in Grand Living LLC II.  Grand Living LLC II is the sole member of Grand Living LLC ("Grand Living").  Grand Living owns the real property at 227 Grand Street, Brooklyn, New York 11211 ("Property"), pictured below:



10.     227 Grand Street Mezz Lender LLC ("Mezz Lender") asserted a joint and several claim in the amount of $15,076,200 as of March 31, 2022 against the Debtors secured by their respective membership interests (the "Membership Interests") in Grand Living LLC II ("Mezz Loan").  The Debtors vigorously disputed the Mezz Lender's claim.  The Debtors asserted that the principal amount of the loan was in the amount of $7.2 million.  $1.5 million (or 20.8%) of the Mezz Loan was advanced by a family member of the one of the Debtors' principals.  By agreement between the Debtors and the Estate of Abraham Schwarzman, a copy of which is annexed to the Plan as Exhibit A, subject to Plan Confirmation, the Estate has agreed to subordinate to the other Mezz Lender participants, and waive payment of its 20.8% interest.

11.     Based on a February 18, 2021 appraisal, the Debtors estimate that the value of the Property is $42 million.  The Property mortgage is currently approximately $18,920,000 ("Property Mortgage").  The net equity in the Property is approximately $23,080,000.  MY2011's 31.75% share of the net equity has a $7,327,900 value.  Monsey's 33% share has a $7,616,400 value for a total value of $14,944,300.

12.     The Mezz Loans came due, but the Debtors could not agree with Mr. Goldman, who controlled All Year's 35.25% membership interest, on refinancing or on a buy-out.  The Debtors nonetheless found hard money financing, but the deal needed a few days more to close.  The Mezz Lender had scheduled a UCC sale of the Debtors' interests and was unwilling to adjourn the sale to enable the Debtors to obtain new financing.

13.     The Debtors, therefore, filed these cases to buy time to obtain such financing.  Initially in these cases, the Debtors moved to dismiss and close on the deal essentially as contemplated before the case was filed.  The Debtors, however, did not proceed because the

4

Mezz Lender and or Debtors' partners in the deal made last minute demands that soured the deal. The Debtors do not own 100% of the interests. It has been hard to get all of the members and the Mezz Lender in agreement, together with financing, at the same time. The Debtors asserted that the Mezz Lender had been particularly obstructive. The Debtors asserted that it broadcasted to the market that its goal is to take over ownership of the building. The Debtors asserted that this chilled efforts to refinance.

14. The original plan to exit bankruptcy was to refinance the Mezz Loan. For some time, the Debtors had a lender committed with a term sheet to refinance Mezz Loan. Part of the delay in effectuating that refinance was that the loan is contingent upon a corresponding refinancing or extension of the Property Mortgage which matured by its terms.

15. The Property Mortgage lender was ready to extend the loan and send extension documents that would have extended the loan and enabled an exit from bankruptcy but due to the unreasonable refusal of Goldman to provide the information that the Property Mortgage Lender needed for the extension, the Property Mortgage loan went into default. Due to COVID-19 and lack of cooperation by Goldman who refused to provide financial information and sign an extension of his personal guaranty, the refinancing lenders became uncomfortable and refused to refinance the Mezz Loan or the Property Mortgage. As a result of the breakdown in financing, the Debtors advised the Court that it could not move forward with confirmation of the original plan.

16. In light of the acrimony between the partners, including pre-petition litigation and the obstructive conduct of Goldman, it became clear to the Debtors, as the majority in interest equity holders of Grand Living, that there would be no ability to reorganize and

5

emerge from the bankruptcy if Goldman, through All Year Holdings Ltd. ("AYHL"), remained an equity owner of Grand Living.  Accordingly, on September 22, 2020, the majority in interest implemented a freeze-out merger (the "Merger"), as is their right under New York law and invoking the broad dispute resolution of this Court. Conducting the Merger was the only way to save the Debtors, Grand Living, their creditors and the Property from financial ruin, not only because of Goldman's most recent intentional misconduct with respect to the Loan extension, but also based on his past misconduct in looting money and obstructing the operation of the business.

17.    Under New York law, the freezeout merger process permits majority holders in an entity to cash out a minority shareholder.  The minority shareholder's recourse is to challenge the proposed merger consideration in a judicial valuation proceeding.

18.    On October 14, 2020, Goldman and AYHL filed a motion objecting to the use of the Debtors' equity interests to effect the Merger without Bankruptcy Court approval under Section 363 of the Bankruptcy Code and for relief from the automatic stay to continue with the Pre-Petition Litigation (the "363/Stay Relief Motion") [ECF No. 67].

19.    On October 2, 2020, well after the commencement of the Bankruptcy Cases, Goldman and AYHL commenced an action in the Supreme Court of the State of New York, Kings County, against certain non-debtors, captioned *Yoel Goldman and All Year Holdings Limited v. Grand Living II, LLC, GL Merger Partner, LLC, Yechiel Michael Lichtenstein and Moshe Doc Schweid*, Index No. 518781/2020 (the "2020 Action").  Plaintiffs in the 2020 Action sought declaratory relief that the merger lacked authorization and was null and void *ab initio*, and damages of not less than $15 million.  In apparent recognition that the 2020

6

Action violated the automatic stay and required the Debtors as parties, Claimants sought relief from the automatic stay to add the Debtors as defendants in the 2020 Action.

20.     On November 30, 2020, the Debtors filed a Response in Opposition to the 363/Stay Relief Motion (the "Response to 363/Stay Relief Motion") [ECF No. 74].

21.     On December 7, 2020, the Court denied the 363/Stay Relief Motion. Thereafter, on January 11, 2021, the Debtors filed an adversary proceeding against Claimants, seeking (i) declaratory relief that that the freezeout merger is authorized and appropriate, and (ii) a determination by this Court as to the appropriate monetary consideration for the merger (the "Adversary Proceeding").

22.     Then, on February 9, 2021, despite the commencement of the Adversary Proceeding seeking identical relief in this Court, the Claimants commenced yet another action in the Supreme Court of the State of New York, County of Kings, against the Company, captioned *Yoel Goldman and All Year Holdings Limited vs. Grand Living II, LLC*, Index No. 503207/2021 (the "2021 Action"). Plaintiffs in the 2021 Action request the state court appraise and determine the fair value of their membership interests in the Company. Similar to the 2020 Action, the 2021 Action required joining the Debtors as indispensable parties, and commensurately requires relief from the automatic stay to proceed. On February 11, 2021, the Debtors amended the complaint in the Adversary Proceeding to add certain parties as plaintiffs.

23.     On February 25, 2021, Grand Living filed a Notice of Removal of the 2021 Action to the United States District Court for the Eastern District of New York, with the goal of having such action ultimately transferred to this Court. Goldman and AYHL filed a motion to remand the 2021 Action to the New York State Supreme Court, Kings County.

7

24.     In the meantime, Goldman lost control of AYHL to its creditors.  The

Debtors, therefore, commenced settlement negotiations with the responsible restructuring

officers, which resulted in a settlement agreement approved by the Bankruptcy Court on October

20, 2021.

25.     The settlement agreement was entered into among the Debtors', certain

Debtor affiliates and Debtor principals, and AYHL.  Under the settlement agreement, Grand

Living agrees to pay four million seven hundred thousand dollars ($4,700,000.00) (the

"Payment") to AYHL under the Plan, assuming confirmation and effectiveness of the Plan.

Upon receipt of the Payment, AYHL's membership interests in Grand Living II will be deemed

surrendered or cancelled

26.     If AYHL has not received the Payment within certain parameters, or if the

Plan is not confirmed, then AYHL shall be entitled to file a junior mortgage, and cause the sale

of the Property by a third-party arms-length broker in a manner designed to maximize its value.

27.     The parties agreed to execute stipulations of discontinuance/dismissal with

prejudice for the pending litigation with such stipulations to be held in escrow pending Payment

of the amounts under the settlement, and to exchange limited mutual releases of each other.

28.     The Court entered an order approving the settlement with AYHL on

October 25, 2021.  AYHL has made a motion to compel compliance with the settlement which is

scheduled to be heard on June 27, 2022.

29.     Goldman and All Year Management ("AYM"), another entity owned and

controlled by Goldman, filed two (2) separate proofs of claim against each of the Debtors arising

8

from the termination of AYM's management contract for the Property (the "Goldman Claims").

The Goldman-AYM Claims are not controlled by AYHL and despite the parties' efforts, they

were unable to reach a settlement in principle with to include the Goldman and AYM claims in

the settlement with AYHL.  The Goldman Claims sought $10,000,000 in compensatory and

punitive damages, alleging breaches of contract, breaches of fiduciary duties, and breaches of

implied covenants of good faith and fair dealing.  The AYM claims sought $10,000,00 in

compensatory and punitive damages against each of the Debtors for breach of contract and

breaches of implied covenants of good faith and fair dealing.  On June 11, 2021, the Debtors

filed an objection to the Goldman and AYM Claims pursuant to which the Debtors sought to

have the Claims expunged.  On November 23, 2021, the Bankruptcy Court entered an order

expunging the Goldman Claims.

      30.     The resolution of the Goldman Claims made the potential settlement of the

Mezz Lender Claims possible.  Ultimately, the Debtors contend that they settled with Mezz

Lender on the terms set forth in a stipulation, a copy of which is annexed to the Plan as Exhibit

B.  Under the proposed settlement, Mezz Lender must be paid $10,800,000 no later than July 15,

2022.[2]  The Mezz Lender contends that it has neither signed the proposed settlement nor

accepted it and reserves all of its rights.

      31.     The last remaining Claim that needed to be resolved to enable the Debtors

to confirm the Plan is asserted by 215 Moore Mezzanine Lender LLC ("Moore Mezz Lender")

---

[2]  The senior lender on the Real Property and a signatory to the stipulation shall provide a per diem for amounts due after July 15, 2022.  Additionally, certain non-substantive and immaterial typographical errors in the stipulation shall be corrected prior to confirmation.

which filed a claim in the amount of $17,848,567.56 (the "215 Moore Claim"), seeking payment

from Monsey under a mezzanine loan allegedly made jointly and severally to Monsey and Moore

Development LLC on November 18, 2016 (the "Moore Mezzanine Loan").  Moore Mezz Lender

asserts that $28,173,113.24 is due as of June 1, 2022.

32.    The Debtors filed an objection seeking to disallow the 215 Moore Claim

based on fraudulent conveyance grounds asserting that none of the loan proceeds were paid to

Monsey or benefited any of Monsey's assets.  The Debtors asserted that the Loan was for

property owned by 215 Moore Development LLC.  Monsey asserted that for tax reasons, it held

a nominal 3% tenant in common interest in the 215 Moore Development LLC real property,

which real property included a number of contiguous lots.  Thus, Monsey asserted, it was a

nominal signatory on the Moore Mezzanine Loan, obligated so Moore Mezzanine Lender could

collect on 100% of the interests in the event of a foreclosure, inclusive of the 3% tenant in

common interest nominally held by Monsey.  And when the tax structure became immaterial,

Monsey transferred its tenant in common interest to Moore Development on June 6, 2018.

33.    The Debtors asserted further, that since the 215 Moore Claimant has

recourse against Moore Development, where it is over-secured by $20-30 million, it should first

be required to collect against Moore Development, which is owned and controlled by the

principals of the Debtors.

34.    Based on the foregoing, and for the Plan to be feasible, the Debtors sought

a ruling from the Court that if the 215 Moore Claim could not be expunged before the Plan is

confirmed, it should be estimated at zero ($0) for voting and distribution purposes.

35.     Moore Mezzanine Lender nonetheless asserted that Monsey was meant to be a signatory and that its exposure was not limited to its 3% interest in Moore.  Moore Mezzanine Lender asserted further that Monsey's transfer of the 3% interest in Moore, was a fraudulent conveyance of valuable property based on the real property owned by Moore, that may be recovered for the benefit of creditors.

36.     Plan feasibility was contingent upon the disallowance of substantially all of the 215 Moore Claim.

37.     Ultimately, the Debtors contend that they settled with Moore Mezz Lender on the terms set forth in the proposed stipulation, a copy of which is annexed to the Plan as Exhibit C.  Under the proposed settlement, Moore Mezz Lender must be paid $750,000 no later than July 15, 2022.  Moore Mezz Lender has neither signed the proposed stipulation nor accepted it, and reserves all of its rights.

38.     For exit financing, the Debtors and their affiliates spoke to numerous lenders. SME Funding ("SME") presented an acceptable term sheet in a maximum amount of $37,000,000.  Annexed to the Plan as Exhibit D is the SME term sheet.

39.     Projected sources and uses are annexed to the Plan as Exhibit E.  During this case, there has been no cash flow to the Debtors because the mortgage on the Property has been in default and Grand Living has been paying default interest.  Post-Confirmation, the Debtors project that cash flow will service post confirmation obligations.

11

40.    On April 11, 2022, 227 Grand Street Mezz Lender LLC filed a motion for an order converting the Debtors' cases to Chapter 7 liquidation cases.  The hearing on the motion is scheduled for June 27, 2022.

## DEBTORS' PLAN OF REORGANIZATION

## CLASSIFICATION AND TREATMENT OF CLAIMS

### MY 2011 Class 1

41.    **Classification** – 227 Grand Street Mezz Lender LLC holds the Mezz Loan, consisting of a note and security interest in the Membership Interests.  As of March 31, 2022, 227 Grand Mezz Lender LLC asserts that $15,076,200 is due from MY 2011 and Monsey, jointly and severally.  This amount includes default rate interest at 24% per annum, together with late fees and legal fees.  Pursuant to the agreement with the estate of Abraham Schwarzman a copy of which is annexed to the Plan as Exhibit A, 20.8% of the Claim has been waived for Plan purposes.

42.    **Treatment** – The 227 Grand Mezz Lender LLC proposed stipulation, a copy of which is annexed to the Plan as Exhibit B, is incorporated by reference in this paragraph. Among other things, on or before July 15, 2022, the Debtors shall pay 227 Grand Mezz Lender LLC $10,800,000, subject to the Debtors' agreement with the estate of Abraham Schwarzman to waive payment of 20.8% of the Class 1 Claim.

43.    **Voting** –Impaired and entitled to vote to accept or reject the Plan.

### MY 2011 Class 2

44.     **Classification** –  Priority Claims under Sections

507(a)(2),(3),(4),(5),(6),(7) and (8) of the Bankruptcy Code..  The Debtors estimate no Class 2

Claims.

45.     **Treatment** – Payment in full in Cash of Allowed Amount on the Effective

Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the

date of payment.

46.     **Voting --** Unimpaired and deemed to have accepted the Plan.

### MY 2011 Class 3

47.     **Classification** – General Unsecured Claims.    Allowed General

Unsecured Claims are projected to total $38,000.

48.     **Treatment** – Payment in full in Cash of Allowed Amount on the Effective

Date, plus interest at the applicable Legal Rate as it accrues from the Petition Date through the

date of payment.

49.     **Voting** – Unimpaired and deemed to have accepted the Plan

### MY 2011 Class 4

50.     **Classification** – Interests Holders.

51.     **Treatment** – To the extent necessary, Interest Holders shall be obligated

to pay or escrow for Administrative Claims and statutory fees due to the Office of the United

States Trustee on or before the Effective Date.  Interest Holders shall be entitled maintain

ownership of their Interests under the Plan.

52.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Monsey Class 1

53.    **Classification** – 227 Grand Street Mezz Lender LLC holds the Mezz Loan, consisting of a note and security interest in the Membership Interests.  As of March 31, 2022, 227 Grand Mezz Lender LLC asserts that $15,076,200 is due from MY 2011 and Monsey, jointly and severally.  This amount includes default rate interest at 24% per annum, together with late fees and legal fees.  Pursuant to the agreement with the estate of Abraham Schwarzman a copy of which is annexed to the Plan as Exhibit A, 20.8% of the Claim has been waived for Plan purposes.

54.    **Treatment**  The 227 Grand Mezz Lender LLC proposed stipulation, a copy of which is annexed to the Plan as Exhibit B, is incorporated by reference in this paragraph. Among other things, on or before July 15, 2022, the Debtors shall pay 227 Grand Mezz Lender LLC $10,800,000, subject to the Debtors' agreement with the estate of Abraham Schwarzman to waive payment of 20.8% of the Class 1 Claim.

