Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| MY 2011 GRAND LLC, *et al*,[1] | Case No.  19-23957 (SHL) |
| | Jointly Administered |
| Debtors. | |

--------------------------------------------------------x

## **<u>SUPPLEMENT TO SIXTH AMENDED JOINT PLAN OF REORGANIZATION</u>**

Dated: New York, New York
        October 4, 2022

**BACKENROTH FRANKEL & KRINSKY, LLP**
Attorneys for Debtors


By:    <u>s/Mark A. Frankel</u>
        800 Third Avenue
        New York, New York 10022
        (212) 593-1100

_____

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: MY 2011 Grand LLC (0415) and S&B Monsey LLC (7070).

# PURCHASE AND SALE AGREEMENT

By and Between

MY 2011 GRAND LLC and S & B MONSEY LLC, as Debtors and owners of GRAND
LIVING II LLC, sole member of GRAND LIVING LLC, solely in their capacity as
Debtors and the Plan Proponents of the Sixth Amended Plan of Reorganization
as Seller

and

227 Grand JFL Holdings LLC,

as Purchaser

Dated as of October __, 2022

Property:

227 Grand Street
Brooklyn. New York 11211

66593573;1

# TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS .................................................................................................. 2

ARTICLE 2 GENERAL TERMS ........................................................................................... 2

    SECTION 2.1    The Transaction ............................................................... 2

    SECTION 2.2    Purchase Price .................................................................. 3

ARTICLE 3 PERMITTED EXCEPTIONS TITLE INSURANCE: .................................... 3

    SECTION 3.1    Sale Subject to .................................................................. 3

    SECTION 3.2    Title Report ....................................................................... 4

    SECTION 3.3    Permitted Exceptions ....................................................... 5

ARTICLE 4 APPORTIONMENTS AND PAYMENTS .......................................................... 6

    SECTION 4.1    Apportionments Relating to the Property ....................... 6

    SECTION 4.2    Taxes and Assessments .................................................... 7

    SECTION 4.3    Transfer of Utilities ......................................................... 8

    SECTION 4.4    Transfer Taxes ................................................................. 8

    SECTION 4.5    Tat Returns ....................................................................... 8

    SECTION 4.6    Title Charges .................................................................... 8

    SECTION 4.7    Transaction Expenses ...................................................... 8

    SECTION 4.8    Survival ............................................................................ 8

ARTICLE 5 COVENANTS REGARDING THE PROPERTY ............................................ 9

    SECTION 5.1    Maintenance and Operation of the Property ................... 9

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................ 9

    SECTION 6.1    Generally .......................................................................... 9

    SECTION 6.2    Closing Conditions; Survival of Representations and Warranties ....................................................................... 10

ARTICLE 7 REPRESENTATIONS AND WARRANTIES OF SELLER ................................ 11

    SECTION 7.1    Generally .......................................................................... 11

    SECTION 7.2    Property Representations ................................................. 13

    SECTION 7.3    Closing Conditions .......................................................... 13

    SECTION 7.4    Knowledge of Seller ..................... **Error! Bookmark not defined.**

ARTICLE 8 CLOSING DATE ............................................................................................. 14

    SECTION 8.1    Closing Date ..................................................................... 14

ARTICLE 9 CLOSING DOCUMENTS ............................................................................... 14

    SECTION 9.1    Closing ............................................................................. 14

66593573;1

SECTION 9.2          Further Assurances ........................................................................ 14

ARTICLE 10 NOTICES ............................................................................................. 15

SECTION 10.1        Notices .................................................................................. 15

ARTICLE 11 BROKER .............................................................................................. 16

ARTICLE 12 DEFAULTS: REMEDIES ..................................................................... 16

SECTION 12.1        Purchaser's Default ............................................................... 16

SECTION 12.2        Seller's Default ...................................................................... 16

ARTICLE 13 CASUALTY; CONDEMNATION ......................................................... 17

SECTION 13.1        Casualty .................................................................................. 17

SECTION 13.2        Condemnation ........................................................................ 18

ARTICLE 14 AS-IS: WHERE-IS DISCLAIMER; WAIVER OF CLAIMS .............. 18

SECTION 14.1        Disclaimers; As-Is, Where-Is Condition ............................... 18

SECTION 14.2        No Claim Against Plan Proponent; Release ........................... 20

SECTION 14.3        Acceptance of Closing Documents: Waivers ......................... 20

SECTION 14.4        Survival .................................................................................. 20

ARTICLE 15 BANKRUPTCY MATTERS ................................................................. 20

SECTION 15.1        Purchaser acknowledges that the Property is owned by
                    Debtor .................................................................................... 20

SECTION 15.2        Purchaser acknowledges that the Seller's obligations under
                    this Agreement ....................................................................... 20

SECTION 15.3        Purchaser further acknowledges that the sale of the Property
                    and the Landlord Claims ......................................................... 20

SECTION 15.4        Break-Up Fee ......................................................................... 20

ARTICLE 16 ESCROW .............................................................................................. 20

SECTION 16.1        Escrow Terms ......................................................................... 20

ARTICLE 17 INTENTIONALLY OMITTED ............................**Error! Bookmark not defined.**

ARTICLE 18 MISCELLANEOUS .............................................................................. 21

SECTION 18.1        Entire Agreement ................................................................... 21

SECTION 18.2        Modification ........................................................................... 21

SECTION 18.3        Binding Agreement ................................................................ 21

SECTION 18.4        Assignment ............................................................................. 22

SECTION 18.5        Illegality ................................................................................. 22

SECTION 18.6        Choice of Law ........................................................................ 22

SECTION 18.7        Construction ........................................................................... 22

SECTION 18.8        Binding Effect: Assignment; Successors and Assigns ............ 22

- ii -

SECTION 18.9      Ambiguities ................................................................. 23

SECTION 18.10     Expenses ..................................................................... 23

SECTION 18.11     Counterparts ................................................................ 23

SECTION 18.12     Waiver or Trial by Jury ................................................. 23

SECTION 18.13     Third Party Beneficiaries .............................................. 23

SECTION 18.14     Jurisdiction ................................................................. 23

SECTION 18.15     No Recording ............................................................... 24

SECTION 18.16     Not am Offer ................................................................ 24

SECTION 18.17     Failure of Deposit ....................................................... 24

SECTION 18.18     No Waiver .................................................................... 24

SECTION 18.19     Severability ................................................................ 24

SECTION 18.20     No Survival ................................................................. 24

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is entered into by and between MY 2011 GRAND LLC and S&B MONSEY LLC (the "**Plan Proponents**"). solely in their capacity as the Plan Proponents of the Sixth Amended Plan of Reorganization and members of Grand Living II LLC the sole member of Grand Living LLC collectively "**Seller**"), the owner of the Property (as defined hereafter) and 227 Grand JFL Holdings LLC ("**Purchaser**") as of this ___ day of October, 2022.