55.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Monsey Class 2

56.    **Classification** – 215 Moore Street Mezzanine Lender LLC asserts a note claim and subordinate security interest in the Moore membership interests previously owned by Monsey.  As of December 23, 2021, the Claimant asserts that $26,337,212.43 is due from Monsey.

14

57.    **Treatment** -- The 215 Moore Street Mezzanine Lender LLC proposed stipulation, a copy of which is annexed to the Plan as Exhibit C, is incorporated by reference in this paragraph.  Among other things, on or before July 15, 2022, the Debtors shall pay 215 Moore Street Mezzanine Lender LLC $750,000.

58.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Monsey Class 3

59.    **Classification** –  Priority Claims under Sections 507(a)(2),(3),(4),(5),(6),(7) and (8) of the Bankruptcy Code..  The Debtors estimate no Class 2 Claims.

60.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

61.    **Voting --** Unimpaired and deemed to have accepted the Plan.

### Monsey Class 4

62.    **Classification** – General Unsecured Claims Allowed General Unsecured Claims are projected to total $122,000.

63.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable Legal Rate as it accrues from the Petition Date through the date of payment.

64.    **Voting** – Unimpaired and deemed to have accepted the Plan

15

### Monsey Class 5

65.      **Classification** – Interests Holders.

66.      **Treatment** – To the extent necessary, Interest Holders shall be obligated to pay or escrow for Administrative Claims and statutory fees due to the Office of the United States Trustee on or before the Effective Date.  Interest Holders shall be entitled maintain ownership of their Interests under the Plan.

67.      **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### UNCLASSIFIED PRIORITY TAX CLAIMS

68.      Priority tax Claims under Sections 507(a)(8) of the Bankruptcy Code. Filed and Scheduled Claims total approximately $0.  The treatment of such Claims, if any, shall be payment in Cash on the Effective Date, of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

### ADMINISTRATIVE EXPENSES

69.      Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtors shall be paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

16

70.     Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served no later than 35 days after entry of the Confirmation Order (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtors' business) must be filed and served on counsel for the Debtors and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

71.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than sixty (60) days after the Effective Date (the "Professional Fee Claims Bar Date"). The Debtors estimate legal fees of approximately $550,000 through the Confirmation Date, inclusive of any interim fees that may be awarded before that date.

72.     Administrative Claims will be larger in a Chapter 7 case than under the Plan because there will be additional expenses for Chapter 7 trustee commissions estimated at 2% of assets, Chapter 7 legal fees estimated at 3% of assets, brokerage commissions on a sale of assets estimated at 3%, transfer taxes on a sale of assets estimated at 3% and accruing interest on secured claims in an unliquidated amount to the extent of remaining equity, if any. In addition, in a liquidation, the estate will not have the benefit of a 20.8% reduction in the Mezz Lender

17

Claim, nor the benefit of the increase in estate assets upon the acquisition of the AYHL interests. Additionally, if the cases are converted to Chapter 7, the senior lender holding a mortgage on the real property has indicated that it will no longer agree to the payoff amounts contained in the stipulation which will result in approximately $6 million of default rate interest. This will result in the inability to pay any amounts to unsecured creditors and will materially limit the amount of payments to the 227 Mezz Lender.

## STATUTORY FEES

73.     The Debtors shall pay from Cash in the Estate all fees payable due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the Debtors shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## MEANS FOR IMPLEMENTATION

74.     The Plan shall be funded from the proceeds of the SME financing pursuant to the term sheet annexed to the Plan as exhibit D and the sources and uses pro forma annexed to the Plan as Exhibit E. Administrative Claims, Priority Claims, if any, and statutory fees to the Office of the United States due on the Effective Date shall be paid either from the proceeds of refinancing or funds to be contributed by the Interest Holders if necessary.

18

75.    The AYHL Settlement is incorporated herein by reference, as modified by the proposed Mezz Lender agreement annexed to the Plan as Exhibit B. The AYHL Settlement Order mandates certain relief that supports confirmation of this Plan, and also mandates certain relief in the event that confirmation of this Plan is denied or, if confirmed, the Plan fails to become effective.  The AYHL Settlement is included as a mandatory provision of this Plan and the Plan may not be deemed effective unless the terms thereof, including the following provisions, are met:[3]

a.    GL II shall cause GL to pay, and GL shall pay, four million seven hundred thousand dollars ($4,700,000.00) to AYHL (the "Payment"). The Payment shall be made by wire transfer to AYHL on and as a disbursement to be made among the Effective Date transactions, with TIME BEING OF THE ESSENCE.

b.    Upon receipt of the Payment, AYHL (including, but not limited to any of, its wholly owned subsidiaries) shall not have any interest in GL, GL II or the Property and shall be entitled to no further consideration for its former membership interests in GL II, which shall be deemed surrendered or cancelled.

c.    The Payment shall be made on the Effective Date. So long as the Payment has not occurred, Additional P&I (as defined below) shall begin to accrue from the earliest of (a) the date of the Bankruptcy Court order denying confirmation (the "Confirmation Denial Date"), and (b) December 31, 2021. "Additional P&I" shall mean interest to accrue on the Payment at 12% per annum and the principal amount thereof shall increase by $10,000 per month. The maximum amount of Additional P&I shall be capped at $1,300,000.

d.    So long as AYHL has not yet received the Payment, six (6) months after the earliest of (a) the Confirmation Denial Date, (b) the date of entry of an order confirming the Plan (the "Confirmation Order"), and (c) October 31, 2021 (the earliest, the "Trigger Date"):

---

[3] Capitalized, undefined, terms are as set forth, if not in this paragraph, in the AYHL Settlement Agreement.

    i. AYHL shall be entitled to the release from escrow of, pursuant to a mutually agreeable escrow agreement (the "Escrow Agreement"), and to record with the Kings County Clerk a junior mortgage (and, inter alia, note) acceptable in form and substance to AYHL upon the Property (the "AYHL Mortgage") (both of which shall be prepared prior to the confirmation hearing date), and

    ii. The Parties, working jointly and in good faith, shall market the Property for sale through a third-party broker in an arms-length transaction which will achieve the highest fair market value, provided, however, that such sale process shall be consummated within six (6) months from the start of the marketing process; notwithstanding the foregoing, AYHL may exercise any and all rights under the AYHL Mortgage.

    e. The AYHL Mortgage shall secure the Payment and shall be subordinate to existing liens with respect to payment priority.[4] The other Parties to the Settlement Agreement covenant to AYHL to ensure that the Property will not voluntarily be encumbered with liens other than those in existence as of the date hereof, or as contemplated and effectuated as of the Effective Date. No encumbrance shall be made on the Property from the date of the Settlement Agreement without the Payment having been made, it being understood that the Effective Date transactions include simultaneous new funding and disbursement to AYHL as provided herein, and disbursements to creditors as identified in the Plan.

    f. The AYHL Mortgage and the transactions in favor of AYHL described in the Settlement Agreement and directed herein (including the sale of the Property pursuant to paragraph subparagraph (b) above, if it occurs) shall qualify for the exemption protections of Section 1146 of the Bankruptcy Code, as set forth below.

In accordance with the AYHL Settlement Order (including as repeated in relevant part at subparagraph (c) above), since December 31, 2021, interest on the amount of the Payment (as defined in the AYHL Settlement Order) has accrued and will continue to accrue at 12% per

---

[4] In the event of dismissal of these cases the AYHL Settlement Order shall remain in effect.

annum and the principal amount of the Payment has increased and will continue to increase by

$10,000 per month.  The chart attached to this Disclosure Statement as Exhibit B reflects the

Payment, including interest and increased principal, as will be due to AYHL on the Effective

Date.  In addition, in accordance with the AYHL Settlement Order (including as repeated in

relevant part at subparagraphs (d) and (e) above), and to the extent the "Trigger Date" occurs,

AYHL maintains its rights, and has authority, to invoke the remedies set forth above.

76.     Based on the equity in the Property at this time, the Debtors believe that

when the SME loans mature, the obligation may be refinanced on the same or better terms as

under the Plan.

77.     Confirmation of the Plan is contingent upon the following conditions

being satisfied:

(i)  Binding commitment of financial institutions or other bona fide capital
providers of amounts necessary to fund Plan payments and refinancing of secured
debt of Grand Living II and Grand Living.

(ii)  the Confirmation Order being in form and substance acceptable to the
Debtors, and there shall not be a stay or injunction (or similar prohibition) in
effect with respect thereto.

(iii) Execution of the proposed 227 Grand Mezz Lender LLC and 215 Moore
Street Mezzanine Lender LLC agreements by the necessary parties.

The Debtors may waive any or all of the confirmation conditions.

78.     The effectiveness of the Plan is contingent upon the following conditions

being satisfied:

(i)     The Bankruptcy Court shall have entered the Confirmation Order in form
and substance satisfactory to the Debtors.

21

(ii)    No stay of the Confirmation Order shall be in effect at the time the other conditions set forth in this paragraph are satisfied, or, if permitted, waived.

(iii)    Implementation of the AYHL Settlement, as set forth above.

(iv)    Implementation of the proposed stipulations with 227 Grand Street Mezz Lender LLC and 215 Moore Mezzanine Lender LLC.

79.    **Vesting** – Except as otherwise provided in the Plan, including with respect to the AYHL Settlement, on the Effective Date all assets and properties of the Estate shall vest in the Reorganized Debtor free and clear of all Liens, Claims and encumbrances and any and all liens, claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.  Except as otherwise provided herein, as of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

80.    **Execution of Documents** – The Debtor shall be authorized to execute, in the name of any necessary party, (except with respect to the AYHL Settlement), any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

81.    **Recording Documents** – Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all

notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly

preserved by the Plan, and the Confirmation Order.

82.    **Preservation of Claims** – All rights pursuant to Sections 502, 544, 545

and 546 of the Bankruptcy Code, all Avoidance Actions shall be preserved for the benefit of the

Reorganized Debtors' estate, provided, however, that

(i)    the Reorganized Debtors shall have sole authority for prosecuting any

such claims, and

(ii)    This provision shall not supersede the terms of the AYHL Settlement.

(iii)    This provision shall not supersede the terms of the proposed stipulations

with 227 Grand Street Mezz Lender LLC and 215 Moore Street

Mezzanine Lender LLC.

83.    **Stamp Tax** – Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a)

the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of

any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of

any lease or sublease or the making or delivery of any deed or other instrument of transfer under

the Plan, or the re-vesting, transfer or sale of any real or personal property pursuant to, in

implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or

securing of indebtedness by such means, and the making, delivery or recording of any deed or

other instrument of transfer under the Plan, including, without limitation, the Confirmation

Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or

23

other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental

assessment.

84.    **Release of Liens** – Except as otherwise provided for in the Plan, (a) each

holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the Debtor any

and all Collateral that secures or purportedly secures such Claim, as pertains to the Property or

such Lien shall automatically, and without further action by the Debtor be deemed released, and

(y) execute such documents and instruments as the Debtor requests to evidence such Claim

holder's release of such property or Lien.

## MANAGEMENT OF THE DEBTORS

85.    Each Debtor is managed by David Goldwasser.  Post-confirmation

management shall be performed by Michael Lichtenstein and Toby Moskovits.

86.    Neither the Debtors nor any of their employees, advisors, attorneys,

accountants, financial consultants, contractors, agents, and their successors and assigns, shall

have or incur any liability to any holder of a Claim or Interest, or to any other entity, for any act

or omission in connection with, related to, or arising out of, the pursuit of confirmation

consummation, or other administration of the Plan or the property to be distributed or otherwise

dealt with under the Plan, except for gross negligence or willful misconduct, and in all respects

the Debtors and each of their employees, advisors, attorneys, accountants, financial consultants,

contractors, and agents shall be entitled to rely upon the advice of counsel with respect to its

duties and responsibilities under the Plan. No current Holder of a Claim or Equity Interest,

representative thereof, shall have or pursue any claim or cause of action against the Debtors for

making payments in accordance with the Plan, or for implementing the provisions of the Plan.

24

The Debtors shall not be liable for obligations relating to Allowed Claims to the extent that Allowed Claims are not paid in full, other than as a result of gross negligence or willful misconduct.

## LIQUIDATION ANALYSIS

87.    In a liquidation under Chapter 7 of the Bankruptcy Code, each Debtor's assets would be sold and the sale proceeds distributed to creditors in their order of priority.  The Debtors believe that the Plan provides at least an equivalent return for each Debtor's estate as could be achieved in a liquidation.  As set forth on Exhibit B to the Disclosure Statement, each Debtor projects that in a Chapter 7 liquidation, the return to such Debtor's estate would be reduced by an additional layer of administration legal expenses and commissions, which the Debtors estimate would total at least 15% of the sale proceeds.  The Debtors estimate an additional 3% transfer tax on the sale of the Properties, 3% trustee commission on the sale, and Chapter 7 brokerage and legal professional fees equal to about 9% of the value of estate assets.

## LITIGATION ANALYSIS

88.    The Debtors are aware of no litigation with third parties, except Mezz Lender's action to foreclose on the Membership Interests, which will be made moot by the Plan.

## PAYMENT OF CLAIMS AND OBJECTIONS TO CLAIMS

89.    The Debtors shall be disbursing agent under the Plan without a bond.  The Debtor reserves the right to file objections to claims in the event grounds exist to object to particular claims, for a period of 120 days after the Effective Date.  On the initial distribution date and on each distribution date as may thereafter be necessary, the Debtor shall maintain an

25

undetermined claims distribution reserve for the holders of undetermined claims as of such date in a sum not less than the amount required to pay each such undetermined claim if such claim was allowed in full. To the extent that an undetermined claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim, shall be released from the undetermined claims distribution reserve and paid to the holder of such Allowed Claim. After all the amounts of all undetermined claims have been fixed, the balance of the undetermined claims distribution reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

90.    The Debtors are aware of no unexpired leases or Executory Contracts. All unexpired leases and Executory Contracts not rejected prior to the Effective Date shall be assumed under the Plan. In the event of a rejection which results in damages a proof of claim for such damages must be filed by the damaged party with the Court within sixty (60) days after the Effective Date. All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as Unsecured Claims. Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided herein shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan. The Debtors believe there are no cure claims with respect to Executory Contracts that may be assumed under the Plan. Any objection to the Debtors' assertion that no cure claims exist must be filed by the party asserting such claim with the Court within fourteen (14) days after the Effective Date.

## TAX CONSEQUENCES

26

91.    The Debtors do not believe that there will be any negative tax consequences to the Debtors or to Creditors under the Plan.  To the extent that a creditor is not paid in full under the Plan, such creditor may be entitled to a bad debt deduction.  To the extent that a creditor has taken a bad debt deduction, Plan distributions may be taxable as income.

92.    THE DEBTORS DO NOT PURPORT, THROUGH THIS DISCLOSURE STATEMENT, TO ADVISE CREDITORS OR INTEREST HOLDERS REGARDING THE TAX CONSEQUENCES OF THE TREATMENT OF THE CREDITORS AND INTEREST HOLDERS UNDER THE PLAN.  CREDITORS AND INTEREST HOLDERS SHOULD SEEK INDEPENDENT COUNSEL CONCERNING THE TAX CONSEQUENCES OF THEIR TREATMENT UNDER THE PLAN.

## PLAN ALTERNATIVES

93.    Generally, plan options in these circumstances include selling, refinancing, recapitalizing or loan modification.  In this case, the Debtors believe that loan modification and refinancing is the best alternative for maximizing value and facilitating payment to Creditors.

## VOTING PROCEDURES AND REQUIREMENTS

94.    A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement.  Each impaired creditor is entitled to execute the ballot and return it to the undersigned to be considered for voting purposes.  The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than _____, 2022, at the following address:

Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, Floor 11, New York, New York 10022, Attn:  Mark A. Frankel, Esq.

95.     Each Creditor of the Debtors whose Claim is impaired under the Plan is entitled to vote, if either (i) its Claim has been scheduled by the Debtors, or (ii) it has filed a Proof of Claim on or before the last date set by the Bankruptcy Court.

96.     Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion by a Creditor whose Claim is subject to an objection.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Court to confirm the Plan.