**WHEREAS**, My 2011 Grand LLC and S&B Monsey LLC (collectively, the "**Debtors**"). are debtors under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), and filed a voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on November 6, 2019 (the "**Petition Dates**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Case Nos. 19-23957 and 19-23959 (SHL) (the "**Bankruptcy Case**");

**WHEREAS**, Grand Living II LLC, which is owned by the Debtors, is the sole member of Grand Living LLC, the owner of the Property (as hereinafter defined): and

**WHEREAS,** the Plan Proponents**,** filed with the Bankruptcy Court the Sixth Amended Plan of Reorganization dated _____, 2022 (the "**Confirmed Plan**"); and

**WHEREAS**, on October __, 2022, the Bankruptcy Court entered an Order (i) Confirming Sixth Amended Plan of Reorganization of My 2011 Grand LLC and S&B Monsey LLC, and (ii) Approving Sale of Real Property Under the Confirmed Plan (the "**Confirmation Order**"); and

**WHEREAS**, the Confirmed Plan contemplated the sale of the Property to the successful bidder who submitted the highest and best offer for the Property as may be approved by the Bankruptcy Court at a hearing that is currently scheduled to take place on October 6, 2022 (the "**Sale Hearing**"); and

**WHEREAS**, the Confirmation Order includes the following general authorization: "Pursuant to section 1142(b) of the Bankruptcy Code, the Plan Proponent, the Disbursing Agent. and/or the Debtor (or Reorganized Debtor, as applicable) arc authorized, empowered and directed to (a) execute and deliver any instrument, agreement or document and (b) perform any act that is necessary, desirable, or required to comply with the terms and conditions of the Plan and consummation of the Plan, and is authorized, empowered and directed, without limitation, to take all actions necessary or appropriate to enter into, implement. and consummate the contracts, instruments, and other agreements or documents (including without limitation, deeds and accompanying transfer documents as may be required by recording officers and/or a title insurance company) created in connection with the Plan"; and

**WHEREAS**, the Bidding Procedures related to the Confirmed Plan that have been filed with the Bankruptcy Court (the "**Bid Procedures**") (copy attached as Exhibit "I") include the following provision: At the conclusion of the Public Auction Sale, and subject to Court approval, following the Public Auction Sale, the successful Bid or Bids shall be selected and announced by the Debtors (the "**Successful Bid or Bids**"), and the backup Bid or Bids shall be selected and

announced by the Debtors (the "**Backup Bid or Bids**") and enter into an asset purchase agreement with such Successful Bidder of Backup Bidder; and

**WHEREAS**, Plan Proponents have selected Purchaser to be the Successful Bidder pursuant to the Bid Procedures and the Debtors will submit to the Bankruptcy Court for the approval of Purchaser of the Property as such;

**WHEREAS**, subject to and contingent upon the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller the Property (as that term is defined in the Confirmed Plan), all as more specifically provided herein pursuant to, *inter alia* Sections 105 and 363 of the Bankruptcy Code, the Confirmed Plan, and an order of the Bankruptcy Court following the Sale Hearing (the "**Sale Order**"[1]),; and

**WHEREAS,** Seller is entering into this Agreement on behalf of Debtors, and in no other capacity, in accordance with the terms of the Confirmed Plan, the Confirmation Order, the Bid Procedures, and subject to and contingent upon approval of the Bankruptcy Court, which approval will be sought from the Bankruptcy Court at the Sale Hearing.

**NOW, THEREFORE,** subject to the terms and conditions of this Agreement, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in <u>Schedule I</u> attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

**SECTION 2.1**        **The Transaction**.

2.1.1.        Subject to the terms and conditions of this Agreement, the Bid Procedures and the entry of a Sale Order and pursuant to Section 363(b) of the Bankruptcy Code and the Confirmed Plan, Seller agrees to sell, transfer, convey and assign to Purchaser, and Purchaser agrees to purchase and accept from Seller on the Closing Date (as defined herein), free and clear of all liens, claim, encumbrances and interests, subject only to Permitted Exceptions, and any other interest to the extent acceptable to Purchaser, all of Debtors' right, title and interest, in and to (i) that certain real property as more particularly described on <u>Schedule II</u> attached hereto and made a part hereof together with the buildings and improvements thereon (the "**Improvements**") located at and commonly known as 227 Grand Street, Brooklyn, New York 11211 (collectively the "**Real Estate**" or "**Property**"). The Real Estate are to be conveyed

---

[1] The Sale Order is included as part of the Confirmation Order

together, in one simultaneous transaction, with (x) all easements, rights of way, air, zoning and/or development rights, reservations, privileges, appurtenances, sidewalks, alleys, strips, gores and other estates and rights of Debtors, if any, pertaining to its interests in the Real Estate, and (y) all right, title and interest of Debtors if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof and any award or payment made or to he made in lieu of any of the foregoing or any portion thereof and (z) all of Seller's transferable right and interest (if any) in all books, records, keys, plans, specifications, tests and other materials of any kind owned by and in the possession or control of Seller which are or may be used by Seller solely in connection with Seller's use and operation of the Real Estate or the Property (collectively, the "Books and Records") (the Real Estate and the Personality, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the "**Property**").

SECTION 2.2    **Purchase Price**.

2.2.1.    Subject to the terms and conditions herein contained, including, without limitation, Section 17.1 of this Agreement, the "**Purchase Price**" for the Property and the various assignments incidental thereto referred to herein is FOURTY MILLION FIVE HUNDRED FOUR THOUSAND EIGHT SEVENTY TWO DOLLARSAND 00/100 (**US** $41,504,872.00).  The Purchase Price shall he payable (i) by the payment of the Escrow Deposit in immediate funds by wire transfer within five days of the date hereof, and (ii) the balance in cash (by wire transfer) at the Closing as directed by Seller in writing at least two (2) Business Days prior to the Closing, Seller may direct, among other things, that Purchaser pay a portion of the Purchase Price at the Closing, in an amount or amounts specified by Seller, to persons or entities other than Seller for Seller's purposes specifically in connection with the Property, including to the Title Company (as defined hereinafter).

2.2.2.    The Parties agree that the Personalty has de minimis value. Accordingly. no portion of the Purchase Price is attributable to the Personalty.

## ARTICLE 3
## PERMITTED EXCEPTIONS TITLE INSURANCE:

SECTION 3.1    **Sale Subject to**. Subject to the terms and conditions of this Agreement and pursuant to Confirmed Plan and the Confirmation Order, Seller shall convey, and Purchaser shall accept good and insurable fee simple title to the Real Estate, insurable by the Title Company (as defined herein), at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can be removed by the Sale Order, or by an affidavit of Seller to be provided pursuant to Section 3.2.3 hereof, (b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement.  The parties hereby agree that "**Title Company**" shall mean Riverside Abstract (through its authorized agent, [_____]).