97.     A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

98.     The Bankruptcy Code defines acceptance of a Plan by a class of Creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the Claims of that class which actually cast ballots for acceptance or rejection of the Plan.

99.     The Bankruptcy Code defines acceptance of a Plan by a class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of such class held by holders of such interests.

28

## CRAMDOWN

100.    If any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

101.    The Debtors intend to invoke the cramdown provisions of section 1129(b) as to any impaired class that does not accept the plan.

102.    A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives less than it is legally entitled to receive for its Claims or Interests.  "Fair and equitable" has different meanings for Secured and Unsecured Claims.

103.    With respect to a Secured Claim, "fair and equitable" means either: (a) the impaired Secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the allowed amount of its Claim with a present value as of the Effective Date at least equal to the value of such Creditor's interest in the property securing its Liens; (b) property subject to the Lien of the impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of the sale; or  (c) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

104.    With respect to an Unsecured Claim, "fair and equitable" means either: (a) each impaired Unsecured Creditor receives or retains property of a value equal to the amount of its Allowed Claim; or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

105.     In the event one or more classes of impaired Claims rejects the Plan, the

Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and

equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

## CONFIRMATION OF THE PLAN

106.     Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy

Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing").

Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

107.     By order of the Bankruptcy Court dated _____, 2022,

the Confirmation Hearing has been scheduled for _____, 2022, at ___.m., in

the Honorable Robert D. Drain's Courtroom, United States Bankruptcy Court, 300 Quarropas

Street, White Plains, NY 10601−5008.  The Confirmation Hearing may be adjourned from time

to time by the Bankruptcy Court without further notice except for an announcement made at the

Confirmation Hearing or any adjourned Confirmation Hearing.  Any objection to confirmation of

the Plan must be made in writing and filed with the Bankruptcy Court with proof of service and

served upon the following on or before _____ 2022 at 5:00 p.m.:  Backenroth

Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York  10022, Attn:  Mark A.

Frankel, Esq.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

108.     At the Confirmation Hearing, the Bankruptcy Court will determine with

respect to each Debtor whether the requirements of Section 1129 of the Bankruptcy Code have

been satisfied to enter an order confirming the Plan.  For each Debtor, the applicable

requirements are as follows:  (a)  the Plan complies with the applicable provisions of the

Bankruptcy Code, (b) the Debtor has complied with the applicable provisions of the Bankruptcy

30

Code; (c) the Plan has been proposed in good faith and not by any means forbidden by law, (d)

any payment made or promised or by a person issuing securities or acquiring property under the

Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in

connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the

Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable,

or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the

approval of the Bankruptcy Court as reasonable, (e) the Debtor has disclosed the identity and

affiliations of any individual proposed to serve, after confirmation of the Plan, as a director,

officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the

Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in,

such office of such individual, is consistent with the interests of Creditors and equity security

holders and with public policy, and the Debtor has disclosed the identity of any insider that will

be employed or retained by the Reorganized Debtor, and the nature of any compensation for such

insider, (f) with respect to each class of impaired Claims, either each holder of a Claim or

interest of such class has accepted the Plan, or will receive or retain under the Plan on account of

such Claim or interest property of a value, as of the Effective Date of the Plan, an amount that is

not less than the amount that such holder would so receive or retain if the Debtor was liquidated

on such date under Chapter 7 of the Bankruptcy Code, (g) each class of Claims or interests has

either accepted the Plan or is not impaired under the Plan, (h) except to the extent that the holder

of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that

Administrative Expenses and priority Claims will be paid in full on the Effective Date, (i) at least

one class of impaired Claims has accepted the Plan, determined without including any

acceptance of the Plan by any insider holding a Claim of such class, and (j) confirmation of the

31

Plan is not likely to be followed by the liquidation, or the need for further financial

reorganization of the Debtor or any successors to the Debtor under the Plan unless such

liquidation or reorganization is proposed in the Plan.

109.    The Debtors believe that the Plan satisfies all of the statutory requirements

of Chapter 11 of the Bankruptcy Code, that each Debtor has complied or will have complied

with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made

in good faith.

## **CONCLUSION**

The Debtors urge the Debtors' Creditors to vote to accept the Plan.

Dated: New York, New York
June 10, 2022

**MY 2011 GRAND LLC and
S&B MONSEY LLC**

By:      s/ David Goldwasser

**BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for Debtors**

By:      s/Mark Frankel
800 Third Avenue
New York, New York 10022
(212) 593-1100

Exhibit A to Disclosure Statement

Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                                     Chapter 11

      MY 2011 GRAND LLC, *et al*,[1]                    Case No.  19-23957 (RDD) (RG)

                                        Jointly Administered

                          Debtors.
--------------------------------------------------------x

## **FIFTH AMENDED JOINT PLAN OF REORGANIZATION**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070)

## INTRODUCTION

MY 2011 GRAND LLC and S&B MONSEY LLC, (each a "Debtor", and collectively, the "Debtors") submit this joint plan of reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG EACH DEBTOR AND EACH DEBTORS' CREDITORS (AS SUCH TERMS ARE DEFINED BELOW).

## DEFINITIONS

1.      As used in this Plan, the following terms will have the meanings hereinafter set forth:

2.      "Administrative Expense" shall mean any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, and any fees or charges assessed against a Debtor's Estate under Chapter 123, Title 28, United States Code.

3.      "Administrative Expense Claim" shall mean a Claim for payment of an Administrative Expense.

4.      "Allowance Date" shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

5.      "Allowed Amount" shall mean the amount of an "Allowed Claim."

6.      "Allowed Claim" shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on a Debtor's

2

schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

7.    "Allowed Secured Claim" shall mean a Secured Claim to the extent it is an Allowed Claim.

8.    "Allowed Unsecured Claim" shall mean an Unsecured Claim to the extent it is an Allowed Claim.

9.    "AYHL" shall mean All Year Holdings Limited.

10.    "AYHL Settlement" shall mean that certain agreement approved by the Bankruptcy Court by order dated October 25, 2021 (docket no. 136).

11.    "AYM" shall mean All Year Management.

12.    "Assets" shall mean any and all of the respective real or personal property of any nature of the Debtors, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Causes of Action and any other general intangibles of the Debtors, of any nature whatsoever, including, without limitation, the property of the Debtors' estates pursuant to section 541 of the Bankruptcy Code.

13.    "Avoidance Actions" shall mean all claims and causes of action which a Debtor has or had the power to assert pursuant to any or all of sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

3

14.     "Bankruptcy Case" shall mean this Chapter 11 bankruptcy case.

15.     "Bankruptcy Code" shall mean Title 11 of the United States Code (11. U.S.C. § 101 et. seq.).

16.     "Bankruptcy Court" shall mean the Court as defined below.

17.     "Bar Date" shall mean August 24, 2020.

18.     "Cash" shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

19.     "Causes of Action" shall mean any and all claims and causes of action of, and remedies granted to, a Debtor against any third party, including, without limitation, any Avoidance Actions or causes of action pursuant to sections 502, 506, 510, 541 through 545, 547 through 551, and/or 553 of the Bankruptcy Code and any claims pursuant to any other statutory or common law.

20.     "Claim" shall mean a right to payment as set forth in § 101(5) of the Bankruptcy Code.

21.     "Claimant" shall mean the holder of a Claim.

22.     "Confirmation Date" shall mean the date of the entry of the Confirmation Order.

23.     "Confirmation Hearing" shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

4

24.     "Confirmation Order" shall mean the order of the Court confirming the Plan.

25.     "Court" shall mean the United States Bankruptcy Court for the SOUTHERN District of New York.

26.     "Creditor" shall mean any entity that holds a Claim against a Debtor.

27.     "Creditors Committee" shall mean a committee of creditors appointed by the United States Trustee in these cases under section 1102 of the Bankruptcy Code.

28.     "Debtors" shall mean MY 2011 GRAND LLC and S&B MONSEY LLC.

29.     "Disputed Claim" shall mean the whole or any portion of any Claim against a Debtor to which an objection is timely filed or may be timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

30.     "Disputed Claim Reserve" shall mean Cash to be set aside by the Disbursing Agent on the Effective Date in an escrow account maintained by the Disbursing Agent, in an amount equal to the amount that would have been distributed to the holders of Disputed Claims had such Claims been deemed Allowed Claims on the Effective Date, or in such other amount as may be approved by the Bankruptcy Court.

31.     "Effective Date" shall mean the date fifteen (15) days after the Confirmation Order is a Final Order, or such other date as may be practicable, provided that absent Bankruptcy Court approval, such date shall be no later than sixty days after the Confirmation Order is a Final Order.

5

32.    "Estate" shall mean the estate of each Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

33.    "Executory Contracts" shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

34.    "Final Order" shall mean an order of a court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

35.    "Impaired" shall mean not Unimpaired.

36.    "Interest" shall mean an existing ownership interest in a Debtor.

37.    "Interest Holder" shall mean a holder and owner of an existing Interest in a Debtor.

38.    "Goldman" shall mean Yoel Goldman.

39.    "Goldman Claims" shall mean the Proofs of Claim filed by Yoel Goldman and All Year Management on August 21, 2020 against each of the Debtors, which have since been expunged.

40.    "Legal Rate" shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Petition Date.

41.    "Lien" shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

42.    "Membership Interests" shall mean the Debtors' membership interests in Grand Living LLC II.

6

43.    "Mezz Lender" shall mean 227 Grand Street Mezz Lender LLC.

44.    "Mezz Loan" shall mean those certain joint and several loans made to Debtors by the Mezz Lender secured by their respective Membership Interests.

45.    "Moore Mezz Lender" shall mean 215 Moore Street Mezzanine Lender."

46.    "Moore Mezzanine Loan" shall mean that certain mezzanine loan allegedly made jointly and severally to Monsey and Moore Development LLC on November 18, 2016.

47.    "Monsey" shall mean S&B Monsey LLC.

48.    "MY 2011" shall mean MY 2011 Grand LLC.

49.    "Petition Date" shall mean November 6, 2019.

50.    "Plan" shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

51.    "Property" shall mean the real property at 227 Grand Street, Brooklyn, New York 11211 owned by Grand Living LLC.

52.    "Property Mortgage' shall mean the $16,350,000 mortgage on the Property.

53.    "Professional(s)" shall mean any entity or person employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code.

7

54.     "Priority Claims" shall mean Claims under Sections 507(a)(3),(4),(5),(6), (7) and (8) of the Bankruptcy Code.

55.      "Professional Fee Claim" shall mean those fees and expenses claimed by a Professional pursuant to sections 330, 331 and/or 503 of the Bankruptcy Code.

56.     "Professional Fee Claim Bar Date" shall mean the last day for a Professional to file a Professional Fee Claim, which shall be no later than thirty (60) days after the Effective Date.

57.     "Reorganized Debtors" shall mean the Debtors on and after the Effective Date.

58.     "Secured Claim" shall mean a Claim secured by a Lien on property included within a Debtor's Estate.

59.     "Secured Creditor" shall mean the owner or holder of a Secured Claim.

60.     "Unclassified Priority Claims" shall mean tax Claims under Sections 507(a)(8) of the Bankruptcy Code.

61.     "Unimpaired" shall mean not impaired under section 1124 of the Bankruptcy Code.

62.     "Unsecured Claim" shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against a Debtor or a Debtor's Estate; or (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages

8

resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code and does not include administrative of priority claims.

63.　　"Unsecured Creditor" shall mean the owner or holder of an Unsecured Claim.

## CLASSIFICATION AND TREATMENT OF CLAIMS

### MY 2011 Class 1

64.　　**Classification** – 227 Grand Street Mezz Lender LLC holds the Mezz Loan, consisting of a note and security interest in the Membership Interests.  As of March 31, 2022, 227 Grand Mezz Lender LLC asserts that $15,076,200 is due from MY 2011 and Monsey, jointly and severally.  This amount includes default rate interest at 24% per annum, together with late fees and legal fees.  Pursuant to the agreement with the estate of Abraham Schwarzman a copy of which is annexed to the Plan as Exhibit A, 20.8% of the Claim has been waived for Plan purposes.

65.　　**Treatment** – The 227 Grand Mezz Lender LLC proposed stipulation, a copy of which is annexed to the Plan as Exhibit B, is incorporated by reference in this paragraph. Among other things, on or before July 15, 2022, the Debtors shall pay 227 Grand Mezz Lender LLC $10,800,000, subject to the Debtors' agreement with the estate of Abraham Schwarzman to waive payment of 20.8% of the Class 1 Claim.

66.　　**Voting** –Impaired and entitled to vote to accept or reject the Plan.

9

### MY 2011 Class 2

67.    **Classification** –  Priority Claims under Sections

507(a)(2),(3),(4),(5),(6),(7) and (8) of the Bankruptcy Code..  The Debtors estimate no Class 2

Claims.

68.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective

Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the

date of payment.

69.    **Voting --** Unimpaired and deemed to have accepted the Plan.

### MY 2011 Class 3

70.    **Classification** – General Unsecured Claims.    Allowed General

Unsecured Claims are projected to total $38,000.

71.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective

Date, plus interest at the applicable Legal Rate as it accrues from the Petition Date through the

date of payment.

72.    **Voting** – Unimpaired and deemed to have accepted the Plan

### MY 2011 Class 4

73.    **Classification** – Interests Holders.

74.    **Treatment** – To the extent necessary, Interest Holders shall be obligated

to pay or escrow for Administrative Claims and statutory fees due to the Office of the United

States Trustee on or before the Effective Date.  Interest Holders shall be entitled maintain

ownership of their Interests under the Plan.

10

75. **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Monsey Class 1

76. **Classification** – 227 Grand Street Mezz Lender LLC holds the Mezz Loan, consisting of a note and security interest in the Membership Interests. As of March 31, 2022, 227 Grand Mezz Lender LLC asserts that $15,076,200 is due from MY 2011 and Monsey, jointly and severally. This amount includes default rate interest at 24% per annum, together with late fees and legal fees. Pursuant to the agreement with the estate of Abraham Schwarzman a copy of which is annexed to the Plan as Exhibit A, 20.8% of the Claim has been waived for Plan purposes.

77. **Treatment** The 227 Grand Mezz Lender LLC proposed stipulation, a copy of which is annexed to the Plan as Exhibit B, is incorporated by reference in this paragraph. Among other things, on or before July 15, 2022, the Debtors shall pay 227 Grand Mezz Lender LLC $10,800,000, subject to the Debtors' agreement with the estate of Abraham Schwarzman to waive payment of 20.8% of the Class 1 Claim.

78. **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Monsey Class 2

79. **Classification** – 215 Moore Street Mezzanine Lender LLC asserts a note claim and subordinate security interest in the Moore membership interests previously owned by Monsey. As of December 23, 2021, the Claimant asserts that $26,337,212.43 is due from Monsey.

11

80.    **Treatment** -- The 215 Moore Street Mezzanine Lender LLC proposed stipulation, a copy of which is annexed to the Plan as Exhibit C, is incorporated by reference in this paragraph.  Among other things, on or before July 15, 2022, the Debtors shall pay 215 Moore Street Mezzanine Lender LLC $750,000.

81.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

**Monsey Class 3**

82.    **Classification** –  Priority Claims under Sections 507(a)(2),(3),(4),(5),(6),(7) and (8) of the Bankruptcy Code..  The Debtors estimate no Class 2 Claims.

83.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

84.    **Voting --** Unimpaired and deemed to have accepted the Plan.

**Monsey Class 4**

85.    **Classification** – General Unsecured Claims Allowed General Unsecured Claims are projected to total $122,000.

86.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable Legal Rate as it accrues from the Petition Date through the date of payment.

87.    **Voting** – Unimpaired and deemed to have accepted the Plan

12

## <u>Monsey Class 5</u>

88.     **<u>Classification</u>** – Interests Holders.

89.     **<u>Treatment</u>** – To the extent necessary, Interest Holders shall be obligated to pay or escrow for Administrative Claims and statutory fees due to the Office of the United States Trustee on or before the Effective Date.  Interest Holders shall be entitled maintain ownership of their Interests under the Plan.

90.     **<u>Voting</u>** – Impaired and entitled to vote to accept or reject the Plan.