3.1.1.    Pursuant to the Sale Order, all liens, and claims (the "Liens") shall attach to the net proceeds of the sale (the "**Net Proceeds**") to the same extent they encumbered the Property. To the extent Seller is required to satisfy any of the Liens from the Net Proceeds, Seller

66593573;1

shall make such payments in accordance with the Sale Order or by further order of the Bankruptcy Court.

  **SECTION 3.2**  **Title Report**. Purchaser will promptly order an examination of title of the Property (the "**Title Report**"), at its sole cost and expense, within three (3) Business Days from receipt of an executed copy of this Agreement and will direct the Title Company to deliver copies of the Title Report to Seller's attorneys, as designated below. Purchaser has the right, at its sole expense, to complete a new survey of the Property in connection with its title review.

  3.2.1.  Purchaser further agrees that no later than the date that is twelve (12) days after the date hereof ("**Title Report Objection Date**") Purchaser will furnish to Seller's attorney a written notice (the "**Title Report Objection Notice**") specifying any exceptions to title to the Property set forth in the Title Report which are not Permitted Exceptions and "subject to", which render title uninsurable and therefore which Purchaser is not required to accept (the "**Non-Permitted Exceptions**"). Notwithstanding anything to the contrary herein, receipt of the Title Report by Seller's attorney shall be deemed notice of any objections and defects to title set forth therein.

  3.2.2.  Seller shall use reasonable efforts, at or prior to Closing, solely through the entry of the Sale Order and as provided in Section 3.1.1 above, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Debtor placed of record or consented to be placed of record and (ii) any and all other Non-Permitted Exceptions that may be trimmed by the entry of the Sale Order. Seller shall base no obligation with respect to the clearance of title as required hereunder other than the delivery of the Sale Order conforming to this Agreement. Seller shall have the right to adjourn the Closing Date, from time to time, up to ninety (90) days in the aggregate for the purpose of removing/eliminating such Non-Permitted Exceptions.

  3.2.3.  In the event that there exist any Non Permitted Exception which is not removed through the entry of the Sale Order, Purchaser may elect within ten (10) Business Days after the entry of the Sale Order, and may also elect within ten (10) Business Days after the entry of the Sale Order, and may also elect within ten (10) Business Days after the delivery to Seller's counsel of any update to the Title Report and/or survey of the Property showing any Non-Permitted Exception which is not removed through the entry of the Sale Order, as the case may be, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall he delivered to Purchaser upon Purchaser's election to terminate this Agreement and neither of the parties hereto shall have any rights or obligations to the other hereunder or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price. Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election to consummate the transaction in accordance with the terms and conditions of this Agreement. Notwithstanding the foregoing, if Purchaser elects to terminate this Agreement as set forth above, Seller shall have the right to void such termination by providing written notice to Purchaser that Seller elects, in its sole discretion, to cure the Non-Permitted Exception by removing the same at or prior to Closing. In the event Seller elects to cure the Non-Permitted Exception, Purchaser shall be obligated to complete the transaction contemplated by this Agreement.

- 4 -

3.2.4.        Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit at Closing as modified for a debtor in Chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to Purchaser in the manner required by Purchaser under this Agreement; provided however that Seller shall not  be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Sale Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein).

**SECTION 3.3**        **Permitted Exceptions**. "**Permitted Exceptions**" means:

3.3.1.        all matters set forth in the Title Report, or an update thereof with respect thereto and not objected to in accordance with Section 3.2.1;

3.3.2.        covenant, easements, restrictions and agreements of record and disclosed in the Title Report provided the same do not prohibit the use of Improvements for their current use.

3.3.3.        Intentionally omitted

3.3.4.        liens for unpaid taxes, water charges, sewer rents, vault charges, assessments, charges, rents and any other governmental charges, which are not yet due and pay able and are apportioned in accordance with the provisions of Article 4 hereof:

3.3.5.        all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate;

3.3.6.        possible minor projections and/or encroachments (of no more than 1 foot) of retaining walls, foundations, stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings. ledges, water tables. lintels. porticos, keystones. windows, hedges, copings. cellar doors, sidewalk elevators, fences, fire escapes and the like, or similar projections or objects upon, under or above any adjoining buildings and/or streets or avenues or those belonging to adjoining premises which encroach upon the Real Estate, or within any set back areas, provided that the Title Company shall insure that such projections or encroachments may remain undisturbed so long as the buildings and improvements shall stand and minor variations between the lines of record title and fences, retaining walk,  hedges. and the like;

3.3.7.        possible minor variation between the tax diagram or the tax map and the record description, to the extent they do not render title uninsurable at regular rates;

3.3.8.        any and all variations of building, fire, sanitary, environmental, housing and similar laws, municipal ordinances, orders or requirements affecting the Property (being hereafter referred to collectively as the "**Violations**") from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a "**Governmental Authority**") and provided, however, that all monetary fines, charges, penalties, judgments, liens and/or fees, together with any interest accruing thereon attaching to the Property or otherwise imposed as a result of the Violations shall be paid by Seller at the Closing;

- 5 -

3.3.9.          building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

3.3.10.          Revocability or lack of right to maintain vaults, coal chutes, excavations, or subsurface equipment beyond the property line;

3.3.11.          any matter created or caused by Purchaser or its agents;

3.3.12.          rights of the public and adjoining owner in highways, streets, roads and lanes crossing the Property provided that the Title Company shall insure (at no additional cost to Purchaser) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Property;

3.3.13.          standard pre-printed exceptions contained in the form of title insurance policy then issued by the Title Company as customarily modified following receipt of Seller's standard title affidavit:

3.3.14.          Intentionally omitted;

3.3.15.          Intentionally omitted

3.3.16.          any matters which the title Company may raise as to incurability of the Property, provided that the Title Company shall agree to omit without additional premium to Purchaser against collection of the same out of the Property; and

3.3.17.          the rights of tenants, or other persons in possession of the Property on the date of the Bankruptcy Court auction of the Property.

Notwithstanding anything to the contrary herein, Purchaser shall not be obligated to take title the Premises subject to any permitted exceptions which provide for a restriction on use, alteration, demolition of any improvements on the Premises or any monetary obligations or a forfeiture or reversion of title.

## ARTICLE 4
## APPORTIONMENTS AND PAYMENTS

**SECTION 4.1**          **Apportionments Relating to the Property**. The following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 11:59 PM of the day immediately preceding the Closing Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing (provided, however, that, other than as provided in Section 3.1.1. nothing in this Agreement shall obligate the Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party);

4.1.1.          real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts. on the basis of the fiscal year for which payable: if the Apportionment Date shall be prior to the date on which the real property tax rate is

- 6 -

fixed, the apportionment of real property taxes shall he made on the basis of the tax rate for the preceding year applied to the latest assessed valuation:

4.1.2.　　　to the extent not metered, water rates and charges, sewer taxes and rents and electricity and other utility charges. If water is metered, the Seller shall obtain a final water meter reading not more than 30 days prior to Closing and if no final reading is obtained or there is no water meter reading, Seller shall establish an escrow in terms and amounts reasonably satisfactory to Purchaser and the Title Company to omit any exception to title in respect of payment of any such charges up to the Closing Date:

4.1.3.　　　Intentionally omitted.

4.1.4.　　　insurance proceeds received by Debtor, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement. Intentionally omitted.