## <u>UNCLASSIFIED PRIORITY TAX CLAIMS</u>

91.     Priority tax Claims under Sections 507(a)(8) of the Bankruptcy Code. Filed and Scheduled Claims total approximately $0.  The treatment of such Claims, if any, shall be payment in Cash on the Effective Date, of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

## <u>ADMINISTRATIVE EXPENSES</u>

92.     Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; <u>provided</u>, <u>however</u>, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtors shall be paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

13

93.     Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served no later than 35 days after entry of the Confirmation Order (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtors' business) must be filed and served on counsel for the Debtors and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

94.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than sixty (60) days after the Effective Date (the "Professional Fee Claims Bar Date").  The Debtors estimate legal fees of approximately $550,000 through the Confirmation Date, inclusive of any interim fees that may be awarded before that date.

95.     Administrative Claims will be larger in a Chapter 7 case than under the Plan because there will be additional expenses for Chapter 7 trustee commissions estimated at 2% of assets, Chapter 7 legal fees estimated at 3% of assets, brokerage commissions on a sale of assets estimated at 3%, transfer taxes on a sale of assets estimated at 3% and accruing interest on secured claims in an unliquidated amount to the extent of remaining equity, if any.  In addition, in a liquidation, the estate will not have the benefit of a 20.8% reduction in the Mezz Lender

14

Claim, nor the benefit of the increase in estate assets upon the acquisition of the AYHL interests. Additionally, if the cases are converted to Chapter 7, the senior lender holding a mortgage on the real property has indicated that it will no longer agree to the payoff amounts contained in the stipulation which will result in approximately $6 million of default rate interest. This will result in the inability to pay any amounts to unsecured creditors and will materially reduce the payment to 227 Mezz Lender.

## STATUTORY FEES

96.     The Debtors shall pay from Cash in the Estate all fees payable due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the Debtors shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## MEANS FOR IMPLEMENTATION

97.     The Plan shall be funded from the proceeds of the SME financing pursuant to the term sheet annexed to the Plan as exhibit D and the sources and uses pro forma annexed to the Plan as Exhibit E.  Administrative Claims, Priority Claims, if any, and statutory fees to the Office of the United States due on the Effective Date shall be paid either from the proceeds of refinancing and funds to be contributed by the Interest Holders if necessary.

98.     The AYHL Settlement is incorporated herein by reference, as modified by the proposed Mezz Lender agreement annexed to the Plan as Exhibit B. The AYHL Settlement

15

Order mandates certain relief that supports confirmation of this Plan, and also mandates certain relief in the event that confirmation of this Plan is denied or, if confirmed, the Plan fails to become effective. The AYHL Settlement is included as a mandatory provision of this Plan and the Plan may not be deemed effective unless the terms thereof, including the following provisions, are met:[2]

a. GL II shall cause GL to pay, and GL shall pay, four million seven hundred thousand dollars ($4,700,000.00) to AYHL (the "Payment"). The Payment shall be made by wire transfer to AYHL on and as a disbursement to be made among the Effective Date transactions, with TIME BEING OF THE ESSENCE.

b. Upon receipt of the Payment, AYHL (including, but not limited to any of, its wholly owned subsidiaries) shall not have any interest in GL, GL II or the Property and shall be entitled to no further consideration for its former membership interests in GL II, which shall be deemed surrendered or cancelled.

c. The Payment shall be made on the Effective Date. So long as the Payment has not occurred, Additional P&I (as defined below) shall begin to accrue from the earliest of (a) the date of the Bankruptcy Court order denying confirmation (the "Confirmation Denial Date"), and (b) December 31, 2021. "Additional P&I" shall mean interest to accrue on the Payment at 12% per annum and the principal amount thereof shall increase by $10,000 per month. The maximum amount of Additional P&I shall be capped at $1,300,000.

d. So long as AYHL has not yet received the Payment, six (6) months after the earliest of (a) the Confirmation Denial Date, (b) the date of entry of an order confirming the Plan (the "Confirmation Order"), and (c) October 31, 2021 (the earliest, the "Trigger Date"):

i. AYHL shall be entitled to the release from escrow of, pursuant to a mutually agreeable escrow agreement (the "Escrow Agreement"), and to record with the Kings County Clerk a junior mortgage (and, inter alia, note) acceptable in form and substance to AYHL upon the Property (the "AYHL

---

[2] Capitalized, undefined, terms are as set forth, if not in this paragraph, in the AYHL Settlement Agreement.

Mortgage") (both of which shall be prepared prior to the confirmation hearing date), and

   ii.  The Parties, working jointly and in good faith, shall market the Property for sale through a third-party broker in an arms-length transaction which will achieve the highest fair market value, provided, however, that such sale process shall be consummated within six (6) months from the start of the marketing process; notwithstanding the foregoing, AYHL may exercise any and all rights under the AYHL Mortgage.

  e.  The AYHL Mortgage shall secure the Payment and shall be subordinate to existing liens with respect to payment priority.[3] The other Parties to the Settlement Agreement covenant to AYHL to ensure that the Property will not voluntarily be encumbered with liens other than those in existence as of the date hereof, or as contemplated and effectuated as of the Effective Date. No encumbrance shall be made on the Property from the date of the Settlement Agreement without the Payment having been made, it being understood that the Effective Date transactions include simultaneous new funding and disbursement to AYHL as provided herein, and disbursements to creditors as identified in the Plan.

  f.  The AYHL Mortgage and the transactions in favor of AYHL described in the Settlement Agreement and directed herein (including the sale of the Property pursuant to paragraph subparagraph (b) above, if it occurs) shall qualify for the exemption protections of Section 1146 of the Bankruptcy Code, as set forth below.

In accordance with the AYHL Settlement Order (including as repeated in relevant part at subparagraph (c) above), since December 31, 2021, interest on the amount of the Payment (as defined in the AYHL Settlement Order) has accrued and will continue to accrue at 12% per annum and the principal amount of the Payment has increased and will continue to increase by $10,000 per month. The chart attached to this Disclosure Statement as Exhibit B reflects the Payment, including interest and increased principal, as will be due to AYHL on the Effective

---

[3] In the event of dismissal of these cases the AYHL Settlement Order shall remain in effect.

17

Date.  In addition, in accordance with the AYHL Settlement Order (including as repeated in relevant part at subparagraphs (d) and (e) above), and to the extent the "Trigger Date" occurs, AYHL maintains its rights, and has authority, to invoke the remedies set forth above.

99.    Based on the equity in the Property at this time, the Debtors believe that when the SME loans mature, the obligation may be refinanced on the same or better terms as under the Plan.

100.    Confirmation of the Plan is contingent upon the following conditions being satisfied:

(i)  Binding commitment of financial institutions or other bona fide capital providers of amounts necessary to fund Plan payments and refinancing of secured debt of Grand Living II and Grand Living.

(ii)  the Confirmation Order being in form and substance acceptable to the Debtors, and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(iii) Execution of the proposed 227 Grand Mezz Lender LLC and 215 Moore Street Mezzanine Lender LLC agreements by the necessary parties.

The Debtors may waive any or all of the confirmation conditions.

101.    The effectiveness of the Plan is contingent upon the following conditions being satisfied:

(v)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors.

(vi)    No stay of the Confirmation Order shall be in effect at the time the other conditions set forth in this paragraph are satisfied, or, if permitted, waived.

(vii)    Implementation of the AYHL Settlement, as set forth above.

18

(viii)    Implementation of the proposed stipulations with 227 Grand Street Mezz Lender LLC and 215 Moore Mezzanine Lender LLC.

102.    **Vesting** – Except as otherwise provided in the Plan, including with respect to the AYHL Settlement, on the Effective Date all assets and properties of the Estate shall vest in the Reorganized Debtor free and clear of all Liens, Claims and encumbrances and any and all liens, claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.  Except as otherwise provided herein, as of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

103.    **Execution of Documents** – The Debtor shall be authorized to execute, in the name of any necessary party, (except with respect to the AYHL Settlement), any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

104.    **Recording Documents** – Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

19

105.    **Preservation of Claims** – All rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all Avoidance Actions shall be preserved for the benefit of the Reorganized Debtors' estate, provided, however, that

(iv)    the Reorganized Debtors shall have sole authority for prosecuting any such claims, and

(v)    This provision shall not supersede the terms of the AYHL Settlement.

(vi)    This provision shall not supersede the terms of the proposed stipulations with 227 Grand Street Mezz Lender LLC and 215 Moore Street Mezzanine Lender LLC.

106.    **Stamp Tax** – Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under the Plan, or the re-vesting, transfer or sale of any real or personal property pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment.

107.    **Release of Liens** – Except as otherwise provided for in the Plan, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the Debtor any

20

and all Collateral that secures or purportedly secures such Claim, as pertains to the Property or

such Lien shall automatically, and without further action by the Debtor be deemed released, and

(y) execute such documents and instruments as the Debtor requests to evidence such Claim

holder's release of such property or Lien.

## MANAGEMENT OF THE DEBTORS

108.    Each Debtor is currently managed by David Goldwasser.  Post-

confirmation management shall be performed by Michael Lichtenstein and Toby Moskovits.

109.    Neither the Debtors nor any of their employees, advisors, attorneys,

accountants, financial consultants, contractors, agents, and their successors and assigns, shall

have or incur any liability to any holder of a Claim or Interest, or to any other entity, for any act

or omission in connection with, related to, or arising out of, the pursuit of confirmation

consummation, or other administration of the Plan or the property to be distributed or otherwise

dealt with under the Plan, except for gross negligence or willful misconduct, and in all respects

the Debtors and each of their employees, advisors, attorneys, accountants, financial consultants,

contractors, and agents shall be entitled to rely upon the advice of counsel with respect to its

duties and responsibilities under the Plan. No current Holder of a Claim or Equity Interest,

representative thereof, shall have or pursue any claim or cause of action against the Debtors for

making payments in accordance with the Plan, or for implementing the provisions of the Plan.

The Debtors shall not be liable for obligations relating to Allowed Claims to the extent that

Allowed Claims are not paid in full, other than as a result of gross negligence or willful

misconduct.

21

## DISTRIBUTIONS TO CREDITORS

110.    The Debtors shall be disbursing agent under the Plan without a bond.  The Debtor reserves the right to file objections to claims in the event grounds exist to object to particular claims, for a period of 120 days after the Effective Date.  On the initial distribution date and on each distribution date as may thereafter be necessary, the Debtor shall maintain an undetermined claims distribution reserve for the holders of undetermined claims as of such date in a sum not less than the amount required to pay each such undetermined claim if such claim was allowed in full.  To the extent that an undetermined claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim, shall be released from the undetermined claims distribution reserve and paid to the holder of such Allowed Claim.  After all the amounts of all undetermined claims have been fixed, the balance of the undetermined claims distribution reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS

111.    The Debtors are aware of no unexpired leases or Executory Contracts.  All unexpired leases and Executory Contracts not rejected prior to the Effective Date shall be assumed under the Plan.  In the event of a rejection which results in damages a proof of claim for such damages must be filed by the damaged party with the Court within sixty (60) days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as Unsecured Claims.  Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided herein shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.  The Debtors believe there are no cure claims with respect to Executory Contracts that may be assumed under the Plan.  Any objection to the Debtors' assertion that no cure claims exist must be filed by the party asserting such claim with the Court within fourteen (14) days after the Effective Date.

## RETENTION OF JURISDICTION

112.    Retention of Jurisdiction.  The Court shall have jurisdiction over all matters arising under, arising in, or relating to each Debtor's Bankruptcy Case including, but not limited to, proceedings:

- To consider any modification of the Plan under Section 1127 of the Bankruptcy Code;

- To hear and determine all Claims, controversies, suits and disputes against the Debtors to the full extent permitted under 28 U.S.C. §§ 1334 and 157;

- To hear, determine and enforce all Claims and Causes of Action which may exist on behalf of the Debtors or a Debtor's Estate, including, but not

23

limited to, any right of a Debtor or a Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

- To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

- To value assets of the Estate.

- To enforce the Confirmation Order, the final decree, and all injunctions therein;

- To enforce all orders entered in this case including without limitation the order approving the AYHL Settlement,

- To enforce the AYHL Settlement,

- To enter an order concluding and terminating the Bankruptcy Case;

- To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

- To determine all questions and disputes regarding title to the assets of the Debtors.

- To re-examine Claims which may have been Allowed or disallowed for purposes of voting, and to determine objections which may be filed to any Claims.

## **GENERAL PROVISIONS**

113.    **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

114.    **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

24

115.  **Other Actions**.  Nothing contained herein shall prevent the Debtors,

Interest Holders, or Creditors from taking such actions as may be necessary to consummate the

Plan, although such actions may not specifically be provided for within the Plan.

116.  **Modification of Plan**.  The Debtors may seek amendments or

modifications to the Plan in accordance with Section 1127 of the Bankruptcy Code at any time

prior to the Confirmation Date.  After the Confirmation Date, the Debtors may seek to remedy

any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order,

in such manner as may be necessary to carry out the purposes and intent of the Plan

## INJUNCTION AND DISCHARGE

117.  **Injunction**.  Except as may be consistent with the AYHL Settlement, the

confirmation of this Plan shall constitute an injunction of the Court against the commencement

or continuation of any action, the employment of process, or any act, to collect, recover or offset

from the Debtors or their property or properties, any obligation or debt except pursuant to the

terms of the Plan.

118.  **Discharge.**  On the Effective Date, except as otherwise expressly provided

in this Plan or the Confirmation Order, the Plan shall:  (i) discharge each Debtor and any of its

Assets from all Claims, demands, liabilities and other debts that arose on or before the Effective

Date, including, without limitation, all debts of the kind specified in section 502 of the

Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is filed or deemed

filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed

pursuant to section 502 of the Bankruptcy Code, (C) a Claim based on such debt is or has been

disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based on such debt

25

has accepted this Plan; and (ii) preclude all entities from asserting against each Debtor or any of

its Assets any other or further Claims based upon any act or omission, transaction or other

activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections

524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any

judgment obtained against each Debtor at any time, to the extent that such judgment relates to a

discharged Claim. The Debtor shall be discharged from any Claims and agreements related to

debts that arose on or before the Effective Date and such debts, Claims and agreements are

deemed restructured and new as set forth in the Plan.

### CLOSING THE CASE

119.    Upon substantial consummation, the Debtors may move for a final decree

to close the Bankruptcy Case and to request such other orders as may be just.

Dated: New York, New York
       June 10, 2022

**MY 2011 GRAND LLC and
S&B MONSEY LLC**

By:      s/ David Goldwasser

**BACKENROTH FRANKEL & KRINSKY, LLP**
Attorneys for Debtors

By:      s/Mark A. Frankel
         800 Third Avenue
         New York, New York 10022
         (212) 593-1100

26

Exhibit A to Plan

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (the "PSA") dated as of August 2\, 2021, is entered into by and between MY2011 Grand LLC ("2011 Grand") and S&B Monsey LLC ("S&B Monsey," together with 2011 Grand, the "Debtors") and the Estate of Abraham Schwarzman (the "Schwarzman Estate"). The aforementioned parties are each a "Party" and are collectively referred to herein as the "Parties".