**SECTION 4.2**　　　**Taxes and Assessments**.

4.2.1.　　　If, on the Closing Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments arc due and payable.  Notwithstanding any other provision of this Agreement. Seller shall have no responsibility for any taxes or assessments that become due or payable as a result of the loss of any exemption following the transfer of the Property.

4.2.2.　　　to the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made alter the Closing Date is applicable to a period before the Closing Date, such refund shall he payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.

4.2.3.　　　To the event that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Date is applicable to a period alter the Closing Dale, such refund shall he payable to Purchaser or returned by Seller to Purchaser, subject to the actual costs incurred by Seller in obtaining same (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to preparation obligations to any third party).

- 7 -

**SECTION 4.3**        **Transfer of Utilities**. Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's name as of the Closing Date and Seller shall reasonably cooperate with Purchaser in connection therewith.  If utility services shall not have been transferred to Purchaser's name for the Real Estate effective as of the Closing Date, then, at the Closing, any such charges obtained by using the most recent period for which readings of such utility services shall then be available. Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's name, and Seller shall reasonably cooperate with Purchaser in connection therewith. Purchaser shall he responsible for all charges for utility services incurred as of the date of Closing. Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having and deposits currently held by such companies and municipalities returned to Seller. However, Seller shall he solely responsible for obtaining the return of its own utility company deposits, if and (provided, however, that nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third parties).

**SECTION 4.4**        **Transfer Taxes**. It is contemplated that the sale of the Property to Purchaser will be exempt from the imposition of all Transfer taxes (defined below) pursuant to the Confirmed Plan, the Confirmation Order and the Sale Order. If for any reason the sale were not exempt from the imposition of Transfer Taxes, then Seller shall he responsible (either by payment or exemption) for any real property transfer taxes, transfer gains taxes, and other similar taxes and fees, if any, imposed on Seller by the State, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser as contemplated by the provisions of this Agreement (collectively, the "**Transfer Taxes**").  Under no circumstances shall Purchaser he required to pay any Transfer Taxes imposed in connection with the sale of the Real Estate to Purchaser.

**SECTION 4.5**        **Tat Returns**. At the Closing, Purchaser and Seller shall delivery to the Title Company a New York State Transfer Tax Return  (TP-584), City of New York Real Property Transfer Tax Return (NYC-RPT) and Equalization form (RP-5217NYC) (Collectively, the "**RE Tax Returns**") and deliver same to the Title Company for delivery to the appropriate authority.

**SECTION 4.6**        **Title Charges**.  Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the costs of a survey for the Property or any update thereto and all recordings and filing fees, including, but not limited to, those in connection with the Deed.

**SECTION 4.7**        **Transaction Expenses**. Except as expressly provided herein, each party shall bear its own costs and expenses. including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

**SECTION 4.8**        **Survival**.  The provisions of this Article 4 shall survive the Closing.

- 8 -

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

**SECTION 5.1** **Maintenance and Operation of the Property**. From the date of this Agreement until the earlier to occur of (x) termination of this Agreement or (y) the Closing Date, Seller shall:

5.1.1. maintain in full force and effect the casualty insurance policies currently in effect with respect to the Property, or policies providing similar coverage, subject to customary exceptions at the time of renewal or issuance, which, without limitation, may not insure against acts of terrorism, war (declared or undeclared), or the like, and shall deliver to Purchaser, upon request, reasonable evidence of same including copies of certificates of such insurance;

5.1.2. not enter into any new lease or modify/extend any existing lease for space at the Property;

5.1.3. not enter into or renew any of the service, maintenance, supply and other contracts relating to the operation, maintenance and construction of the Property, if any (collectively, together with any amendments or modifications thereto. the "**Contracts**") that still survive the Closing; and

5.1.4. not (i) further transfer, mortgage or encumber the Property, unless as required by the Bankruptcy Court or in connection with Debtor's pending bankruptcy, (ii) execute any easements, covenants, conditions, restrictions, or rights-of-way with respect to the Property which survive Closing, (iii) enter into any recorded or unrecorded contracts with respect to the Property which are not by their terms terminable prior to Closing and not otherwise inconsistent with this Agreement, or (iv) seek any zoning changes or other governmental approvals with respect to the Property.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**SECTION 6.1** **Generally**. Purchaser represents and warrants that

6.1.1. (a) Purchaser is a duly formed and validly existing limited liability company under the Laws of the state or commonwealth of its formation and is in good standing under the Laws of the state or commonwealth of its formation and, to the extent required by Law, under the Laws of the State of New York, (b) Purchaser has the full right, authority and corporate power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party. (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms'

6.1.2. there are no legal administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser or Purchaser's Controlling Member that would adversely affect Purchaser's legal authority or

- 9 -

financial ability to perform its obligations under this Agreement and the Closing Documents which it is a party;

6.1.3.    the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party, do not and will not (a) violate or conflict with any judgment, decree or order of any court or any Law or penult applicable to it, or (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which it is a party, or by which Purchaser is bound;

6.1.4.    the execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person, or any lender from which Purchaser may seek to obtain financing, as may he applicable provided however that Purchaser acknowledges and agrees that its obligations under this Agreement are not contingent upon any such lamming;

6.1.5.    Intentionally omitted.

6.1.6.    Neither Purchaser nor any of Purchaser's affiliates or any of their manager, member, partner, shareholders or agents, have any legal or contractual relationship with the Debtors, or any of their affiliates, managers, members, partners, shareholders or agents (each, a "**Debtors' Affiliate**").  Further, Purchaser does not have an "Affiliated Relationship" (as such term is defined below) with Debtors. For purposes of this Agreement, "Affiliated Relationship"' means with respect to any specified Person, a relationship of any kind in which any other Person directly or indirectly controls, is controlled by or is under common control with such specified Person, "Affiliated Relationship" also includes an understanding, arrangement, or agreement (written or oral) between or among two or more Persons. No Affiliate has and it is not anticipated that any Debtor Affiliate will have any interest in the Purchaser.

**SECTION 6.2    Closing Conditions; Survival of Representations and Warranties**.  The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may at Seller's option be waived in writing'

6.2.1.    Each of the representations and warranties of Purchaser set forth in this Agreement shalt be deemed to have been repeated by Purchaser, at and as oft Closing Date with the same force and effect as if first made on and as of such date.  It shall be a condition to Seller's obligation to close hereunder that all such representations and warranties of Purchaser be true and correct in all material respects as of the Closing Dale.