**WHEREAS**, on or about November 6, 2019 (the "Petition Date"), the Debtors each filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code"), which cases are jointly administered under Case No. 19-23957 (RDD) (the "Bankruptcy Cases");

**WHEREAS**, on or about December 29, 2016, 227 Grand Street Mezz Lender LLC ( the "Mezz Lender") loaned the sum of Seven Million Two Hundred Thousand Dollars ($7,200,000) to 2011 Grand (the "Mezz Loan"), which Mezz Loan is secured by the equity interests of each of the Debtors in Grand Living II LLC;

**WHEREAS**, on August 24, 2021, based upon the obligation created under the Mezz Loan, Mezz Lender filed a proof of claim in the amount of $10,281,719.45, in each of the Debtors' cases (each claim assigned Claim No. 3) (the "227 Bankruptcy Claims");

**WHEREAS**, on July 1, 2021, 227 Mezz Lender filed a *Motion for an Order Granting Relief from the Automatic Stay and Related Relief* [ECF No. 98] against the Debtors in which it asserted that as of July 15, 2021 its owed by the Debtors the sum of $13,632,948.93;

**WHEREAS**, the Schwarzman Estate holds a 20.8 percent (20.8%) participation interest in the Mezz Loan;

59459662;2

**WHEREAS**, on April 15, 2020, the Schwarzman Estate and the principals of the Debtors, Toby Moskowitz (Mr. Schwarzman's daughter) ("Ms. Moskowitz") and Michael Lichtenstein ("Mr. Lichtenstein"), entered into that certain Waiver and Release of Participation Agreement ('Waiver and Release")  pursuant to which (i) the Schwarzman Estate waived its rights to its share of the proceeds of the payoff of the Mezz Loan effectively reducing the Mezzanine Loan payoff amount, provided that such payoff results in "one or more of the Borrowers maintaining control of the property at 227 Grand Street, Brooklyn NY", (ii) the Schwarzman Estate agreed to subordinate its share of the original principal amount  of the Mezz Loan in the amount of One Million Five Hundred Thousand Dollars ($1,500,000) to the balance of Five Million Seven Hundred Thousand Dollars ($5,700,000) owed to the other participants in the Mezz Loan; and (iii) the Schwarzman Estate further agreed to waive any claims to repayment of its share of the Mezz Loan, including the principal of One Million Five Hundred Thousand Dollars ($1,500,000) and any accrued interest, fees, default interest and any such fees attributable to such 20.8% interest, upon the payoff of the Mezz Loan to the Mezz Lender;

**WHEREAS**, on July 9, 2021, the Debtors filed their Amended Joint Disclosure Statement ("DS") [ECF No. 104] and Amended Joint Plan of Reorganization ('Plan") [ECF No. 103], and the hearing to approve the adequacy of the DS is scheduled for August 31, 2021 [ECF No. 111];

**WHEREAS**, the Mezz Lender asserts that the Waiver and Release does not operate to reduce the Mezz Lender's Claims as it is not approved by the Court, the Schwarzman Estate does not have the authority to reduce the amounts due to Mezz Lender under the Mezz Loan and the "Borrower" is defined as Ms. Moskowitz and Mr. Lichtenstein rather than 2011 Grand;

**WHEREAS**, the Parties are desirous of seeking Court approval of the agreements originally set forth in the Waiver and Release and clarified and amplified herein and to memorialize the Schwarzman Estate's contractual commitment to aid in the confirmation and

consummation of the Plan by subordinating payment of, or waiving its entitlement to, its 20.8%

interest in the Mezz Loan as may be necessary for the confirmation and consummation of the Plan,

including without limitation, receiving its 20.8% of the payoff amount of the Mezz Loan and

immediately turning over its share of the Mezz Loan payoff to the Debtors if necessary;

      **NOW, THEREFORE**, in consideration of the promises made to each other in this PSA

and other good and valuable consideration, the receipt and sufficiency of which is hereby

acknowledged, the Parties, intending to be legally bound, agree to the terms hereof as follows:

      1.     The Schwarzman Estate waives its rights to its share of the proceeds on the payoff

of the Mezz Loan, thus effectively reducing the Mezz Loan payoff amount proportionally by its

20.8% interest therein, provided that the Plan is confirmed resulting in the reorganized Debtors

maintaining control of the property at 227 Grand Street, Brooklyn NY.

      2.     The Schwarzman Estate agrees to subordinate its share of the payoff of the Mezz

Loan in the original amount of One Million Five Hundred Thousand Dollars ($1,500,000) to the

holders of the share of the Mezz Loan attributable to Five Million Seven Hundred Thousand

Dollars ($5,700,000) of the original principal balance of the Loan.

      3.     If necessary for the confirmation and consummation of the Plan, the Schwarzman

Estate further agrees to waive any claims to its share of the Mezz Loan payoff, including its share

based on the original principal of One Million Five Hundred Thousand Dollars ($1,500,000) and

any accrued interest, fees, default interest and other fees, upon the payoff of the Mezz Loan to the

Mezz Lender effected under a confirmed Plan resulting in the reorganized Debtors maintaining

control of the property at 227 Grand Street, Brooklyn NY.

      4.     The Schwarzman Estate agrees to use its best efforts to aid in the confirmation and

consummation of the Plan by subordinating payment of, or waiving its entitlement to its 20.8%

interest in the Mezz Loan, as may be necessary for the confirmation and consummation of the

Plan, including without limitation, receiving its 20.8% of the payoff amount of the Mezz Loan and immediately turning over its share of the Mezz Loan payoff proceeds to the Debtors.

5.    **Acknowledgment**.    Each Party represents and warrants that he, she, or it has carefully read and fully understands this PSA and its final and binding effect; has been afforded sufficient time and opportunity to review it with advisors or attorneys of his, her, or its choice; has had an opportunity to negotiate the terms; is fully competent to manage his, her, or its own business and to enter into and sign this PSA; has signed it knowingly, freely, and voluntarily; and that the only promises made to induce him, her, or it to sign this PSA are those stated herein.

6.    **Entire Agreement**. This PSA constitutes the entire agreement of the Parties relating to the Schwarzman Estate's 20.8% interest in the Mezz Loan, the Debtors and the Plan. This PSA may not be modified, amended, waived or revoked orally, except by a writing signed by all Parties. This PSA supersedes and replaces all prior agreements, discussions and representations between the Parties, all of which are merged into, and superseded by, this PSA. No party is entering into this PSA in reliance upon any oral or written promises, inducements, representations, understandings, interpretations or agreements other than those contained in this PSA.

7.    **Governing Law**. The enforcement and interpretation of this PSA shall be governed by the laws of the State of New York, without giving effect to New York's choice of law rules.

8.    **Jurisdiction**. Any dispute that arises regarding the performance or enforcement of this PSA shall be resolved in the Bankruptcy Court. By execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding.

9.    **Construction**. This PSA shall be construed in accordance with its plain meaning. The organization, format and headings are for convenience only, and shall not be used in

construing the meaning of the provisions of this PSA. This PSA has been negotiated and drafted by the Parties and their attorneys, and it will be interpreted fairly in accordance with its terms and without any construction in favor of or against any Party.

10.   **Successors**. This PSA shall be binding upon and inure to the benefit of the Parties and their respective successors, assigns, and heirs.  The Parties represent and warrant that they are authorized to enter into this PSA and that the person executing this PSA has the power and authority to bind the Party on whose behalf he or she signs this PSA.

11.   **Joint Drafting of PSA**. Preparation of this  PSA has been a joint effort of the Parties and their attorneys and therefore this PSA  should not be construed more severely against any of the Parties.

12.   **Counterparts**. This PSA may be executed by the Parties in two identical counterparts, each of which shall constitute an original for all purposes.

13.   **Signatures**. The Parties agree that PDF copies sent via email shall be effective and enforceable as if original.

14.   **Cooperation**. The Parties agree to cooperate with each other, and the Parties and their counsel agree to perform such further and additional acts and to execute such further and additional documents, upon reasonable notice to the other, as may reasonably be required for the purpose of carrying out the terms and intent of this PSA.

**[SIGNATURE PAGE TO FOLLOW]**

Dated: August 25, 2021
     New York, New York

MY2011 GRAND LLC

By: _____

Its: _____
     Manager


THE SCHWARTZMAN ESTATE

By: _____

Title: _____
     EXECUTOR

Exhibit B to Plan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**MY 2011 Grand LLC, *et al.*,** [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-23957 (RDD)<br>(Jointly Administered) |

## STIPULATION AND ORDER RESOLVING PROOF OF CLAIM
## FILED BY 227 GRAND STREET MEZZ LENDER LLC
## <u>(CLAIM NOS. 3 IN BOTH CASES)</u>

MY 2011 Grand LLC ("2011 Grand") and S&B Monsey LLC ("S&B"), the jointly administered debtors herein (each a "Debtor" and collectively, the "Debtors"), the Estate of Abraham Schwarzman (the "Schwarzman Estate"), Grand Living II, LLC ("GL II") and Grand Living, LLC ("GL", collectively with the Estate, GL and GL II, the "Non-Debtors") and 227 Grand Street Mezz Lender LLC  ("227 Mezz Lender," and together with the Debtors and the Non-Debtors, collectively the "Parties", and each a "Party"), by and through undersigned counsel, hereby stipulate and agree (the "Stipulation") as follows:

**WHEREAS**, on November 6, 2019 (the "Petition Date"), the Debtors filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); and

**WHEREAS**, on July 7, 2020, the Debtors filed their Joint Plan of Reorganization [ECF No. 37] and Joint Disclosure Statement [ECF No. 38], as further amended by *First Amended Joint Plan of Reorganization and First Amended Joint Disclosure Statement* on July 9, 2021 [ECF Nos. 103, 104]; *Second Amended Joint Plan of Reorganization and Second Amended Joint Disclosure Statement* on November 19, 2021 [ECF Nos. 146, 147, 151], *Third Amended Joint Plan of Reorganization and Third Amended Joint Disclosure Statement* on January 5, 2022 [ECF No. 164,

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification numbers are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).

{01151941.DOCX;3 }

165] and *Fourth Amended Joint Plan of Reorganization and Joint Fourth Amended Disclosure Statement* [ECF Nos. 171, 172] (collectively, the "Plan" and Disclosure Statement"); and

**WHEREAS**, on August 24, 2020, 227 Mezz Lender timely filed a proof of claim against each Debtor (assigned claim number 3 in both Debtor cases) asserting a secured claim in the amount of $10,281,719.45 in each of the Debtors' cases (collectively, the "Filed 227 Mezz Lender Claims"); and

**WHEREAS**, on August 24, 2021, the 227 Mezz Lender filed an objection to the Amended Disclosure Statement [ECF No. 119] and on August 27, 2021, the Debtors filed their Response to the objection [ECF No. 123]; and

**WHEREAS**, on December 30, 2021, 227 Mezz Lender and 215 Moore Street Mezzanine Lender LLC ("Moore Mezz Lender") filed their joint objection to Second Amended Disclosure Statement [ECF No. 159] and on January 5, 2022, the Debtors' filed their Response to the objection [ECF No. 167]; and

**WHEREAS**, on February 25, 2022, the Debtors filed the Verified Objection to the 227 Mezz Lender Claims (the "Debtors' Claims Objection") [ECF No. 176]; and

**WHEREAS**, on March 24, 2022, the 227 Mezz Lender filed its Response to the Debtors' Claims Objection (the "Mezz Lender Response") [ECF No. 180] asserting that the Filed 227 Mezz Lender Claim was $15,075,199.55 as of March 31, 2022 (the "227 Mezz Lender Claim"); and

**WHEREAS**, on March 28, 2022, the Debtors filed their Verified Reply in support of the Objection and in reply to the Response (the "Debtors' Reply") [ECF No. 184]; and

**WHEREAS,** on March 31, 2022, a hearing was held on the Debtors' Claims Objection, where the Court provided preliminary views as to its ruling on the Debtors' Claims Objection.

**WHEREAS**, on April 11, 2022, the 227 Mezz Lender filed a Motion for an Order Converting the Debtors' Cases to Cases Under Chapter 7 of the Bankruptcy Code (the "Conversion Motion") [ECF No. 187], which is currently scheduled to be heard on June 8, 2022 at 10:00 a.m.

**NOW, THEREFORE**, upon the foregoing recitals, which are incorporated as though fully set forth herein, subject to the approval of the Court, and after good faith negotiations between the Parties, it is hereby stipulated and agreed by and between the Parties as follows:

1.      Except as otherwise provided herein, the Parties hereby agree that entry into this Stipulation shall fully and completely resolve any and all issues, disputes or controversies related to, arising from, or derivative of the 227 Mezz Lender Claim.

2.      The 227 Mezz Lender Claims (claim nos. 3 in both cases) are hereby settled, fixed, and allowed as a secured claim in the amount of $10,800,000 against each of the Debtors to be paid pursuant to a Fifth Amended Joint Plan of Reorganization (the "New Plan") (as set forth hereinafter, the "Allowed Plan Claims"). The $10,800,000 payment as an Allowed Plan Claim does not include any payments to the Schwarzman Estate, which shall receive no payment on account of the Schwarzman's Estate's investment in 227 Mezz Lender other than in the context of a Sale (whether the 227 Mezz Lender submits a credit bid or receives proceeds). The Schwarzman Estate agrees that it shall not receive any of the $10,800,000 payment to 227 Mezz Lender on account of the settlement of the 227 Mezz Lender Claims if the payment under this Stipulation is on the $10.8 million Allowed Plan Claims.

3.      Upon Court approval of this Stipulation, the Debtors shall submit a further amended Disclosure Statement ("New Disclosure Statement") and New Plan to the Court incorporating the terms of this Stipulation and shall seek to schedule a confirmation hearing on the New Plan during June 2022. Upon approval or preliminary approval of the New Disclosure Statement, the 227 Mezz Lender shall submit a ballot voting in favor of confirmation of the New Plan and shall

withdraw its prior disclosure statement objections on the express condition that the New Plan provide for full payment of the Allowed Claims by no later than July 15, 2022, with time being of the essence (the "Agreed Payment"). The 227 Mezz Lender agrees to support confirmation of a New Plan that provides for full payment of the Allowed Plan Claims, including having the confirmation hearing on the New Plan scheduled on shortened notice, and to not object to confirmation thereof; provided there is nothing in the New Plan that is adverse to or inconsistent with this Stipulation.

4.     Upon the approval of the New Plan and 227 Grand Mezz Lender's receipt of the $10.8 million, the Estate shall be deemed to have fully released and discharged 227 Grand Mezz Lender and its respective heirs, agents, legal representatives, members, affiliates, successors, assigns and beneficiaries from any and all claims (as defined in Section 101(5) of the Bankruptcy Code), which the Schwarzman Estate has or may have had at any time against 227 Grand Mezz Lender, including, but not limited to, claims relating to the payment of the $10.8 million Allowed Plan Claim to paid to 227 Grand Mezz Lender.

5.     Upon the receipt of $10.8 million by Debtors on account of the Allowed Plan Claim, 227 Grand Mezz Lender shall be deemed to have fully released and discharged the Schwartzman Estate and its respective agents, legal representatives, successors, assigns and beneficiaries of any and all Claims (as defined in Section 101(5) of the Bankruptcy Code) which 227 Mezz Lender has or may have had at any time against the Schwarzman Estate.

6.     If the $10.8 million Allowed Plan Claim is not received by 227 Mezz Lender by July 15, 2022, the real property owned by GL located at 225-227 Grand Street, Brooklyn, New York (the "Real Property") shall be marketed for sale by DJ Johnston of B6 Brokerage as of July 16, 2022 for 60 days, until September 16, 2022. This shall be a fair market value sale process, seeking the highest and best offer with a contract signing scheduled to the highest bidder for no

later than September 15th and closing to occur no later than 30 days after the contract signing (i.e., Friday, October 14, 2022) (the "Sale"). In the event that the process shall not result in the net proceeds from the Sale in sufficient amounts to cover the Allowed Sale Claim and the other payments necessary as per Section 8 below by Sept 15, 2022, then an auction shall take place on September 16, 2022, with a contract signing on the same day, and a closing to occur no later than 30 days after the contract signing (i.e., Friday, October 14, 2022). 227 Mezz Lender shall have the right to credit bid at the auction for the Sale of the Real Property as set forth herein.

7.    If 227 Mezz Lender is not paid by July 15, 2022, time of the essence, then the 227 Mezz Lender Claims shall become allowed claims in their full amount, including default interest, legal fees and any other fees and expenses allowed under the loan documents, which is in the amount of $16,148,422.96 (as of October 15, 2022), including legal fees through May 15, 2022 and all costs (the "Allowed Sale Claims")[2], and the Debtors waive all objections to such claims, including the right to commence an adversary proceeding to equitably subordinate the claim of 227 Mezz Lender.  For the avoidance of doubt, in the event of a Sale, the Allowed Sale Claims shall include the participation interest of the Schwarzman Estate.  In the event of a Sale, the 227 Mezz Lender shall receive full payment on account of its Allowed Sale Claim (of which the Schwarzman Estate with its 20.8% participation interest in 227 Mezz Lender would receive an aggregate of $3,358,871.96 on account of the Allowed Sale Claims). To ensure full payment, 227 Mezz Lender shall be entitled to credit bid at an auction (as set forth in paragraph 11 below).