6.2.2.    Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall he ready, willing and able to perform same on the Scheduled Closing Dace) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms or this Agreement, and (c) performed

- 10 -

in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Dale.

   6.2.3.   All other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived in writing by Seller).

   6.2.4.   The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order

   6.2.5.   The representations, warranties and certifications of Purchaser set forth in this Agreement shall not survive the Closing.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

  **SECTION 7.1**  **Generally**.  Seller represents and warrants, that the following are true and correct on the date hereof and as of the date of the Closing:

   7.1.1.   (a) subject to the Confirmed Plan, the Confirmation Order and entry of the Sale Order contemplated under the Confirmed Plan, Seller has the full right, authority and power to enter into this Agreement, and subject to the entry of the Sale Order, to consummate the transactions contemplated herein and to perform Seller's obligations hereunder and (b) subject to the entry of the Sale Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable in accordance with its terms;

   7.1.2.   The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court of governmental or quasi-governmental entity having jurisdiction over Seller including the United States of America, the State of New York or any political subdivision of either of the foregoing, of any decision or ruling of any arbitrator to which Seller is a party;

   7.1.3.   Neither Seller, nor any person controlling or controlled by Seller, is a country, territory, individual or entity named on a government list, and the monies used in connection with this Agreement and amounts committed with respect thereto, were not and are not dated from any activities that contravene any applicable anti-money laundering or anti-bribery laws and regulations (including funds being derived from any person, entity, country or territory on a government list or engaged in any unlawful activity defined under Title 18 of the United States Code, Section 1936(c)(7)). For purposes of this paragraph "Government List" means any of (a) the two lists maintained by the United States Department of Commerce (Denied Persons And Entities), (b) the list maintained by the United States Department of Treasury (specially designated nationals and blocked persons), and (c) the two lists maintained by the United States Department of State (Terrorist Organizations and Debarred Parties). Seller is not a person or an entity described by Section I of the Executive Order (No. 13,224) Blocking Premises and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (September 24.2001):

- 11 -

7.1.4.        Seller is not a "foreign person" (as defined in the Internal Revenue Code); and

7.1.5.        Debtor's Federal Tax Identification Number is _____.

7.1.6.        Seller has neither notice nor knowledge of litigation proceedings, or any similar matters, which would prohibit, delay, or impair Seller's conveyance of the Property.

7.1.7.        No person or entity holds an option to purchase, right of first offer, or right of first refusal with respect to the Property or any part thereof.

7.1.8.        Seller has not entered into any service, maintenance, supply, leasing, brokerage, and listing and/or other contracts relating to the Property which will be binding upon the Purchaser after the Closing.

7.1.9.        Seller has not received any notice and has no knowledge: (A) that any hazardous materials have been or are currently placed, used, stored, treated, manufactured, disposed of, released, discharged, spilled or emitted in, under or about, or are emanating from, the Property or any part thereof; (B) of any violations of environmental laws relating to or with respect to the Property; (C) of any orders issued or threatened or investigations conducted, taken or threatened pursuant to any environmental law relating to or with respect to the Property; and/or (D) of any circumstances or events that have any reasonable prospect of resulting in any claim, action, or other proceeding with respect to hazardous materials or in an order or investigation under or pursuant to any environmental law relating to or with respect to the Property.

7.1.10.        The information concerning written leases, written licenses and written occupancy agreements (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies or occupancies in the Property not arising out of the Leases (collectively, "Tenancies"; and each, individually, a "Tenancy") set forth in Schedule VI attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Property other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract:

(a)        all of the Leases are in valid and binding;

(b)        no tenant, occupant or licensee has an option to purchase the Property or a right of first refusal or first offer with respect to a sale of the Property;

(c)        the rents set forth in the Rent Schedule are being collected on a current basis and there are no arrearages.

(d)        no action or proceeding instituted against Seller by any tenant, occupant or licensee of all or part of the Property is presently pending in any court or other tribunal, except with respect to claims involving personal injury or property damage which are covered by insurance;

- 12 -

(e) there are no prepaid rents other than those set forth in the Rent Schedule;

(f) the Rent Schedule accurately sets out all security deposits held by Seller with respect to the Leases and Tenancies;

(g) Seller has received no notice(s) of any default of the landlord under the Leases that remains pending;

(h) to Seller's actual knowledge, no action or proceeding, voluntary or involuntary, is pending against any tenant, licensee or occupant under any bankruptcy or insolvency act;

(i) no leasing commissions are due or owing with respect to any of the Leases or Tenancies and all leasing commissions have been paid in full with respect to all of the Leases and Tenancies; and

(j) All improvements to be constructed and completed under the Leases have been constructed and completed, and all payments to be made by landlord to any tenant in respect thereof, including without limitation the tenant improvement allowance, have been paid in full.

**SECTION 7.2** **Property Representations**. Seller represents and warrants to Purchaser to the best of its knowledge, without inquiry, that, as of the date hereof, with respect to the Property:

7.2.1. Debtors are the sole owner of the Property.

**SECTION 7.3** **Closing Conditions**; Survival of Representations and Warranties. The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option he waived in writing:

7.3.1. Each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date.

7.3.2. Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3. At the time of the Closing, title to the Real Estate shall be as provided in this Agreement and the Title Company shall be willing to issue fee title insurance policies in favor of Purchaser subject only to the Permitted Exceptions.

7.3.4. The representations, warranties and certifications of Seller set forth in this Agreement shall survive the Closing.

66593573;1

7.3.5.        The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order or, if not final, not be subject to as stay on its effectiveness, finding, among other things, that Purchaser qualities as a good faith purchaser under Section 363(m) of the Bankruptcy Code.

Intentionally omitted.

## ARTICLE 8
## CLOSING DATE

**SECTION 8.1        Closing Date**. The consummation of the transactions contemplated by this Agreement (the "**Closing**"), subject to Section 3.2.2, shall take place on the "Closing Date" which shall be a date mutually agreeable to Seller and Purchaser that is not later than October 14, 2022 (the "**Scheduled Closing Date**"), which "Closing Date", TIME BEING OF THE ESSENCE WITH RESPECT TO SELLER'S OBLIGATIONS HEREUNDER. The Scheduled Closing Date (it being agreed that neither Seller nor Purchaser shall have any obligation to agree to any adjournment of the Closing), is referred to herein as the "**Closing Date**". The Closing shall occur in escrow through the Tile Company.

## ARTICLE 9
## CLOSING DOCUMENTS

**SECTION 9.1        Closing**.

9.1.1.        At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents required to be delivered by Purchaser hereunder, there shall be delivered to Purchaser, duly executed by or on behalf of Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set funk on Schedule IV attached hereto and made a part hereof.

9.1.2.        At the Closing, contemporaneously with delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder. Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed in Purchaser in recordable form, where applicable, as set forth on Schedule V attached hereto and made a part hereof (the documents described in this Section 9.1.1 and in Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the "**Closing Documents**".