8.    The Parties agree that in the event of a Sale, the proceeds from the Sale of the Real Property shall be in the following order:

---

[2] For the avoidance of doubt, in the event that 227 Mezz Lender is paid on account of its Allowed Sale Claim, it shall be entitled to recover its legal fees and expenses between May 16, 2022 and the date it receives payment. Nothing in this Stipulation shall affect or impair 227 Mezz Lender's right to collect attorneys' fees under the loan documents with the Debtors.

{01151941.DOCX;3 }                                    - 5 -

(a)   First, to the senior lender 227 Grand Street LLC , whose claim will be in the amount of $18,918,262.30 as of July 15, 2022, not including attorney fees and costs ("Senior Claim"), provided however, the amount of the Senior Claim shall only be valid if GL complies with its agreement and understandings with 227 Grand Street LLC..

(b)   Second, to All Year Holdings Limited ("AYHL"), as provided in the AYHL Stipulation (as defined below), whose claim is in the approximate amount of $5 million as of June 1, 2022 ("AYHL Claim").

(c)   Third, to 227 Mezz Lender, whose Allowed Sale claim is $16,148,422.96 as of October 15, 2022 (not including legal fees after May 15, 2022). For the avoidance of doubt, in the event of a Sale, the Allowed Sale Claim shall include the interests of the Schwarzman Estate's participation interest in the Allowed Sale Claim of 227 Mezz Lender.

(d)   Fourth, pro rata to the claims of allowed unsecured creditors in the aggregate amount of $1,710,675, inclusive of a $1,500,000 allowed claim of the 215 Moore Mezzanine Lender.

(e)    Fifth, to the Debtors in their proportion of ownership of the Real Property.

9.      The Parties agree that no other payments shall be made from the proceeds before the claimants in paragraph 8 above receive payment.

10.      In the event of a Sale, the form of Purchase and Sale Agreement ("PSA") must be reasonably acceptable to 227 Mezz Lender and consistent with the terms of this Stipulation. To the extent  there is a dispute as to the terms of the PSA, the Bankruptcy Court shall make a final determination as to the appropriate terms of the PSA consistent with this Stipulation.

11.      In the event that 227 Mezz Lender seeks to submit a bid for the Real Property at the auction for the sale of the Real Property, it shall pay sufficient cash to pay the full amount of the Senior Claim and AYHL Claim  ("Initial Cash Amount") before it is entitled to bid its Allowed Sale Claim toward the purchase price of the Real Property. In the event the bidding to purchase the Real Property exceeds the aggregate amount of the Senior Claim and AYHL Claim, the 227 Mezz Lender may credit bid up to the amount of the Allowed Sale Claim. To the extent that the

amount bid at the auction exceeds, the sum of the Senior Claim, the AYHL Claim and the Allowed Sale Claim, then the 227 Mezz Lender must pay cash for any bid it makes to purchase the Real Property in excess thereof.

12.    It is a condition of the effectiveness of this Stipulation that both 227 Grand Street LLC agrees to Section 8(a) of this Stipulation only, and AYHL, the holder of a junior mortgage on the Real Property, agree to the terms of this Stipulation  and execute same on or prior to June 7, 2022.

13.    GL and GL II each hereby waive the right and ability to file for bankruptcy protection and represent that they have no present or future intent to file for bankruptcy protection. GL and GL II further acknowledge that any bankruptcy filing by either of them would be futile and commenced in bad faith.

14.    GL and GL II each hereby acknowledge and agree that should a proceeding under any bankruptcy or insolvency law be commenced by or against them, or if any of their property (including the Real Property) should become the subject of any bankruptcy or insolvency proceeding, then the 227 Mezz Lender shall be entitled, as specific consideration for this Stipulation, to, among other relief to which it may be entitled under thus Stipulation and the loan documents it has executed with the Debtors (the "Loan Documents") and/or applicable law, an order from the Court granting immediate relief from the automatic stay pursuant to 11 U.S.C. §362 to permit (i) the Sale of the Real Property to occur and (ii) 227 Mezz Lender to exercise all of its rights and remedies pursuant to the Loan Documents, the Stipulation and/or applicable law.

15.    In the event that either GL or GL II become the subject of any bankruptcy or insolvency proceeding, the Debtors each hereby acknowledge and agree that the 227 Mezz Lender shall be entitled as specific consideration for this Stipulation, to, among other relief to which it may be entitled under this Stipulation and the Loan Documents and/or applicable law, an order

from the Court granting immediate relief from the automatic stay pursuant to 11 U.S.C. §362 to permit (i) the Sale of the Real Property to occur and (ii) 227 Mezz Lender to exercise all of its rights and remedies pursuant to the Loan Documents, the Stipulation and/or applicable law.

16.     The Conversion Motion is hereby withdrawn without prejudice.

17.     227 Mezz Lender affirmatively represents and warrants that it has not previously assigned, sold or pledged either the Mezz Lender Claims to any third party, in whole or in part.

18.     The Parties agree that upon (i) this Stipulation being approved by the Bankruptcy Court, (ii) and upon 227 Mezz Lender receiving payment on account of the Allowed Plan Claims or the Allowed Sale Claims, as the case may be, the 227 Mezz Lender shall be barred from asserting any further claims with respect to 227 Mezz Lender's loan to the Debtors or the Real Property against the Debtors or the Debtors' estates, and (iii) and 92 days after the 227 Mezz Lender receives payment on account of the Allowed Plan Claims or the Allowed Sale Claims, as the case may be, the 227 Mezz Lender, on behalf of itself, and its successors and assigns, hereby releases, acquits and forever discharges the Debtors and the Debtors' estates from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorney's fees) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, that 227 Mezz Lender may have or claims to have arising out of or connected with the 227 Mezz Lender's loan to the Debtors or the Real Property (other than the Debtors' obligations to pay the Allowed Plan Claims or Allowed Sale Claims and any other obligations under this Stipulation). Notwithstanding the foregoing, in the event that all or a portion of the payment on account of the Allowed Plan Claims or the Allowed Sale Claims are required to be disgorged as a preferential transfer or otherwise, the release provided by the 227 Mezz Lender herein shall be *void ab initio* and the 227 Mezz Lender Claim shall remain an obligation of the Debtors minus the

payment amounts that it has received and retained, and the 227 Mezz Lender shall have the right to bring such claims against the Debtors and others as it deems appropriate.

19.    Upon the Court approval of this Stipulation and the entry of an order confirming the New Plan becoming a Final Order, the Debtors shall be deemed to have fully released and discharged the 227 Mezz Lender and its respective heirs, agents, legal representatives, members, affiliates, successors, assigns, and beneficiaries from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorney's fees) of any kind, character or nature whatsoever, known or unknown, fixed or contingent which any of the Debtors have or may have had at any time against the 227 Mezz Lender, its members, owners, affiliates, successors and assigns, including, but not limited to, claims relating to the Allowed Plan Claims, the Allowed Sale Claims and the Debtors' Claims Objection (including the right to commence any adversary proceedings against the 227 Mezz Lender, provided, however, that nothing contained in this paragraph 19 shall release any of the obligations of the 227 Mezz Lender under this Stipulation, the New Plan or the Sale (including the obligation to pay 227 Mezz Lender under the terms of this Stipulation).

20.    The terms of this Stipulation shall be incorporated into the Plan and the order confirming the Plan.

21.    This Stipulation constitutes the entire agreement between the Parties related to the subject matter hereof, and supersedes all prior negotiations or agreements, oral or written, between the Parties with respect to all or any part of the subject matter hereof, which negotiations or agreements shall be of no further force or effect. It is expressly understood and agreed by the Parties hereto that this Stipulation may not be altered, amended, modified or otherwise changed in any respect whatsoever except by a writing duly executed by each Party or its authorized representatives.

22.    A condition to this Stipulation is that prior to the execution of this Stipulation, the Debtors are required to provide 227 Mezz Lender with either a binding term sheet or financing commitment satisfactory to it.

23.    227 Grand Street LLC has executed this Stipulation solely to indicate the amount due to it as of July 15, 2022 (subject to the caveat in paragraph 8(a) hereof. In consideration of 227 Grand Street LLC's execution of this Stipulation, upon execution thereof the Debtors, GL and GL II shall be deemed to have fully released and discharged 227 Grand Street LLC and its heirs, agents, legal representatives, members, owners, principals, affiliates, subsidiaries, successors, assigns, and beneficiaries from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorney's fees) of any kind, character or nature whatsoever, known or unknown, fixed or contingent which any of the Debtors, GL or GL II have or may have had at any time against 227 Grand Street LLC, and its heirs, agents, legal representatives, members, owners, principals, affiliates, subsidiaries, successors, assigns, and beneficiaries relating the Senior Claim and the loan and the Property in connection therewith,

24.    As requested by the parties hereto, in exchange for AYHL acknowledging the terms of this Stipulation, the Debtors have agreed to modify the terms of the AYHL Stipulation (as defined below) as set forth in this paragraph and the entry of this Stipulation as ordered shall act similarly as a court order modifying the AYHL Stipulation.  AYHL has agreed to acknowledge the terms of this Stipulation subject to the following:

A.    The terms of this Stipulation shall not alter or diminish in any way the rights of AYHL under the Stipulation of Settlement between the Debtors and AYHL so ordered by the Court on October 25, 2021 [Docket No. 136] (the "AYHL Stipulation") and shall only complement and augment such rights, and not be in derogation of the AYHL Stipulation, other than as set forth herein.

B.  AYHL shall be paid, as reimbursement toward its additional legal fees, an amount of $50,000 payable as follows: (a) $25,000 to be wired to the escrow account of AYHL counsel, to be released upon execution of this Stipulation, and (b) $25,000 to be paid on the earlier of distributions to claimants under a Plan or upon a Sale, provided, however, that  such payments shall not be paid by the Debtors or from Sale proceeds and shall, instead, be paid by Grand Living LLC, Grand Living II, LLC or their or the Debtors' principals as named in the AYHL Stipulation out of non-Debtor assets, which parties explicitly consent to be so obligated hereunder as indicated by their signatures below.

C.    AYHL shall have received, in recordable form, the AYHL Mortgage (as defined in the AYHL Stipulation) including  the note required under the AYHL Stipulation and, pursuant to this Stipulation, is hereby authorized to file such Mortgage in accordance with the terms set forth in this Stipulation and the AYHL Stipulation.

D.    AYHL shall be entitled to the benefit of paragraphs 10, 13-15, 20 and 22 of this Stipulation and to enforce, inter alia, such provisions hereunder for the benefit of AYHL.

E.    Section 7(a) of the Settlement Agreement as defined in the AYHL Stipulation and Section 19(c) of the AYHL Stipulation are each, hereby modified to remove the last sentence of each such respective section.

F.    The Debtors will share any term sheets with AYHL.

G.    By no later than June 10, 2022, the Debtors shall retain the agreed upon broker, provide such broker with requisite and sufficient information as is customary to commence a marketing and sales process.  The Parties further agree that for purposes of

{01151941.DOCX;3 }                                        - 11 -

the AYHL Stipulation and Settlement Agreement, the "marketing process" is deemed to have commenced on May 1, 2022.

25.    This Stipulation shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing officers, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments hereunder, or who may be required to report or insure any title or state of title in or to the Property.    Each and every federal, state, and local governmental agency or department, and any other person or entity described in the preceding sentence, is hereby authorized to accept any and all documents and instruments in connection with or necessary and appropriate to consummate the Sale contemplated by this Stipulation.    A certified copy of this Stipulation may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any encumbrances.

26.    This Court shall retain jurisdiction over the Parties, who each consent to such jurisdiction of the Court, to interpret, enforce, and resolve any disputes advising on or related to the Stipulation, the New Plan and the Sale.

27.    This Stipulation may be executed in any number of counterparts and by facsimile, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument.

28.    This Stipulation shall be binding upon and inure to the benefit of the Parties and each and all of their respective successors, assigns, heirs and personal representatives.

{01151941.DOCX;3 }                                 - 12 -

29.     It is hereby acknowledged that each Party has participated in and jointly consented to the drafting of this Stipulation, and that any claimed ambiguity shall not be construed for or against either Party on account of such drafting.

30.     The undersigned attorneys hereby represent and warrant that they are authorized to execute this Stipulation on behalf of their respective clients.

*[SIGNATURE PAGE TO FOLLOW]*

Dated: New York, New York
May ___, 2022

**AKERMAN LLP**


By:_____
      Mark S. Lichtenstein
      Joshua D. Bernstein
      Benjamin R. Joelson
      1251 Avenue of the Americas, 37th Floor
      New York, NY 10020
      Tel. (212) 880-3800
      E-mail: mark.lichtenstein@akerman.com
      E-mail: joshua.bernstein@akerman.com
      E-mail: benjamin.joelson@akerman.com

-and-

BACKENROTH FRANKEL & KRINSKY, LLP
Mark Frankel
800 Third Avenue
New York, New York 10022
Tel. No.: (212) 593-1100
E-mail: mfrankel@bfklaw.com

*Counsel for the Debtors*

**Dated: May __, 2022**

**GRAND LIVING II LLC**

By:_____
Name:_____
Title: Manager

**Dated: May __, 2022**

**GRAND LIVING LLC**

By:_____
Name:_____
Title: Manager

Dated: New York, New York
May __, 2022

**LEECH TISHMAN ROBINSON BROG, PLLC**


By:_____
      Steven B. Eichel
      Fred B. Ringel
      875 Third Avenue, 9th Floor
      New York, New York 10022
      Tel. Co.: (212) 603-6300
      E-mail: Fringel@ leechtishman.com
      E-mail: Seichel@leechtishman.com

*Counsel for 227 Grand Street Mezz Lender LLC*

Dated: New York, New York
    May ___, 2022

**AKERMAN LLP**

By:_____

    Mark S. Lichtenstein
    Joshua D. Bernstein
    Benjamin R. Joelson
    1251 Avenue of the Americas, 37th Floor
    New York, NY 10020
    Tel. (212) 880-3800
    E-mail: mark.lichtenstein@akerman.com
    E-mail: joshua.bernstein@akerman.com
    E-mail: benjamin.joelson@akerman.com

-and-

BACKENROTH FRANKEL & KRINSKY, LLP
Mark Frankel
800 Third Avenue
New York, New York 10022
Tel. No.: (212) 593-1100
E-mail: mfrankel@bfklaw.com

*Counsel for the Debtors*

**Dated: May __, 2022**

**GRAND LIVING II LLC**

By:_____
Name:_____
Title: Manager

**Dated: May __, 2022**

**GRAND LIVING LLC**

By:_____
Name:_____
Title: Manager

Dated: New York, New York
    May __, 2022

**LEECH TISHMAN ROBINSON BROG,
PLLC**

By:_____

    Steven B. Eichel
    Fred B. Ringel
    875 Third Avenue, 9th Floor
    New York, New York 10022
    Tel. Co.: (212) 603-6300
    E-mail: Fringel@ leechtishman.com
    E-mail: Seichel@leechtishman.com

*Counsel for 227 Grand Street Mezz Lender LLC*

**ESTATE OF ABRAHAM SCHWARTZMAN**

By :

_____

Toby Moskovits

_____

Michael Lichtenstein

**ESTATE OF ABRAHAM SCHWARTZMAN**

By :

**CONSENTED AND ACKNOWLEDGED TO THIS __ DAY OF JUNE, 2022:**

**ALL YEAR HOLDINGS LIMITED**

By:_____
Name:_____
Title:_____

**227 GRAND STREET LLC,**
**as to the applicable paragraphs set forth**
**above only.**

By:_____
Name:_____
Title:_____
Joshua Zegen
Authorized Signatory

**SO ORDERED THIS ___ DAY OF JUNE, 2022:**

—
Robert D. Drain
United States Bankruptcy Judge

{01151941.DOCX;3 }                    - 16 -

# Exhibit C to Plan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MY 2011 Grand LLC, *et al.*, [1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 19-23957 (RDD)<br>(Jointly Administered) |

## STIPULATION AND ORDER RESOLVING PROOF OF CLAIM
## FILED BY 215 MOORE STREET MEZZANINE LENDER LLC
### (CLAIM NO. 4)

MY 2011 Grand LLC ("2011 Grand") and S&B Monsey LLC ("S&B"), the jointly administered debtors herein (each a "Debtor" and collectively, the "Debtors"), Toby Moskovits, Michael Lichtenstein, 215 Moore Street Development LLC ("Moore Development") and 215 Moore Street Mezzanine Lender LLC ("Moore Mezz Lender," and together with the Debtors, Toby Moskovits, Michael Lichtenstein, and Moore Development, collectively the "Parties", and each a "Party"), by and through undersigned, hereby stipulate and agree (the "Stipulation") as follows:

**WHEREAS,** on November 6, 2019 (the "Petition Date"), the Debtors filed for bankruptcy protection under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and

**WHEREAS,** On November 18, 2016, the Moore Mezz Lender made a loan to S&B and Moore Development evidenced by, among other things, a promissory note ("Note") dated November 18, 2016 made, executed and delivered by S&B Monsey and Moore Development to the Moore Mezz Lender in the principal sum of $9,850,000[2]; and

**WHEREAS,** on November 18, 2016, to secure the repayment of the debt evidenced by the Note, S&B and Moore Development executed and delivered a Mezzanine Loan Agreement

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification numbers are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).