**SECTION 9.2        Further Assurances**. Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them, the Title Company or the Bankruptcy Court may reasonably request to carry out the intents and purposes of this Agreement. The provisions of this Section 9.2 shall survive the Closing.

- 14 -

# ARTICLE 10
## NOTICES

**SECTION 10.1**        **Notices**. Any notice, demand or request required or permitted to be given under this Agreement (collective "**Notices**") must be in writing and given to the party to whom or which such notice is being sent, (a) by nationally reorganized overnight delivery service with receipt acknowledged in writing or (b) by hand delivery, against a signed receipt, in each case, addressed as follows:

If to Seller (Plan
Proponent to:

My 2011 Grand LLC and S&B Monsey LLC
c/o **BACKENROTH FRANKEL & KRINSKY, LLP**
800 Third Avenue
New York, New York 10022
Attn: Mark A. Frankel

and

AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
Attention: Mark S. Lichtenstein

If to Purchaser. to:        [                    ]

with a copy to:        Rothman Law PLLC
555 Madison Avenue, 23rd Floor
New York, New York 10022
Attn: Daniel Rothman, Esq.

66593573;1

If to Escrow Agent          Leech Tishman Robinson Brog, PLLC
to:.                        875 3rd Ave 9th Floor
                            New York, NY 10022
                            Attention: Steven B. Eichel, Esq.

In the event of overnight delivery or by hand delivery, notices shall be deemed effective on the next Business Day following deposit with the delivery service or following the day of such hand delivery against appropriate receipt. From time to time either party may designate another or additional addresses for all purposes of this Agreement by giving the other party no less than ten (10) days' prior notice of such change of address in accordance with the provisions of this Article 10. Each party's counsel shall have the right to deliver notices on behalf of its client and any such notice shall he effective as if sent by such party.

## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent or any other Person in connection with the transaction contemplated by this Agreement other than B6 Real Estate Advisors, 1040 6th Ave, New York, NY 10018 (the "**Broker**"). Seller and Purchaser hereby indemnify the other and holds the other harmless from and against any and all claims for commission, fee or other compensation by any other Person other than Broker and for any and all costs incurred by such party in connection with such claims, including reasonable attorneys' fees and disbursements. Subject to approval of the Bankruptcy Court, Purchaser agrees to pay Broker post closing a commission in an amount approved by the Bankruptcy Court . The provisions of this Article 11 shall survive the Closing or the sooner termination of this Agreement.

## ARTICLE 12
## DEFAULTS: REMEDIES

**SECTION 12.1        Purchaser's Default**.  If Purchaser shall (a) fail or refuse to close as and when required by the terms of this Agreement, or (b) otherwise be in willful default hereunder, which default shall continue for five (five) days after receipt of notice to Purchaser and its counsel specifying such default, or (c)  fail to deposit the Additional Deposit after three (3) days written notice by Seller to Purchaser and its counsel, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, Seller's sole and exclusive remedy shall be to terminate this Agreement and for Plan Proponent's counsel to retain the Escrow Deposit for the benefit of the Debtor's bankruptcy estate in which event Escrow Agent shall deliver the Escrow Deposit to or at the direction of Plan Proponent, in which event Purchaser, Plan Proponent and Seller shall have no further rights or obligations under this Agreement, except those expressly provided herein to survive the termination of this Agreement.

**SECTION 12.2        Seller's Default**,  If Seller, shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default hereunder, which default shall continue for five (5) days after written notice to Seller and its counsel thereof, then Purchaser's sole remedy shall be either (i) to terminate this Agreement and receive a return of the Escrow

- 16 -

Deposit and any third party costs of Purchaser in connection with this Agreement or (ii) if the Sale Order is effective, to seek relief from the Bankruptcy Court to enforce the terms of the Sale Order and obtain Specific Performance, Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any consequential or punitive damages or amounts against Seller or Plan Proponent for any matter arising under or related to this Agreement. This provision shall survive the Closing or the termination of this Agreement. Notwithstanding the foregoing in the event of Seller's willful failure to comply with the terms of this Agreement, Purchaser shall be entitled to all remedies at law and/or in equity.

## ARTICLE 13
## CASUALTY; CONDEMNATION

**SECTION 13.1      Casualty**. Notwithstanding anything to the contrary at law or otherwise, Purchaser and Seller acknowledge and agree that in the event that prior to Closing, the Property shall be damaged by fire other casualty and suffer a "Material Loss", as such term is defined below, (whether or not such damage or casualty is covered by insurance), Purchaser shall have the option to either (a) elect to terminate this Agreement and receive back the Escrow Deposit and all parties hereto shall be released and discharged from any further obligation to each other hereunder with respect to the Property (except those expressly stated to survive the termination of this Agreement), and this Agreement shall be of no further force and effect or (b) to consummate the transactions contemplated hereby and proceed to Closing without abatement or the Purchase Price; provided, however, that Purchaser must give notice to Seller of such election no later than ten (10) days after Purchaser first becomes aware of the Material Loss. If Purchaser fails to give notice to Seller within that time. TIME BEING OF THE ESSENCE FOR PURCHASER TO GIVE SUCH NOTICE. Purchaser shall be deemed to have elected clause (a) above and this Agreement shall be terminated. If a casualty loss that is not a Material Loss occurs, Purchaser shall consummate the transactions contemplated in this Agreement (as such loss shall not excuse Purchaser's obligations to consummate the transactions contemplated herein), and the parties shall proceed to Closing without any credit, abatement or reduction of the Purchase Price. In the event that either (i) Purchaser elects to consummate the transactions contemplated herein and proceed to Closing or (iii) Purchaser is obligated to consummate the transactions contemplated herein because the damage was not a Material Loss, Purchaser shall be entitled to receive all insurance proceeds in connection with any such casualty which occurs prior to the Closing Date (with a credit to Purchaser for the deductible) and Purchaser shall consummate the contemplated transactions in accordance with the terms set forth in this Agreement (as the same may hereafter be modified or amended pursuant to the provisions of this Agreement or by Purchaser at the Auction). In such event, Seller shall assign to Purchaser (or use its best efforts to cause Debtor to assign to Purchaser) at the Closing, by written instrument in form and substance reasonably satisfactory to Purchaser, all of Debtor's interest in any insurance proceeds which may payable to Debtor on account of any such fire or casualty, and shall deliver to Purchaser any such proceeds actually theretofore paid (with a credit to Purchaser for the deductible), less any amounts actually and reasonably incurred or expended by or for the account of Seller or Debtor for the cost of any compliance with laws, protective restoration or emergency repairs made by or on behalf of Seller or Debtor (to the extent neither Seller nor Debtor has not therefore been reimbursed by its insurance carriers for such expenditures). For purposes of this Section 13.1 only the term "Material loss" shall mean a fire or other casually prior to Closing where the cost of repairing such damage excluding business

interruption. shall amount to at least $100,000. as determined by the casualty insurer or insurers insuring the Property.