[2] For brevity, the recitals do not include all loan documents that were entered into between the Parties.
{01151921.DOCX;3 }

("Mezzanine Loan Agreement") between them and the Moore Mezz Lender, as Administrative Agent; and

**WHEREAS,** on November 18, 2016, to further secure repayment of the debt, S&B executed and delivered a Pledge and Security Agreement ("S&B Pledge and Security Agreement") to Moore Mezz Lender, pursuant to which S&B pledged its 100% interest in S&B Moore to Moore Mezz Lender; and

**WHEREAS,** S&B Moore previously held a 3% interest in 215 Moore Acquisition LLC ("Moore Acquisition"), which owns the property located at 207-215 Moore Street, Brooklyn, New York ("215 Moore Property"), which 3% interest was transferred to Moore Development prior to the Petition Date without the knowledge of Moore Mezz Lender when S&B transferred and assigned its 100% interest in S&B Moore to Moore Development ("S&B Moore Transfer"); and

**WHEREAS,** as a result of the S&B Moore Transfer, Moore Development owns 100% of Moore Acquisition, which is the 100% owner of the 215 Moore Property; and

**WHEREAS,** on November 18, 2016, to further secure the repayment of the debt, Moore Development executed and delivered a Pledge and Security Agreement ("Moore Pledge and Security Agreement") to Moore Mezz Lender; and

WHEREAS, as a result of the S&B Moore Transfer, Moore Development now has a 100% interest in Moore Acquisition, which interest is fully pledged to Moore Mezz Lender under the Moore Pledge and Security Agreement; and

**WHEREAS,** on July 7, 2020, the Debtors filed their Joint Plan of Reorganization [ECF No. 37] and Joint Disclosure Statement [ECF No. 38], as further amended by *First Amended Joint Plan of Reorganization and First Amended Joint Disclosure Statement* on July 9, 2021 [ECF Nos.

103, 104]; *Second Amended Joint Plan of Reorganization and Second Amended Joint Disclosure Statement* on November 19, 2021 [ECF Nos. 146, 147, 151], *Third Amended Joint Plan of Reorganization and Third Amended Joint Disclosure Statement* on January 5, 2022 [ECF No. 164, 165] and *Fourth Amended Joint Plan of Reorganization and Fourth Amended Joint Disclosure Statement* [ECF Nos. 171, 172] (collectively, the "Plan" and "Disclosure Statement"); and

WHEREAS, on August 24, 2020, Moore Mezz Lender timely filed a proof of claim (assigned claim number 4) asserting a secured claim in the amount of $17,848,567.56 against S&B (the "Filed 215 Moore Claim"); and

WHEREAS, on November 19, 2021, the Debtors filed the Verified Objection to the Filed 215 Moore Claim (the "Debtors' Objection") [ECF No. 149]; and

WHEREAS, on December 29, 2021, the Moore Mezz Lender filed its Response to the Debtors' Objection, where the Moore Mezz Lender asserted that the Filed 215 Moore Claim was $26,337,212.43 as of December 23, 2021 [ECF No. 157-158] (the "Moore Mezz Lender Response Claim") and now asserts that as of June 1, 2022 (excluding legal fees for May 2022), the claim of Moore Mezz Lender is $28,173,113.24 ("215 Moore Mezz Lender Claim"); and

WHEREAS, on December 30, 2021, Moore Mezz Lender and 227 Grand Street Mezz Lender LLC filed their joint objection to the Second Amended Disclosure Statement [ECF No. 159] and on January 5, 2022, the Debtors filed their Response to the objection [ECF No. 167]; and

WHEREAS, on January 3, 2022, the Debtors filed their Verified Reply in support of the Objection and in reply to the Moore Mezz Lender Response (the "Debtors' Reply") [ECF No. 162]; and

WHEREAS, on March 2, 2022, the Court entered an order (i) denying the portion of the claims objection seeking to estimate the 215 Moore Mezz Lender Response Claim at $0 for distribution and voting purposes, and (ii) that the allegations by Monsey against Moore

Mezz Lender asserting fraudulent transfer, equitable subordination and/or equitable marshaling as objections and/or defenses to the 215 Moore Mezz Lender Response Claim must be made in an adversary proceeding and therefore, such claims and defenses in the claims objection are denied without prejudice to their assertion in such a proceeding. [Dkt No 178].

NOW, THEREFORE, upon the foregoing recitals, which are incorporated as though fully set forth herein, subject to the approval of the Court, and after good faith negotiations between the Parties, it is hereby stipulated and agreed by and between the Parties as follows:

1.     Except as otherwise provided herein, the Parties hereby agree that entry into this Stipulation shall fully and completely resolve any and all issues, disputes or controversies related to, arising from, or derivative of the 215 Moore Mezz Lender Claim against S&B (and only S&B) under a new confirmed plan of reorganization or pursuant to a Sale (as defined below).

2.     The 215 Moore Mezz Lender Claim (Claim No. 4, as modified) is hereby settled, fixed, and allowed as an allowed unsecured claim in the amount of $750,000 against S&B Monsey in the event that  the Debtors confirm a newly filed plan of reorganization (the "215 Moore Allowed Plan Claim").

3.     Upon Court approval of this Stipulation, the Debtors shall file an amended plan ("New Plan") and disclosure statement ("New Disclosure Statement"), and upon the approval or preliminary approval of the New Disclosure Statement, the Moore Mezz Lender shall submit a ballot voting in favor of confirmation of the Plan (within the requisite period provided by the Court for voting) and shall withdraw its prior Disclosure Statement Objection on condition that the New Plan provides for full payment of the 215 Moore Allowed Plan Claim by no later than July 15, 2022.  The Moore Mezz Lender agrees to support confirmation of the New Plan that provides for full payment of the 215 Moore Allowed Plan Claim by no later than July 15, 2022, including having the confirmation hearing on the New Plan scheduled on shortened notice, and to not object

to confirmation thereof; provided there is nothing in the New Plan that is adverse, contrary to or inconsistent with this Stipulation.

4.      In the event that the 215 Moore Allowed Plan Claim is not satisfied under the New Plan by July 15, 2022, the Moore Mezz Lender shall have an allowed unsecured claim against S&B in the amount of $1,500,000 (the "215 Moore Allowed Sale Claim") in connection with any sale of the equity interests of S&B in Grand Living II, LLC or the sale of the real estate located at 225-227 Grand Street, Brooklyn, New York (the "Property") owned by Grand Living, LLC (each, a "Sale"). In the event that the Moore Mezz Lender does not receive full payment on account of the 215 Moore Allowed Sale Claim by October 14, 2022, interest shall accrue at the rate of twenty-four percent (24%) per annum from such date until the Moore Mezz Lender receives payment on account of the 215 Moore Allowed Sale Claim. The amount paid under this Stipulation will reduce the amount owed to the Moore Mezz Lender. Other than reducing the amounts owed to the Moore Mezz Lender by the Obligors (defined below) by the amount of the payment, this payment does not otherwise affect or further reduce the amount of the claim that the Obligors (defined below) owe to Moore Mezz Lender, Toby Moskovits, Michael Lichtenstein, and Moore Development each specifically acknowledge and agree to this provision.

5.      For the avoidance of doubt, any payment to the Moore Mezz Lender under the New Plan and/or under a Sale is for, as the case may be, the 215 Moore Allowed Plan Claim or the 215 Moore Allowed Sale Claim, is inclusive of all legal fees and other fees and expenses owed to the Moore Mezz Lender by S&B, and for all outstanding interest and principal owed to the Moore Mezz Lender by S&B. Notwithstanding any payment to the Moore Mezz Lender under the New Plan and/or a Sale and the attendant release of any further recourse and claims against S&B, all parties, other than S&B, that are indebted to the Moore Mezz Lender including (i) Moore Development and (ii) guarantors Toby Moskovits and Michael Lichtenstein (Lichtenstein, together

with Moskovits and Moore Development the "Obligors") shall remain liable to the Moore Mezz

Lender in all respects. Each of the Obligors specifically agrees that nothing in this Stipulation

reduces the liability to Moore Mezz Lender, except for the payments under this Stipulation.

6.      The Parties agree that in the event of a Sale, the proceeds from the Sale of the Real

Property shall be in the following order:

(a)     First, to the senior lender Madison Realty, whose claim is approximatley $19 million as of June 1, 2022 ("Senior Claim").

(b)     Second, to All Year Holdings Limited ("AYHL"), whose claim is in the approximate amount of $ 5 million as of June 1, 2022 ("AYHL Claim").

(c)     Third, to 227 Mezz Lender, whose Allowed Sale Claim is in the amount of approximately $16,148,422.96 as of October 15, 2022. For the avoidance of doubt, in the event of a Sale, the Allowed Sale Claim shall include the the Schwarzman Estate's participation interest in the Allowed Sale Claim of 227 Mezz Lender.

(d)     Fourth, to the Moore Mezz Lender and the other holders of allowed unsecured claims, whose claims are in the aggregate amount of $1,710,675 with 215 Moore Allowed Sale Claim representing  $1,500,000 of such amount.

(e)     Fifth, to the Debtors on account of their equity interests.

7.      The Parties agree that no other payments shall be made from the proceeds before

the claimants in paragraph 6 above receive payment.

8.      In the event that the Moore Mezz Lender seeks to bid for the Real Property at the

auction for the sale of the Real Property, it shall pay cash to pay the full amount of the Senior

Claim, the AYHL Claim, and 227 Mezz Lender's Allowed Sale Claim ("Initial Cash Amount")

before it is entitled to bid its 215 Moore Allowed Sale Claim toward the purchase price of the Real

Property.  In the event the bidding to purchase the Real Property exceeds the aggregate amount of

the Senior Claim, the AYHL Claim, and the 227 Mezz Lender Allowed Sale Claim, the Moore

Mezz Lender may credit bid up to $1.5 million, which is the amount of the 215 Moore Allowed

Sale Claim, but also must take into account the claims of the other unsecured creditors and provide a further cash bid in proportion to the amount of the other holders of allowed general unsecured claims to ensure that such other unsecured creditors receive a distribution based on their pro rata percentage of all unsecured claims (including the 215 Moore Allowed Sale Claim to the extent the Moore Mezz Lender submits a credit bid of all or a portion of its 215 Moore Allowed Sale Claim). To the extent that the amount bid at the auction exceeds, the sum of the Senior Claim, the AYHL Claim, the Allowed Sale Claim and the 215 Moore Allowed Sale Claim, then the Moore Mezz Lender must pay cash for any bid it makes to purchase the Real Property in excess thereof (inclusive of cash necessary to compensate the other unsecured creditors in their proportional amount of the Moore Mezz Lender's credit bid as compared to the amount of the claims of the other unsecured creditors).

9.      In connection with the execution of the Stipulation, the Debtors acknowledge that the assignment of membership interests in S&B Moore from S&B to Moore Development was *void ab initio*. The Obligors shall execute a new assignment of the membership interests in S&B Moore LLC from S&B to Moore Development (the "Assignment of Interests") as well as an omnibus loan modification agreement and guarantor ratification agreements, and in addition, the Obligors shall cause Moore Development to execute a pledge and security agreement, a new membership interest certificate, UCC-1 financing statement, resolutions, organizational documents, any other documents that would be required to be delivered in order to obtain a UCC insurance policy and to deliver such other documents as are requested by the Moore Mezz Lender to ensure that its claim against the Obligors and its security interest set forth in the existing loan documents, including, but not limited to, (1) the First Omnibus Loan Modification Agreement, (ii) the Moore Pledge and Security Agreement, and (iii) and guarantees previously executed in favor of the Moore Mezz Lender, are preserved (collectively, the "Modification Documents"). The

execution and delivery of the Modification Documents must be signed by no later than June 3, 2022 and are a condition subsequent to the effectiveness of this Stipulation. In the event that the Modification Documents are not signed and delivered by June 3, 2022, this Stipulation shall become null and void.

10.     The Modification Documents shall contain certain representations and covenants, including, but not limited to, representing that following the effectiveness of the Assignment of Interests (which Assignment if Interests has been approved by the Court in connection with the transactions contemplated by the Stipulation): (i) Moore Development is the 100% owner of Moore Acquisition and S&B Moore (S&B Moore"), and (ii) S&B Moore and Moore Acquisition are collectively, the 100% fee owner of 215 Moore Street, Brooklyn, NY, and has not assigned that ownership interest to a third party. There will also be covenants that Moore Acquisition and S&B Moore, outside of the context of a sale of the real property or interests, as the case may be, subject to existing liens, shall not transfer, sell or convey its ownership of the 215 Moore Property to any other entity and that Moore Development shall not transfer, sell or convey its membership interest in Moore Acquisition and/or S&B Moore to any other entity. The Debtors are only aware of liens against the Property held by Madison Realty Capital and AYHL.

11.     The Additional Loan Documents are incorporated herein and attached as Exhibit A hereto. For the avoidance of doubt, the parties, including Development, agree that upon the entry of the order approving this Stipulation, the Moore Mezz Lender is hereby authorized to file a new or amended UCC financing statement against Development.

12.     It is agreed and acknowledged that Moore Development, whether as part of a bankruptcy case or under state law, shall not transfer voluntarily or involuntarily, directly or indirectly or in any other manner or by way of a fraudulent conveyance action, the three (3) percent

interest in Moore Acquisition (i.e., S&B Moore Transfer) other than as part of a sale subject to the secured claim of the Moore Mezz Lender against Moore Development.

13.    The Moore Mezz Lender affirmatively represents and warrants that it has not previously assigned, sold or pledged the 215 Moore Claim to any third party, in whole or in part.

14.    The Parties agree that upon (i) this Stipulation being approved by the Bankruptcy Court and (ii) 92 days after the Moore Mezz Lender receives payment of its 215 Moore Claim (provided that there is no filing of a bankruptcy by Grand Living or Grand Living II) on account of either the 215 Moore Allowed Plan Claim or the 215 Moore Allowed Sale Claim, the Moore Mezz Lender shall be barred from asserting any further claims against the Debtors' estates relating to the 215 Moore Property and the Moore Mezz Lender's loan to S&B and Moore Development.

15.    The Parties agree that upon (i) this Stipulation being approved by the Bankruptcy Court and (ii) 92 days after the Moore Mezz Lender receives payment of its 215 Moore Claim (provided that there is no filing of a bankruptcy by Grand Living or Grand Living II) under either the 215 Moore Allowed Plan Claim or the 215 Moore Allowed Sale Claim, the Moore Mezz Lender, on behalf of itself, hereby releases, acquits and forever discharges the Debtors and the Debtors' estates from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorney's fees) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, that Moore Mezz Lender may have against the Debtors solely with respect to the 215 Moore Property and its loan to S&B and Moore Development (other than the obligations of the Debtors with respect to the 215 Moore Allowed Plan Claim, the 215 Moore Allowed Sale Claim and any other obligations existing under this Stipulation or the New Plan).  Notwithstanding the foregoing, nothing herein shall be construed as a release, or waiver by the Moore Mezz Lender, of any rights or remedies it may have against parties other than the Debtors, including the Obligors.  The payment of the 215 Moore Allowed

Claim under the Plan or under a Sale shall be credited against the residual amount remaining due to the Moore Mezz Lender from Obligors Moore Development, Toby Moskovits and Michael Lichtenstein.