SECTION 13.2    **Condemnation**.  If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain,  Purchaser may by notice to Seller given within thirty (30) Business Days after notice from Seller to Purchaser of the taking, elect to cancel this Agreement.  In the event that Purchaser shall so timely elect, the Escrow Deposit shall be paid to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement, Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the Closing Date, and upon receipt of the balance of the Purchase Price, pay to Purchaser (or use its best efforts to cause Debtor to pay to Purchaser) any sums of money collected by Seller (or by Debtor, as the case may be) as an award for any taking by eminent domain, after deducting any reasonable amount which Seller or Debtor may has agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements. Seller shall not negotiate, compromise, or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, Seller shall assign, transfer and set over to Purchaser all of Debtor's right, title and interest in and to any portion of any condemnation award not yet received by Debtor or by Seller, on behalf of Debtor. For purposes of this Section 13.2 only, "**Material Part**" shall mean a taking of more than ten (10%) percent of the Property. The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law. This provision shall survive the Closing.

**ARTICLE 14**
**AS-IS: WHERE-IS**
**DISCLAIMER; WAIVER OF CLAIMS**

SECTION 14.1    **Disclaimers; As-Is, Where-Is Condition**.

14.1.1.    Purchaser acknowledges and represents that it (a) is a sophisticated purchaser with experience in owning and operating real property in the nature of the Property, (b) realizes the nature of this transaction, understands and is freely taking risks, if any, involved in connection with this transaction, (c) has undertaken such independent investigations and es evaluations of the Property as it has determined to be necessary or desirable in connection with the transaction contemplated herein, including the matters set forth in Section 14.1.2 below, (d) acknowledges that the foregoing is reflected in the Purchase Price and the terms upon which Purchaser is willing to purchase and Seller is willing to sell.

14.1.2.    Except as otherwise expressly set forth in this Agreement, the Property is being sold by Seller and Purchaser agrees to accept the Property AS IS AND WHERE IS, in its condition on the date hereof (subject to reasonable wear and tear and natural deterioration between the date hereof and the Closing Date). Purchaser acknowledges, represents and warrants that (i) Purchaser has had ample opportunity to make an independent investigation and examination of the Property (and all matters of every nature related thereto), and to become fully familiar with the physical condition, state of title, compliance with Law and environmental

- 18 -

conditions of the Property, (ii) Purchaser inspected, examined, investigated and sampled the Property to its satisfaction and is familiar with the physical conditions, state of title, compliance with Law and environmental conditions of the Property and uses thereof and will rely on that inspection, examination, investigation, and sampling, (iii) Purchaser has inspected, examined and investigated to its satisfaction all laws, ordinances. and governmental rules and regulations relating thereto and is purchasing the Property subject to any Violations thereof, (iv) Purchaser has inspected and examined to its satisfaction all licenses and permits relating to the facility, including but not limited to environmental and operational permits, and it agrees to be bound the terms of those licenses and permits and/or bill ensure that it obtains new or additional licenses and permits to fully comply with all applicable governmental rules and regulations, (v) Purchaser has independently investigated, analyzed and appraised the value and the profitability of the Property, (vi) Purchaser has independently investigated the tenant files made available for review by Purchaser and all other due diligence documents delivered to Purchaser by Seller, (vii) Purchaser has independently investigated and evaluated all matters of a financial nature relating to the Property, and (viii) Debtor, Seller, Plan Proponent and Broker have not made and shall not make any verbal or written representations, warranties or statements of any nature or kind whatsoever to Purchaser, whether express or implied, with respect to the above, and, in particular, except as expressly set forth herein, no representations or warranties have been made or shall be made with respect to (a) the physical condition or operation of the Property, including the existence of any environmental hazards or conditions thereon (including the presence of asbestos containing materials or the release or threatened release of Hazardous Materials), (b) the revenues or expenses of the Property, (c) the zoning and other laws applicable to the Property or the compliance of the Property therewith. (d) the status of any approvals required for the development of the Property, (e) the nature and extent of any matter affecting title to the Property or to any personality, (f) the quantity. quality. or condition of the personalty, or (g) any other matter or thing whatsoever affecting or relating to the Property, or any portion thereof, the interests therein to be conveyed to Purchaser pursuant to the terms of the transactions contemplated hereby or the status thereof. Purchaser has had the opportunity to inspect the Property and will rely on that inspection and its outer investigations and evaluations of the Property.

       14.1.3.       Purchaser acknowledges that except as stated herein, Debtor, Seller and Plan Proponent have not made, and no such party is liable for or bound in any manner by, any express or implied warranties, guarantees, promises, statements, inducements, representations, information pertaining to the Property or any part thereof, the physical condition, size, zoning, income, expenses or operation thereof, the uses which can be made of the same or of any other manner or thing with respect thereto. Without limiting the foregoing. and for the avoidance of any doubt, Purchaser acknowledges and agrees that Debtor, Seller and Plan Proponent are not liable for or bound by, and Purchaser has not relied upon, any verbal or written statements, representations, or any other information respecting the Property furnished by Debtor, Seller, Plan Proponent or any broker, employee, agent, consultant or other person representing or purportedly representing

            14.1.4.       Intentionally Omitted.

            14.1.5.       Intentionally omitted.

            14.1.6.       Intentionally omitted.

14.1.7.        Except as set forth in this Agreement, Debtor and Seller hereby specifically disclaim any warranty, guaranty, oral or written, express or implied or arising by operation of law or otherwise, with respect to the matters referred to in this Section 14.1 and any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect to the Property. Purchaser declares and acknowledges that this express disclaimer shall he considered a material and integral part of this sale and is reflected in the consideration payable by Purchaser hereunder and, as an inducement for Seller to proceed with this transaction, Purchaser further declares and acknowledges that this disclaimer has been brought to the attention of Purchaser and explained in detail and that Purchaser has voluntarily and knowingly consented thereto.

**SECTION 14.2**        **INTENTIONALLY OMITTED.**

**SECTION 14.3**        **Acceptance of Closing Documents: Waivers**. Except for those matters expressly set forth in this Agreement to survive the Closing and except for the agreements of Seller and Purchaser set forth in the Closing Documents or otherwise entered into at the Closing, Purchaser's acceptance of the Deed and the other Closing Documents shall be and he deemed to be an acknowledgment by Purchaser that Seller has fully performed, discharged and complied with all of Seller's obligations, covenants and agreements hereunder to be performed prior to Closing and that Seller shall have no further liability with respect thereto.

**SECTION 14.4**        **Survival**. The provisions of this Article 14 shall survive the Closing.

## ARTICLE 15
## BANKRUPTCY MATTERS

**SECTION 15.1**        **Purchaser acknowledges   the transaction contemplated herein is subject to Bankruptcy Court  approving the sale of the Property to Purchaser.**

**SECTION 15.2**        **Purchaser acknowledges that the Seller's obligations under this Agreement** are subject to and contingent upon entry of a Sale Order by the Bankruptcy Court authorizing and approving the transaction contemplated by this Agreement.