16.    Upon the entry of an order confirming the New Plan becoming a final order, the Debtors shall be deemed to have fully released and discharged the Moore Mezz Lender and its respective heirs, agents, legal representatives, members, affiliates, successors, assigns, and beneficiaries from any and all Claims which any of the Debtors has or may have had at any time against the Moore Mezz Lender, including, but not limited to, claims relating to the 215 Moore Claim and the Objection, including the commencement of any adversary proceeding seeking the avoidance and/or the disallowance of the 215 Moore Claim, provided, however, that nothing contained in this Paragraph 16 shall release any of the obligations of the Moore Mezz Lender under this Stipulation or under the confirmed New Plan. For the avoidance of doubt, the Obligors are not waiving any claims or defenses herein against the releasees for matters arising on and after the date hereof relating to the balance of the indebtedness to the Moore Mezz Lender remaining due and owing by the Obligors.

17.    The Parties agree that in the event that Moore Development files for bankruptcy (voluntarily or involuntarily), then the Moore Mezz Lender's lien on 3% of the membership interests that were transferred by S&B Moore to Moore Development as the S&B Moore Transfer shall not be deemed a preference, and Development agrees not to commence such an action to avoid the lien on the membership interests as a preference. In the event that Development commences such an action and is successful, then the S&B Moore Transfer shall revert back to S&B and Moore Mezz Lender shall retain its lien against S&B's interest in S&B Moore, notwithstanding the release provided for in paragraph 15 above. Moreover, in the event Development commences such an action, Moore Mezz Lender shall be entitled to recover

reasonable attorneys' fees and expenses in defending such an action (whether it is successful or not).

18.     This Stipulation constitutes the entire agreement between the Parties related to the subject matter hereof, and supersedes all prior negotiations or agreements, oral or written, between the Parties with respect to all or any part of the subject matter hereof, which negotiations or agreements shall be of no further force or effect.  It is expressly understood and agreed by the Parties hereto that this Stipulation may not be altered, amended, modified or otherwise changed in any respect whatsoever except by a writing duly executed by each Party or its authorized representatives.

19.     The Court shall retain jurisdiction to interpret, enforce, and resolve any disputes arising under or related to the Stipulation.

20.     This Stipulation may be executed in any number of counterparts and by facsimile, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument.

21.     This Stipulation shall be binding upon and inure to the benefit of the Parties and each and all of their respective successors, assigns, heirs and personal representatives.

22.     It is hereby acknowledged that each Party has participated in and jointly consented to the drafting of this Stipulation, and that any claimed ambiguity shall not be construed for or against either Party on account of such drafting.

23.     The undersigned attorneys hereby represent and warrant that they are authorized to execute this Stipulation on behalf of their respective clients.

### *[SIGNATURE PAGE TO FOLLOW]*

Dated: New York, New York
May __, 2022

**AKERMAN LLP**

By:

Mark S. Lichtenstein
Joshua D. Bernstein
Benjamin R. Joelson
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel. (212) 880-3800
E-mail: mark.lichtenstein@akerman.com
E-mail: joshua.bernstein@akerman.com
E-mail: benjamin.joelson@akerman.com

-and-

BACKENROTH FRANKEL & KRINSKY, LLP
Mark Frankel
800 Third Avenue
New York, New York 10022
Tel. No.: (212) 593-1100
E-mail: mfrankel@bfklaw.com

*Counsel for the Debtors*

215 Moore Street Development LLC

_____

Toby Moskovits

_____

Michael Lichtenstein

_____

**SO ORDERED:**

Dated: New York, New York
May ___, 2022

**LEECH TISHMAN ROBINSON BROG, PLLC**

By:_____

Steven B. Eichel
Fred B. Ringel
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. Co.: (212) 603-6300
E-mail: fringel@Leechtishman.com
E-mail: seichel@Leechtishman.com

*Counsel for 215 Moore Street Mezzanine Lender LLC*

Dated: New York, New York
    May __, 2022

**AKERMAN LLP**


By:_____
    Mark S. Lichtenstein
    Joshua D. Bernstein
    Benjamin R. Joelson
    1251 Avenue of the Americas, 37th Floor
    New York, NY 10020
    Tel. (212) 880-3800
    E-mail: mark.lichtenstein@akerman.com
    E-mail: joshua.bernstein@akerman.com
    E-mail: benjamin.joelson@akerman.com

                    -and-

BACKENROTH FRANKEL & KRINSKY, LLP
Mark Frankel
800 Third Avenue
New York, New York 10022
Tel. No.: (212) 593-1100
E-mail: mfrankel@bfklaw.com

*Counsel for the Debtors*

215 Moore Street Development LLC

_____
Toby Moskovits

_____
Michael Lichtenstein

_____

**SO ORDERED:**

Dated: New York, New York
    May ___, 2022

**LEECH TISHMAN ROBINSON BROG,
PLLC**


By:_____
    Steven B. Eichel
    Fred B. Ringel
    875 Third Avenue, 9th Floor
    New York, New York 10022
    Tel. Co.: (212) 603-6300
    E-mail: fringel@Leechtishman.com
    E-mail: seichel@Leechtishman.com

*Counsel for 215 Moore Street Mezzanine Lender
LLC*

# Exhibit D to Plan



May 20, 2022

Heritage Equity Partners
679 Driggs Avenue
Brooklyn, NY 11211
**VIA EMAIL**

**RE: 227 GRAND STREET BROOKLYN NY**

Please accept this term sheet, as an offer from SME Capital Ventures (The "Lender") to finance the above-mentioned premises. The property will be financed on the following business terms, subject to the completion of due diligence and an execution of loan documents in the form and substance satisfactory to the parties involved:

| | |
|---|---|
| Loan Amount: | Thirty-Seven Million Dollars, ($37,000,000) (The "Loan") |
| Subject Property: | 227 Grand Street, Brooklyn, NY (The "Property") including the real property and improvements. |
| Borrower: | An SPE owning 100% interest within the subject Property (The "Borrower") including independent mangers appointed to each of the Borrower entities. Borrower must be an SPE controlled by Heritage Equity Partners or an affiliate |
| Collateral Type: | Mixed Use Investment Property |
| Interest Rate: | 1-Month LIBOR (0.25% floor) plus Seven and one half of one percent (7.50%) of the Loan payable monthly and calculated on a 360-day basis. |
| Closing: | On or about; June 15, 2022 |
| Security: | A Mortgage and Security Agreement as a 1st priority lien on the Property, a loan Policy of Title Insurance, UCC-1, pledge of equity interests in the Borrower, a Mezzanine loan, an Eagle 9 policy and such other items as shall be required by Lender to secure Loan. |
| Good Faith Deposit: | Thirty Thousand Dollars ($30,000) which shall be used towards Lender's reasonable out of pocket expenses associated with the Loan. |
| Amortization: | Interest Only |
| Loan Term: | Twelve (12) months. (The "Initial Term"). The Borrower may have two (2) options to extend the term of the loan for an additional six (6) months subject to no outstanding defaults on the Loan and each extension subject to a fee equal to one percent (1.00%) of the Loan amount paid upon execution of each extension option. |



| | |
|---|---|
| Interest Reserve: | One (1) months of interest reserve to be held by Lender from the Loan proceeds shall be maintained at all times during the Term of the Loan. Any monthly debt service payment deficiency from the rents collected by the Soft Lockbox shall be disbursed to Lender from the Interest Reserve and the Interest Reserve shall be replenished by the Borrower. Lender shall agree to an accrual on interest shortfalls above income. |
| Soft Lockbox: | Rents from the property shall be deposited into a Lender-controlled account until an amount equal to the monthly debt service is collected, followed by a sweep of any monthly excess funds to the Borrower account. |
| Origination Fee: | One and one quarter of one percent (1%) of the Loan amount paid upon execution of loan documents disbursed from the Loan proceeds. |
| Exit Fee: | One quarter of one percent (0.25%) |
| Prepayment: | The initial six (6) months of the Loan are subject a yield maintenance requirement equal to the sum of the initial six months of interest payments. Each extension option is also subject to an additional six (6) months of yield maintenance. |
| Environmental: | SME Capital Ventures will not lend on environmentally impaired properties. Borrower represents that there are no environmental issues current or past associated with the Property and shall provide third party reports illustrating the same. |
| Insurance: | The Borrower shall maintain at all times, at the Borrower's sole cost and expense policies of liability and property (including business income coverage) insurance, and other insurance required by Lender. All insurance policies must be paid at closing for 24 months. Lender shall be listed as loss payee and additional insured. Insurance policies shall be issued by insurance companies that are satisfactory to Lender and shall have an A.M. Best Key Rating of at least A/IX. |
| Guaranty: | The Lender shall have full recourse against the Principals of the Borrower ("The Guarantor") including Toby Moskovits, Michael Lichtenstein and Moshe Schweid including but not limited to 100% of the Loan's principal balance, 100% of the debt service including interest at the default rate (24.00%), leasing costs, enforcement costs, property carrying costs, instances of fraud, misrepresentation, misappropriation of funds, gross negligence, willful misconduct, removal or disposal of property of Borrower or the Property after a default, unauthorized secondary financing, unauthorized transfer of title or transfer of ownership of Borrower or voluntary bankruptcy of Borrower. Guarantor shall also deliver an environmental indemnity, governmental compliance agreement and a completion guaranty from the Borrower and Guarantor. The Guarantor, collectively, shall provide a global net worth requirement equal to the Loan and liquidity requirement. |



CAPITAL VENTURES

Disclaimer:    This Term Sheet is a commitment offer subject to, and conditioned upon, completion of all due diligence and execution of legal documentation to the satisfaction of the Lender and its counsel, including a review and approval of all Property-related documents including without limitation, title reports, insurance policies and/or certificates, surveys, engineering and property condition report, environmental reports, operating statements and tenant and lease information. If, prior to the proposed disbursement of the Loan, any fact or circumstance concerning or affecting the Property, the project, the Borrower, or any Guarantor varies materially from information previously

submitted to or received by us in our sole discretion, we shall have the right to refuse to consummate the Loan.

Governing Law:    The terms hereof shall be governed by the laws of the State of New York.

Exclusivity and Termination:    Borrower and Guarantor hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of the Loan; (b) in Lender's industry, business opportunities are limited and extremely competitive; (c) compensation to the Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit its resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry in the event the Borrower does not complete this proposed transaction or obtains financing from a competitor of the Lender. Accordingly, Borrower and Guarantor hereby expressly agree to work exclusively with Lender to procure the Loan and agree not to, and will cause their principals and affiliates not to, obtain or attempt to arrange financing in connection with the Property with any party other than Lender. The exclusivity period in this paragraph shall run through August 1, 2022 (the "End Date"). If prior to the End Date Borrower, Guarantor or an affiliate or controlled entity of either (a) obtains financing for or related to the Property from a source other than Lender (including joint venture equity), or (b) sells, assigns or otherwise conveys the Property or its contract to acquire the Property, then Borrower and Guarantor on a joint and several basis, shall be obligated to pay and Lender shall be deemed to have earned a break-up fee in the amount of (i) 2% of the Loan amount and (ii) the total out-of-pocket costs of the Lender in connection with underwriting, allocating and attempting to consummate the Loan (inclusive of breakage fees and costs of committed capital) and reasonable attorneys' fees and disbursements related to the Loan and this Term Sheet (collectively, the "Break-Up Fee"), which break-up fee constitutes a reasonable estimate of Lender's damages and which break-up fee shall constitute liquidated damages. Borrower and Guarantor shall also be responsible for Lender's reasonable legal fees and costs in connection with the recovery of the break-up fee. This foregoing exclusivity provision and



obligation to pay the Break-Up Fee are in consideration for Lender issuing this Term Sheet and shall be binding upon Borrower and Guarantor shall survive the termination or expiration of this Term Sheet. The break-up fee shall be due and payable to Lender within five (5) days of written demand for payment by Lender.  The obligations of Borrower and Guarantor under this paragraph are joint and several. To the extent that, (a) the Loan does not close in accordance with the terms herein by the Closing Date or (b) any of the documents or materials contemplated to be delivered to Lender are not satisfactory to Lender (in lender's sole and absolute discretion), then in such event, Borrower and Guarantor, on a joint and several basis, shall be responsible to pay Lender a fee equal to (i) 1% of the Loan amount and (ii) the total out of pocket costs of the Lender in connection with underwriting, allocating and attempting to consummate the Loan (inclusive of breakage fees and costs of committed capital) and reasonable attorneys' fees and disbursements related to the Loan and this Term Sheet (such amount being the "Termination Fee").  Borrower and Guarantor each agree that the Termination Fee is a reasonable estimate of Lender's liquidated damages in the event that the Termination Fee becomes due and payable to Lender and shall be due and payable to Lender within five (5) days of written demand for payment by Lender.  The obligation to pay the Termination Fee shall survive termination or expiration of this Term Sheet.

Expiration:                  This Term Sheet shall be null and void unless SME Capital Ventures receives an executed counterpart hereof signed by the Borrower along with the Deposit on or before May 27, 2022.

Lender:
SME CAPITAL VENTURES

By: _____
Eran Silverberg
Authorized Officer

Accepted and agreed:
Borrower

By: _____
Print Name: Michael Lichtenstein
Principal

Guarantor:

By: _____
Print Name: M. Lichtenstein

# Exhibit E to Plan

B"H

## 227 Grand Street

### Pro Forma Sources & Uses 7.15.22

Sources of Funds:

| | |
|---|---|
| Loan Amount | 37,100,000.00 |
| **Total Sources of Funds:** | **37,100,000.00** |

Uses of Funds:

| | |
|---|---|
| Senior Debt Payoff | 18,920,000.00 |
| *Mezz Debt Payoff  *** | 11,550,000.00 |
| AYHL Buyout | 5,100,000.00 |
| Unsecured Credtors | 150,000.00 |
| ***Title Fees*** | |
| Misc Title Fees | 168,000.00 |
| Loan Policy - Estimate | 50,000.00 |
| ***Sub Total - Title Fees*** | ***218,000.00*** |
| | |
| Loan Origination Fee - Senior | 371,000.00 |
| Legal - Lenders | 50,000.00 |
| Legal - Borrower | 25,000.00 |
| Bankruptcy Fees | 550,000.00 |
| UST Fees | 150,000.00 |
| Miscellaneous Expenses (TBD) | 16,000.00 |
| | |
| **Total Uses of Funds:** | **37,100,000.00** |

**\* Includes Moore Payment**

## EXHIBIT B TO DISCLOSURE STATEMENT

## PLAN ANALYSIS BASED ON FILED AND PROPOSED SETTLED CLAIMS

| Assets | |
|---|---|
| Membership Interests | $14,944,300, before acquisition of AYHL interests, $23,675,000 after acquisition |

| Liabilities | |
|---|---|
| Administrative Expense Claims | $550,000 |
| Unclassified Priority Claims | $0 |
| AYHL Settlement | $5,077,000[8] |
| 227 Grand Mezz Lender LLC | $10,800,000 |
| 215 Moore Street Mezzanine Lender LLC | $750,000 |
| Priority Claims under Sections 507(a)(2),(3),(4),(5),(6),(7) and (8) of the Bankruptcy Code. | $0 |
| General Unsecured Claims | $150,000 |
| Interest Holder Equity | $6,408,675, after acquisition of AYHL interests |
| Total | $14,944,300 |

## CHAPTER 7 LIQUIDATION ANALYSIS BASED ON FILED CLAIMS

| Assets | |
|---|---|
| Membership Interests | $14,944,300 |

| Liabilities | |
|---|---|
| Administrative Expense Claims | $1,643,840 |
| Unclassified Priority Claims | $0 |
| AYHL Settlement | $0 |
| 227 Grand Street Mezz Lender LLC | $13,643,411 |
| Priority Claims under Sections 507(a)(2),(3),(4),(5),(6),(7) and (8) of the Bankruptcy Code. | $0 |
| General Unsecured Claims | -0- |
| Interest Holder Equity | -0- |
| Total | $14,944,300 |

Note: All Claim amounts subject to objection.

---

[8] Payable on Effective Date; subject to additional principal and interest, and the other remedies of AYHL, as set forth, *inter alia* at paragraph 95 of this Disclosure Statement, describing the AYHL Settlement.