**SECTION 15.3**        **INTENTIONALLY OMITTED** .

**SECTION 15.4**        **INTENTIONALLY OMITTED.**.

15.4.1.

## ARTICLE 16
## ESCROW

**SECTION 16.1**        **Escrow Terms**. The Escrow Deposit shall he held in escrow by Escrow Agent in accordance with the terms of the Escrow Agreement.

66593573;1

## ARTICLE 17
## ESTOPPELS

**SECTION 17.1        TENANT ESTOPPEL AND SNDA.** Seller shall obtain and deliver to Purchaser prior to Closing from each Tenant at the Property a written estoppel certificate dated within thirty (30) days prior to the Closing (each, a "Tenant Estoppel") in the form attached hereto as Schedule 17.1, and, to the extent required by Purchaser's lender, a subordination, non-disturbance and attornment agreement in commercially reasonable form and substance (each, an "SNDA") and shall deliver same to Purchaser within five (5) days prior to the Closing. In no event shall Purchaser be obligated to accept any Tenant Estoppel delivered to Purchaser that states a material difference on economic terms than as set forth in the Rent Schedule or in the copies of the Leases delivered to Purchaser, a claim of offset by the tenant, a default by Seller under the Leases or any circumstance which would with the giving of notice or passing of time be a default by Seller under any Lease (each, a "Dirty Estoppel") and no Dirty Estoppel will be counted as satisfying the obligations of Seller in this Section. Seller's delivery of the Tenant Estoppels and the SNDAs shall be a condition precedent to Purchaser's obligation to close the transaction contemplated by this Agreement; provided, however, Purchaser acknowledges that the failure to obtain any or all Tenant Estoppels or SNDAs shall not constitute a default on the part of Seller. In the event Seller fails to deliver all of the Tenant Estoppels and SNDAs to Purchaser prior to Closing, Purchaser's sole remedy shall be to terminate this Agreement and upon such termination, the Deposit shall be refunded to Purchaser together with third party costs, and this Agreement shall be deemed to be null, void, terminated and of no further force or effect, except as herein to the contrary expressly provided.

## ARTICLE 18
## MISCELLANEOUS

**SECTION 18.1        Entire Agreement**. This Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto

**SECTION 18.2        Modification**.  Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination. Either parties hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.

**SECTION 18.3        Binding Agreement**. Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this

- 21 -

Agreement shall inure to the benefit of and be binding upon the respective parties hereto. This Agreement shall not inure to the benefit of or be enforceable by any other Person.

SECTION 18.4        **Assignment**Purchaser may assign this Agreement to another entity

SECTION 18.5        **Illegality**.    If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by I ass.

SECTION 18.6        **Choice of Law**. EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH. THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

SECTION 18.7        **Construction**.  The heading and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto. All Exhibits and Schedules attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein. All references in this Agreement to "**this Agreement**" shall he deemed to include the Exhibits and Schedules attached hereto.  The terms "**hereby**", "**hereof**", "**hereto**", "**hereunder**" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall he deemed to man reasonable attorneys' fees and paralegals fees.  The term "**including**" when used herein shall mean "**including, without limitation**."  Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the comet shall require.

SECTION 18.8        **Binding Effect: Assignment; Successors and Assigns**.  This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their  respective successors, administrators and permitted assigns.  Except to the extent provided for in Section 18.4 of this Agreement, no assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall he void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement

- 22 -

or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors. administrator, and permitted assigns.

SECTION 18.9        **Ambiguities**.  Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that am ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

SECTION 18.10        **Expenses**. If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall he entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 18.11        **Counterparts**.  This Agreement may he executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement.  Any counterpart may be executed by facsimile or PDF signature and such facsimile or PDF signature dull he deemed an original.

SECTION 18.12        **Waiver or Trial by Jury**. THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE, THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

SECTION 18.13        **Third Party Beneficiaries**.  Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

SECTION 18.14        **Jurisdiction**.

18.14.1.        FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH HEREBY EXPRESSLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREES THAT SUCH COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

18.14.2.        Intentionally omitted.

18.14.3.        THE PROVISIONS OF THIS SECTION SHALL SURVIVE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

- 23 -

**SECTION 18.15      No Recording**. Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit it, assignment or other document relating to this Agreement prior to the Closing and, if Purchaser breaches the provisions of this Section, Seller shall has the option of terminating this Agreement and retaining the Escrow Deposit as its liquidated damages.

**SECTION 18.16      Not an Offer**. Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto tin any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions  precedent to the effectiveness  thereof including, but not limited to, the delivery of the escrow Deposit to Escrow Agent, shall have been fulfilled or waived, and (c) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part  performance, promissory estoppel, or undue enrichment) or otherwise.

**SECTION 18.17      Failure of Deposit**. If the payment made on account of the Escrow Deposit is by cheek, and if such check falls collection in due course, Seller, at its option, may declare this Agreement null, void and of no force and effect, and may pursue its remedies against Purchaser upon such check or in any other manner permitted in law. such remedies being cumulative.

**SECTION 18.18      No Waiver**. The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of. or not strictly complying with, the terms hereof from constituting a default hereunder.

**SECTION 18.19      Severability**. If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby. Each term, condition or provision of this Agreement shall he valid and enforceable to the fullest extent permitted to lass.

**SECTION 18.20      No Survival**.  The delivery and acceptance of the deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions  and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth

66593573;1

in this Agreement shall not survive the Closing, and/no action based thereon shall be commenced after the Closing.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.**
**SIGNATURES FOLLOW ON THE NEXT PAGE.**

66593573;1

IN WITNESS WHEREOF, the  parties have executed this Agreement as of the day and year first written above,


SELLER:

MY 2011 GRAND LLC and S & B MONSEY LLC, as Debtors and owners of GRAND LIVING LLC, sole member of GRAND LIVING II LLC, solely in their capacity as Debtors and the Plan Proponents of the Sixth Amended Plan of Reorganization

By:_____
    Name:
    Title:




PURCHASER:

227 Grand JFL Holdings LLC

By:_____
    Name:
    Title:

66593573;1

**SCHEDULE TO PURCHASE AND SALE AGREEMENT**

66593573;1

**SCHEDULE II**

**PROPERTY DESCRIPTION**

66593573;1

## SCHEDULE V

## CLOSING DOCUMENTS TO BE DELIVERED BY SELLER

66593573;1

**<u>SCHEDULE V</u>**

**<u>PURCHASER'S CLOSING DOCUMENTS</u>**

66593573;1

## SCHEDULE VI

## RENT SCHEDULE

## **EXHIBIT A**

Intentionally Omitted

66593573;1

## **EXHIBIT B**

## **DEEDS**

[See Attached]

66593573;1